**KESSLER TOPAZ MELTZER & CHECK, LLP**
JENNIFER L. JOOST (Bar No. 296164)
jjoost@ktmc.com
One Sansome Street, Suite 1850
San Francisco, CA 94104
Telephone: (415) 400-3000
Facsimile: (415) 400-3001

*Counsel for Lead Plaintiff Sjunde AP-Fonden and additional Plaintiff James Stephen Muhl and Lead Counsel for the Proposed Class*

[Additional Counsel on signature page.]

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

CHARLES LARRY CREWS, JR., Individually and on Behalf of All Others Similarly Situated,

Plaintiffs,

v.

RIVIAN AUTOMOTIVE, INC., ROBERT J. SCARINGE, CLAIRE MCDONOUGH, JEFFREY R. BAKER, KAREN BOONE, SANFORD SCHWARTZ, ROSE MARCARIO, PETER KRAWIEC, JAY FLATLEY, PAMELA THOMAS-GRAHAM, MORGAN STANLEY & CO. LLC, GOLDMAN SACHS & CO., LLC, J.P. MORGAN SECURITIES LLC, BARCLAYS CAPITAL INC., DEUTSCHE BANK SECURITIES INC., ALLEN & COMPANY LLC, BOFA SECURITIES, INC., MIZUHO SECURITIES USA LLC, WELLS FARGO SECURITIES, LLC, NOMURA SECURITIES INTERNATIONAL, INC., PIPER SANDLER & CO., RBC CAPITAL MARKETS, LLC, ROBERT W. BAIRD & CO. INC., WEDBUSH SECURITIES INC., ACADEMY SECURITIES, INC., BLAYLOCK VAN, LLC, CABRERA CAPITAL MARKETS LLC, C.L. KING &

Case No. 2:22-cv-01524-RGK-E

**<u>CLASS ACTION</u>**

**CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

**<u>DEMAND FOR JURY TRIAL</u>**

Judge: Hon. R. Gary Klausner

ASSOCIATES, INC., LOOP CAPITAL MARKETS LLC, SAMUEL A. RAMIREZ & CO., INC., SIEBERT WILLIAMS SHANK & CO., LLC, and TIGRESS FINANCIAL PARTNERS LLC,

Defendants.

# TABLE OF CONTENTS

Page


I. INTRODUCTION ..... 1

II. JURISDICTION AND VENUE FOR PLAINTIFFS' EXCHANGE ACT CLAIMS ..... 8

III. PARTIES ..... 8

A. Plaintiffs ..... 8

B. Defendants ..... 9

1. Corporate Defendant Rivian ..... 9

2. Executive Defendants ..... 9

C. Relevant Non-Parties—Former Rivian Employees ..... 10

IV. SUMMARY OF THE EXCHANGE ACT DEFENDANTS' FRAUD ..... 12

A. Rivian's Founding and Early Years ..... 12

B. Rivian Introduces the R1 Platform ..... 13

C. Rivian Raises Significant Capital and Grows Rapidly ..... 16

D. Rivian Lowers R1 "Base" Prices in January 2020 ..... 17

E. After Several Delays, Rivian Begins Production and Delivers Its First Consumer Vehicles in September 2021 ..... 18

F. Rivian's IPO ..... 18

G. Unbeknownst to Investors, Prior to the IPO, Rivian Executives Knew That Rivian Had to Increase Prices and Significantly Alter Available Options for the R1 Platform in Order to Achieve Profitability ..... 24

1. Rivian's Projected Margins for the R1 Platform Consistently Declined from 2018 Until the IPO, Pushing R1 Profitability Ever-Farther into the Future ..... 24

2. The Bill of Materials on R1s Exceeded Customers' Purchase Prices ..... 25

3. Senior Executives Knew That Rivian's Costs Were Rising Through Their Participation in Regularly Scheduled "Gate Reviews" ..... 27

4. At the Time of the IPO, Company Insiders Recognized That R1 Platform Pricing Needed to Be Revised, But Delayed Doing So Until After the IPO ..... 28

5. The Exchange Act Defendants Misled Investors Regarding the Pricing and Profitability Assumptions for Rivian's Vehicles ............ 29

H. The Relevant Truth Is Revealed ............ 35

V. THE EXCHANGE ACT DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ............ 39

A. Registration Statement ............ 39

B. December 16, 2021: 3Q21 Earnings Conference Call, Shareholder Letter, and 3Q21 10-Q ............ 41

VI. ALLEGATIONS OF LOSS CAUSATION ............ 44

VII. ADDITIONAL ALLEGATIONS OF THE EXCHANGE ACT DEFENDANTS' SCIENTER ............ 48

A. The Exchange Act Defendants' Fraud Concerned a Core Rivian Operation: Production, Pricing, and Sale of the R1 Platform ............ 49

B. The Exchange Act Defendants Publicly Acknowledged Their Focus on R1 Platform Pricing ............ 49

C. Information from Multiple FEs Supports a Strong Inference of the Exchange Act Defendants' Scienter ............ 50

D. Schwab's Statements Support a Strong Inference of the Exchange Act Defendants' Scienter ............ 51

E. The Exchange Act Defendants' Scienter Is Imputed to Rivian ............ 51

VIII. PRESUMPTION OF RELIANCE ............ 52

IX. THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE ............ 53

X. CAUSES OF ACTION UNDER THE EXCHANGE ACT ............ 54

COUNT I Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder Against the Exchange Act Defendants ............ 54

COUNT II Violation of Section 20(a) of the Exchange Act Against the Executive Defendants ............ 55

XI. JURISDICTION AND VENUE FOR PLAINTIFFS' SECURITIES ACT CLAIMS ............ 56

XII. ADDITIONAL SECURITIES ACT DEFENDANTS ............ 57

A. Director Defendants ............ 57

B. Underwriter Defendants ............ 57

XIII. SECURITIES ACT DEFENDANTS' VIOLATIONS OF THE SECURITIES ACT ............ 60

A. Rivian's Blockbuster $13.7 Billion IPO ..... 62

B. Unbeknownst to Investors, Rivian Had to Increase Prices and Significantly Alter Available Options for the R1 Platform in Order to Achieve Profitability ..... 64

1. Rivian's Projected Margins for the R1 Platform Consistently Declined from 2018 Until the IPO, Pushing R1 Profitability Ever-Farther into the Future ..... 64

2. The Bill of Materials on R1s Exceeded Customers' Purchase Prices ..... 65

3. Senior Executives Knew That Rivian's Costs Were Rising Through Their Participation in Regularly Scheduled "Gate Reviews" ..... 66

4. In Order to Achieve Profitability, R1 Platform Pricing Needed to Be Revised as of the Time of the IPO ..... 67

C. As Information Incorrectly Stated in, and Omitted from, the Registration Statement Is Gradually Disclosed, the True Value of Rivian Class A Common Stock Is Revealed ..... 67

D. The Registration Statement Contained Untrue Statements of Material Fact and Material Omissions in Violation of Section 11 of the Securities Act ..... 71

E. The Registration Statement Failed to Disclose Information Required to Be Disclosed Under SEC Regulation S-K ..... 72

1. Item 105 ..... 72

2. Item 303 ..... 73

XIV. THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE ..... 75

XV. CAUSES OF ACTION UNDER THE SECURITIES ACT ..... 76

COUNT III Violation of Section 11 of the Securities Act Against the Securities Act Defendants ..... 76

COUNT IV Violation of Section 12(a)(2) of the Securities Act Against the Underwriter Defendants ..... 78

COUNT V Violation of Section 15 of the Securities Act Against the Executive and Director Defendants ..... 80

XVI. CLASS ACTION ALLEGATIONS APPLICABLE TO ALL CLAIMS ..... 80

XVII. PRAYER FOR RELIEF ..... 82

XVIII. JURY DEMAND ..... 82

Lead Plaintiff Sjunde AP-Fonden ("AP7") and additional plaintiff James Stephen Muhl ("Muhl," and together with AP7, "Plaintiffs"), by and through Plaintiffs' counsel, bring this action individually and on behalf of all other persons and entities who purchased or otherwise acquired Class A common stock of Rivian Automotive, Inc. ("Rivian" or the "Company") between November 10, 2021, and March 10, 2022, both dates inclusive (the "Class Period"), and who were damaged thereby.

Plaintiffs allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and upon information and belief as to all other matters, including the investigation of Plaintiffs' counsel, which included, among other things, interviews with former Rivian employees, a review of Rivian's United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by Rivian, analyst reports and advisories about the Company, media reports concerning the Company, judicial filings, and other publicly available information. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

# I. INTRODUCTION

1. Rivian, a new and highly-watched entrant in the booming electric vehicle ("EV") industry, completed its highly-anticipated initial public offering ("IPO") on or about November 10, 2021, with the help of the largest and most prominent investment banks in the country, raising a staggering $13.7 billion in gross proceeds in the process. A key premise of Rivian's valuation was its promise to deliver a feature-packed EV truck at a price that was highly competitive with its existing and established competition, including Tesla, Inc. In the months leading up to the IPO, however, Rivian's management internally recognized that this premise was flawed, the Company had vastly underestimated its costs to manufacture the vehicles, and a price increase was necessary to ensure long-term profitability. They also knew that satisfying Rivian's pipeline of pre-orders (which had reached over 55,000 R1 vehicles by the time of the IPO) at the prices promised to customers would extend the Company's years of unprofitability beyond market expectations. Yet,

notwithstanding their awareness of these material facts and risks, Rivian executives resolved to wait until ***after*** the IPO to raise prices and reduce the standard features for the Company's vehicles to conform with the internally-known actual cost realities, and they failed to disclose these material facts and risks to investors in Rivian's IPO offering documents.

2. Prior to and throughout the Class Period, Rivian promised prospective customers who put down a deposit of $1,000 one of two "category defining" "flagship" EVs—an all-electric pickup truck dubbed the R1T, and a full-size sport utility vehicle ("SUV") dubbed the R1S (R1T and R1S collectively, the "R1 Platform" or "R1"). Both the R1T and R1S were promised to include quad-motors (i.e., one motor for each of the vehicles' four wheels), an impressive battery that delivered roughly 300 miles of range, and luxurious but functional interior and exterior finishes, all with base starting prices of $67,500 and $70,000 for the R1T and R1S, respectively.

3. The Company's suite of R1T and R1S offerings and their attractive price points drove significant consumer demand for the vehicles, generating a backlog of more than 55,000 R1 Platform pre-orders leading into the IPO. Yet, by the time the Company went public, it had produced and delivered fewer than 200 vehicles, nearly all of which went to Rivian employees.

4. Rivian set R1T and R1S pricing at the end of 2018 when the Company publicly debuted the vehicles at the LA Auto Show. In 2020, on the heels of EV industry titan Tesla's announcement of its own future all-electric pickup truck, Rivian reduced the base prices for the R1T and R1S by a few thousand dollars, to $67,500 and $70,000, respectively, while keeping its promise of a base quad-motor and battery pack that delivered roughly 300 miles of range.

5. However, prior to the November 2021 IPO, it was clear within the Company that the publicly announced R1 Platform pricing regime would not support the near- or long-term viability of the R1 Platform absent, among other things, significant price increases and a reduction of feature configurations to include those that generated a much

lower cost to Rivian. By the same token, Rivian executives knew prior to the IPO that constructing the pre-ordered vehicles at the prices promised to Rivian's customers would significantly undermine the Company's timeline for profitability. In fact, between 2018 and November 2021, senior Rivian executives received financial forecasts showing a clear trend of ***declining*** profit margins fueled by rising costs for the parts and materials needed for each vehicle, which in nearly all cases exceeded a customer's purchase price. These forecasts also indicated that Rivian did not expect the R1 Platform to be profitable until at least 2025. High-level executives also knew of an analysis showing that the Company would continue losing money on each R1 vehicle sold unless and until it raised prices.

6. Even when accounting for assumed cost savings from Rivian's future production ramp and associated manufacturing efficiencies, it was well-known at the highest-levels of the Company prior to the IPO that the R1 Platform's bill of materials—i.e., the cost of the roughly 3,000 parts required to build each R1—exceeded Rivian's publicly-disclosed purchase prices. What's more, the Company forecasted that this pricing pressure would persist for several years following its IPO, and that lowering the bill of materials to a point where it was less than Rivian's current pricing was dependent upon the introduction of a significantly cheaper dual-motor offering. Confronted with this reality, senior executives internally conceded that Rivian would need to raise prices, but chose to wait until after the IPO to do so. Highly-placed confidential witnesses confirm these core facts, all of which were concealed from investors.

7. Just a few weeks after Rivian's IPO, on December 16, 2021, during its first ever earnings call for the third quarter of 2021, the Company continued to mislead the market concerning the need for and timing of a price hike. In her prepared remarks, Claire McDonough ("McDonough"), Rivian's Chief Financial Officer ("CFO"), asserted that because of "the inflationary backdrop, we also continue to evaluat[e] the pricing for our vehicle[s]." Analysts immediately pressed Robert J. Scaringe ("Scaringe"), Rivian's Chief Executive Officer ("CEO"), on McDonough's reference to a pricing review, to which Scaringe responded:

> Now with regards to pricing, it's certainly the backdrop of inflation that we're seeing and the very strong demand for products . . . has caused us to look at our pricing and really I'd say recognizing the set of product features that we've been able to put together into the vehicles . . . So in terms of the competitive step, we recognized they're very aggressively priced. That is something that we certainly considered and talk about quite a bit as a management team.

8. These statements had the intended effect of misdirecting the market about the need for a price increase and the introduction of less-expensive features for the R1 Platform. Rather than disclosing the truth—that a price increase was necessary because Rivian's current pricing was generating a large loss per vehicle on the components alone (without regard to the massive overhead costs that could be mitigated by ramped production), Defendants' statements led the market to believe that it was demand for the vehicle that was prompting Rivian's pricing evaluation. As an analyst from Deutsche Bank noted in a report published after the call: "The momentum acceleration in vehicle reservations, now at 71k units up from 55k just 6 weeks ago, is very encouraging and is prompting management to consider price increases." In other words, Rivian had conveyed to the market that pricing increases were being considered in order to increase the profits Rivian earned on each vehicle, not mitigate the losses that Rivian suffered on each vehicle, which Rivian's management knew to be the case.

9. In January 2022, GM unveiled the EV version of its most popular pickup truck, the Chevy Silverado, while Ford had previously publicly debuted its EV pickup truck, the Ford F-150 Lightning, in early 2021. Rivian's pricing relative to these vehicles was a critical competitive advantage in the eyes of market observers. Over the next two months, the major analysts, including analysts associated with the investment banks that had underwritten Rivian's IPO, maintained their ratings for the Company's stock.

10. Then, on March 1, 2022, after months of silence since its December 16 earnings call, Rivian dropped a truth bomb on investors and its customers who had ordered

R1 vehicles. On that day, in an email to pre-order holders and through revised pricing available on its website, the Company revealed that its current pricing was unsustainable when it announced eye-popping minimum price hikes of roughly ***17%*** and ***20%*** to virtually all R1T and R1S models. Notably, Rivian announced that the price increases would also apply to the more than 70,000 confirmed R1 pre-orders as of that date, unless those customers, who previously thought they were getting a quad-motor and at least a "Large" battery pack, agreed to accept a vehicle with half as many motors and a smaller battery. According to Rivian, these price increases were necessary to address increases "on the cost of supplier components and raw materials."

11. As reported by numerous media outlets and industry analysts, many customers who pre-ordered R1Ts and R1Ss were enraged by what was perceived as a "bait and switch" by Rivian. Indeed, pre-order holders expressed their outrage in online postings, including one user on the popular website RivianOwnersForum.com, who stated:

> My quoted price previously was $78,820 for an R1S after going through the configurator to get the same vehicle it's $92k. ***A 17k increase is not inflation – it means it wasn't priced appropriately to begin with***. Add-in the new 'option' for a dual motor which is position [sic] as a great new option but in reality it just means they are now charging you more for the quad motor which was previously the only option. ***This feels like a gigantic bait and switch***.[1]

12. In response to news of the Company's substantial price increases on all vehicles, including pre-orders, Rivian's stock price fell $14, or more than 20%, from a close of $67.56 per share on February 28, 2022, to close at $53.56 per share on March 2, 2022.

13. On March 3, 2022, facing intense public pressure from customers, in an email to pre-order holders and in a letter published on *Business Wire*, Scaringe reversed the Company's decision to extend its price hikes to customers who ordered the vehicles before

[1] Unless otherwise noted, all emphasis is added.

March 1, 2022 (which was somewhere between approximately 71,000 and 83,000). Given the Company's prior concession that these vehicles were underwater on their costs, analysts seized on the financial impact that this disclosure would have on Rivian going forward. For example, a March 3, 2022 report from analyst RBC stated: "***The roll-back on pricing is costing it ~$850mm in revenue*** (assuming no cancelations) . . . ."

14. On March 3, 2022, *The Wall Street Journal* stated that Rivian's share price had declined the previous day as a result of the Company's price-increase disclosure, and that "[s]hares fell further Thursday, down nearly 5% to $50.91." *Reuters* similarly wrote on March 3 that "Rivian stock, which plunged over 13% on Wednesday, extended losses on Thursday, down 4%."

15. Over the next week—from the close of trading on March 2 through the close of trading on March 10—the price of Rivian's Class A common stock fell from $53.56 to $41.16. During this period, analysts digested the potential financial impact of Rivian's pricing disclosures, and the market braced itself for the additional news slated to be released on March 10 when Rivian disclosed its earnings. One analyst wrote on March 9: "We believe RIVN required a $12-$14k price increase in order to achieve their prior financial targets. Without the price increases, we think Consensus (for 2022-2023) will need to be lowered by at least $0.8-$1.4 bn (~70k-100k reservation holders x $12-$14k implied cost headwind)."

16. After the market closed on March 10, 2022, the market finally learned the extent to which Rivian's long-term financial prospects had been impacted by its previously undisclosed need to reprice its vehicles, including existing orders. The Company disclosed that its projected adjusted EBITDA for FY2022 was a disappointing ($4,750 million), and it revealed that Rivian would face negative gross margins throughout 2022 "[a]s we continue to ramp-up our manufacturing facility, manage supply chain challenges, face continued inflationary pressures, ***and minimize price increases to customers in the near term***."

17. Reporting on this revised EBITDA guidance, J.P. Morgan noted in its coverage of the earnings release that Rivian's pricing disclosures would result in bigger losses over the near term and lower demand for Rivian vehicles over the long term. In particular, J.P. Morgan stated:

> The company reversed course for those who had placed deposits prior to March 1, which we estimate implies similarly lower gross profit margin for the first nearly 83,000 units delivered (which we now expect to occur during 1Q24). For future reservations, however, the material price hikes will still apply, and while this should offset currently foreseeable inflationary cost pressures (meaning dilution to gross profit margin but not dollars), it does imply also some demand destruction.

18. Meanwhile, Deutsche Bank noted "Rivian's soft 4Q results and weak 2022 outlook reflect largely predictable delays ramping up vehicle production amid challenges from its supply chain, but also steep cost pressures from input costs in the current inflationary environment, which it cannot offset with pricing following the backlash around its proposed price increase."

19. The market reaction to this revised scenario was swift and severe. On March 11, 2022, Rivian's stock price fell from March 10 almost 8%, from $41.16 to $38.05, and continued to fall further the next trading day on high volume, closing on March 14 at $35.83, or less than half of its $78 per share IPO price. In all, over the two-week period between February 28 and March 14, Rivian's share price declined by ***nearly $32 per share***.

20. This action seeks to recover these losses suffered by Rivian investors, which were a foreseeable consequence of Defendants' false statements and omissions alleged herein.

## II. JURISDICTION AND VENUE FOR PLAINTIFFS' EXCHANGE ACT CLAIMS

21. Plaintiffs' claims arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

22. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

23. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), because Rivian is headquartered in this District, Rivian conducts business in this District, and many of the acts and conduct that constitute the violations of law complained of herein, including the dissemination to the public of materially false and misleading information, occurred in this District.

24. In connection with the acts, conduct, and other wrongs alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications, and the facilities of the national securities markets.

## III. PARTIES

### A. Plaintiffs

25. Lead Plaintiff AP7 is a Swedish public pension fund, established under law as a Swedish governmental agency, with over $90 billion in assets under management. As set forth in the certification attached as Exhibit A, incorporated by reference herein, AP7 purchased or otherwise acquired Rivian Class A common stock at artificially inflated prices during the Class Period, including Class A common stock traceable to the Registration Statement (as defined in Paragraph 63 below), and has been damaged thereby.

26. Additional plaintiff James Stephen Muhl is an individual investor who, as set forth in the certification attached as Exhibit B, incorporated by reference herein, purchased or otherwise acquired Rivian Class A common stock at artificially inflated prices during the

Class Period, including Class A common stock pursuant and/or traceable to the Registration Statement, and has been damaged thereby.

**B. Defendants**

**1. Corporate Defendant Rivian**

27. Defendant Rivian is a Delaware corporation with principal executive offices at 14600 Myford Road, Irvine, California. Rivian designs, develops, and manufactures EVs and accessories and sells them directly to consumer and commercial customers. Rivian also offers its customers a full suite of proprietary services addressing the entire lifecycle of the Company's EVs, including, among other things, financing, insurance, software, vehicle charging, and vehicle service. Rivian went public through an IPO on November 10, 2021. Since that date, Rivian's Class A common stock has traded on the Nasdaq under the ticker "RIVN." Each share of Class A common stock is entitled to one vote. Rivian also has unlisted Class B common stock, which is entitled to ten votes per share. Scaringe owns all of Rivian's Class B common stock.

**2. Executive Defendants**

28. Defendant Scaringe is, and during the Class Period was, Rivian's founder and CEO, and Chairman of the Company's Board of Directors. Scaringe signed the false and misleading Registration Statement and, throughout the Class Period, made statements in the Company's conference call as alleged herein.

29. Defendant McDonough is, and during the Class Period was, Rivian's CFO. McDonough signed the false and misleading Registration Statement and, throughout the Class Period, made statements in the Company's conference call as alleged herein. As CFO, McDonough reported directly to Scaringe.

30. Defendant Jeffrey R. Baker ("Baker") is, and during the Class Period was, Rivian's Chief Accounting Officer. Baker signed the false and misleading Registration Statement.

31. Scaringe, McDonough, and Baker are collectively referred to as the "Executive Defendants."

32. The Executive Defendants, because of their positions within the Company, possessed the power and authority to control the contents of Rivian's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. Each Executive Defendant was provided with copies of the Company's SEC filings alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of the Executive Defendants knew that the adverse facts specified herein had not been disclosed to, and/or were being concealed from, the public, and that the positive representations that were being made were then materially false and/or misleading.

33. Together with Rivian, the Executive Defendants are collectively referred to as the "Exchange Act Defendants."

**C. Relevant Non-Parties—Former Rivian Employees**

34. Laura Schwab is a former Rivian employee who recently sued Rivian for gender discrimination, unlawful retaliation, wrongful termination, and unfair competition. In her lawsuit against Rivian filed in California State Court in Orange County on November 4, 2021, and in a Statement of Claims to the American Arbitration Association,[2] Schwab has alleged that, starting in the spring of 2021, she "started to raise the alarm about concerns she had relating to Rivian's ability to deliver on its promises to investors." In particular, Schwab alleged that Rivian's vehicles were underpriced. She also alleged that she worked with Rivian's Finance Director, Dennis Lucey, to develop projections of how much the Company would lose if it did not raise vehicle prices, and raised this issue with several executives, including Rivian's Chief Growth Officer, Jiten Behl ("Behl").[3]

---

[2] After filing her complaint, Schwab's State Court case was stayed pending resolution of the arbitration proceedings in front of the American Arbitration Association. Schwab filed for a dismissal of her State Court action without prejudice on May 27, 2022, which was granted the same day.

[3] On November 10, 2021, the day of Rivian's IPO, Scaringe publicly rejected Schwab's claims, telling the *Financial Times*: "We do fully disagree with any of the characterisations of our culture and how we work together."

35. Schwab served as Rivian's Vice President of Sales and Marketing from November 30, 2020, through October 15, 2021, when she was terminated by the Company. As Vice President of Sales and Marketing, Schwab reported to Behl. Prior to joining Rivian in November 2020, Schwab held management and executive roles for 15 years at Jaguar Land Rover, including as Director of Marketing for the U.K., and five years as President of Aston Martin Lagonda for the Americas.

36. Former Employee #1 ("FE-1") held several finance positions at Rivian starting from before 2018, and worked for several years before the Class Period until the end of 2021 as a senior-level finance employee. FE-1 reported to former CFO Ryan Green in the spring of 2021, and thereafter reported to Gerard Dwyer, Vice President of Business Finance, until FE-1's departure. While at Rivian, FE-1 helped prepare monthly and quarterly profitability forecasts.

37. Former Employee #2 ("FE-2") was a senior executive with responsibility for vehicle quality from several years prior to the IPO until spring 2022. FE-2 reported to Rod Copes, Rivian's former Chief Operating Officer, from early 2021 until September 2021 in connection with Copes' retirement from Rivian in December 2021, at which time FE-2 began reporting to VP of Quality, Mike Smith. FE-2's responsibilities included, among others, manufacturing quality, warranty service, customer satisfaction, and metrology.

38. Former Employee #3 ("FE-3") was a business analytics and finance manager at Rivian from prior to the IPO in the summer of 2021 until spring 2022. FE-3 reported to Dennis Lucey, Director of Commercial Finance (a role in which Lucey led Commercial Finance's vehicle sales and planning process for corporate inventory planning, and sales and gross margin management reporting), who reported to Gerard Dwyer, Vice President of Business Finance, who in turn reported to McDonough. FE-3 was involved with forecasting for Rivian's Commercial Finance group. FE-3 regularly saw what was known internally as the "Revenue and Margins Report." FE-3 explained that the Revenue and Margins Report was an internal PowerPoint presentation prepared by Finance Manager, Eric Socia, using forecasting information pulled from Adaptive Insights, where all of

Rivian's forecasting information was loaded. FE-3 recalled that the Revenue and Margins Report was then integrated into a Tableau report for the Company's executives to access on demand. FE-3 attended meetings in the fall of 2021 wherein Eric Socia presented the Revenue and Margins Report to the Commercial Finance team, including FE-3's boss, Director of Commercial Finance Dennis Lucey, and specifically recalled that at the time of the IPO, Rivian forecasted negative gross margins until 2025 for the R1 Platform.

## IV. SUMMARY OF THE EXCHANGE ACT DEFENDANTS' FRAUD

### A. Rivian's Founding and Early Years

39. Scaringe founded Rivian in Florida in 2009 as Mainstream Motors, Inc. Shortly thereafter, the Company changed its name to Avera Motors Inc. After an initial two-and-half year foray into developing a sports car, in 2011, the Company again changed its name, this time to Rivian, shelved its plans for an internal combustion engine sports car, and spent the next several years redefining its business model and securing investors.

40. In 2012, Rivian secured a major investor, a Saudi Arabian auto distribution company named Abdul Latif Jameel. Over the next several years Rivian worked closely with Abdul Latif Jameel and ultimately settled on developing an all-electric pickup truck, and eventually an all-electric SUV. During that same time period, Rivian moved its headquarters to the Detroit, Michigan suburbs to be closer to automotive industry talent and suppliers.

41. Rivian maintained a low-profile during this time period. According to Scaringe, as reported by WGLT, Bloomington-Normal's NPR member-station: "Because of frankly some of the things we talked too much about in the early days, we made the decision to go deep into stealth mode, and to avoid the distraction of committing to things and making statements that were highly likely to change." In a January 2020 interview with McKinsey & Company, an Abdul Latif Jameel Deputy President and Vice Chairman explained: "We kept Rivian in stealth for a good eight years because we wanted to make sure we didn't flex our muscles until we had muscles to flex."

42. After years of keeping a low-profile, however, Rivian began generating public attention. In January 2017, the Company made headlines when it purchased a former Mitsubishi Motors manufacturing plant in Normal, Illinois—a significant step toward becoming a legitimate auto manufacturer.

**B. Rivian Introduces the R1 Platform**

43. In December 2017, Rivian publicly revealed its plans, announcing that it planned to introduce its first EV—a five-passenger truck—in 2020, followed by a second vehicle—a seven-passenger SUV in 2021.

44. Just under a year later, in November 2018, the Company debuted its first two vehicles after publicly teasing them for weeks. Rivian unveiled its first vehicle, the R1T—a two-row, five-passenger pickup truck—on November 26, 2018, as part of the LA Auto Show. The next day, Rivian unveiled its second vehicle, the R1S—a three-row, seven-passenger SUV at the same auto show. Rivian announced plans to begin delivering the R1T in late 2020, and the R1S in 2021.









45. Rivian also set the initial pricing for the R1T and R1S in 2018. Specifically, the Company priced the R1T and R1S base models at $69,000 and $72,500 (before tax

incentives), respectively. The base model for each vehicle included a quad-motor, i.e., a motor to power each wheel of the vehicle, and a "Large," "mid-tier" battery pack with a roughly 300-mile range.

46. Rivian's debut of the R1T and R1S was met with tremendous excitement in the automotive industry. *Electrek* wrote in a November 26, 2018 article titled, "Rivian unveils all-electric pickup truck with unbelievable specs," "Rivian Automotive is coming out in a big way today by unveiling its all-electric pickup truck: the Rivian R1T. They are promising some unbelievable specs that would compete with any gas-powered pickup truck on the market." *Electrek* continued, focusing on the R1T's battery and motor options:

> Like almost every other company making electric vehicles these days, Rivian adopted the "skateboard" platform, but it put its own twist on it and integrated 4 small (but powerful) electric motors[.]
>
> Each motor has a 147 kW power capacity at the wheel and the total power output can be configured to different levels from 300 kW to 562 kW (input to gearbox).
>
> The different power levels match different choices of battery packs, which are another impressive feature since they have the highest capacity of any other passenger electric vehicle out there: 105 kWh, 135 kWh, and 180 kWh.
>
> Rivian says that it will translate to "230+ miles, 300+ miles, and 400+ miles" of range on a full charge.

47. Industry commentators seized on the R1T's purchase price as one of its key selling points. For example, following the debut of the R1T at the LA Auto Show, *Motortrend* wrote that Rivian's claim that it would:

> be able to bring the R1T to market for $61,500 after the federal tax credit . . . suggests the vehicle's retail price will be $69,000 in total. While that's a tough pill to swallow at first blush, many modern 1/2-ton trucks cost in excess of $60,000, and the Tesla Model X has a starting price well above $80,000.

> ***Viewed in that light, the Rivian R1T might be something of a bargain, especially given its modern, aggressive interior and exterior design***.

48. Automotive website MotorAuthority.com similarly noted the R1 Platform's impressive debut and starting purchase price, writing on December 1, 2018:

> Rivian turned out to be a surprise star of this past week's 2018 LA Auto Show. The American electric car startup showed up with two production-bound vehicles: a crew cab pickup truck and related SUV with third-row seats. What's impressive is the no-nonsense nature of the vehicles and the world-beating specs, coupled with a very reasonable price tag. Assuming Rivian can keep its promise, the R1T pickup truck will be priced from $69,000 and the R1S SUV from $72,500. Both prices are before incentives.

49. An executive director of insights at auto-market researcher Edmunds noted the significance of the R1 Platform's debut, stating: "When Rivian showcased its electric trucks and SUVs, it gave the EV market hope in the sense that electric vehicles could evolve to meet more mainstream preferences[.]"

**C. Rivian Raises Significant Capital and Grows Rapidly**

50. By May 2018, the Company raised $450 million in funding from investors, including Abdul Latif Jameel, Japan's Sumitomo Corporation of Americas, which also included a $200 million loan from London's Standard Chartered Bank to retool the recently-purchased Normal, Illinois manufacturing facility.

51. Over the next few years, Rivian rapidly expanded and investment capital continued to pour in. Rivian raised $10.5 billion between February 2019 and July 23, 2021, including significant investments from companies such as Amazon.com. Inc., Ford Motor Company, T. Rowe Price Associates, Inc., BlackRock, Cox Automotive, Fidelity Management and Research Company, Soros Fund Management, and hedge funds Coatue Management, Third Point LLC, and D1 Capital Partners, among others.

52. Rivian's headcount and operations also significantly expanded during this period. In 2018, the Company had roughly 700 employees. By September 2019, the

Company's headcount had grown to over 1,000 employees, and its footprint had expanded beyond the Normal manufacturing plant to include development centers in Plymouth, Michigan; San Jose, California; Irvine, California; and Surrey, England. By July 2020, Rivian's headcount swelled to 2,400. That same year, the Company also moved its headquarters from Michigan to its current location in Irvine, California. Throughout 2021, Rivian's headcount continued to grow exponentially—by March 31, 2021, it had nearly doubled to more than 4,200, and over the next six months, it nearly doubled again, growing to over 8,300 by September 30, 2021.

**D. Rivian Lowers R1 "Base" Prices in January 2020**

53. At the end of 2019, Tesla unveiled its own fully-electric pickup truck with a base price of $39,900. Thereafter, on January 25, 2020, *Reuters* reported that Rivian was decreasing the base price for the R1T and R1S, and that the base prices originally announced in 2018 for its R1Ts and R1Ss would now be the prices of well-equipped R1 vehicles. Specifically, "Scaringe told Reuters the mid-range R1T pickup truck with a glass sky panel that can change from blue to clear was about $69,000. It can travel 300 miles on a full charge. A similar range R1S SUV will sell for about $72,000." The next day, EV industry news site *Electrek* reported on the price decrease, noting that a Rivian spokesperson confirmed that the "original listed prices represent a well-equipped vehicle," and that Rivian would "be releasing more details about pricing soon."

54. By November 2020, Rivian confirmed that the new "base" model prices for the R1T and R1S were $67,500 and $70,000, respectively.

55. Unbeknownst to investors, and as explained in Section IV.G, Rivian's decision to decrease the base price of both of its R1 vehicles approximately two months after Tesla's announcement was in direct conflict with its original 2018 forecast of generating positive R1 gross profits by 2023, particularly in light of the fact that it was known internally that gross profit margins had consistently trended worse since pricing was publicly announced in 2018. Indeed, Rivian's price decrease would have contributed to pushing its timeline for profitability farther into the future.

### E. After Several Delays, Rivian Begins Production and Delivers Its First Consumer Vehicles in September 2021

56. In April 2020, Rivian pushed its previously announced timeline for the delivery of the R1 vehicles to customers into 2021, citing construction delays at the Normal manufacturing plant due to COVID-related shutdowns. By May 2020, the Company told customers that it also would begin R1 deliveries in 2021. In a July 2020 email to customers, Scaringe provided additional specifics, stating that Rivian would begin deliveries of the R1T and R1S in June and August 2021, respectively.

57. Then, on May 28, 2021, CNET.com reported that Rivian had told customers that deliveries of the R1T and R1S would begin in July 2021. In July, CNET.com reported that Rivian had pushed back deliveries again, with the first R1T deliveries expected to occur in September 2021, and the first R1S deliveries to follow later in the fall.

58. Finally, on September 14, 2021, the Company's first customer vehicle—an R1T—rolled off the production line. By September 30, 2021, the Company produced 12 R1Ts and delivered 11 of them to customers. On December 20, 2021, Rivian announced that it had finally delivered two R1Ss the previous week—one to Scaringe and one to McDonough.

59. Despite the delivery delays, however, interest in Rivian's R1 Platform remained strong, with CNET.com noting that Rivian "seem[ed] serious about finally getting its much-hyped EVs into the hands of buyers."

### F. Rivian's IPO

60. Reports of a Rivian IPO first surfaced on February 9, 2021, with *Bloomberg* reporting that a Rivian IPO could happen as early as September 2021 at a valuation of roughly $50 billion. On May 28, 2021, *Bloomberg* reported that Rivian had selected underwriters for its IPO and could seek a valuation as high as $70 billion.

61. Three months later, on August 24, 2021, Rivian filed a confidential draft registration statement and prospectus on Form DRS with the SEC for a proposed public

offering of Rivian common stock. The Company publicly announced its intent to go public three days later, on August 27, 2021.

62. Thereafter, on October 1, 2021, Rivian filed a preliminary registration statement and prospectus for the IPO on Form S-1. Rivian subsequently filed amendments to the registration statement and prospectus with the SEC on Forms S-1/A on October 22, 2021, November 1, 2021, and November 5, 2021. The Executive Defendants and the Director Defendants signed the Registration Statement. Rivian also generated a Form 424(B)(4) Prospectus dated November 9, 2021, which it subsequently filed with the SEC on November 12, 2021.

63. The SEC declared the Registration Statement effective on November 9, 2021. Together with the November 9, 2021 prospectus, the Registration Statement offered 153,000,000 shares of Rivian's Class A common stock at a price of $78.00 per share (together, the "Registration Statement"). Rivian also granted the Underwriter Defendants a period of 30 days to purchase up to an additional 22,950,000 shares of Class A common stock from Rivian at the IPO price, less underwriting discounts and commissions.

64. In the Registration Statement, Rivian touted the purportedly ground-breaking nature of its R1 Platform, stating that it "design[ed], develop[ed], and manufacture[d] category-defining electric vehicles ('EVs') and accessories," and complemented its vehicles with a "a full suite of proprietary, value-added services that address the entire vehicle lifecycle and deepen our customer relationships."

65. Dubbed "Electric Adventure Vehicles," Rivian further stressed that the R1T and R1S were the Company's "flagship products" and its "handshake with the world," and played-up the prospects for the Company's growth and profitability, assuring investors that the Company's "vehicles occupy an attractive whitespace, addressing large, fast-growing, and high-margin market segments, and are designed to accelerate the large-scale adoption of sustainable transportation."

66. Rivian also emphasized the R1 Platform's impressive specifications and high-end finishes, stating that the R1 Platform "deliver[s] a high level of safety, premium feel,

and outstanding on- and off-road capabilities, with more than 300 miles of range and 0-60 acceleration in approximately 3 seconds," and included the following graphic highlighting the vehicles' specifications and capabilities:





| | R1T | R1S |
|---|---|---|
| EPA Rated Range | 314 miles<br>(400+ mi. targeted for 2022) | 316 miles |
| Wheelbase | 135 in. | 121 in. |
| Length | 217 in. | 201 in. |
| Storage | ~62 cu. ft. | ~105 cu. ft. |
| Powertrain | 800+ horsepower<br>quad motor all-wheel drive | 800+ horsepower<br>quad motor all-wheel drive |
| Acceleration | 0-60 mph in<br>~3 seconds | 0-60 mph in<br>~3 seconds |
| Towing Capacity | Up to 11,000 lbs. | Up to 7,700 lbs. |
| Wading Depth | Up to 3 ft. | Up to 3 ft. |

67. In addition, the Company touted the high-end finishes for the R1 Platform, emphasizing that "[f]rom seating design to ergonomics to audio systems, our team has delivered innovation wrapped in premium materials intended to always be highly functional." It also trumpeted the "groundbreaking performance both on- and off-road," as well as the R1 Platform's impressive "quad motor all-wheel drive configuration."

68. Rivian also told investors that it "expect[ed] to fill our preorder backlog of approximately 55,400 R1 vehicles by the end of 2023."

69. On or about November 10, 2021, Rivian commenced its IPO, and its Class A common stock began trading on the Nasdaq the same day.

70. The Company concluded its IPO on November 15, 2021, raising gross proceeds of more than $13.7 billion (prior to underwriting discounts and commissions, and estimated expenses) by selling 175,950,000 shares of its Class A common stock to the public at a price of $78.00 per share, which included the exercise in full by the Underwriter Defendants of their option to purchase an additional 22,950,000 shares of the Company's Class A common stock. Rivian's IPO was one of the largest U.S. IPOs in history.

71. In connection with its IPO, Rivian and its underwriters conducted a roadshow in early November 2021. In a slide deck for the roadshow, Rivian and its underwriters touted Rivian's R1 Platform, emphasizing the Company's offerings as being the "first" of their kind in the EV pickup truck and SUV space, and also highlighted the base purchase price and standard battery and motor configuration for the R1T and R1S:






72. Rivian and its underwriters also highlighted the praises the R1T received by auto-industry commentators, further hyping the Company's impending IPO and key first consumer offering during the roadshow:



73. *The Wall Street Journal* noted the Underwriter Defendants' contributions to the hype around Rivian's IPO, including touting the Company's purportedly favorable prospects and drawing comparisons to EV industry stalwart, Tesla:

> On its roadshow pitch to investors, Rivian's bankers compared the company to electric-vehicle giant Tesla Inc., whose explosive share increase has handed it a market capitalization of more than $1 trillion. Though Rivian is at a much earlier stage, has big losses and had no revenue until very recently, investors were clearly receptive and drawn to the company's growth potential.

74. Rivian's IPO was hotly anticipated by investors. For example, after Rivian filed its draft registration statement with the SEC, auto-industry news source *Motortrend* wrote on August 27, 2021, that "[f]or a while now, followers, fans, and stock market speculators have been keeping their eyes on Rivian. The question on everyone's minds, aside from whether the R1T is actually going to deliver on its promises or not, is whether the company would go public." In the run up to Rivian's IPO, *The Financial Times* noted "huge hype" around Rivian and its impending "blockbuster IPO," while also noting that some of the hype stemmed from the fact that Rivian's "prospects have been burnished by an order from Amazon for 100,000 electric delivery vans by 2025, and by the belief that Rivian's stylish pick-up trucks may attract the same fervour as Tesla's sports cars and sedans."

75. In September 2021, in an article titled "Rivian is coming. Here's why it matters," E&E News, a subscription-based news organization that reports on energy and environment issues quoted a policy analyst at Consumer Reports as stating, "[Rivian is] going to be the first to market with an electric pickup truck," "[t]hat's a big deal." The article continued, quoting an auto industry analyst as stating that "[Rivian] is one of the best-positioned new EV startups ever." *The Wall Street Journal* wrote on November 1, 2021, that Rivian's IPO was "one of the biggest and most-anticipated deals yet in a blockbuster year for new issues."

76. Similarly, *Motortrend* wrote that "[i]nvestors have had high expectations for the IPO since Rivian announced it would be filing one back in August." *Motortrend* continued, singing the praises of the R1T, noting that the R1T "is also making waves by rocketing to the top of our list of fastest pickups we've ever tested. We also crossed the U.S. off-road in the R1T a little while back."

77. The market's interest in Rivian did not end with its IPO. Despite being priced at $78 per share as part of the IPO, Rivian's Class A common stock opened for trading on the Nasdaq at more than $106 per share, catapulting the Company to a valuation of more than $100 billion—well north of the valuations of traditional and long-established automotive manufacturers like General Motors and Ford. In the days following its IPO, the hype over Rivian continued and in a post-IPO rally its Class A common stock reached a Class Period high of nearly $180 per share—valuing Rivian at over $150 billion on November 16, 2021.

### G. Unbeknownst to Investors, Prior to the IPO, Rivian Executives Knew That Rivian Had to Increase Prices and Significantly Alter Available Options for the R1 Platform in Order to Achieve Profitability

#### 1. Rivian's Projected Margins for the R1 Platform Consistently Declined from 2018 Until the IPO, Pushing R1 Profitability Ever-Farther into the Future

78. As noted above, Rivian set its R1 Platform pricing in 2018. At that time, according to FE-1, a senior-level finance employee at the Company from before 2018 until after the IPO, the Company structured its pricing such that gross profit margins, i.e., the difference between revenue plus the costs of selling and producing the vehicle, for the R1 Platform was forecasted to be somewhere around breakeven or negative 3% for the first few thousand vehicles. According to FE-1, as of 2018, Rivian forecasted that the "inflection point" for the R1 Platform, i.e., the point in time when the R1 unit economics would shift and the Company's gross margins would shift from loss to profit, would occur in 2023.

79. Instead of progressing towards the inflection point, however, Rivian's forecasted margins consistently declined from 2018 until FE-1 left the Company after the IPO. FE-1 indicated that inflation and other events, including supply chain issues, and escalating component costs, all negatively impacted gross margins. According to FE-1, by the time of the IPO, FE-1 believed Rivian's internal forecasts projected its R1 models to have negative gross margins of approximately ***20%*** for 2021 and 2022—***over six times worse*** than the low end of its original projections. As its margins deteriorated, Rivian extended the inflection point for the R1 Platform farther into the future. According to FE-1, by the time of the IPO, Rivian had pushed out the R1 inflection point to 2025—two years later than originally projected. FE-3, a business analytics and finance manager from summer 2021 until spring 2022, likewise recalled that by November 2021, Rivian had pushed its anticipated R1 inflection point out to 2025.

80. Rivian's original breakeven-to-negative gross margin forecasts for the R1, its long-term trend of margin deterioration following those original forecasts, and the resulting push-out of the R1 inflection point, were well known at the highest level within the Company. For example, FE-1 explained that the forecasted negative gross margins on R1 units was reflected in financial forecasts that FE-1 was responsible for aggregating, and which were sent to Defendant McDonough, Rivian's CFO, on a roughly monthly basis. FE-1 also attended meetings with McDonough where these forecasts were discussed.

81. Per FE-1, McDonough was unhappy with how far into the future Rivian was forecasting negative gross profit margins, and she was involved in discussions in meetings FE-1 attended about how to turn that around.

### 2. The Bill of Materials on R1s Exceeded Customers' Purchase Prices

82. Even after they pushed out the R1 inflection point by two years, Rivian executives knew that in order to achieve positive R1 margins by 2025, Rivian had to significantly reduce its overall cost of goods sold ("COGS"). According to FE-1 and FE-3, COGS included Rivian's bill of materials (i.e., the cost of the roughly 3,000 components

required to build the R1T and R1S), labor, certain factory-related manufacturing costs, and other related costs such as freight and warranty expenses.

83. Critically, Rivian executives knew that the cost efficiencies it expected to realize through increased production would not be sufficient to make the R1 Platform profitable. As a result, at the time of the IPO, Rivian's ability to achieve positive margins in 2025 was highly contingent on its ability to reduce its COGS and also raise prices for its R1 Platform. This is because Rivian's bill of materials, which consistently increased over time, was a significant factor driving the negative gross profit margins for the R1s and the delays to the R1's inflection point.

84. FE-3 recalled that the bill of materials alone for R1 vehicles prior to and at the time of the IPO was around $90,000. FE-3 noted that while different R1 models would have had a slightly different total bill of materials cost, each R1 vehicle's cost of materials was approximately the same. FE-3 noted that even the least expensive R1 model had a bill of materials that exceeded a customer's purchase price at the time of the IPO.

85. FE-3 stated that at the time of the IPO, the Revenue and Margins Report, which McDonough and other high-level executives received, showed the roughly $90,000 R1 Platform bill of materials.

86. According to FE-3, Rivian's forecast for positive gross profit margins in 2025 was contingent upon several factors, a key one of which was rolling out a significantly cheaper dual-motor option for the R1s. FE-1 similarly recounted that FE-1 was aware of discussions about using fewer motors in the future in an effort to increase gross profit margins.

87. FE-3 stated that the R1 production line would eventually gain efficiencies, thereby reducing the amount of labor and factory costs contributing to the per-vehicle cost and positively impact margins. FE-3 clarified, however, that because the bill of materials alone exceeded the customer sale price of the R1 Platform, Rivian would continue to have negative gross profit margins on the R1 even after those benefits were realized. FE-3 indicated that the bill of materials would exceed the customer sales price for the R1 models

until Rivian could successfully source and implement a new—and significantly cheaper—dual motor, among other changes. FE-3 believed that Rivian anticipated implementing the dual motor in late-2023, and that the bill of materials was projected to no longer exceed a customer's purchase price thereafter. Even still, FE-3 said that this change was only forecast to lower the bill of materials, and the Company still was projecting that the total COGS would exceed the sale price to customers until some point in 2025.

### 3. Senior Executives Knew That Rivian's Costs Were Rising Through Their Participation in Regularly Scheduled "Gate Reviews"

88. Scaringe, McDonough, and Behl, as well as other high-level Rivian employees, including Nick Kalayjian, Chief Product Development Officer, Jacob Kohn, Vehicle Line Director, Rod Copes, the Company's former Chief Operating Officer, and Charly Mwangi, the Company's former Executive Vice President of Manufacturing and Engineering, attended "Gate Review" meetings which featured discussions about the elevating costs of goods sold. According to FE-2, the Gate Reviews occurred at varying cadences, anywhere from one to six months, when a certain milestone, or "gate," was reached prompting the internal review. FE-2 recalled that there were nine gates in total that Rivian had to clear internally in order to successfully launch its vehicles.

89. Through their attendance at the Gate Reviews, senior executives received reporting that showed the costs increases of the R1 vehicles during the launch process. As FE-2 explained, "[t]here was an accumulation of costs that were added since the prior [Gate] review." According to FE-2, as Rivian launched the vehicles and ramped up production, the Company "would identify more issues that needed to be addressed. The issues come at a cost. There were multiple cost adds, just based on the learning curve."

### 4. At the Time of the IPO, Company Insiders Recognized That R1 Platform Pricing Needed to Be Revised, But Delayed Doing So Until After the IPO

90. Given their knowledge of the R1 Platform's consistently deteriorating margins and increasing bill of costs—and their awareness of internal Company forecasts indicating that the R1 would not become profitable until at least 2025—Rivian's senior management privately acknowledged prior to the IPO that they needed to increase the R1 prices. However, Rivian's senior management deliberately delayed implementing this required price increase until ***after*** the Company's IPO, and they did not disclose the need for a price increase to investors in the IPO offering documents.

91. Schwab's statements corroborate the facts provided by other former Rivian employees, and underscore that Rivian's senior most executives knew that R1 Platform unit sales would generate losses for the Company for the foreseeable future. Specifically, Schwab has stated that, "[b]eginning in spring of 2021, [she] started to raise the alarm about concerns she had relating to Rivian's ability to deliver on its promises to investors." One such "promise to investors" was the price of the R1T and R1S vehicles. According to Schwab, "it was clear that the vehicles were underpriced, and each sale would result in a loss the company." Schwab stated that she "ultimately contacted Dennis Lucey, Rivian's Finance Director, and worked with him to develop projections showing how much of a loss the company would incur if Rivian did not raise prices."

92. Schwab has said that she "raised this issue with several executives, including Mr. Behl, Stuart Dixon (Director of Product Management), and Andy Zicheck (Principal Product Manager). Mr. Behl brushed her off." Schwab has recounted that she "criticiz[ed] and disclos[ed] the company's misleading and inaccurate messaging around its delivery schedule, pricing, vehicle readiness, and production rates." She also stated that she "voiced her concerns about the company making false commitments to customers and investors in multiple meetings with the company's senior leadership."

93. Schwab further explained prior to the IPO in a November 4, 2021 post on *medium.com* titled, "Life Outside the Boys Club: Why I Spoke Up About Rivian's Toxic Bro Culture (and Got Fired)," that she repeatedly raised the issue of Rivian's vehicle prices, stating: "Time and time again, I raised concerns regarding vehicle pricing and manufacturing deadlines."

94. According to Schwab, after raising the issue of R1 pricing and that each unit sold to consumers would generate losses for the Company with a host of high-level managers, including Behl, Behl finally "***agreed that [Rivian] would need to raise the vehicle prices after the IPO***."

95. FE-1 similarly stated that, prior to the IPO, Rivian executives understood that R1 prices had to be increased and that the current pricing would need to be cut off. FE-1 further noted that the point at which Rivian would cut off current pricing shifted over time "depending on our read of when the executive team was going to have the stomach to take pricing up."

**5. The Exchange Act Defendants Misled Investors Regarding the Pricing and Profitability Assumptions for Rivian's Vehicles**

96. In the Registration Statement, the Exchange Act Defendants recognized that vehicle pricing and customers' perceived value of Rivian's vehicles was a material element of the Company's value. For example, in one of the Registration Statement's "Risk Factors," Rivian acknowledged:

> If our existing preorder and prospective customers do not perceive our vehicles and services to be of sufficiently high value and quality, cost competitive and appealing in aesthetics or performance, or if the final production version of the R1S is not sufficiently similar to the drivable design prototypes, we may not be able to retain our current preorder customers or attract new customers, and our business, prospects, financial condition, results of operations, and cash flows would suffer as a result.

97. In another Risk Factor in Rivian's Registration Statement (and its 3Q21 10-Q filed in December 2021), Rivian acknowledged the likely negative consequences of a price increase, stating:

> Any attempts to increase the announced or expected prices of our vehicles in response to increased costs could be viewed negatively by our potential customers and could adversely affect our business, prospects, financial condition, results of operations, and cash flows.

98. Nevertheless, in the Registration Statement, the Exchange Act Defendants made several materially false and misleading statements and omitted material facts concerning the pricing and profitability of Rivian's R1 Platform. For example, in the "Prospectus Summary" section of the Registration Statement, Defendants stated:

> We generated negative gross profit for the three months ended September 30, 2021, as we began manufacturing the R1T. ***The negative gross profit relates primarily to significant labor and overhead costs for the Normal Factory, reflecting our factory's large-scale capabilities***; however, as we just started to ramp vehicle production at the site, the facility produced limited quantities of vehicles in the period. We also expect to record a lower of cost or net realizable value adjustment to write-down the value of certain inventory to the amount we anticipate receiving upon vehicle sale (after considering future costs necessary to ready the inventory for sale).

99. In addition, in the Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") section of the Registration Statement, in a subsection titled "Our Business Model," Defendants stated:

> ***We expect to operate at a negative gross profit per vehicle for the near term as our fixed costs from investments in vehicle technology, manufacturing capacity, and charging infrastructure are spread across a smaller product base until we launch additional vehicles and ramp production***.

100. As set forth in detail below in Section V, these statements were materially false and misleading when made, and omitted material facts regarding, among other things, the fact that Rivian's margins had consistently deteriorated over time due to its rising bill of materials (which alone exceeded the R1's purchase price), and that absent a substantial price increase or a significant reduction in costs, the R1 Platform would continue generating losses for Rivian over the long term.

101. In addition, the Exchange Act Defendants explicitly told investors to rely only on the information in the Registration Statement, stating:

> You should rely only on the information contained in this prospectus or contained in any free writing prospectus filed with the Securities and Exchange Commission (the "SEC"). Neither we nor any of the underwriters have authorized anyone to provide any information or make any representations other than those contained in this prospectus or in any free writing prospectus we have prepared. Neither we nor the underwriters take responsibility for, and can provide assurance as to the reliability of, any other information that others may give you. This prospectus is an offer to sell only the shares of Class A common stock offered by this prospectus, but only under circumstances and in jurisdictions where it is lawful to do so. The information contained in this prospectus is accurate only as of the date of this prospectus, regardless of the time of delivery of this prospectus or of any sale of the Class A common stock. Our business, results of operations, financial condition, and prospects may have changed since such date.

102. Following the IPO, several of the Underwriter Defendants and other market research analysts initiated coverage of Rivian. For example, Piper Sandler initiated coverage on December 5, 2021, with an overweight rating and price target of $148, which it noted "impl[ied] 40% upside potential." Piper Sandler called out Rivian's Tesla-like approach of "develop[ing] their own software, semiconductors, batteries, charging networks, and direct-to-consumer business models" as giving the Company an "upper

hand." Piper Sandler also assumed Rivian's longer-term market share would reach 11%–12% and 7%–8% in the U.S. and Europe, respectively, with a "particular strength in the pickup and van markets," and specifically called out that it believed software and services were a key factor driving Piper Sandler's 40% upside.

103. Wedbush also initiated coverage on December 5, 2021 with an outperform rating and a $130 price target. After touting Rivian's "unmatched" features, Wedbush gushed, stating:

> We believe Rivian is in the driver's seat for a golden opportunity as current market demand for electric vehicles has never been higher . . . . We believe Rivian has put together a product offering with such attention to detail, build quality, luxury, and performance not seen potentially at scale since Tesla's debut of the Model S years ago in our opinion.

104. Wedbush continued, explaining additional considerations driving its price target, including that:

> [T]he company expects to sell more than 742,000 units cumulatively over the next five years, and its 2 flagship models, the R1S and R1T, have already collectively received 48,000 reservations. We believe Rivian is set to create a new category in the EV space with its game-changing debuts, a massive Normal, Illinois factory footprint, and create a major brand within the EV market over the next decade.

105. Similarly, Barclays initiated coverage on December 6, 2021, explaining that "Rivian's differentiated consumer branding centered around adventure makes it unique in the EV market and provides a solid foundation for recurring revenues," and also flagged the Company's relationship with "premier last-mile customer" Amazon for Rivian's commercial vans. In light of this, Barclays wrote that it was "confident that RIVN can grow into a major, multi-product OEM." While Barclays issued a rating of equal weight, it did so because, following Rivian's explosive stock price growth after the IPO, "much of this is already priced in" to the Company's stock price.

106. Rivian continued to mislead and conceal material facts from investors on December 16, 2021, during the Company's 3Q21 earnings call and in its 3Q21 Shareholder Letter and 10-Q. Rivian made false or misleading statements that were substantially identical to those made in the Registration Statement attributing negative gross profits to "significant labor and overhead costs" and statements that, in the "near-term," the Company expected that limited vehicle production would have a negative impact on the Company's gross profit as production remained lower. In making these statements to investors, the Exchange Act Defendants failed to disclose, among other things, the fact that Rivian's margins had consistently deteriorated over time due to its rising bill of materials (which alone exceeded the R1's purchase price), and that absent a substantial price increase or a significant reduction in costs, the R1 Platform would continue generating losses for Rivian over the long term.

107. During the 3Q21 earnings call, however, the Exchange Act Defendants went even further. In particular, McDonough told investors that, "given the inflationary market backdrop, we also continue to evaluat[e] the pricing for our vehicle[s]," leaving investors with the false and misleading impression that—prior to the IPO—the Exchange Act Defendants had not actively discussed the fact that Rivian's R1 pricing needed to be, and would be, increased after the IPO. Later during the 3Q21 earnings call, an analyst pressed Scaringe on Rivian's pricing. In response, Scaringe doubled-down on the Company's misleading narrative, stating: "Now with regards to pricing, it's certainly the backdrop of inflation that we're seeing and the very strong demand for products not just looking our product (inaudible) broadly within the electrified space has caused us to look at our pricing . . . ." Scaringe continued, telling investors, "in terms of the competitive step, we recognized they're very aggressively priced. That is something that we certainly considered and talk about quite a bit as a management team."

108. These statements had the intended effect of misdirecting the market about the need for a price increase and a reduction of available features for the R1 Platform. Rather than disclosing the truth—that a price increase was necessary because Rivian's current

pricing was generating a large loss per vehicle on the components alone (without regard to the massive overhead costs that could be mitigated by ramped production)—the statements made by Scaringe and McDonough led the market to believe that it was demand for the vehicle that was prompting Rivian's pricing evaluation. As an analyst from Deutsche Bank noted in a report published after the call: "The momentum acceleration in vehicle reservations, now at 71k units up from 55k just 6 weeks ago, is very encouraging and is prompting management to consider price increases." In other words, Rivian had conveyed to the market that pricing increases were being considered in order to increase the profits Rivian earned on each vehicle, not mitigate the losses that Rivian suffered on each vehicle, which Rivian's management knew to be the case.

109. A January 6, 2022 report by analyst Wolfe Research reveals that the market effectively understood Rivian's December statements about potential price increases to be due to the strong demand Rivian was seeing for its R1T and in light of the competitive landscape. In particular, following GM's official unveiling of its EV Silverado pickup truck in early January 2022, Wolfe compared the R1T against up-fitted versions of the EV Silverado and Ford's EV F-150 Lightning, the other dominating options in the EV pickup truck space. While acknowledging that the three vehicle platforms were strongly competitive, Wolfe's report is clear that the price point of Rivian's R1T was a significant competitive aspect of the R1T's value proposition and prospects in the burgeoning EV pickup truck market:

**Exhibit 1: EV Pickup Specs Comparison**

| Truck | Chevy Silverado EV RST | Ford F150 Lightning Platinum | Rivian R1T |
|---|---|---|---|
| Size | Full-Size | Full-Size | Mid-Size |
| Power | 664 HP | 563 HP | 835 HP |
| Torque | 780 ft-lbs | 775 ft-lbs | 908 ft-lbs |
| 0-60 | 4.5s | 4.4s | 3s |
| Payload | 1300 lbs | 1800 lbs | 1760 lbs |
| Towing | 10,000 lbs | 10,000 lbs | 11,000 lbs |
| Suspension | Independent Front + Rear Air Suspension | Independent Rear Suspension | Independent Front + Rear Air Suspension |
| Range | 400 miles | 300 miles | 314-400 miles |
| Battery Pack Size | 200 kWh | 131 kWh | 135-185 kWh |
| Miles/kWh | 2 | 2.3 | 2.3 |
| Approximate Price | $80,000-$105,000 | $90,874 | $77,500-$83,000 |

*Source: Company Data*

### H. The Relevant Truth Is Revealed

110. On February 1, 2022, Rivian announced that it would release its fourth quarter and full year 2021 results on March 10, 2022. Then, on March 1, 2022, following months of silence after its 3Q21 earnings call held on December 16, 2021, Rivian implemented the price increases that it had privately discussed prior to the IPO.

111. Specifically, in an email to pre-order holders and through revised pricing available on its website, the Company revealed that its previous pricing was unsustainable by dramatically increasing the price for R1Ts and R1Ss equipped with quad-motor and "Large" battery pack specifications (which were previously the only available "base" options for both vehicles) by approximately ***17%*** for the R1T (from roughly $67,500 to roughly $79,500) and approximately ***20%*** for the R1S (from roughly $70,000 to roughly $84,500). Whereas the quad-motor and "Large" battery pack were previously standard, the quad-motor option and the "Large" battery pack options now cost customers an extra $6,000 each. Rivian stated these price increases were the result of "inflationary pressure on the cost of supplier components and raw materials across the world."

112. The new, significantly increased pricing would apply not only to all future pre-orders, but also to virtually all existing pre-orders, with the exception of those already in the final steps of completing their transaction with Rivian. The Company announced that it was introducing a new "Standard" battery size and a new dual-motor option for both

vehicles (which was intended to allow pre-order holders, all of whom previously had a quad-motor and at least a "Large" battery pack, to retain their original pricing), as well as increased prices for "certain options, upgrades and accessories." Moreover, the new, significantly increased pricing would apply not only to all future pre-orders, but also to virtually all existing pre-orders, with the exception of those already in the final steps of completing their transaction with Rivian.

113. As described by InsideEVs.com, Rivian's price increase announcement effectively gave pre-order holders two options: "keep[] their original order and pay[] the extra 17% - 20%, which, with options may be between $12,000 and $14,000 extra," or "delay[] their delivery a year or two, accept[] a dual-motor version instead of the promised quad-motor setup, and also accept[] a smaller battery pack in order to keep the same price they believed they were getting from the start." *Vice* similarly reported that "[c]onfigurations that had previously been standard, or the only available option, now cost thousands of dollars extra. The end result is people who thought they were buying a car for approximately $75,000 are finding that car now costs closer to $100,000. Customers are furious, obviously."

114. In a statement to *Electrek*, Behl stated the price increases were the result of "inflationary pressure, increasing component costs, and unprecedented supply chain shortages and delays for parts (including semiconductor chips). This rise in cost and complexity due to these challenging circumstances necessitate an increase to the prices of the R1T and R1S models we offer today – prices which were originally set in 2018."

115. As reported by numerous media outlets and industry analysts, many customers who pre-ordered R1Ts and R1Ss were enraged and indicated that they had or were planning to cancel their pre-orders because of the price increases. As explained by *Vice*:

> Price increases are obviously a fact of life these days, especially with the car market, a key driver of inflation. But it is rare to see car companies apply price changes, especially such drastic ones, to existing preorders. For example, Tesla regularly changes vehicle prices, but only to new orders.

> Legacy automakers have been fighting with dealers who are charging much more than the sticker price for electric vehicle preorders, telling them to knock it off.

116. Likewise, a March 3, 2022 report from RBC noted that "[a] scan of message boards and online postings indicated there was a lot of anger among reservation holder and cancelations," while a March 4, 2022 report by Deutsche Bank noted that the price increases led to "a very negative reaction in the market in which many reservation holders cancelled their orders." Indeed, pre-order holders expressed their outrage in online postings, with one user on the popular RivianOwnersForum.com stating:

> My quoted price previously was $78,820 for an R1S after going through the configurator to get the same vehicle it's $92k. ***A 17k increase is not inflation – it means it wasn't priced appropriately to begin with***. Add-in the new 'option' for a dual motor which is position [sic] as a great new option but in reality it just means they are now charging you more for the quad motor which was previously the only option. ***This feels like a gigantic bait and switch***.

117. In response to news of the Company's substantial price increases on pre-orders, Rivian's stock price fell $14, or more than 20%, from a close of $67.56 per share on February 28, 2022, to close at $53.56 per share on March 2, 2022.

118. Then, on March 3, 2022, after facing intense public pressure from customers, in an email to pre-order holders and in a letter published on *Business Wire*, both signed by Scaringe, the Company reversed its decision to hike prices on between 71,000 and 83,000 customers who ordered R1s before March 1, 2022. Given Rivian's concession that these pre-ordered vehicles were underwater on costs, analysts seized on the significant negative impact to Rivian's financial condition going forward. For example, a March 3, 2022 report from analyst RBC stated: "***The roll-back on pricing is costing it ~$850mm in revenue*** (assuming no cancelations) . . . ."

119. On March 3, 2022, *The Wall Street Journal* noted that, following the prior day's share price decline due to the price hikes, "[s]hares fell further Thursday, down nearly 5% to $50.91." *Reuters* similarly wrote on March 3 that "Rivian stock, which plunged over 13% on Wednesday, extended losses on Thursday, down 4%."

120. From the close of trading on March 2, 2022, through the close of trading on March 10, 2022, the price of Rivian's Class A common stock fell from $53.56 to $41.16. During this time, analysts digested the potential impact of Rivian's attempted price hike and what to expect from the additional news slated to be released during the Company's forthcoming earnings call on March 10. For example, Wolfe Research wrote on March 9: "We believe RIVN required a $12-$14k price increase in order to achieve their prior financial targets. Without the price increases, we think Consensus (for 2022-2023) will need to be lowered by at least $0.8-$1.4 bn (~70k-100k reservation holders x $12-$14k implied cost headwind)."

121. Then, after trading closed on March 10, 2022, the market finally learned the full extent to which Rivian's long term financial prospects had been impacted by its previously undisclosed need to reprice its vehicles, including existing orders. According to the Company's disclosures, its projected adjusted EBITDA for FY2022 was a disappointing ($4,750 million) and reported that Rivian would face negative gross margins throughout "[a]s we continue to ramp-up our manufacturing facility, manage supply chain challenges, face continued inflationary pressures, ***and minimize price increases to customers in the near term***."

122. Reporting on this revised EBITDA guidance, J.P. Morgan noted in its coverage of the earnings release:

> The company reversed course for those who had placed deposits prior to March 1, which we estimate implies similarly lower gross profit margin for the first nearly 83,000 units delivered (which we now expect to occur during 1Q24). For future reservations, however, the material price hikes will still apply, and while this should offset currently foreseeable inflationary cost

pressures (meaning dilution to gross profit margin but not dollars), it does imply also some demand destruction.

123. Meanwhile, Deutsche Bank noted "Rivian's soft 4Q results and weak 2022 outlook reflect largely predictable delays ramping up vehicle production amid challenges from its supply chain, but also steep cost pressures from input costs in the current inflationary environment, which it cannot offset with pricing following the backlash around its proposed price increase."

124. The market reaction to this revised scenario was swift and severe. On March 11, 2022, Rivian's stock price fell almost 8%, from a close of $41.16 on March 10 to a close of $38.05 on March 11, and continued to fall further the next trading day on high volume, closing on March 14 at $35.83—less than half of its $78 per share IPO price.

## V. THE EXCHANGE ACT DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

125. As alleged below, the Exchange Act Defendants issued numerous false or misleading statements and omissions of material fact during the Class Period concerning, Rivian's R1T and R1S vehicle pricing. The Exchange Act Defendants' misstatements and omissions were made in the Company's Registration Statement, 3Q21 10-Q, Shareholder Letter, and conference call with analysts and investors.

### A. Registration Statement

126. In the "Prospectus Summary" section of the Registration Statement, the Exchange Act Defendants stated:

> We generated negative gross profit for the three months ended September 30, 2021, as we began manufacturing the R1T. ***The negative gross profit relates primarily to significant labor and overhead costs for the Normal Factory, reflecting our factory's large-scale capabilities***; however, as we just started to ramp vehicle production at the site, the facility produced limited quantities of vehicles in the period. We also expect to record a lower of cost or net realizable value adjustment to write-down the value of certain

inventory to the amount we anticipate receiving upon vehicle sale (after considering future costs necessary to ready the inventory for sale).

127. In the MD&A section of the Registration Statement, in a subsection titled "Our Business Model," the Exchange Act Defendants stated:

> ***We expect to operate at a negative gross profit per vehicle for the near term as our fixed costs from investments in vehicle technology, manufacturing capacity, and charging infrastructure are spread across a smaller product base until we launch additional vehicles and ramp production***.

128. The statements in Paragraphs 126-127 above were materially false and misleading when made. Specifically, at the time the Exchange Act Defendants made these statements, they knowingly or with deliberate recklessness misrepresented, concealed, and/or failed to disclose that Rivian's negative margins were not simply the result of large upfront investments in vehicle technology, manufacturing capacity, charging infrastructure, and labor and overhead costs for the Normal manufacturing plant, and would not turn positive as production volumes increased. Instead, Rivian's negative margins were due to the fact that Rivian's COGS for R1s was significantly higher than the purchase price charged to customers, and Rivian could not generate positive gross margins on the R1 simply by scaling vehicle production or implementing significant COGS reductions in the short term. In addition, the R1 Platform's negative profit margins had consistently deteriorated in the years leading up to the IPO, causing Rivian to push out its forecast for profitability to 2025, and were the product of a long-term, systemic issue that could only be remedied by a price increase on both existing and future R1 pre-orders. Moreover, the statement in Paragraph 127 that Rivian "expect[ed] to operate at a negative gross profit per vehicle for the near term" was materially false or misleading when made because it lacked any basis in fact given the Exchange Act Defendants' awareness of internal Company forecasts indicating that the R1 would continue to generate negative gross profits until at least 2025.

**B. December 16, 2021: 3Q21 Earnings Conference Call, Shareholder Letter, and 3Q21 10-Q**

129. After the market closed on December 16, 2021, Rivian released its financial results for 3Q21, a Shareholder Letter, and held an earnings conference call to discuss the Company's 3Q21 results. In the Shareholder Letter, the Rivian stated:

> We generated negative gross profit of $(82) million for the third quarter of 2021, as we began manufacturing the R1T. ***The negative gross profit relates primarily to significant labor and overhead costs for the large-scale Normal Factory***; however, given we just started to ramp vehicle production at the site, the facility produced limited quantities of vehicles in the period. ***In the near-term, we expect this dynamic—of vehicle production being significantly less than our manufacturing capacity—will continue to have a negative drag on gross profit as we ramp production of the R1T, R1S, and EDV at the same time***.

130. Rivian's 3Q21 10-Q, dated December 16, 2021, stated:

> We generated negative gross profit of $(82) million for the three and nine month periods ended September 30, 2021. ***This increase was driven by significant labor and overhead costs for the Normal Factory***, reflecting our factory's large-scale capabilities; however, as we recently started to ramp vehicle production at the site, the facility produced limited quantities of vehicles in these periods. ***In the near-term, we expect this dynamic of vehicle production being significantly less than our manufacturing capacity will continue to have a negative impact on gross profit***.

131. In her prepared remarks during the December 16, 2021 3Q21 earnings conference call, McDonough stated:

> ***In the near term, we expect that this dynamic of high fixed cost associated with operating and running our large scale, highly vertically integrated plan amortized over a small but growing number of vehicles produced across the***

> ***R1 and RCV platform will continue to have a negative drag on gross profit***. As a result, in the third quarter we generated a negative gross profit of $82 million.

132. The statements in Paragraphs 129-31 above were materially false and misleading when made. Specifically, at the time the Exchange Act Defendants made these statements, they knowingly or with deliberate recklessness misrepresented, concealed, and/or failed to disclose that Rivian's negative margins were not simply the result of labor and overhead costs for the Normal manufacturing plant, and would not turn positive as production volumes increased. Instead, Rivian's negative margins were due to the fact that Rivian's COGS for R1s was significantly higher than the purchase price charged to customers, and Rivian could not generate positive gross margins on the R1 simply by scaling vehicle production or implementing significant COGS reductions in the short term. In addition, the R1 Platform's negative profit margins had consistently deteriorated in the years leading up to the IPO, causing Rivian to push out its forecast for profitability to 2025, and were the product of a long-term, systemic issue that could only be remedied by a price increase on both existing and future R1 pre-orders. Moreover, the statements in Paragraphs 129-31 that Rivian in "the near term" expected negative gross profits due to "vehicle production being significantly less than our manufacturing capacity," and the "dynamic of high fixed cost associated with operating and running our large scale, highly vertically integrated plan amortized over a small but growing number of vehicles," were materially false or misleading because they lacked any basis in fact given the Exchange Act Defendants' awareness of internal Company forecasts indicating that the R1 would continue to generate negative gross profits until at least 2025.

133. Also during her prepared remarks, McDonough stated, "***[a]nd given the inflationary market backdrop, we also continue to evaluation [sic] the pricing for our vehicle [sic]***."

134. During the Q&A portion of the 3Q21 earnings call, Wolfe Research analyst Robert Saltzman and Scaringe had the following exchange:

SALTZMAN: Claire mentioned that you're looking at opportunities to accelerate your strategy. Are there things that you can do to maybe accelerate the ramp that you originally envisioned for the TR1 platform, just given the response to the product or are you I think Claire alluded to, inflation and looking at pricing, are you looking at opportunities to adjust pricing just based on what the demand is for the product?

SCARINGE: ***Now with regards to pricing, it's certainly the backdrop of inflation that we're seeing and the very strong demand for products not just looking our product (inaudible) broadly within the electrified space has caused us to look at our pricing and really I'd say recognizing the set of product features that we've been able to put together into the vehicles***. And the vehicles are incredibly -- you had a chance to drive them, they're incredibly fun to drive, very capable, over 800-horsepower, 0 to 60, three seconds, great on-road, great off-road but also a great everyday vehicle. ***So in terms of the competitive step, we recognized they're very aggressively priced***. That is something that we certainly considered and talk about quite a bit as a management team.

135. The statements in Paragraphs 133-34 above were materially false and misleading when made. Specifically, at the time the Exchange Act Defendants made these statements, they knowingly or with deliberate recklessness misrepresented, concealed, and/or failed to disclose that the R1 Platform's negative profit margins had consistently deteriorated in the years leading up to the IPO, causing Rivian to push out its forecast for profitability to 2025, and were the product of a long-term, systemic issue that could only be remedied by a price increase on both existing and future R1 pre-orders, and that Rivian had been discussing increasing R1 purchase prices prior to the IPO, and had acknowledged that the then-present R1 pricing needed to be adjusted and increased after the IPO. In addition, the Exchange Act Defendants' statements were materially false or misleading when made because they conveyed to the market that the reason Rivian was evaluating a price increase

was not to mitigate losses on each vehicle, which was the case, but was instead to increase profits based on the value proposition they offered to customers. In addition, Scaringe's and McDonough's statements gave the misleading impression that the possibility of a price increase due to inflation was a new development, when they knew that the R1 Platform's negative profit margins had consistently deteriorated prior to the IPO for several reasons, including inflationary pressures, causing Rivian to push out its forecast for profitability to 2025, and were the product of a long-term, systemic problem.

## VI. ALLEGATIONS OF LOSS CAUSATION

136. Class members were damaged as a result of the Exchange Act Defendants' fraudulent conduct as alleged herein. During the Class Period, the Exchange Act Defendants engaged in a scheme to deceive investors by issuing a series of material misrepresentations and omissions of material facts, trends, events, and uncertainties required to be disclosed, relating to, among other things, the pricing and profitability of Rivian's R1 Platform.

137. As a direct result of the Exchange Act Defendants' scheme, misrepresentations of material fact, and omissions of material fact, Rivian's Class A common stock traded at artificially inflated prices throughout the Class Period.

138. Unknowingly, and in reliance upon the Exchange Act Defendants' materially false or misleading statements and omissions, Class members purchased or otherwise acquired Rivian's Class A common stock at artificially inflated prices on the Nasdaq exchange. But for the Exchange Act Defendants' misrepresentations, omissions, and fraudulent scheme, Plaintiffs and other Class members would not have purchased or otherwise acquired Rivian's Class A common stock at the artificially inflated prices at which it traded during the Class Period.

139. The relevant truth was revealed beginning on March 1, 2022, when Rivian announced that it was dramatically increasing the price for R1Ts and R1Ss by "approximately 17%" for the R1T (from roughly $67,500 to roughly $79,500) and "approximately 20%" for the R1S (from roughly $70,000 to roughly $84,500). In addition, the Company announced that it was introducing a new "Standard" battery size and a new

dual-motor option for both vehicles, as well as increased prices for "certain options, upgrades and accessories." Moreover, the new, significantly increased pricing would apply not only to all future pre-orders, but also to virtually all existing pre-orders, with the exception of those already in the final steps of completing their transaction with Rivian.

140. As described by InsideEVs.com, Rivian's price increase announcement effectively gave pre-order holders two options: "keep[] their original order and pay[] the extra 17% - 20%, which, with options may be between $12,000 and $14,000 extra," or "delay[] their delivery a year or two, accept[] a dual-motor version instead of the promised quad-motor setup, and also accept[] a smaller battery pack in order to keep the same price they believed they were getting from the start." *Vice* similarly reported that "[c]onfigurations that had previously been standard, or the only available option, now cost thousands of dollars extra. The end result is people who thought they were buying a car for approximately $75,000 are finding that car now costs closer to $100,000. Customers are furious, obviously."

141. In a statement to *Electrek*, Behl stated the price increases were the result of "inflationary pressure, increasing component costs, and unprecedented supply chain shortages and delays for parts (including semiconductor chips). This rise in cost and complexity due to these challenging circumstances necessitate an increase to the prices of the R1T and R1S models we offer today – prices which were originally set in 2018."

142. In response to news of the Company's substantial price increases on pre-orders, Rivian's stock price fell $14, or more than 20%, from a close of $67.56 per share on February 28, 2022, to close at $53.56 per share on March 2, 2022.

143. Market analysts and commentators identified the price increases as driving the decline in the price of Rivian's Class A common stock. For example, a March 1, 2022 report from RBC stated:

> While price increases were expected and previously communicated by the company, we were under the impression that pre-orders before a certain date would be grandfathered in. It now appears that only customers who are

> in the final steps of completing the transaction will see the prior price honored. To be fair, pricing was initially established in 2018 and a lot has changed since then with regard to inflation and the supply chain world. Still, it will be interesting to see whether orders are canceled or deferred. We will look for color on next week's earnings call.

144. An article titled "EV Startup Rivian Walks Back Price Increase, Apologizes to Customers; Price rise on already-ordered electric trucks and SUVs sent Rivian's stock sliding this week," published by *The Wall Street Journal* on March 3, 2022, noted "Rivian shares slid more than 13% Wednesday [i.e., March 2] following the price-increase disclosure, as angry customers aired their frustration on social media and online forums."

145. Similarly, *Bloomberg* reported in a March 3, 2022 article titled "Rivian Hits Record Low After Admitting 'Mistake' on Price Hikes," noted Rivian stock price's "13.5% slide the day prior, driven by Rivian's late-Tuesday decision to raise prices." In a March 2, 2022 article titled "Rivian Stock Is Falling Because EV Prices Are Rising. Investors Aren't Happy," *Barron's* wrote that "Rivian Automotive's decision to raise prices has caused its stock to tumble."

146. Then, on March 3, 2022, after facing intense public pressure from customers, in an email to pre-order holders and in a letter published on *Business Wire*, both signed by Scaringe, the Company reversed its decision to hike prices on pre-order holders who ordered R1s before March 1, 2022. Given Rivian's concession that these vehicles were underwater on costs, analysts seized on the significant negative impact to Rivian going forward. For example, a March 3, 2022 report from analyst RBC stated: "***The roll-back on pricing is costing it ~$850mm in revenue*** (assuming no cancelations) . . . ."

147. Market commentators explained that the Company's Class A common stock share price fell in light of this news. On March 3, 2022, *The Wall Street Journal* noted that, following the prior day's share price decline due to the price hikes, "[s]hares fell further Thursday, down nearly 5% to $50.91." *Reuters* similarly wrote on March 3 that "Rivian stock, which plunged over 13% on Wednesday, extended losses on Thursday, down 4%."

148. From the close of trading on March 2, 2022, through the close of trading on March 10, 2022, the price of Rivian's Class A common stock fell from $53.56 to $41.16. During this time, analysts digested this news regarding the potential impact of Rivian's attempted price hike and what to expect from the additional news slated to be released during the Company's forthcoming earnings call on March 10. For example, Wolfe Research wrote on March 9: "We believe RIVN required a $12-$14k price increase in order to achieve their prior financial targets. Without the price increases, we think Consensus (for 2022-2023) will need to be lowered by at least $0.8-$1.4 bn (~70k-100k reservation holders x $12-$14k implied cost headwind)."

149. Then, after trading closed on March 10, 2022, the market finally learned the extent to which Rivian's long term financial prospects had been impacted by its previously undisclosed need to reprice its vehicles, including existing orders. According to the Company's disclosures, its projected adjusted EBITDA for FY2022 was a disappointing ($4,750 million) and reported that Rivian would face negative gross margins throughout "[a]s we continue to ramp-up our manufacturing facility, manage supply chain challenges, face continued inflationary pressures, ***and minimize price increases to customers in the near term***."

150. The market reaction to this revised scenario was swift and severe. On March 11, 2022, Rivian's stock price fell almost 8%, from a close of $41.16 on March 10 to a close of $38.05 on March 11, and continued to fall further the next trading day on high volume, closing on March 14 at $35.83—less than half of its $78 per share IPO price.

151. Analysts focused on these negative disclosures in coverage of Rivian after the 3Q21 earnings call. For example, reporting on this revised EBITDA guidance, J.P. Morgan noted in its coverage of the earnings release:

> The company reversed course for those who had placed deposits prior to March 1, which we estimate implies similarly lower gross profit margin for the first nearly 83,000 units delivered (which we now expect to occur during 1Q24). For future reservations, however, the material price hikes will still

apply, and while this should offset currently foreseeable inflationary cost pressures (meaning dilution to gross profit margin but not dollars), it does imply also some demand destruction.

152. Meanwhile, Deutsche Bank noted "Rivian's soft 4Q results and weak 2022 outlook reflect largely predictable delays ramping up vehicle production amid challenges from its supply chain, but also steep cost pressures from input costs in the current inflationary environment, which it cannot offset with pricing following the backlash around its proposed price increase."

153. Rivian's disclosures on March 1, March 3, and March 10, 2022, partially corrected or reflected the materialization of risks concealed by the Exchange Act Defendants' material misstatements and omissions of material facts alleged herein.

154. The decline in the price of Rivian Class A common stock between the close of market on February 28, 2022, and March 14, 2022, is directly attributable to the market absorbing information that corrected, or reflected the materialization of risks concealed by, the Exchange Act Defendants' material misrepresentations or omissions.

155. Plaintiffs and other Class members suffered economic losses as the price of Rivian Class A common stock fell in response to the disclosure of new information concealed by the Exchange Act Defendants' misstatements and omissions on these dates. These price declines were a direct result of the materially false or misleading statements and omissions alleged herein. It was foreseeable that these disclosures would cause the price of Rivian Class A common stock to decline. Thus, the Exchange Act Defendants' wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by Plaintiffs and other Class members.

## VII. ADDITIONAL ALLEGATIONS OF THE EXCHANGE ACT DEFENDANTS' SCIENTER

156. In addition to the facts discussed in Section IV.G above, the following facts further support a strong inference that, throughout the Class Period, the Exchange Act

Defendants knowingly or with deliberate recklessness made false or misleading statements and omitted material information as alleged herein.

**A. The Exchange Act Defendants' Fraud Concerned a Core Rivian Operation: Production, Pricing, and Sale of the R1 Platform**

157. The production, pricing, and sale of Rivian's R1 Platform was a core Company operation at the time of the IPO. Described by Rivian as "our handshake with the world, the first step in building a relationship with customers," the importance of these flagship vehicles cannot be overstated. Indeed, throughout the Class Period, the R1 vehicles were Rivian's only commercialized consumer units. As stated in the Registration Statement, Rivian was "focused on ensuring this first experience with a Rivian vehicle creates excitement and passion for our brand."

158. At the time of the IPO, Rivian also projected its nearly $1 trillion consumer serviceable addressable market ("SAM"), meaning the market opportunity that Rivian believed it could address in the next three years, as solely comprised of its "R1 platform variants and associated lifetime revenue."

**B. The Exchange Act Defendants Publicly Acknowledged Their Focus on R1 Platform Pricing**

159. During the Class Period, the Exchange Act Defendants told the market that R1 vehicle pricing had been and continued to be a topic of regular focus and discussion. McDonough told investors during Rivian's December 16, 2021 earnings call that the Company "continue[d] to evaluat[e] the pricing for our vehicle," while Scaringe emphasized the frequency with which the Company discussed R1 pricing, stating "in terms of the competitive step, we recognized they're very aggressively priced. That is something that we certainly considered and talk about quite a bit as a management team."

160. The Registration Statement also made clear that the Executive Defendants were focused on the importance of pricing and price hikes. For example, one of the Registration Statement's "Risk Factors" stated that Rivian's "business, prospects, financial condition, results of operations, and cash flows [c]ould suffer" if current and prospective

customers did not perceive Rivian's vehicles as "cost competitive." In another Risk Factor in Rivian's Registration Statement (and its 3Q21 10-Q filed in December 2021), Rivian acknowledged the likely negative consequences of a price increase, stating: "Any attempts to increase the announced or expected prices of our vehicles in response to increased costs could be viewed negatively by our potential customers and could adversely affect our business, prospects, financial condition, results of operations, and cash flows."

### C. Information from Multiple FEs Supports a Strong Inference of the Exchange Act Defendants' Scienter

161. Statements from former Rivian employees demonstrate that the highest levels at the Company knew that the R1 Platform was underpriced, had access to forecasts projecting negative gross profit margins on the R1 units until 2025, and knew that Rivian planned to increase R1 prices after the IPO.

162. As set forth above, information from several FEs demonstrates that:

a. Profit margins were between -3% and breakeven for the R1 Platform in 2018, when pricing was first announced to the public.

b. Management consistently received forecasts between 2018 and the IPO showing a long-term trend of R1 gross profit margins growing increasingly negative.

c. Rivian's senior management regularly received and discussed the forecasts that projected negative gross margins from the R1 Platform being delayed from 2023 to 2025.

d. Management knew that a key aspect of reaching this inflection point was Rivian's ability to reduce the overall COGS through the implementation of a dual-motor option by 2023.

e. Scaringe, McDonough, and other members of senior management regularly attended Gate Review meetings wherein they would be debriefed on all areas of the Company, including the total cost of manufacturing the R1 vehicles.

f. Rivian executives knew prior to the IPO that the then-current pricing of the R1 vehicles had to be cut off and pricing had to be increased after the IPO.

**D. Schwab's Statements Support a Strong Inference of the Exchange Act Defendants' Scienter**

163. The Company's termination of Schwab shortly after she raised with senior Rivian executives, concerns about the price of Rivian's R1 vehicles and losses stemming from each R1 unit sold supports a strong inference of the Exchange Act Defendants' scienter.

164. In addition, Schwab stated that, prior to the IPO, she worked with Rivian's Finance Director, Dennis Lucey, to develop projections showing how much of a loss the Company would incur if Rivian did not raise prices on the R1 Platform, and that she raised that issue with numerous high-level executives, including Behl, Stuart Dixon, Rivian's Director of Product Management, and Andy Zicheck, Rivian's Principal Product Manager. Schwab also stated that she "voiced her concerns about the company making false commitments to customers and investors in multiple meetings with the company's senior leadership."

165. Accordingly, Senior Rivian executives, including the Exchange Act Defendants, were aware of Schwab's concerns regarding the pricing of the R1 at the time the Registration Statement was deemed effective (November 9, 2021) when they publicly disputed her claims on November 10, 2021. Indeed, Schwab's lawsuit and Statement of Claims were filed on November 4, 2021, which Scaringe publicly disputed on the day of the Company's IPO. However, at the time of the IPO—and unlike investors—the Exchange Act Defendants had access to the information necessary to confirm the accuracy Schwab's statements.

**E. The Exchange Act Defendants' Scienter Is Imputed to Rivian**

166. By virtue of their high-level positions as the most senior officers of the Company, participation in and awareness of Rivian's day-to-day operations, and control over the issuance of the false or misleading statements alleged above in Section V, the

knowledge or deliberate recklessness of the Exchange Act Defendants concerning their materially false or misleading statements and omission is imputed to Rivian. In addition, the knowledge or deliberate recklessness of other senior employees and managers concerning the pricing of the Company's R1 Platform is also imputed to Rivian. Accordingly, by the date of Rivian's IPO, Rivian knew about or deliberately recklessly disregarded the information alleged in Section IV.G, above.

## VIII. PRESUMPTION OF RELIANCE

167. At all relevant times, the market for Rivian's common stock was an efficient market for the following reasons, among others:

a. Rivian's common stock met the requirements for listing, and was listed and actively traded on the Nasdaq, a highly efficient and automated market;

b. As a regulated issuer, Rivian filed periodic public reports with the SEC and the Nasdaq;

c. Rivian regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d. Rivian was followed by several securities analysts employed by major brokerage firm(s) who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace.

168. As a result of the foregoing, the market for Rivian's Class A common stock promptly digested current information regarding Rivian from all publicly available sources and reflected such information in the price of Rivian's Class A common stock. Under these circumstances, all purchasers and acquirers of Rivian's Class A common stock during the Class Period suffered similar injury through their purchase or acquisition of Rivian's Class A common stock at artificially inflated prices and the presumption of reliance applies.

169. Further, at all relevant times, Plaintiffs and all other Class members reasonably relied upon the Exchange Act Defendants to disclose material information as required by law and in the Company's SEC filings. Plaintiffs and the other Class members would not have purchased or otherwise acquired Rivian common stock at artificially inflated prices if the Exchange Act Defendants had disclosed all material information as required. Thus, to the extent that the Exchange Act Defendants concealed or improperly failed to disclose material facts with regard to the Company and its business, Plaintiffs and other Class members are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972).

## IX. THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE

170. The Private Securities Litigation Reform Act's statutory safe harbor and the bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements alleged herein.

171. None of the statements complained of herein was a forward-looking statement. Rather, each was a historical statement or a statement of purportedly current facts and conditions at the time such statement was made.

172. To the extent that any of the materially false and misleading statements alleged herein can be construed as forward-looking, any such statement was not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statement.

173. To the extent that the statutory safe harbor does apply to any forward-looking statement alleged herein, the Exchange Act Defendants are liable for any such statement because at the time such statement was made, the particular speaker actually knew that the statement was false or misleading, and/or the statement was authorized and/or approved by an executive officer of Rivian who actually knew that such statement was false when made.

174. Moreover, to the extent that any Exchange Act Defendant issued any disclosures purportedly designed to "warn" or "caution" investors of certain "risks," those disclosures were also materially false and/or misleading when made because they did not disclose that the risks that were the subject of such warnings had already materialized and/or because such Defendant had the requisite state of mind.

## X. CAUSES OF ACTION UNDER THE EXCHANGE ACT

### COUNT I

### Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder Against the Exchange Act Defendants

175. Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

176. During the Class Period, the Exchange Act Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and the Class; and (ii) cause Plaintiffs and the Class to purchase or otherwise acquire Rivian's Class A common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, the Exchange Act Defendants took the actions set forth herein.

177. The Exchange Act Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers or acquirers of Rivian's Class A common stock in an effort to maintain artificially high market prices thereof in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5.

178. During the Class Period, the Exchange Act Defendants made the false statements specified above, which they knew or deliberately recklessly disregarded to be false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

179. The Exchange Act Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or deliberately recklessly disregarded the true facts that were available to them. The Exchange Act Defendants engaged in this misconduct to conceal Rivian's true condition from the investing public and to support the artificially inflated prices of Rivian's Class A common stock.

180. Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid for or otherwise acquired Rivian's Class A common stock at inflated prices. Plaintiffs and the Class would not have purchased or otherwise acquired Rivian's Class A common stock at such prices, or at all, had they been aware that the market prices for Rivian's Class A common stock had been artificially inflated by the Exchange Act Defendants' fraudulent course of conduct.

181. As a direct and proximate result of the Exchange Act Defendants' wrongful conduct, Plaintiffs and the Class suffered damages in connection with their respective purchases or acquisitions of Rivian's Class A common stock during the Class Period.

**COUNT II**

**Violation of Section 20(a) of the Exchange Act**

**Against the Executive Defendants**

182. Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

183. The Executive Defendants acted as controlling persons of Rivian within the meaning of Section 20(a) of the Exchange Act. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations, and/or intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Executive Defendants had the power to influence and control—and did influence and control, directly or indirectly—the decision-making of the Company, including the content and dissemination of the various false and/or misleading statements alleged herein. The Executive Defendants were provided with or had unlimited access to copies of the Company's reports and other statements alleged by Plaintiffs to be false and misleading prior to and/or shortly after these statements

were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

184. In particular, each Executive Defendant had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the activities giving rise to the securities violations as alleged herein, and exercised the same.

185. As described above, Rivian and the Executive Defendants each violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Executive Defendants are liable under Section 20(a) of the Exchange Act. As a direct and proximate result of this wrongful conduct, Plaintiffs and Class members suffered damages in connection with their purchases or acquisitions of Rivian's Class A common stock during the Class Period.

## XI. JURISDICTION AND VENUE FOR PLAINTIFFS' SECURITIES ACT CLAIMS

186. Plaintiffs' claims arise under Sections 11, 12, and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77*l*, and 77o.

187. This Court has jurisdiction over the subject matter of this action under Section 22 of the Securities Act, 15 U.S.C. § 77v, and 28 U.S.C. § 1331.

188. Venue is proper in this District under Section 22 of the Securities Act, 15 U.S.C. § 77v, and 28 U.S.C. § 1391(b) because Rivian is headquartered in this District, Rivian conducts business in this District, and many of the acts and conduct that constitute the violations of law complained of herein, including the dissemination to the public of materially false and misleading information, occurred in this District.

189. In connection with the acts, conduct, and other wrongs alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications, and the facilities of the national securities markets.

# XII. ADDITIONAL SECURITIES ACT DEFENDANTS

## A. Director Defendants

190. Defendant Karen Boone ("Boone") is, and during the Class Period was, a Rivian Director. Boone signed the false and misleading Registration Statement.

191. Defendant Jay Flatley ("Flatley") is, and during the Class Period was, a Rivian Director. Flatley signed the false and misleading Registration Statement.

192. Defendant Peter Krawiec ("Krawiec") is, and during the Class Period was, a Rivian Director. Krawiec signed the false and misleading Registration Statement.

193. Defendant Rose Marcario ("Marcario") is, and during the Class Period was, a Rivian Director. Marcario signed the false and misleading Registration Statement.

194. Defendant Sanford Schwartz ("Schwartz") is, and during the Class Period was, a Rivian Director. Schwartz signed the false and misleading Registration Statement.

195. Defendant Pamela Thomas-Graham ("Thomas-Graham") is, and during the Class Period was, a Rivian Director. Thomas-Graham signed the false and misleading Registration Statement.

196. Boone, Flatley, Krawiec, Marcario, Schwartz, and Thomas-Graham are collectively referred to as the "Director Defendants."

## B. Underwriter Defendants

197. Morgan Stanley & Co. LLC ("Morgan Stanley") served as a lead bookrunner for Rivian's IPO.

198. Goldman Sachs & Co. LLC ("Goldman Sachs") served as a lead bookrunner for Rivian's IPO.

199. J.P. Morgan Securities LLC ("J.P. Morgan") served as a lead bookrunner for Rivian's IPO.

200. Barclays Capital Inc. ("Barclays") served as a bookrunner for Rivian's IPO.

201. Deutsche Bank Securities Inc. ("Deutsche Bank") served as a bookrunner for Rivian's IPO.

202. Allen & Company LLC ("Allen & Company") served as a bookrunner for Rivian's IPO.

203. BofA Securities, Inc. ("BofA") served as a bookrunner for Rivian's IPO.

204. Mizuho Securities USA LLC ("Mizuho") served as a bookrunner for Rivian's IPO.

205. Wells Fargo Securities, LLC ("Wells Fargo") served as a bookrunner for Rivian's IPO.

206. Nomura Securities International, Inc. ("Nomura") served as a co-manager for Rivian's IPO.

207. Piper Sandler & Co. ("Piper Sandler") served as a co-manager for Rivian's IPO.

208. RBC Capital Markets, LLC ("RBC") served as a co-manager for Rivian's IPO.

209. Robert W. Baird & Co. Incorporated ("Robert W. Baird") served as a co-manager for Rivian's IPO.

210. Wedbush Securities Inc. ("Wedbush") served as a co-manager for Rivian's IPO.

211. Academy Securities, Inc. ("Academy") served as a co-manager for Rivian's IPO.

212. Blaylock Van, LLC ("Blaylock Van") served as a co-manager for Rivian's IPO.

213. Cabrera Capital Markets LLC ("Cabrera") served as a co-manager for Rivian's IPO.

214. C.L. King & Associates, Inc. ("C.L. King") served as a co-manager for Rivian's IPO.

215. Loop Capital Markets LLC ("Loop") served as a co-manager for Rivian's IPO.

216. Samuel A. Ramirez & Company, Inc. ("Samuel A. Ramirez") served as a co-manager for Rivian's IPO.

217. Siebert Williams Shank & Co., LLC ("Siebert Williams Shank") served as a co-manager for Rivian's IPO.

218. Tigress Financial Partners, LLC ("Tigress") served as a co-manager for Rivian's IPO.

219. Morgan Stanley, Goldman Sachs, J.P. Morgan, Barclays, Deutsche Bank, Allen & Company, BofA, Mizuho, Wells Fargo, Nomura, Piper Sandler, RBC, Robert W. Baird, Wedbush, Academy, Blaylock Van, Cabrera, C.L. King, Loop, Samuel A. Ramirez, Siebert Williams Shank, and Tigress are collectively referred to as the "Underwriter Defendants."

220. The Underwriter Defendants facilitated the offer and sale of Rivian Class A common stock to the investing public through the IPO. As the following table demonstrates, each of the Underwriter Defendants sold the following number of Class A common stock in the IPO:

| Name | Number of Shares |
|---|---|
| Morgan Stanley & Co. LLC | 38,898,305 |
| Goldman Sachs & Co. LLC | 38,898,305 |
| J.P. Morgan Securities LLC | 32,415,254 |
| Barclays Capital Inc. | 7,331,250 |
| Deutsche Bank Securities Inc. | 7,331,250 |
| Allen & Company LLC | 9,319,386 |
| BofA Securities, Inc. | 4,143,750 |
| Mizuho Securities USA LLC | 4,143,750 |
| Wells Fargo Securities, LLC | 4,143,750 |
| Nomura Securities International, Inc. | 1,275,000 |
| Piper Sandler & Co. | 1,275,000 |
| RBC Capital Markets, LLC | 1,275,000 |
| Robert W. Baird & Co. Incorporated | 637,500 |
| Wedbush Securities Inc. | 637,500 |
| Academy Securities, Inc. | 159,375 |

| Name | Number of Shares |
|---|---|
| Blaylock Van, LLC | 159,375 |
| Cabrera Capital Markets LLC | 159,375 |
| C.L. King & Associates, Inc. | 159,375 |
| Loop Capital Markets LLC | 159,375 |
| Samuel A. Ramirez & Company, Inc. | 159,375 |
| Siebert Williams Shank & Co., LLC | 159,375 |
| Tigress Financial Partners, LLC | 159,375 |
| Total: | 153,000,000 |

221. In addition, the Underwriter Defendants were granted, and exercised, the right to purchase an additional 22,950,000 shares of Rivian Class A common stock. This obligated each of the Underwriter Defendants, subject to certain conditions, to purchase roughly the same percentage of the additional shares of Class A common stock as the number listed next to the Underwriter Defendant's name in the preceding table bears to the total number of shares of Class A common stock listed next to the names of all Underwriter Defendants in the preceding table. For example, Morgan Stanley's and Goldman Sachs's 38,898,305 shares equated to roughly 25% of the total 153,000,000 shares of Class A common stock initially offered to the public, so each firm was obligated to purchase roughly 25% (approximately 5.8 million) of the additional 22,950,000 shares.

222. Together with the Exchange Act Defendants, the Director Defendants and the Underwriter Defendants are collectively referred to as the "Securities Act Defendants."

## XIII. SECURITIES ACT DEFENDANTS' VIOLATIONS OF THE SECURITIES ACT

223. In this part of the Complaint, Plaintiffs assert a series of strict-liability and negligence claims under Sections 11, 12(a)(2), and 15 of the Securities Act on behalf of all persons or entities who purchased or otherwise acquired Rivian Class A common stock in or traceable to the IPO and pursuant to the Registration Statement.

224. The Securities Act claims are asserted against Rivian, the Executive Defendants, the Director Defendants, and the Underwriter Defendants. Each of these defendants is statutorily liable under Section 11 of the Securities Act for the materially inaccurate statements contained in the Registration Statement (including the accompanying prospectus). Additionally, Section 12(a)(2) claims are asserted against the Underwriter Defendants, including Morgan Stanley, who sold shares in the IPO pursuant to the Registration Statement (including the accompanying prospectus), on behalf of Class members who purchased Class A common stock in the IPO. Plaintiffs also assert control person liability under Section 15 of the Securities Act against the Executive Defendants and the Director Defendants.

225. The Securities Act claims are based on the fact that the Registration Statement contained untrue statements of material fact and omitted material facts about the Company's business and operations, including misrepresentations and omissions regarding, among other things, the fact that Rivian's R1 Platform was significantly underpriced and that it cost the Company significantly more to purchase the parts to build R1 units, manufacture those units, and deliver them to customers than the purchase price charged to customers. Indeed, at the time of the IPO, Rivian internally projected that R1s would have negative 20% gross profit margins for 2021 and 2022, the Company did not expect to get to positive gross profit margins for R1 unit sales until 2025, and that R1 pricing would need to be increased after the IPO.

226. As described below, the Securities Act claims against the Securities Act Defendants are premised on the fact that R1 negative gross margins were not a short-term issue but had instead consistently deteriorated such that by the time of the IPO, profitability of R1 sales was pushed out to 2025, and was dependent on not only manufacturing efficiencies and new, significantly cheaper critical vehicle options, but also on price increases, which were delayed until after the IPO. These facts, among other undisclosed facts, rendered materially untrue and incomplete the statements contained in the Registration Statement.

227. The Securities Act claims against the Executive, Underwriter, and Director Defendants are also premised upon their negligent failure to conduct a reasonable due-diligence investigation into the accuracy and completeness of the representations contained in the Registration Statement. Had the Executive, Underwriter, and Director Defendants not acted negligently, and had they conducted reasonable due-diligence investigations before the IPO, they would have uncovered that the Registration Statement contained untrue statements of fact and omitted material facts.

228. Plaintiffs' Securities Act claims are not based on any knowing or deliberately reckless misconduct on the part of the Securities Act Defendants. Thus, for purposes of Counts III-V below, Plaintiffs' claims do not sound in fraud, and Plaintiffs expressly disclaim any allegations of fraud or intentional misconduct in connection with these non-fraud claims, which are pleaded separately in this Complaint from Plaintiffs' Exchange Act claims.

**A. Rivian's Blockbuster $13.7 Billion IPO**

229. On August 24, 2021, Rivian filed a confidential draft version of the registration statement and prospectus on Form DRS with the SEC. On October 1, 2021, Rivian filed a preliminary version of the registration statement and prospectus on Form S-1. Rivian subsequently filed several amendments to the registration statement and prospectus with the SEC on Forms S-1/A on October 22, 2021, November 1, 2021, and November 5, 2021. The Executive Defendants and the Director Defendants signed the Registration Statement. Rivian also generated a Form 424(B)(4) Prospectus dated November 9, 2021, which it subsequently filed with the SEC on November 12, 2021.

230. The SEC declared the Registration Statement effective on November 9, 2021. Together with the November 9, 2021 prospectus, the Registration Statement offered 153,000,000 shares of Rivian's Class A common stock at a price of $78.00 per share (collectively, the "Registration Statement"). Rivian also granted the Underwriter Defendants a period of 30 days to purchase up to an additional 22,950,000 shares of Class A common stock from Rivian at the IPO price, less underwriting discounts and

commissions. The Underwriter Defendants exercised this option to purchase all of the additional 22,950,000 shares of Rivian's Class A common stock.

231. The Securities Act Defendants explicitly told investors to rely only on the information in the Registration Statement, stating:

> You should rely only on the information contained in this prospectus or contained in any free writing prospectus filed with the Securities and Exchange Commission (the "SEC"). Neither we nor any of the underwriters have authorized anyone to provide any information or make any representations other than those contained in this prospectus or in any free writing prospectus we have prepared. Neither we nor the underwriters take responsibility for, and can provide assurance as to the reliability of, any other information that others may give you. This prospectus is an offer to sell only the shares of Class A common stock offered by this prospectus, but only under circumstances and in jurisdictions where it is lawful to do so. The information contained in this prospectus is accurate only as of the date of this prospectus, regardless of the time of delivery of this prospectus or of any sale of the Class A common stock. Our business, results of operations, financial condition, and prospects may have changed since such date.

232. On or about November 10, 2021, Rivian commenced its IPO, and its Class A common stock began trading on the Nasdaq the same day.

233. On or about November 15, 2021, the Company completed its IPO, in total offering of 175,950,000 shares of Class A common stock and generating gross proceeds of more than $13.7 billion before deducting underwriting discounts and commissions and estimated offering expenses payable by the Company.

234. The Underwriter Defendants reaped massive profits in connection with Rivian's IPO, which generated a total of more than ***$195 million in fees*** for the Underwriter Defendants.

### B. Unbeknownst to Investors, Rivian Had to Increase Prices and Significantly Alter Available Options for the R1 Platform in Order to Achieve Profitability

#### 1. Rivian's Projected Margins for the R1 Platform Consistently Declined from 2018 Until the IPO, Pushing R1 Profitability Ever-Farther into the Future

235. As noted above, Rivian set its R1 Platform pricing in 2018. At that time, according to FE-1, a senior-level finance employee at the Company from before 2018 until after the IPO, the Company structured its pricing such that gross profit margins, i.e., the difference between revenue plus the costs of selling and producing the vehicle, for the R1 Platform was forecasted to be somewhere around breakeven or negative 3% for the first few thousand vehicles. According to FE-1, as of 2018, Rivian forecasted that the "inflection point" for the R1 Platform, i.e., the point in time when the R1 unit economics would shift and the Company's gross margins would shift from loss to profit, would occur in 2023.

236. Instead of progressing towards the inflection point, however, Rivian's forecasted margins consistently declined from 2018 until after FE-1 left the Company following the IPO. FE-1 indicated that inflation and other events, including supply chain issues, and escalating component costs, all negatively impacted gross margins. According to FE-1, by the time of the IPO, FE-1 believed Rivian's internal forecasts projected its R1 models to have negative gross margins of approximately ***20%*** for 2021 and 2022—***over six times worse*** than the low end of its original projections. As its margins deteriorated, Rivian internally extended the "inflection point" for the R1 Platform further into the future. According to FE-1, by the time of the IPO, Rivian had pushed out the R1 inflection point to 2025—two years later than originally projected. FE-3, a business analytics and finance manager from summer 2021 until spring 2022, likewise recalled that by November 2021, Rivian had internally pushed its anticipated R1 inflection point out to 2025.

237. Rivian's original breakeven-to-negative gross margin forecasts for the R1, its long-term trend of margin deterioration following those original forecasts, and its push-out

of the R1 inflection point were reflected in financial forecasts that FE-1 was responsible for aggregating, and which were sent to Defendant McDonough, Rivian's CFO, on a roughly monthly basis. FE-1 also attended meetings with McDonough where these forecasts were discussed.

**2. The Bill of Materials on R1s Exceeded Customers' Purchase Prices**

238. At the time of the IPO, Rivian had to significantly reduce its overall COGS in order to achieve positive R1 margins by 2025. According to FE-1 and FE-3, COGS included Rivian's bill of materials (i.e., the cost of the roughly 3,000 components required to build the R1T and R1S), labor, certain factory-related manufacturing costs, and other related costs such as freight and warranty expenses.

239. Critically, the cost efficiencies associated with increased production would not be sufficient to make the R1 Platform profitable. As a result, at the time of the IPO, Rivian's ability to achieve positive margins in 2025 was highly contingent on its ability to reduce its COGS and also raise prices for its R1 Platform. This is because Rivian's bill of materials, which consistently increased over time, was a significant factor driving the negative gross profit margins for the R1s and the delays to the R1's inflection point.

240. FE-3 recalled that the bill of materials alone for R1 vehicles prior to and at the time of the IPO was around $90,000. FE-3 noted that while different R1 models would have had a slightly different total bill of materials cost, each R1 vehicle's cost of materials was approximately the same. FE-3 noted that even the least expensive R1 model had a bill of materials that exceeded a customer's purchase price at the time of the IPO.

241. FE-3 stated that at the time of the IPO, the Revenue and Margins Report, which McDonough and other high-level executives received, showed the roughly $90,000 R1 Platform bill of materials.

242. According to FE-3, Rivian's forecast for positive gross profit margins in 2025 was contingent upon several factors, a key one of which was rolling out a significantly cheaper dual-motor option for the R1s. FE-1 similarly recounted that FE-1 was aware of

discussions at the Company about using fewer motors in the future in an effort to increase gross profit margins.

243. FE-3 stated that the R1 production line would eventually gain efficiencies, thereby reducing the amount of labor and factory costs contributing to the per-vehicle cost and positively impact margins. FE-3 clarified, however, that because the bill of materials alone exceeded the customer sale price of the R1 Platform, Rivian would continue to have negative gross profit margins on the R1 even after those benefits were realized. FE-3 indicated that the bill of materials would exceed the customer sales price for the R1 models until Rivian could successfully source and implement a new—and significantly cheaper—dual motor, among other changes. FE-3 believed that Rivian anticipated implementing the dual motor in late-2023, and that the bill of materials was projected to no longer exceed a customer's purchase price thereafter. Even still, FE-3 said that this change would only lower the bill of materials. Total COGS would exceed the sale price to customers until some point in 2025.

### 3. Senior Executives Knew That Rivian's Costs Were Rising Through Their Participation in Regularly Scheduled "Gate Reviews"

244. Scaringe, McDonough, and Behl, as well as other high-level Rivian employees, including Nick Kalayjian, Chief Product Development Officer, Jacob Kohn, Vehicle Line Director, Rod Copes, the Company's former Chief Operating Officer, and Charly Mwangi, the Company's former Executive Vice President of Manufacturing and Engineering, attended "Gate Review" meetings which featured discussions about the elevating costs of goods sold. According to FE-2, the Gate Reviews occurred at varying cadences, anywhere from one to six months, when a certain milestone, or "gate," was reached prompting the internal review. FE-2 recalled that there were nine gates in total that Rivian had to clear internally in order to successfully launch its vehicles.

245. Through their attendance at the Gate Reviews, the senior executives received reporting that showed the costs increases of the R1 vehicles during the launch process. As

FE-2 explained, "[t]here was an accumulation of costs that were added since the prior [Gate] review." According to FE-2, as Rivian launched the vehicles and ramped up production, the Company "would identify more issues that needed to be addressed. The issues come at a cost. There were multiple cost adds, just based on the learning curve."

**4. In Order to Achieve Profitability, R1 Platform Pricing Needed to Be Revised as of the Time of the IPO**

246. Given their knowledge of the R1 Platform's consistently deteriorating margins and increasing bill of costs—and their awareness of internal Company forecasts indicating that the R1 would not become profitable until at least 2025—Rivian's senior management had determined prior to the IPO that Rivian needed to increase the R1 prices. For instance, FE-1 stated that, prior to the IPO, Rivian executives understood that R1 prices had to be increased and that the current pricing would need to be cut off. FE-1 further noted that the point at which Rivian would cut off current pricing shifted over time "depending on our read of when the executive team was going to have the stomach to take pricing up."

247. The Securities Act Defendants did not disclose the need for a price increase to investors in the IPO offering documents.

**C. As Information Incorrectly Stated in, and Omitted from, the Registration Statement Is Gradually Disclosed, the True Value of Rivian Class A Common Stock Is Revealed**

248. The Registration Statement contained untrue statements of material fact and omissions of material fact that rendered the statements made in the Registration Statement misleading, as well as material omissions in violation of the affirmative disclosure obligations applicable to the Registration Statement. As a result of these misstatements and omissions, the information disclosed in the Registration Statement did not accurately reflect the true state of affairs within the Company or the risks associated with investments in Rivian's Class A common stock, and therefore the initial offering price set for the IPO did not reflect the true value of Rivian's Class A common stock.

249. As the information misstated in or omitted from the Registration Statement was gradually disclosed to the market, the disclosure of this new information revealed the true value of Rivian's Class A common stock, causing the trading price of Rivian's Class A common stock to decline, thereby damaging Plaintiffs and the other members of the Class.

250. The following events, among others, revealed the relevant truth concealed by the misstatements and omissions in the Registration Statement:

a. On March 1, 2022, in an email to pre-order holders and through revised pricing available on its website, Rivian announced that it was introducing new battery and motor options and configurations for the R1T and R1S, and also implementing other price increases on the R1T and R1S, that applied to all current and future R1T and R1S reservations. The result was a dramatic price increase to the original R1T and R1S base configuration price by about 17% for the R1T (to approximately $79,000 from $67,500), and by about 20% for the R1S (to approximately $84,500 from $70,000), which the Company said were the result "of inflationary pressure on the cost of supplier components and raw materials across the world." In a statement to EV industry news site *Electrek*, Behl claimed that the price increases were due to "inflationary pressure, increasing component costs, and unprecedented supply chain shortages and delays for parts (including semiconductor chips)." The backlash was immediate and severe, with media outlets reporting that many Rivian customers indicated that they cancelled, or planned to cancel, their pre-orders as a result of the sizeable price hikes. On this news of the Company's substantial price increases on pre-orders, Rivian's stock price fell $14, or more than 20%, from a close of $67.56 per share on February 28, 2022, to close at $53.56 per share on March 2, 2022.

b. Between the close of trading on March 2 and March 10, the price of Rivian's Class A common stock continued to decline as the market digested the

potential impact of Rivian's attempted price hike and partial reversal. On March 3, 2022, in an email to customers and a letter published on *Business Wire*, both signed by Scaringe, the Company reversed its decision to hike prices on between 71,000 and 83,000 customers who ordered R1s before March 1, 2022. Analysts seized on the significant negative impact this decision would have on Rivian going forward, with one analyst explaining, for example, that: "The roll-back on pricing is costing it ~$850mm in revenue (assuming no cancelations) . . . ." Rivian's Class A common stock price continued its decline from the prior day, dropping from a close of $53.56 per share on March 2, to a close of $50.91 per share on March 3. Thereafter, Rivian's stock price continued to fall as analysts continued to mull over the potential impact of Rivian's attempted price hike and what to expect from the additional news slated to be released during the Company's forthcoming earnings call on March 10. For example, Wolfe Research wrote on March 9: "We believe RIVN required a $12-$14k price increase in order to achieve their prior financial targets. Without the price increases, we think Consensus (for 2022-2023) will need to be lowered by at least $0.8-$1.4 bn (~70k-100k reservation holders x $12-$14k implied cost headwind)." All told, from the close of trading on March 2, 2022, through the close of trading on March 10, 2022, the price of Rivian's Class A common stock fell from $53.56 to $41.16.

c. After the market closed on March 10, the Company disclosed disappointing projected adjusted EBITDA for FY2022 of ($4,750 million) and reported that Rivian would face negative gross margins throughout "[a]s we continue to ramp-up our manufacturing facility, manage supply chain challenges, face continued inflationary pressures, and minimize price increases to customers in the near term." The market sized on Rivian's recent price increase and subsequent walk-back as contributing to this negative EBITDA outlook. For example, Deutsche Bank noted "Rivian's soft 4Q results and weak 2022

outlook reflect largely predictable delays ramping up vehicle production amid challenges from its supply chain, but also steep cost pressures from input costs in the current inflationary environment, which it cannot offset with pricing following the backlash around its proposed price increase." J.P. Morgan noted in its coverage of the earnings release:

> The company reversed course for those who had placed deposits prior to March 1, which we estimate implies similarly lower gross profit margin for the first nearly 83,000 units delivered (which we now expect to occur during 1Q24). For future reservations, however, the material price hikes will still apply, and while this should offset currently foreseeable inflationary cost pressures (meaning dilution to gross profit margin but not dollars), it does imply also some demand destruction.

251. In response to this news, on March 11, 2022, Rivian's stock price fell almost 8%, from a close of $41.16 on March 10 to a close of $38.05 on March 11, and continued to fall further during the next trading day on high volume, closing on March 14 at $35.83—less than half of its $78 per share IPO price.

252. These events, among others, revealed to the market that the Registration Statement contained untrue statements of material fact and omitted to state material facts concerning, among other things, the fact that prior to the IPO, Rivian knew that its R1 Platform was underpriced such that each R1 unit sale to customers was projected to have negative gross margins for 2021 and 2022 of approximately negative 20%, which had consistently grown worse since R1 pricing was initially set in 2018, and that at the then-current cost to Rivian and purchase price to customers, the Company projected to have negative gross margins on R1 unit sales until at least 2025, and knew that the then-present R1 pricing would need to be cut off, and that the Company planned to increase prices after the IPO.

### D. The Registration Statement Contained Untrue Statements of Material Fact and Material Omissions in Violation of Section 11 of the Securities Act

253. In the "Prospectus Summary" section of the Registration Statement, Rivian stated:

> We generated negative gross profit for the three months ended September 30, 2021, as we began manufacturing the R1T. ***The negative gross profit relates primarily to significant labor and overhead costs for the Normal Factory, reflecting our factory's large-scale capabilities***; however, as we just started to ramp vehicle production at the site, the facility produced limited quantities of vehicles in the period. We also expect to record a lower of cost or net realizable value adjustment to write-down the value of certain inventory to the amount we anticipate receiving upon vehicle sale (after considering future costs necessary to ready the inventory for sale).

254. In the MD&A section of the Registration Statement, in a subsection titled "Our Business Model," Rivian stated:

> ***We expect to operate at a negative gross profit per vehicle for the near term as our fixed costs from investments in vehicle technology, manufacturing capacity, and charging infrastructure are spread across a smaller product base until we launch additional vehicles and ramp production***.

255. The statements in Paragraphs 253-54 above contained untrue statements of material fact and omitted to state material facts necessary to make the statements not misleading. Rivian's negative margins were not simply the result of large upfront investments in vehicle technology, manufacturing capacity, charging infrastructure, and labor and overhead costs for the Normal manufacturing plant, and would not turn positive as production volumes increased. Instead, Rivian's negative margins were due to the fact that Rivian's COGS for R1s was significantly higher than the purchase price charged to customers, and Rivian could not generate positive gross margins on the R1 simply by

scaling vehicle production or implementing significant COGS reductions in the short term. In addition, the R1 Platform's negative profit margins had consistently deteriorated in the years leading up to the IPO, causing Rivian to push out its forecast for profitability to 2025, and were the product of a long-term, systemic issue that could only be remedied by a price increase on both existing and future R1 pre-orders. Moreover, the statement in Paragraph 254 that Rivian "expect[ed] to operate at a negative gross profit per vehicle for the near term" was untrue because it lacked any basis in fact given internal Company forecasts indicating that the R1 would continue to generate negative gross profits until at least 2025.

**E. The Registration Statement Failed to Disclose Information Required to Be Disclosed Under SEC Regulation S-K**

**1. Item 105**

256. Pursuant to Item 3 of Form S-1, the Registration Statement was required to furnish the information required by Item 105 of Regulation S-K, which requires the registrant to disclose under the caption "Risk Factors," "a discussion of the material factors that make an investment in the registrant or offering speculative or risky" and "[c]oncisely explain how each risk affects the registrant or the securities being offered." 17 C.F.R. § 229.105. Nevertheless, the Registration Statement failed to disclose information regarding material risks pursuant to Item 105. The disclosures in the Registration Statement therefore failed to adequately alert investors to the actual risks associated with an investment in Rivian.

257. As set forth herein, the Registration Statement omitted material information required to be stated therein regarding the need for R1 purchase price increases, that R1 gross margins had consistently grown worse over several years since R1 pricing was initially set in 2018, that, at the time of the IPO, the R1 Platform's unprofitability was not a short-term issue but had steadily grown into a long-term issue, and that the timeline for positive gross margins on R1 unit sales had been pushed ever-farther into the future, going from 2023 to 2025.

258. As a result, the Securities Act Defendants had a duty to disclose the following adverse factors that made Rivian's IPO risky: (i) Rivian's COGS for R1s had consistently increased from 2018 to 2021, which in turn lead to increasingly negative R1 gross profit margins; (ii) that between 2018 and the IPO, Rivian's projected timeline for positive gross profit margins on R1 unit sales was consistently pushed farther into the future as margins declined, going from 2023 to 2025; (iii) Rivian's need to increase R1 pricing; and (vi) that absent price increases on current and future R1 pre-orders, Rivian would lose money on each pre-ordered R1 unit sold to customers for several years. Because the Registration Statement failed to make the requisite disclosures, the Securities Act Defendants violated Item 105.

**2. Item 303**

259. Pursuant to Item 303 and the SEC's related interpretive releases thereto, an issuer is required to identify (i) "any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way," and "[i]f a material deficiency is identified, indicate the course of action that the registrant has taken or proposes to take to remedy the deficiency;" and (ii) "any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing." 17 C.F.R. § 229.303(b)(1)(i), (b)(2)(ii). Such disclosures are required to be made by an issuing company in registration statements filed in connection with public stock offerings.

260. In May 1989, the SEC issued an interpretive release on Item 303 (the "1989 Interpretive Release"), stating, in pertinent part, as follows:

> Required disclosure is based on *currently known trends, events, and uncertainties that are reasonably expected to have material effects*, such as: A reduction in the registrant's product prices; erosion in the registrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract.

> . . . .
>
> A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.

261. Furthermore, the 1989 Interpretive Release provided the following test to determine if disclosure under Item 303(a) is required:

> Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:
>
> (1) Is the known trend, demand, commitment, event or uncertainty likely to come to fruition? If management determines that it is not reasonably likely to occur, no disclosure is required.
>
> (2) If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition. Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur.

262. On April 7, 2003, the SEC issued a final rule addressing registrants' disclosure obligations under Item 303 ("2003 Rule"), and modified it on May 7, 2003. It emphasizes that MD&A disclosures are "of paramount importance in increasing the transparency of a company's financial performance and providing investors with the disclosure necessary to evaluate a company and to make informed investment decisions." The 2003 Rule further states that the MD&A provides "a unique opportunity for management to provide investors with an understanding of its view of the financial performance and condition of the company, an appreciation of what the financial statements show ***and do not show***, as well as ***important trends and risks*** that have shaped the past ***or are reasonably likely to shape the future***."

263. The "Objective" of Item 303 is as follows:

> The objective of the discussion and analysis is to provide material information relevant to an assessment of the financial condition and results of operations of the registrant including an evaluation of the amounts and certainty of cash flows from operations and from outside sources. The discussion and analysis must focus specifically on material events and uncertainties known to management that are reasonably likely to cause reported financial information not to be necessarily indicative of future operating results or of future financial condition. This includes descriptions and amounts of matters that have had a material impact on reported operations, as well as matters that are reasonably likely based on management's assessment to have a material impact on future operations.

17 C.F.R. § 229.303(a).

264. The Registration Statement failed to disclose the following known trends, events, and uncertainties pursuant to Item 303, which existed at the time of the IPO: (i) Rivian's COGS for R1s had consistently increased from 2018 to 2021 which in turn lead to increasingly negative R1 gross profit margins; (ii) between 2018 and the IPO, Rivian's projected timeline for positive gross profit margins on R1 unit sales had been consistently pushed farther into the future as margins declined, going from 2023 to 2025; (iii) the need to increase R1 pricing; and (vi) absent price increases on current and future R1 pre-orders, Rivian would continue to lose money on each pre-ordered R1 unit sold to customers for several years.

265. Because the Registration Statement failed to make the requisite disclosures, the Securities Act Defendants failed to comply with Item 303.

## XIV. <u>THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE</u>

266. The Private Securities Litigation Reform Act's statutory safe harbor and the bespeaks caution doctrine applicable to forward-looking statements under certain

circumstances does not apply to any of the materially false and misleading statements alleged herein.

267. None of the statements complained of herein was a forward-looking statement. Rather, each was a historical statement or a statement of purportedly current facts and conditions at the time such statement was made.

268. To the extent that any of the materially false and misleading statements alleged herein can be construed as forward-looking, any such statement was not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statement.

269. To the extent that the statutory safe harbor does apply to any forward-looking statement alleged herein, the Securities Act Defendants are liable for any such statement because at the time such statement was made, the particular speaker actually knew that the statement was false or misleading, and/or the statement was authorized and/or approved by an executive officer of Rivian who actually knew that such statement was false when made.

270. Moreover, to the extent that any Securities Act Defendant issued any disclosures purportedly designed to "warn" or "caution" investors of certain "risks," those disclosures were also materially false and/or misleading when made because they did not disclose that the risks that were the subject of such warnings had already materialized and/or because such Defendant had the requisite state of mind.

## XV. CAUSES OF ACTION UNDER THE SECURITIES ACT

### COUNT III

### Violation of Section 11 of the Securities Act

### Against the Securities Act Defendants

271. Plaintiffs incorporate by reference the allegations in the paragraphs in Sections XI–XIV by reference. This claim is premised on the remedies available under Section 11 of the Securities Act and does not assert that the Director or Underwriter Defendants acted with fraudulent intent.

272. The Registration Statement contained untrue statements of material fact, omitted to state other facts necessary to make the statements made therein not misleading, and omitted facts required to be stated therein.

273. Each of the Executive and Director Defendants signed the Registration Statement and caused it to be declared effective by the SEC on or about November 9, 2021.

274. Rivian is the registrant for the IPO and as issuer of the Class A common stock sold in the IPO is strictly liable to Plaintiffs and the Class for the misstatements and omissions contained in the Registration Statement.

275. Each of the defendants named in this Count is responsible for and is liable for the contents and dissemination of the Registration Statement.

276. As a result of their roles with Rivian and their direct access to information contradicting the statements in the Registration Statement, the Executive Defendants reasonably should have known of the untrue and misleading statements of material fact contained in the Registration Statement.

277. The Director Defendants likewise had access to internal reports and information which, had they conducted reasonable due diligence, would have put them on notice of the untrue and misleading statements of material fact contained in the Registration Statement.

278. The Underwriter Defendants were obligated to conduct an adequate due diligence investigation, and their negligent failure to do so was a substantial factor leading to the harm complained of in this Count.

279. Together, the defendants named in this Count caused the Registration Statement to be filed with the SEC and to be declared effective, resulting in the issuance and sale of Rivian Class A common stock, which was purchased by Plaintiffs and other Class members.

280. None of the defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and did not omit any material facts required to be stated

in the Registration Statement or facts that were necessary to make the statements made in the Registration Statement not false or misleading. By reason of the conduct alleged in this Count, each Defendant named in this Count violated Section 11 of the Securities Act.

281. Plaintiffs acquired Rivian Class A common stock in or traceable to the IPO.

282. Plaintiffs and the Class have sustained damages as a result of the Securities Act violations alleged in this Count.

283. At the time of Plaintiffs' purchases or acquisitions of Rivian Class A common stock, Plaintiffs and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged in this Count and could not have reasonably discovered those facts.

284. Less than one year elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which the initial complaint filed in this action is based and the time that complaint was filed. Less than three years have elapsed between the time that the securities upon which this claim is brought were bona fide offered to the public and the time that the initial complaint and this Complaint were filed.

**COUNT IV**

**Violation of Section 12(a)(2) of the Securities Act**

**Against the Underwriter Defendants**

285. Plaintiffs incorporate by reference the allegations in the paragraphs in Sections XI–XIV by reference. This claim is premised on the remedies available under Section 12(a)(2) of the Securities Act and does not assert that the Underwriter Defendants, including Morgan Stanley, acted with fraudulent intent.

286. This claim is asserted by additional plaintiff Muhl against the Underwriter Defendants, including Morgan Stanley, on behalf of all persons who purchased from the Underwriter Defendants, including Morgan Stanley, Rivian Class A common stock issued in or traceable to the IPO.

287. By means of the Registration Statement (which, as defined herein included Rivian's Form 424(B)(4) Prospectus dated November 9, 2021, which it subsequently filed

with the SEC on November 12, 2021), the Underwriter Defendants, including Morgan Stanley offered, promoted, and sold Rivian Class A common stock in the IPO, and therefore are liable under Section 12(a)(2) of the Securities Act for the untrue statements of material fact and omissions of material fact in the Registration Statement.

288. The Underwriter Defendants, including Morgan Stanley, failed to conduct a reasonable investigation and did not possess a reasonable basis for the belief that the statements contained in the Registration Statement were true and without omissions of material fact.

289. By reason of the conduct alleged in this Count, the Underwriter Defendants, including Morgan Stanley, violated Section 12(a)(2) of the Securities Act.

290. Additional plaintiff Muhl and other Class members who purchased Rivian Class A common stock from the Underwriter Defendants, including Morgan Stanley, that were issued pursuant or traceable to the IPO or have sustained damages because the value of their Rivian Class A common stock has declined precipitously.

291. Additional plaintiff Muhl, individually and on behalf of the Class who purchased Rivian Class A common stock from the Underwriter Defendants, including Morgan Stanley, that were issued pursuant or traceable to the IPO, seeks the remedies available under Section 12(a)(2) of the Securities Act for the Underwriter Defendants' and Morgan Stanley's violations.

292. At the time of their purchases of Rivian Class A common stock in or traceable to the IPO from the Underwriter Defendants, including Morgan Stanley, additional plaintiff Muhl and the Class were without knowledge of the wrongful conduct alleged in this Count and could not have reasonably discovered those facts more than one year before the filing of the initial complaint in this action. The initial complaint was filed within three years of the time that the Underwriter Defendants, including Morgan Stanley, first sold Rivian Class A common stock to the investing public.

**COUNT V**

**Violation of Section 15 of the Securities Act**

**Against the Executive and Director Defendants**

293. Plaintiffs incorporate by reference the allegations in the paragraphs in Sections XI–XIV by reference. This claim is premised on the remedies available under Section 15 of the Securities Act and does not assert that the Executive or Director Defendants acted with fraudulent intent.

294. This Count is brought under Section 15 of the Securities Act against the Executive and Director Defendants.

295. Each of the Executive and Director Defendants was a control person of Rivian by virtue of his or her position as a director or senior officer of Rivian.

296. The Executive and Director Defendants oversaw all operations at Rivian and Rivian could not have completed the IPO without these defendants signing or authorizing their signatures on the Registration Statement.

297. Less than one year elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which the initial complaint filed in this action is based and the time that this Complaint was filed. Less than three years has elapsed between the time that the securities upon which this claim is brought were bona fide offered to the public and the time that the initial complaint and this Complaint were filed.

## XVI. CLASS ACTION ALLEGATIONS APPLICABLE TO ALL CLAIMS

298. Plaintiffs bring this action as a class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class consisting of all persons and entities who purchased Rivian Class A common stock between November 10, 2021, and March 10, 2022, both dates inclusive, including those who purchased Rivian Class A common stock pursuant and/or traceable to the Registration Statement (collectively, the "Class"). Excluded from the Class are Defendants and their families, the officers, directors and affiliates of Defendants, at all relevant times, members of their immediate families and their legal

representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

299. The members of the Class are so numerous that joinder of all members is impracticable. Rivian Class A common stock is actively traded on the Nasdaq. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of members in the proposed Class because over 892 million shares of Class A common stock were outstanding as of December 13, 2021. Record owners and other members of the Class may be identified from records maintained by Rivian or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

300. Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law as complained of herein.

301. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

302. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a. whether the Securities Act Defendants violated the Securities Act of 1933 Act, or the Exchange Act Defendants violated the Securities Exchange Act of 1934 Act and Rule 10b-5 promulgated thereunder;

b. whether the Registration Statement contained untrue statements of material fact or omitted material information required to be stated therein;

c. whether the Registration Statement omitted material facts necessary in order to make the statements made therein not misleading;

d. whether the Exchange Act Defendants made false or misleading statements of material fact during the Class Period;

e. whether the Exchange Act Defendants knew or recklessly disregarded that their statements were false and misleading during the Class Period;

f. whether the price of Rivian Class A common stock was artificially inflated;

g. whether the market for Rivian Class A common stock was efficient; and

h. the extent of damage sustained by Class members, and the appropriate measure of damages.

303. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XVII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

a. Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

b. Awarding compensatory damages and equitable relief in favor of Plaintiffs and other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c. Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d. Such other and further relief as the Court may deem just and proper.

## XVIII. JURY DEMAND

Plaintiffs hereby demand a trial by jury.

Dated: July 22, 2022

**KESSLER TOPAZ MELTZER & CHECK, LLP**

/s/ Jennifer L. Joost
JENNIFER L. JOOST (Bar No. 296164)
jjoost@ktmc.com One
Sansome Street, Suite 1850
San Francisco, CA 94104
Telephone: (415) 400-3000
Facsimile: (415) 400-3001

-and-

SHARAN NIRMUL (to be admitted *pro hac vice*)
snirmul@ktmc.com
RICHARD A. RUSSO (to be admitted *pro hac vice*)
rrusso@ktmc.com
EVAN R. HOEY (to be admitted *pro hac vice*)
ehoey@ktmc.com
ALEX B. HELLER (to be admitted *pro hac vice*)
aheller@ktmc.com
AUSTIN W. MANNING (to be admitted *pro hac vice*)
amanning@ktmc.com
280 King of Prussia Road
Radnor, PA 19807
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

*Counsel for Lead Plaintiff Sjunde AP-Fonden and additional Plaintiff James Stephen Muhl and Lead Counsel for the Proposed Class*

**LARSON LLP**
STEPHEN G. LARSON (Bar No. 145225)
slarson@larsonllp.com
PAUL A. RIGALI (Bar No. 262948)
prigali@larsonllp.com
555 South Flower Street, Suite 4400
Los Angeles, CA 90071
Telephone: (213) 436-4888
Facsimile: (213) 623-2000

*Liaison Counsel for Lead Plaintiff Sjunde AP-Fonden and additional Plaintiff James Stephen Muhl and Liaison Counsel for the Proposed Class*