UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES – GENERAL

Case No.  2:22-cv-01524-JLS-E                    Date: February 16, 2023
Title:  Charles Larry Crews, Jr. v. Rivian Automotive, Inc. et al

Present: **Honorable JOSEPHINE L. STATON, UNITED STATES DISTRICT JUDGE**

   V.R. Vallery                                             N/A
Deputy Clerk                                                    Court Reporter

Attorneys Present for Plaintiffs:              Attorneys Present for Defendants:

Not Present                                                    Not Present

**PROCEEDINGS:  (IN CHAMBERS)  ORDER GRANTING:  (1) RIVIAN
DEFENDANTS' MOTION TO DISMISS (Doc. 135); and (2)
UNDERWRITER DEFENDANTS' MOTION TO DISMISS
(Doc. 136)**

Before the Court are two motions to dismiss, one filed by the "Rivian Defendants"[1] and one filed by the "Underwriter Defendants."[2]  (Rivian Mot., Doc. 135; Underwriters Mot., Doc. 136).  Plaintiffs opposed both motions (Rivian Opp., Doc. 138; Underwriters Opp., 139), and both sets of Defendants replied.  (Rivian Reply, Doc. 141; Underwriters Reply, Doc. 140).  Having considered the parties' briefs, for the reasons set forth below, the Court GRANTS Defendants' Motions to Dismiss.

---

[1] The Rivian Defendants include Rivian Automotive, Inc. ("Rivian"), Robert J. Scaringe, Claire McDonough, Jeffrey R. Baker, Karen Boone, Sanford Schwartz, Rose Marcario, Peter Krawiec, Jay Flatley, and Pamela Thomas-Graham.

[2] The Underwriter Defendants include Morgan Stanley & Co. LLC, Goldman Sachs & Co., LLC, J.P. Morgan Securities LLC, Barclays Capital Inc., Deutsche Bank Securities Inc., Allen & Company LLC, BofA Securities, Inc., Mizuho Securities USA LLC, Wells Fargo Securities, LLC, Nomura Securities International, Inc., Piper Sandler & Co., RBC Capital Markets, LLC, Robert W. Baird & Co. Inc., Wedbush Securities Inc., Academy Securities, Inc., Blaylock Van, LLC, Cabrera Capital Markets LLC, C.L. King & Associates, Inc., Loop Capital Markets LLC, Samuel A. Ramirez & Co., Inc., Siebert Williams Shank & Co., LLC, and Tigress Financial Partners LLC.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:22-cv-01524-JLS-E                    Date: February 16, 2023
Title:  Charles Larry Crews, Jr. v. Rivian Automotive, Inc. et al

## I.    **BACKGROUND**[3]

This is a federal securities class action against the publicly traded company Rivian, several of its top executives, and underwriters for Rivian's initial public offering ("IPO").  (Consolidated Complaint ("CC") ¶¶ 21–33, 186–222, Doc. 125).  Lead Plaintiffs Sjunde AP-Fonden ("AP7") and Additional Plaintiff James Stephen Muhl (together, "Plaintiffs") purchased Rivian stock during or shortly after Rivian's IPO, between November 10, 2021, and March 10, 2022 (the "Class Period").

Plaintiffs allege that various Defendants violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act") and Rule 10b–5 promulgated by the Securities and Exchange Commission, and Sections 11, 12(a)(2) and 15 of the Securities Exchange Act of 1933 ("1933 Act") and Regulation S-K promulgated by the Securities and Exchange Commission.  (CC ¶¶ 175–85, 271–297.)  The 1934 Act claims allege that the Rivian Defendants made materially false and misleading statements in Rivian's IPO prospectus and in December 16, 2021 statements regarding Rivian's financial results for the third quarter of 2021 ("3Q21") and knowingly concealed internal company forecasts of deteriorating profit margins.  (Id. ¶¶ 126–35.)  The 1933 Act claims allege that: 1) Rivian's directors and executives violated Regulation S-K by failing to disclose in Rivian's Registration Statement a known trend of deteriorating profit margins; and 2) the Underwriter Defendants failed to conduct an adequate due diligence investigation.  (Id. ¶¶ 253–65.)

Rivian designs and manufactures electric vehicles ("EVs") and accessories and sells them directly to consumers and businesses.  (Id. ¶ 27.)  Defendant Scaringe founded

---

[3] For the purposes of a defendant's motion to dismiss under Rule 12(b)(6), the Court deems the well-pleaded allegations of a plaintiff's complaint to be true.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:22-cv-01524-JLS-E                          Date: February 16, 2023
Title:  Charles Larry Crews, Jr. v. Rivian Automotive, Inc. et al

Rivian in 2009 and began developing an all-electric pickup truck and an all-electric SUV after securing a major investor, a Saudi Arabian auto distribution company named Abdul Latif Jameel, in 2012.  (*Id.* ¶¶ 39–40.)  Rivian maintained a low profile until approximately January 2017, when it made headlines after purchasing a former Mitsubishi Motors manufacturing plant in Normal, Illinois.  (*Id.* ¶¶ 41–42.)

In December 2017, Rivian revealed to the public its plans to introduce its first EV— a five-passenger truck—in 2020, followed by a second vehicle—a seven-passenger SUV— in 2021.  (*Id.* ¶ 43.)  On November 26, 2018, as part of the Los Angeles Auto Show, Rivian unveiled the R1T—a two-row, five-passenger pickup truck—and the next day unveiled the R1S—a three-row, seven-passenger SUV.  (*Id.* ¶ 44.)  Rivian announced plans to begin delivering the R1T in late 2020, and the R1S in 2021.  (*Id.*)  After several delays, in September 2021, Rivian began delivering its customer vehicles.  (*Id.* ¶¶ 56–58.)

At first, Rivian set the pricing of the base model R1T at $69,000 and of the base model R1S at $72,500.  (*Id.* ¶ 45.)  The base model for each EV included a quad-motor—*i.e.*, a motor to power each wheel of the vehicle, and a "[l]arge," "mid-tier" battery pack with a range of roughly 300 miles.  (*Id.*)  Observers of the EV sector recognized that Rivian's pricing "might be something of a bargain" for consumers and were impressed with "the world-beating specs, coupled with a very reasonable price tag."  (*Id.* ¶¶ 47–48.)  After competitor Tesla introduced its own electric pickup truck in late 2019, Rivian decreased the base prices for the R1T and R1S to $67,500 and $70,000, respectively.  (*Id.* ¶¶ 53–54.)

Rivian raised $10.5 billion in private investments between February 2019 and July 23, 2021, including significant investments from Amazon.com. Inc., Ford Motor Company, T. Rowe Price Associates, Inc., BlackRock, Cox Automotive, Fidelity Management and Research Company, Soros Fund Management, and hedge funds Coatue

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:22-cv-01524-JLS-E                              Date: February 16, 2023
Title:  Charles Larry Crews, Jr. v. Rivian Automotive, Inc. et al

Management, Third Point LLC, and D1 Capital Partners.  (*Id.* ¶ 51.)  On August 27, 2021, Rivian announced that it intended to go public.  (*Id.* ¶ 61.)  On October 1, 2021, Rivian filed a preliminary Registration Statement and Prospectus for its IPO on Form S-1.  (*Id.* ¶ 62.)  Rivian later filed amendments to the registration statement and prospectus with the SEC on Forms S-1/A on October 22, 2021, November 1, 2021, and November 5, 2021.  (*Id.*)  Rivian also produced a Form 424(B)(4) Prospectus dated November 9, 2021, which it filed with the SEC on November 12, 2021.  (*Id.*)  The SEC declared the Registration Statement effective on November 9, 2021.  (*Id.* ¶ 63.)  The Registration Statement and Prospectus (together, the "Registration Statement") offered 153,000,000 shares of Rivian's Class A common stock at $78.00 per share.  (*Id.*)  Rivian also granted the Underwriter Defendants a 30-day period to purchase a maximum of an additional 22,950,000 shares of Class A common stock at the IPO price, minus underwriting discounts and commissions.  (*Id.*)

Rivian concluded its IPO on November 15, 2021.  (*Id.* ¶ 70.)  Through its IPO, Rivian raised gross proceeds of over $13.7 billion (before underwriting discounts and commissions, as well as estimated expenses) by selling 175,950,000 shares of its Class A common stock to the public at a price of $78.00 per share.  (*Id.*)  In the days following Rivian's IPO, Rivian's Class A common stock climbed and reached a high of nearly $180 per share on November 16, 2021.  (*Id.* ¶ 77.)

Plaintiffs allege that the Registration Statement included several misrepresentations about the pricing and profitability of Rivian's R1 Platform—the platform for its electric pickup truck.  (*Id.* ¶¶ 98–100.)  Plaintiffs' Consolidated Complaint identifies the following actionable statements in the Registration Statement:

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:22-cv-01524-JLS-E                           Date: February 16, 2023
Title:  Charles Larry Crews, Jr. v. Rivian Automotive, Inc. et al

Statement 1

We generated negative gross profit for the three months ended September 30, 2021, as we began manufacturing the R1T.  ***The negative gross profit relates primarily to significant labor and overhead costs for the Normal Factory, reflecting our factory's large-scale capabilities***; however, as we just started to ramp vehicle production at the site, the facility produced limited quantities of vehicles in the period.  We also expect to record a lower of cost or net realizable value adjustment to write-down the value of certain inventory to the amount we anticipate receiving upon vehicle sale (after considering future costs necessary to ready the inventory for sale).[4]

(*Id.* ¶¶ 98, 126.)

Statement 2

***We expect to operate at a negative gross profit per vehicle for the near term as our fixed costs from investments in vehicle technology, manufacturing capacity, and charging infrastructure are spread across a smaller product base until we launch additional vehicles and ramp production.***

(*Id.* ¶¶ 99, 127.)

According to Plaintiffs, these statements were materially false and misleading when they were made because Rivian senior executives knew prior to Rivian's IPO that (i) the cost of the R1's bill of materials exceeded its purchase price, so that the R1 would continue generating negative gross profit margins even after its production volumes

---

[4] The Court has numbered the alleged actionable statements and uses bold and italics to indicate the part of each statement that Plaintiffs allege is materially false and misleading.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:22-cv-01524-JLS-E                          Date: February 16, 2023
Title:  Charles Larry Crews, Jr. v. Rivian Automotive, Inc. et al

ramped up; (ii) Rivian had determined that it needed significant increases in R1 prices
and cheaper options before the IPO; and (iii) Rivian's internal forecasts showed that even
after raising prices and reducing costs, the R1 Platform would not be profitable until at
least 2025.  (*Id.* ¶¶  78–80, 83, 86–87, 90.)

Plaintiffs claim that Rivian knew before its IPO that addressing the negative
profitability of its R1 EVs demanded that it adopt one or both of the following options: 1)
increase prices for the R1 Platform; and 2) implement significantly cheaper options.  (*Id.*
¶¶ 82–83.)  Plaintiffs rely on three confidential, former employees ("FEs") to support this
allegation.  FE-1 was employed by Rivian "from before 2018 . . . until the end of 2021 as
a senior-level finance employee."  (*Id.* ¶ 36.)  FE-1 reported to former Rivian Chief
Financial Officer Ryan Green in the spring of 2021 and to Gerard Dwyer, Rivian's Vice
President of Business Finance, until FE-1's departure later that year.  (*Id.*)  At Rivian,
FE-1 "helped prepare monthly and quarterly profitability forecasts."  (*Id.*)  FE-2 worked
was a senior executive at Rivian who oversaw vehicle quality for several years prior to
the IPO until spring 2022.  (*Id.* ¶ 37.)  FE-2 answered to Rod Copes, former Chief
Operating Officer at Rivian, from early 2021 until September 2021, and thereafter began
reporting to Mike Smith, Rivian's Vice President of Quality.  (*Id.*)  FE-3 was a business
analytics and finance manager at Rivian from before the IPO until spring 2022.  (*Id.*
¶ 38.)  FE-3 reported to Dennis Lucey, Director of Commercial Finance.  (*Id.*)  Lucey led
Commercial Finance's vehicle sales and planning process for corporate inventory
planning, as well as reporting for sales and gross margin management.  (*Id.*)  Lucey
answered to Gerard Dwyer, who in turn reported to Claire McDonough, Rivian's Chief
Financial Officer after the IPO.  (*Id.*)  Plaintiffs allege that FE-3 attended meetings in fall
2021 in which a Revenue and Margins Report was presented to the Commercial Finance
team, including Lucey, and specifically recalls that Rivian forecasted negative gross
margins until 2025 for the R1 Platform at the time of the IPO.  (*Id.*)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:22-cv-01524-JLS-E                              Date: February 16, 2023
Title:  Charles Larry Crews, Jr. v. Rivian Automotive, Inc. et al

Plaintiffs also rely on statements by Laura Schwab, Rivian's Vice President of Sales and Marketing from November 30, 2020 until October 15, 2021.  (*Id.* ¶ 35.)  In a lawsuit against Rivian filed on November 4, 2021—that is, prior to the IPO—and in a Statement of Claims to the American Arbitration Association, Schwab alleged that she had "started to raise the alarm" about Rivian's ability to deliver on its promises, in part because Rivian's EVs were underpriced.  (*Id.* ¶¶ 34, 91.)  Schwab alleged that it was clear to Rivian by the spring of 2021 that the R1 EVs "were underpriced, and each sale would result in a loss [sic] the company."  (*Id.* ¶ 91.)  Schwab claimed that she had worked with Lucey "to develop projections of how much the Company would lose if it did not raise vehicle prices, and raised this issue with several executives, including Rivian's Chief Growth Officer, Jiten Behl."  (*Id.* ¶ 34.)  Schwab alleged that Behl "brushed her off."  (*Id.* ¶ 92.)

Schwab also published an online article on November 4, 2021, where she similarly claimed: "Time and time again, I raised concerns regarding vehicle pricing and manufacturing deadlines."  (*Id.* ¶ 93.)  In the article, Schwab claimed that after she raised that each R1 unit sold to consumers would generate losses for the Rivian with several high-level managers, Behl finally "agreed that [Rivian] would need to raise the vehicle prices after the IPO."  (*Id.* ¶ 94.)

FE-1 contends that from 2018 until after Rivian's IPO Rivian structured its pricing so that gross profit margins for the R1 Platform were forecasted to approximate breakeven or negative 3% for the first few thousand EVs produced.  (*Id.* ¶ 78.)  FE-1 also contends that as of 2018 Rivian forecasted that the point in time when the R1 Platform's economics would shift from loss to profit would occur in 2023.  (*Id.*)  But Rivian's forecasted margins consistently deteriorated from 2018 until FE-1 left Rivian after its IPO.  (*Id.* ¶ 79.)  FE-1 states that at the time of Rivian's IPO he understood Rivian's internal forecasts projected the R1 models to have negative gross margins of approximately 20% for 2021 and 2022.  (*Id.*)  FE-1 further contends that at the time of

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:22-cv-01524-JLS-E                          Date: February 16, 2023
Title:  Charles Larry Crews, Jr. v. Rivian Automotive, Inc. et al

the IPO Rivian projected that the R1 would not yield positive gross margins until 2025—two years later than the original projection from 2018.  (*Id.*)  FE-1 claims that the forecasted negative gross margins were reflected in financial forecasts that FE-1 aggregated and shared with McDonough on a monthly basis.  (*Id.* ¶ 80.)  FE-1 also claims to have attended meetings where McDonough discussed how to address the deteriorating profit margin forecasts.  (*Id.* ¶ 81.)  Last, FE-1 claims that Rivian executives understood prior to the IPO that R1 prices had to be increased, and that the timing of anticipated price increases shifted "depending on our read of when the executive team was going to have the stomach to take pricing up."  (*Id.* ¶ 95.)

FE-2 contends that Scaringe, McDonough, and other Rivian executives learned about the R1's rising bill of costs during periodic "Gate Reviews," meetings that occurred at varying intervals whenever Rivian reached a milestone warranting internal review.  (*Id.* ¶ 88.)  FE-2 claims that as Rivian launched the EVs and scaled up production, Rivian "would identify more issues that needed to be addressed.  The issues come at a cost. There were multiple cost adds, just based on the learning curve."  (*Id.* ¶ 89.)

FE-3 contends that the R1 Platform's bill of materials—the materials and components required to build the EV—prior to and at the time of Rivian's IPO was approximately $90,000.  (*Id.* ¶ 84.)  FE-3 claims that at the time of the IPO Rivian's Revenue and Margins Report, which high-level executives received, indicated the $90,000 bill of materials.  (*Id.* ¶ 85.)  FE-3 further contends that, because the bill of materials alone exceeded the customer sale price of the R1 Platform, Rivian would continue having negative gross profit margins on the R1 even after realizing efficiency gains and reducing labor and factory costs per unit.  (*Id.* ¶ 87.)  According to FE-3, the bill of materials would exceed the customer sales price for the R1 EVs until Rivian implemented a new and cheaper dual motor and made other changes to the R1.  (*Id.*)  FE-3 contends that Rivian did not anticipate implementing the dual motor until late 2023, and that the bill of materials would be lower than the customer purchase price after that change.  (*Id.*)  FE-3 maintains that the gross profit margins for the R1 would remain

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:22-cv-01524-JLS-E                           Date: February 16, 2023
Title:  Charles Larry Crews, Jr. v. Rivian Automotive, Inc. et al

negative in spite of the lower bill of materials—that Rivian projected that the total cost of goods sold ("COGS") for the R1 would exceed the sale price until some point in 2025. (*Id.*)

According to Plaintiffs, the FEs' and Schwab's statements indicate that Rivian misled investors by implying Rivian's profitability depended on efficiencies Rivian would gain from scaling up manufacturing even though it understood that in fact profitability required price increases—which would undercut Rivian's competitive edge in the EV marketplace.  (*Id.* ¶¶ 90–95.)  Plaintiffs further contend that Rivian had determined prior to the IPO that it would need to raise R1 prices to address rising bill of material costs but delayed the necessary price increases so that Rivian stock would trade at artificially inflated prices.  (*Id.* ¶¶ 94, 136–39.)

Plaintiffs contend that the Registration Statement should have disclosed that Rivian's negative profit margins were not simply driven by labor and overhead costs that would be reversed after production ramped up, but also because the R1's bill of materials had been rising since 2018 and exceeded R1 purchase prices.  (*Id.* ¶¶ 238–43, 245.)  They argue that the Registration Statement should have disclosed that ramped-up production alone could not possibly generate positive profit margins without price increases because Rivian's internal forecasts showed that the R1 would not be profitable until at least 2025 even with a combination of increased prices and reduced costs.  (*Id.*)

Plaintiffs also allege that Rivian executives further misled investors about the need to increase prices through additional misrepresentations when Rivian released its 3Q21 financial results.  (*Id.* ¶ 106.)  Plaintiffs' Consolidated Complaint identifies the following additional actionable statements in a Shareholder Letter, Rivian's 3Q21 Form 10-Q, and during an earnings conference call —all dated December 16, 2021:

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:22-cv-01524-JLS-E                    Date: February 16, 2023
Title:  Charles Larry Crews, Jr. v. Rivian Automotive, Inc. et al

Statement 3 (Shareholder Letter)

We generated negative gross profit of $(82) million for the third quarter of 2021, as we began manufacturing the R1T.  ***The negative gross profit relates primarily to significant labor and overhead costs for the large-scale Normal Factory***; however, given we just started to ramp vehicle production at the site, the facility produced limited quantities of vehicles in the period. ***In the near-term, we expect this dynamic—of vehicle production being significantly less than our manufacturing capacity—will continue to have a negative drag on gross profit as we ramp production of the R1T, R1S, and EDV at the same time***.

(*Id.* ¶ 129.)

Statement 4 (3Q21 Form 10-Q)

We generated negative gross profit of $(82) million for the three and nine month periods ended September 30, 2021.  ***This increase was driven by significant labor and overhead costs for the Normal Factory***, reflecting our factory's large-scale capabilities; however, as we recently started to ramp vehicle production at the site, the facility produced limited quantities of vehicles in these periods.  ***In the near-term, we expect this dynamic of vehicle production being significantly less than our manufacturing capacity will continue to have a negative impact on gross profit.***

(*Id.* ¶ 130.)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:22-cv-01524-JLS-E                        Date: February 16, 2023
Title:  Charles Larry Crews, Jr. v. Rivian Automotive, Inc. et al

Statement 5 (Earnings Call)

*In the near term, we expect that this dynamic of high fixed cost associated with operating and running our large scale, highly vertically integrated plan amortized over a small but growing number of vehicles produced across the R1 and RCV platform will continue to have a negative drag on gross profit.* As a result, in the third quarter we generated a negative gross profit of $82 million.

(*Id.* ¶ 131.)

Statement 6 (Earnings Call)

*And given the inflationary market backdrop, we also continue to evaluation [sic] the pricing for our vehicle [sic].*

(*Id.* ¶ 133.)

Statement 7 (Earnings Call)

[Question:]   Claire mentioned that you're looking at opportunities to accelerate your strategy.  Are there things that you can do to maybe accelerate the ramp that you originally envisioned for the TR1 platform, just given the response to the product or are you I think Claire alluded to, inflation and looking at pricing, are you looking at opportunities to adjust pricing just based on what the demand is for the product?

[Answer (Scaringe):] *Now with regards to pricing, it's certainly the backdrop of inflation that we're seeing and the very strong demand for*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:22-cv-01524-JLS-E                                    Date: February 16, 2023
Title:  Charles Larry Crews, Jr. v. Rivian Automotive, Inc. et al

> ***products not just looking our product (inaudible) broadly within the
> electrified space has caused us to look at our pricing and really I'd say
> recognizing the set of product features that we've been able to put together
> into the vehicles.***  And the vehicles are incredibly—you had a chance to drive
> them, they're incredibly fun to drive, very capable, over 800-horsepower, 0
> to 60, three seconds, great on-road, great off-road but also a great everyday
> vehicle.  ***So in terms of the competitive step, we recognized they're very
> aggressively priced.***  That is something that we considered and talk about
> quite a bit as a management team.

(*Id.* ¶ 134.)

According to Plaintiffs, these December 16, 2021 statements were materially false
and misleading because, like the Statements 1 and 2, they created a false impression that
that Rivian's profitability depended on achieving efficiencies from ramping up
production even though Rivian's executives knew that price increases were necessary.
(*Id.* ¶ 135.)  Specifically, Plaintiffs aver that at this point Rivian's executives knew and
failed to disclose

> that the R1 Platform's negative profit margins had consistently deteriorated
> in the years leading up to the IPO, causing Rivian to push out its forecast for
> profitability to 2025, and were the product of a long-term, systemic issue that
> could only be remedied by a price increase on both existing and future R1
> pre-orders, and that Rivian had been discussing increasing R1 purchase
> prices prior to the IPO, and had acknowledged that the then-present R1
> pricing needed to be adjusted and increased after the IPO.

(*Id.*)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:22-cv-01524-JLS-E                        Date: February 16, 2023
Title:  Charles Larry Crews, Jr. v. Rivian Automotive, Inc. et al

On March 1, 2022, Rivian announced price increases of approximately 17% for the R1T—from roughly $67,500 to roughly $79,500—and 20% for the R1S—from roughly $70,000 to roughly $84,500.  (*Id.* ¶¶ 110–11.)  Additionally, the formerly standard "large" battery pack and quad motor option would cost purchasers an extra $6,000.  (*Id.* ¶ 111.)  Rivian claimed that the price increases resulted from "inflationary pressure on the cost of supplier components and raw materials across the world."  (*Id.*)  The new elevated prices would apply not only to all future orders, but also to nearly all extant pre-orders, excluding only purchasers already in the final stages of completing their transaction.  (*Id.* ¶ 112.)  According to Plaintiffs, these price increases revealed what Rivian and its executives had known since before Rivian's IPO: that Rivian's original pricing was unsustainable and price increases were needed to address increasing supplier components and raw materials costs.  (*Id.* ¶¶ 111, 118.)

Following the disclosure of the price increases, Rivian's Class A common stock price fell $14—over 20%—from $67.56 per share on February 28, 2022, to close at $53.56 per share on March 2, 2022.  (*Id.* ¶ 142.)  Market analysts singled out the price increases as causing the decline in the price of Rivian's stock.  (*Id.* ¶¶ 143–45.)

On March 3, 2022, after facing backlash from customers who had already ordered R! EVs, Rivian reversed its decision to raise prices for pre-order holders who had placed their orders prior to March 1, 2022.  (*Id.* ¶ 146.)  Rivian shares fell further after this development, from $53.56 at the close of March 2, 2022, to $41.16 at the close of March 10, 2022.  (*Id.* ¶¶ 147–48.)

After trading closed on March 10, 2022, Rivian disclosed that its projected adjusted EBITDA for fiscal year 2022 was negative $4,750 million and reported that it would face negative gross margins "[a]s we continue to ramp-up our manufacturing facility, manage supply chain challenges, face continued inflationary pressures, and minimize price increases to customers in the near term."  (*Id.* ¶ 149.)  Rivian shares

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:22-cv-01524-JLS-E                               Date: February 16, 2023
Title:  Charles Larry Crews, Jr. v. Rivian Automotive, Inc. et al

continued slipping: they slid from a close of $41.16 on March 10, 2022 to a close of $35.83 on March 14, 2022—less than half of the $78 IPO price.  (*Id.* ¶ 150.)  Market analysts attributed the decline to backlash around Rivian's proposed price increases and anticipated diminution of demand for R1 EVs.  (*Id.* ¶¶ 151–52.)

According to Plaintiffs, Rivian's disclosures from March 1, 2022 to March 10, 2022 partially corrected or reflected the materializing of risks that Rivian and its executives concealed or misrepresented in the alleged actionable statements.  (*Id.* ¶¶ 153–54.)

## II.    <u>**JUDICIAL NOTICE**</u>

The Rivian Defendants ask the Court to take judicial notice of Exhibits 1–14, which are attached to the Declaration of Elise Lopez in Support of Rivian Defendants' Motion to Dismiss Plaintiffs' Consolidated Complaint.  (Lopez Decl., Doc. 135-1.)  In reviewing a motion to dismiss, a district court is typically limited to the facts stated in the complaint.  *See Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 925 (9th Cir. 2001).  "A court may, however, consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).  Thus, the doctrines of incorporation by reference and judicial notice "allow a court to consider material outside the complaint without turning a Rule 12(b)(6) motion to dismiss into a Rule 56 motion for summary judgment[.]"  *Hsu v. Puma Biotechnology, Inc.*, 213 F. Supp. 3d 1275, 1279–80 (C.D. Cal. 2016) (citing *Ritchie*, 342 F.3d at 908).

Incorporation by reference "is a judicially created doctrine that treats certain documents as though they are part of the complaint itself."  *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018).  A document may be incorporated

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:22-cv-01524-JLS-E                           Date: February 16, 2023
Title:  Charles Larry Crews, Jr. v. Rivian Automotive, Inc. et al

by reference into a complaint "if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim." *Ritchie*, 342 F.3d at 908.  "Once a document is deemed incorporated by reference, the entire document is assumed to be true for purposes of a motion to dismiss, and both parties—and the Court—are free to refer to any of its contents." *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1058 n.10 (9th Cir. 2014) (cleaned).  Incorporation by reference "prevents plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims." *Khoja*, 899 F.3d at 1002 (cleaned up).

Judicial notice, by contrast, is established by Federal Rule of Evidence 201, which allows courts to take judicial notice of facts that are "not subject to reasonable dispute" because they (1) are "generally known within the trial court's territorial jurisdiction," or (2) "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).  "A court may take judicial notice of 'matters of public record.'" *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2016) (cleaned up).  Documents on file in federal or state courts are considered undisputed matters of public record. *Harris v. Cnty. of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012) (cleaned up).  Federal courts regularly take judicial notice of press releases, news articles, and SEC filings in securities complaints. *See, e.g.*, *Wietschner v. Monterey Pasta Co.*, 294 F. Supp. 2d 1102, 1108–9 (N.D. Cal. 2003) (judicially noticing SEC filings and press releases); *Brodsky v. Yahoo! Inc.*, 630 F. Supp. 2d 1104, 1111 (N.D. Cal. 2009) (judicially noticing press releases and news articles).

Here, the Rivian Defendants ask the Court to take judicial notice of 24 documents, all of which are attached as exhibits to the Declaration of Elise Lopez ("Lopez Decl."). (*See* Rivian Defendants' Request for Judicial Notice in Support of their Motion to Dismiss Plaintiffs' Consolidated Complaint ("RJN"), Doc. 135-26.)  Plaintiffs oppose the Rivian Defendants' request in full.  (Plaintiffs' Opposition to RJN at 4, Doc. 138-1.)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:22-cv-01524-JLS-E                                Date: February 16, 2023
Title:  Charles Larry Crews, Jr. v. Rivian Automotive, Inc. et al

   In ruling on Defendants' Motions, the Court considers only documents incorporated by reference in Plaintiffs' Consolidated Complaint.  The Court finds that the following documents are incorporated by reference in Plaintiffs' Consolidated Complaint:

- Lopez Decl. Ex. 4:  Rivian's Rule 424(b)(4) (Final Prospectus), publicly filed with the SEC on November 12, 2021. ("Prospectus," Doc. 135-5.)

- Lopez Decl. Ex. 7:  Rivian's Q3-21 Shareholder Letter, publicly filed with the SEC on December 16, 2021.  ("Shareholder Letter," Doc. 135-8.)

- Lopez Decl. Ex. 21:  Rivian's 3Q21 Earnings Call Transcript, dated December 17, 2021.  ("Earnings Call Tr.," Doc. 135-22.)

- Lopez Decl. Ex. 22:  Rivian's Form 10-Q for the quarter ending September 30, 2021, publicly filed with the SEC on December 17, 2021. ("3Q21 Form 10-Q," Doc. 135-23.)

Plaintiffs' opposition to judicial notice of these documents—which contain those statements Plaintiffs allege are actionable under federal securities law—is meritless. "[W]hile the complaint does not specifically incorporate these documents by reference, they constitute the subject matter of the claim: [Rivian's] public statements." *Wochos v. Tesla, Inc.*, 2018 WL 4076437, at *2 (N.D. Cal. Aug. 27, 2018).  As the Ninth Circuit has explained, incorporation by reference applies to such documents, so that plaintiffs may not cherry-pick portions of documents that support their claims while ignoring other portions of the same documents that undermine their claims.  *Khoja*, 899 F.3d at 1002 (cleaned up).  Accordingly, the Court may consider these documents when evaluating motions to dismiss to determine what representations Rivian made to the market. *Wochos*, 2018 WL 4076437, at *2.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:22-cv-01524-JLS-E                    Date: February 16, 2023
Title:  Charles Larry Crews, Jr. v. Rivian Automotive, Inc. et al

As to the other documents the Rivian Defendants ask the Court to consider, the Court denies the request.  Not only is consideration of those documents unnecessary for the Court to decide the Motions, but judicial notice of the content of most of the documents not referenced in the Consolidated Complaint would be inappropriate at any rate.

### III.   LEGAL STANDARD

#### A.  12(b)(6) Generally

In deciding a motion to dismiss under Rule 12(b)(6), courts must accept as true all "well-pleaded factual allegations" in a complaint.  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  However, "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).  The complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).

#### B.  Pleading Fraud Under Rule 9(b)

Claims sounding in fraud must also pass muster under Rule 9(b) of the Federal Rules of Civil Procedure, which requires that allegations of fraud be made "with particularity."  *See* Fed. R. Civ. P. 9(b).  To satisfy Rule 9(b)'s higher pleading standard, plaintiffs bringing claims sounding in fraud must sufficiently allege "'the who, what, when, where, and how' of the misconduct charged[.]"  *Brenner v. Procter & Gamble Co.*, 2016 WL 8192946, at *5 n.5 (C.D. Cal. Oct. 20, 2016) (Staton, J.) (citing *Vess v. Ciba-Geigy Corp. USA,* 317 F.3d 1097, 1106 (9th Cir. 2003)).

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:22-cv-01524-JLS-E                               Date: February 16, 2023
Title:  Charles Larry Crews, Jr. v. Rivian Automotive, Inc. et al

### C.  Pleading Requirements Under the PSLRA

The PSLRA mandates that "securities fraud complaints 'specify' each misleading statement; that they set forth the facts 'on which [a] belief' that a statement is misleading was 'formed'; and that they 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'"  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) (alterations in original) (quoting 15 U.S.C. §§ 78u–4(b)(1)– (2)); *see also Metzler Inv. GmbH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008) ("The PSLRA has exacting requirements for pleading 'falsity.'").  Plaintiffs also bear the burden of proving that the defendant's misrepresentations "'caused the loss for which the plaintiff seeks to recover.'"  *Dura Pharms.*, 544 U.S. at 345–46 (quoting § 78u-4(b)(4)).

There is "an inevitable tension . . . between the customary latitude granted the plaintiff on a motion to dismiss under Fed. R. Civ. P. 12(b)(6), and the heightened pleading standard set forth under the PSLRA."  *Gompper v. VISX, Inc.*, 298 F.3d 893, 896 (9th Cir. 2002).  As with any Rule 12(b)(6) motion, the Court will "accept all factual allegations in the complaint as true."  *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007).  The Court will also "consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  *Id.*  In the context of the PSLRA, this examination involves the "dual inquiry" of, first, "whether any of the plaintiff's allegations, standing alone, are sufficient to create a strong inference of scienter," and second, a "'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness."  *Zucco Partners, LLC v. Digimarc, Corp.*, 552 F.3d 981, 992 (9th Cir. 2009).  The Ninth Circuit has further clarified that a court may continue to engage in this two-step analysis as long as it "does not unduly focus on the weakness of individual

---

CIVIL MINUTES – GENERAL                                                          18

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:22-cv-01524-JLS-E                                Date: February 16, 2023
Title:  Charles Larry Crews, Jr. v. Rivian Automotive, Inc. et al

allegations to the exclusion of the whole picture"; alternatively, it may conduct only a holistic review, mindful that it does not "simply ignore the individual allegations and the inferences drawn from them." *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 703 (9th Cir. 2012).

## IV.   DISCUSSION

### A. Section 10(b) and Rule 10b–5 Claims

To show securities fraud under Section 10(b) and Rule 10b–5 of the Securities Exchange Act, plaintiffs must allege facts sufficient to establish (1) a material misrepresentation or omission; (2) made with scienter, i.e., a wrongful state of mind; (3) a connection between the misrepresentation and the purchase or sale of a security; (4) reliance upon the misrepresentation; (5) economic loss; and (6) loss causation.  *Loos v. Immersion Corp.*, 762 F.3d 880 (9th Cir. 2014), *amended* (Sept. 11, 2014).

Here, the elements at issue are falsity and scienter.  (Rivian Mot. at 6–18; Rivian Opp. at 9–15.)  The Court first addresses whether the Consolidated Complaint adequately pleads falsity and, finding the claims lacking in that regard, does not reach the issue of scienter.

### Falsity

To survive the higher pleading standards required by the PSLRA, the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which the belief is formed." 15 U.S.C. § 78u–4(b)(1)(B).  A plaintiff may rely on contemporaneous statements or conditions to demonstrate why statements were false

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:22-cv-01524-JLS-E                          Date: February 16, 2023
Title:  Charles Larry Crews, Jr. v. Rivian Automotive, Inc. et al

when made, but such circumstantial evidence must be pleaded with particularity.  *In re Stratosphere Corp. Sec. Litig.*, 1997 WL 581032, at *13 (D. Nev. May 20, 1997).  Thus, to be actionable, a statement must be "known to be false or misleading at [the time made] by the people who made them."  *Ronconi v. Larkin*, 253 F.3d 423, 430 (9th Cir. 2001).

Further, for a misstatement to be actionable, the statement must be both false and material.  *See Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988) ("It is not enough that a statement is false or incomplete, if the misrepresented fact is otherwise insignificant.").  Statements are misleading only if they "affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists."  *Brody v. Transitional Hosp. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002).  Rule 10b–5 prohibits "*only* misleading and untrue statements, not statements that are incomplete."  *Id.*  Silence, absent a duty to disclose, "is not misleading under Rule 10b–5."  *Basic*, 485 U.S. at 239 n.17.  "Often a statement will not mislead even if it is incomplete or does not include all relevant facts."  *Brody*, 280 F.3d at 1006.

**Statement 1** pertains to Rivian's negative gross profit for the three months ending on September 30, 2021.  (CC ¶¶ 98, 126.)  Rivian stated in its Registration Statement that the primary causes of its negative gross profit during those months were "significant labor and overhead costs" for its Illinois factory, with the qualification that Rivian had "just started to ramp vehicle production at the site, [and] the facility produced limited quantities of vehicles in the period."  (*Id.*)

Plaintiffs argue that Statement 1 is actionable because it "created the false impression that Rivian's negative gross margins on the R1 Platform were caused by its low production volume and that the R1 Platform would become profitable when production volume increased at a time when Defendants knew that ramped production would not lead to profitability absent cost cuts and a material price increase."  (Rivian Opp. at 10, citing CC ¶¶ 82–87, 128, 132.)  Plaintiffs contend that Defendants understood

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:22-cv-01524-JLS-E                              Date: February 16, 2023
Title:  Charles Larry Crews, Jr. v. Rivian Automotive, Inc. et al

that, because the R1's bill of materials' cost exceeded its purchase prices, negative gross profits would persist "even if production volumes were higher and its fixed costs were spread across a larger product base."  (Rivian Opp. at 10–11.)  In particular, the final sentence in Statement 1 was inconsistent with this understanding because it "falsely suggested that Rivian's negative gross profits would dissipate as production volumes increased."  (Rivian Opp. at 11.)

The Rivian Defendants counter that Statement 1 was accurate because it pertains specifically to Rivian's first quarter manufacturing EVs and Rivian produced only 12 EVs during that period—so the cost of producing EVs was immaterial.  (Rivian Mot. at 6, citing Prospectus at 38.)  That same quarter, Rivian spent $450 million on "property, plant, and equipment" and lost $745 million from operations costs.  (Rivian Mot. at 6, citing Prospectus at 46.)  Accordingly, it is true that during the quarter ending on September 30, 2021 labor and overhead costs dwarfed the costs of producing R1 EVs. The Rivian Defendants also note that Statement 1 is consistent with FE-1's and FE-3's statements supporting the proposition that Rivian understood that achieving positive R1 margins by 2025 demanded significant reductions in its overall cost of goods sold ("COGS").  (Rivian Mot. at 7, citing CC ¶¶ 128, 82.)  COGS includes overhead and labor costs—not only the bill of materials.

Plaintiffs' theory of falsity here is implausible.  There is no dispute that Statement 1 addresses negative gross margins for Rivian's first quarter producing R1 units.  Further, the concluding sentence does not suggest, as Plaintiffs claim, that "Rivian's negative gross profits would dissipate as production volumes increased."  Statement 1 makes no promises, explicit or implied, that negative gross margins would be solved by ramping up production volumes.  And it is established that an alleged misstatement must be read "in light of its surrounding text, including hedges, disclaimers, and apparently conflicting information."  *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 190 (2015); *see also In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1405 n.4

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:22-cv-01524-JLS-E                                        Date: February 16, 2023
Title:  Charles Larry Crews, Jr. v. Rivian Automotive, Inc. et al

(9th Cir. 1996) (noting that the court evaluating falsity should "consider[] the full text of the Prospectus, including portions which were not mentioned in the complaints").  Here, Rivian's Prospectus noted that Rivian "ha[d] not generated material revenue to date[,]" because "[v]ehicle production and deliveries [only] began in September 2021." (Prospectus at 127.)  It also stated: "We do not expect to be profitable for the foreseeable future as we invest in our business, build capacity and ramp up operations, and we cannot assure you that we will ever achieve or be able to maintain profitability in the future." (*Id.* at 57.)  The Prospectus also included extensive analysis of various risks to profitability, including increases in freight charges and raw material costs.  (*Id.* at 61–62.) Read reasonably and in context, Statement 1 does not create a false impression that Rivian could become profitable by simply ramping up R1 production volumes.

     **Statement 2** pertains to Rivian's expectation that it would continue "to operate at a negative gross profit per vehicle for the near term as our fixed costs from investments in vehicle technology, manufacturing capacity, and charging infrastructure are spread across a smaller product base until we launch additional vehicles and ramp production." (CC ¶¶ 99, 127.)

     Plaintiffs argue that Statement 2 also created a false impression that that Rivian's negative gross margins were the result of low production volume and that the R1 would become profitable once production volume ramped up.  In particular, the use of the phrase "near term" in Statement 2 contradicted Rivian's understanding of the challenges to profitability and its internal forecasts showing that R1 sales would not be profitable until at least 2025 and only after price increases and significant cost cuts.  (Rivian Opp. at 11.)  According to Plaintiffs, Statement 2 misled investors by describing a long-term profitability problem as a near-term issue and mischaracterizing Rivian's profitability challenges.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:22-cv-01524-JLS-E                               Date: February 16, 2023
Title:  Charles Larry Crews, Jr. v. Rivian Automotive, Inc. et al

The Rivian Defendants counter that Statement 2 was accurate for similar reasons as Statement 1: none of Plaintiffs' allegations related to production costs and internal projections impact the statement's veracity given the minimal number of vehicles produced at the time, and the Prospectus explicitly stated that Rivian might never achieve profitability.  (Rivian Mot. at 6–7; Rivian Reply at 2–3.)

Plaintiffs' theory of falsity is implausible here as well.  First, the Court notes again that the Prospectus clearly indicated that Rivian did not expect to be profitable for the foreseeable future and warned that Rivian might never achieve positive margins.  Further, the phrase "near term" is not inconsistent with Plaintiffs' allegations that Rivian internally projected negative margins until at least 2025.  "Near term" is a vague and capacious enough concept to reasonably encompass approximately three years in the future.  Given the lack of any objective standard of what constitutes the "near term," the phrase does not render Statement 2 misleading to a reasonable reader.  Last, Statement 2 does not create a false impression that Rivian could become profitable by simply ramping up R1 production volumes because it explicitly identifies *both* launching additional vehicles *and* ramping up production as key to overcoming negative margins.  That is consistent with FE-3's contentions that the bill of materials would exceed the customer sales price for the R1 EVs until Rivian implemented a new and cheaper dual motor.  (CC ¶ 87.)  Read reasonably and in context, Statement 2 does not present a false picture of Rivian's profitability prospects and the causes behind negative margins.

**Statements 3, 4, and 5** also pertain to Rivian's negative gross profits during the quarter ending on September 30, 2021 and similarly ascribe increasing negative margins to "significant labor and overhead costs" from the Illinois factory.  (CC ¶¶ 129–31.) Statements 3, 4, and 5 also project that the "near-term . . . dynamic of vehicle production being significantly less than our manufacturing capacity will continue to have a negative impact on gross profit."  (*Id.* ¶ 130; *accord id.* ¶¶ 129, 131.)

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:22-cv-01524-JLS-E                          Date: February 16, 2023
Title:  Charles Larry Crews, Jr. v. Rivian Automotive, Inc. et al

Plaintiffs argue that Statements 3, 4, and 5 "largely repeated" Statements 1 and 2 and are therefore actionable for the same reasons.  (Rivian Opp. at 11–12.)  Having concluded that Plaintiffs' theory of falsity for Statements 1 and 2 is deficient, the Court concludes that the same theory fails to render Statements 3, 4, and 5 actionable.

**Statement 6** is the first of two statements related to pricing changes for Rivian's EVs.  During the 3Q21 earnings call, McDonough stated: "And given the inflationary market backdrop, we also continue to evaluation [sic] the pricing for our vehicle [sic]." (CC ¶ 133.)  **Statement 7** is the second statement related to pricing changes from the 3Q21 earnings call.  In response to an analyst's question whether Rivian was considering adjusting R1 prices "based on what the demand is for the product[,]" Scaringe cited "the backdrop of inflation and the very strong demand for products" in the EV sector generally as causes prompting Rivian "to look at our pricing" and recognize that R1 EVs were "very aggressively priced."  (*Id.* ¶ 134.)

Plaintiffs argue that Statements 6 and 7 were false and misleading "because they suggested that: (i) inflation was a new, post-IPO development when, in truth, price increases had been causing R1 margins to deteriorate since 2018; and (ii) management was discussing price increases in an effort to capitalize on increased demand rather than to mitigate rising losses."  (Rivian Opp. at 13, citing CC ¶ 135.)  According to Plaintiffs, R1 price increases were necessitated not only on account of rising inflation, but more importantly by "a long-term, systemic problem"—that "Rivian's COGS for R1s was significantly higher than the purchase price charged to customers[.]"  (CC ¶¶ 132, 135.)

The Rivian Defendants counter as follows.  First, they argue that Statement 6 was not misleading in context because it followed McDonough's statements explaining that Rivian had negative gross profit of $82 million in 3Q21 and faced high "fixed costs" that would continue to affect Rivian's margins in upcoming quarters.  (Rivian Mot. at 12; 3Q21 Earnings Call Transcript at 469.)  According to Defendants, Plaintiffs' claim that

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:22-cv-01524-JLS-E                          Date: February 16, 2023
Title:  Charles Larry Crews, Jr. v. Rivian Automotive, Inc. et al

R1 margins had been deteriorating since 2018 "makes no sense" because no R1 EVs were produced until 2021.  (Rivian Mot. at 12; Rivian Reply at 7.)  Because there were no "actual margins" until the third quarter of 2021, Plaintiffs cannot plausibly state that margins had been deteriorating for years before the IPO.  (Rivian Reply at 7.) Defendants further argue that Statement 7 did not falsely attribute potential price increases to high demand because Scaringe made the statement in response to a question whether Rivian intended to adjust its pricing given the high demand for R1 EVs.  (Rivian Mot. at 13.)

　　Plaintiffs' theory of falsity fails here too.  Even if Rivian's pre-IPO internal forecasts indicated that the profit margins for the R1 would remain negative into 2025 absent price increases and lowered costs, that is consistent with Statements 6 and 7: increasing inflationary pressures exacerbated the problem of high costs, which weighed in favor of raising prices.  That high demand for the R1 would weigh in favor of raising purchase prices makes sense as well, even if it was but one of several factors justifying higher prices.  To the extent that Rivian understood before the IPO that it would eventually have to raise prices for the R1 to turn a profit based on internal profitability forecasts, that understanding does not render Statements 6 and 7 false or misleading. Rising inflation and high demand would be crucial factors guiding a decision to raise customer prices regardless of such forecasts.  When broaching the subject of potential price increases, Rivian did not need to address all relevant considerations or disclose its internal profitability projections and pricing strategy.  *Cf. Weston Family P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 615 (9th Cir. 2022) ("Securities laws . . . do not require real-time business updates or complete disclosure of all material information whenever a company speaks on a particular topic.  To the contrary, a company can speak selectively about its business so long as its statements do not paint a misleading picture.") Accordingly, the Court concludes that Statements 6 and 7 were not actionable.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:22-cv-01524-JLS-E                          Date: February 16, 2023
Title:  Charles Larry Crews, Jr. v. Rivian Automotive, Inc. et al

For these reasons, the Court concludes that Plaintiffs have not adequately pleaded falsity.  When falsity allegations are deficient, a court need not address scienter.  *See, e.g.*, *Weston Family P'ship*, 29 F.4th at 623 n.7  ("Because we hold that the complaint did not adequately allege falsity, we need not address scienter or loss causation.").  Accordingly, the Court does not address whether Plaintiffs adequately allege scienter and DISMISSES Plaintiffs' Section 10(b) and Rule 10b–5 claims.  Because Plaintiffs may be able to cure the identified deficiencies, Plaintiffs are GRANTED LEAVE TO AMEND.

### B.  Section 20(a) Claims

Under Section 20(a) of the 1934 Act, "certain 'controlling' individuals [are] also liable for violations of section 10(b) and its underlying regulations."  *Zucco Partners*, 552 F.3d at 990 (citing 15 U.S.C. § 78t(a)).  Because a Section 20(a) claim is derivative, "a defendant employee of a corporation who has violated the securities laws will be jointly and severally liable to the plaintiff, as long as the plaintiff demonstrates 'a primary violation of federal securities law' and that 'the defendant exercised actual power or control over the primary violator.'"  *Id.* (cleaned up).  Here, as explained above, Plaintiffs have not adequately pleaded primary violations of Section 10(b) or Rule 10b–5.  Thus, control person liability under Section 20(a) cannot survive.  Accordingly, the Court DISMISSES Plaintiffs' Section 20(a) claims with LEAVE TO AMEND.

### C.     Section 11 Claims — Statements 1 and 2

To state a claim under Section 11, a plaintiff must plead facts proving the following elements: "'(1) that the registration statement contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material, that is, it would have misled a reasonable investor about the nature of his or her investment.'"  *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1161 (9th Cir. 2009) (quoting *In re Daou*

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:22-cv-01524-JLS-E                    Date: February 16, 2023
Title:  Charles Larry Crews, Jr. v. Rivian Automotive, Inc. et al

*Sys., Inc.*, 411 F.3d 1006, 1027 (9th Cir. 2005)).  Section 11 liability arises from false or misleading statements in the Registration Statement.  15 U.S.C. § 77k(a).

"Although the heightened pleading requirements of the PSLRA do not apply to section 11 claims, plaintiffs are required to allege their claims with increased particularity under Federal Rule of Civil Procedure 9(b) if their complaint sounds in fraud."  *Rubke*, 551 F.3d at 1161 (cleaned up).  To determine whether a complaint sounds in fraud, a court must closely examine the complaint's language and structure and assess "whether the complaint alleges a unified course of fraudulent conduct and relies entirely on that course of conduct as the basis of a claim."  *Id.* (cleaned up).  But "[w]here . . . a complaint employs the exact same factual allegations to allege violations of section 11 as it uses to allege fraudulent conduct under section 10(b) of the Exchange Act, we can assume that it sounds in fraud."  *Id.*

Here, Plaintiffs allege that Statements 1 and 2, which the Court has already addressed above, give rise to liability under Section 11 as well.  (CC ¶¶ 253–54.)  Plaintiffs allege that their Section 11 claims "are not based on any knowing or deliberately reckless misconduct" and therefore "do not sound in fraud."  (*Id.* ¶ 228.)  Plaintiffs argue that their Section 11 claims do not sound in fraud because the Consolidated Complaint "carefully segregates the fraud claims under the Exchange Act from the negligence claims under the Securities Act."  (Underwriters Opp. at 9–10.)   But the gravamen of Plaintiffs' Consolidated Complaint sounds in fraud, and Plaintiffs allege that Defendants *knowingly* failed to disclose material facts even in the Securities Act sections of their Complaint.  (*Id.* ¶¶ 246, 247, 252, 269.)  "[A] plaintiff's nominal efforts to disclaim allegations of fraud with respect to its section 11 claims are unconvincing where the gravamen of the complaint is fraud and no effort is made to show any other basis for the claims."  *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 885–86 (9th Cir. 2012) (holding that Rule 9(b) applied when the plaintiff's Section 11 claim "relie[d] on the same alleged misrepresentations from the December 13, 2007 press release that are

CIVIL MINUTES – GENERAL                                          27

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:22-cv-01524-JLS-E                          Date: February 16, 2023
Title:  Charles Larry Crews, Jr. v. Rivian Automotive, Inc. et al

central to the plaintiff's Section 10(b) fraud claim" even though the plaintiff "disclaimed in its complaint any allegation of fraud in connection with the section 11 cause of action").

Given that "the course of conduct" alleged to support Plaintiffs' Section 11 and Section 10(b) claims against Rivian, Scaringe, McDonough, and Baker "is so substantively similar," the Court concludes that Plaintiffs' Section 11 claims against them sound in fraud and Rule 9(b) applies. *In re Eventbrite, Inc. Sec. Litig.*, 2020 WL 2042078, at *15 (N.D. Cal. Apr. 28, 2020). Accordingly, Plaintiffs' Section 11 claims against Rivian, Scaringe, McDonough, and Baker survive only if the Complaint has "set forth what is false or misleading about [the challenged statements] and why [they are] false." *Rubke*, 551 F.3d at 1161.

As to the Underwriter Defendants and the "Director Defendants" (Karen Boone, Jay Flatley, Peter Krawiec, Rose Marcario, Sanford Schwartz, and Pamela Thomas-Graham), the Court holds Plaintiffs to their representation that they allege that those Defendants acted negligently rather than intentionally or knowingly. (*See* Underwriters Opp. at 10.) Accordingly, Plaintiffs' allegations against the Underwriter Defendants and the Director Defendants do not need to be pleaded with the particularity that Rule 9(b) requires—these allegations are evaluated under Rule 8(a). *Cf. Bos. Ret. Sys. v. Uber Techs., Inc.*, 2020 WL 4569846, at *4 (N.D. Cal. Aug. 7, 2020) (holding that, although "a disclaimer alone is insufficient to recharacterize a complaint whose gravamen is plainly fraud," Rule 9(b) does not apply where the plaintiff "has made an effort to plead a non-fraudulent basis for Section 11 liability").

Regardless of whether Rule 8(a) or Rule 9(b) applies, Plaintiffs have not adequately pleaded that Statements 1 and 2 were false or misleading when made, for the reasons stated above. Therefore, the Court GRANTS the Rivian Defendants' Motion and

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:22-cv-01524-JLS-E                    Date: February 16, 2023
Title:  Charles Larry Crews, Jr. v. Rivian Automotive, Inc. et al

the Underwriter Defendants' Motion as to Plaintiffs' misrepresentation-based Section 11 claims, with LEAVE TO AMEND.

### D.      Item 105 and Item 303 Claims

Item 105 of SEC Regulation S-K requires that offering materials regulation statements filed on form S-1 include "a discussion of the most significant factors that make an investment in the registrant or offering speculative or risky."  17 C.F.R. § 229.105.  Item 303 of SEC Regulation S-K, on the other hand, requires that offering materials disclose "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  17 C.F.R. § 229.303(a)(3)(ii).  A "disclosure duty exists where a trend, demand, commitment, event or uncertainty is both [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operation."  *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1296 (9th Cir. 1998).  Allegations sufficient to state a claim under Items 105 and 303 are also sufficient to state a claim under Sections 11 and 12(a)(2) of the 1933 Act.  *Id.*

Here, Plaintiffs allege violations of Items 105 and 303 on the grounds that the Registration Statement was required, but failed, to disclose that:

(i) Rivian's COGS for R1s had consistently increased from 2018 to 2021, which in turn lead to increasingly negative R1 gross profit margins; (ii) that between 2018 and the IPO, Rivian's projected timeline for positive gross profit margins on R1 unit sales was consistently pushed farther into the future as margins declined, going from 2023 to 2025; (iii) Rivian's need to increase R1 pricing; and [(iv)] that

CIVIL MINUTES – GENERAL                                        29

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:22-cv-01524-JLS-E                    Date: February 16, 2023
Title:  Charles Larry Crews, Jr. v. Rivian Automotive, Inc. et al

absent price increases on current and future R1 pre-orders, Rivian would lose
money on each pre-ordered R1 unit sold to customers for several years.

(CC ¶¶ 258, 264.)  According to Plaintiffs, these were both "adverse factors that made
Rivian's IPO risky" and "known trends, events, and uncertainties [that] existed at the
time of the IPO" that Rivian was obligated to disclose pursuant to Items 105 and 103.
(*Id.*)  Plaintiffs argue that they "do not allege that Defendants failed to disclose
projections of future margins, but rather R1's increasing costs of materials (a trend that
Rivian had been experiencing since 2018), its impact on Rivian's margins (which had
been deteriorating since 2018), and the related uncertainty stemming from senior
management's pre-IPO determination that prices needed to be increased."  (Underwriters
Opp. at 17.)

The Rivian Defendants and the Underwriter Defendants counter as follows.  As to
Item 303, Defendants argue that Rivian extensively and repeatedly disclosed rising
operating expenses and how they would result in continuing negative gross profits.
(Rivian Mot. at 7; Underwriters Mot. at 13; Underwriters Reply at 7–8.)  According to
Defendants, the Prospectus unambiguously disclosed that Rivian "was already suffering
significant financial losses and increasing costs—and had been for years."  (Underwriters
Reply at 7.)  For example, under the heading "Risk Factors," the Prospectus stated:

> **We are a growth stage company with a history of losses and expect to
> incur significant expenses and continuing losses for the foreseeable
> future.**
>
> We have incurred net losses since our inception, including net losses of $426
> million and $1.0 billion for the years ended December 31, 2019 and 2020,
> respectively.  We believe that we will continue to incur operating and net
> losses in the future while we grow, including following our initial generation

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:22-cv-01524-JLS-E                          Date: February 16, 2023
Title:  Charles Larry Crews, Jr. v. Rivian Automotive, Inc. et al

of revenues from the sale of our vehicles, which began with the R1T in
September 2021, to be followed by the R1S and EDV planned for December
2021, but which may occur later than we expect or not at all.  We do not
expect to be profitable for the foreseeable future as we invest in our business,
build capacity and ramp up operations, and we cannot assure you that we will
ever achieve or be able to maintain profitability in the future.  Even if we are
able to successfully develop our vehicles and attract customers, there can be
no assurance that we will be financially successful.

(Prospectus at 57; *see also id.* at 48, 109.)  The Prospectus also disclosed a "steady
increase in operating expenses over the last eight quarters reflect[ing] the continued
advances in development of our R1T, R1S, and EDV vehicle programs, including the
construction of prototype vehicles and testing, go-to-market strategy, service offerings,
and early development of planned future products." (*Id.* at 132.)  It further noted that
operational losses had increased from $409 million in 2019, to $1.02 billion in 2020, to
$990 million in only the first two quarters of 2021. (*Id.* at 119.)  Per Defendants, these
disclosures in the Prospectus provided sufficiently detailed, concrete information to put
investors on notice of the significant risks and trends affecting Rivian's profitability.
That is, given these disclosures, the putative risk factors and known trends that Plaintiffs
argue should have been disclosed pursuant to Items 105 and 303 were "minutia" whose
inclusion in the Prospectus was unnecessary.  (Underwriters Reply at 7.)

Defendants further contend that Plaintiffs have not pleaded adequately that the
omitted information was a "known trend" under Item 303 because at the time of the IPO
Rivian had produced only twelve vehicles within the span of two months.  (Rivian Mot.
at 7–8; Underwriters Mot. at 13–14; Rivian Reply at 5–7; Underwriters Reply at 9.)
Accordingly, "[t]here could be no known trend of rising costs of car production when no
cars were produced."  (Rivian Reply at 6.)  Per the Rivian Defendants, what Plaintiffs
characterize as a known trend is in fact a series of internal forecasts regarding profit

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:22-cv-01524-JLS-E                     Date: February 16, 2023
Title:  Charles Larry Crews, Jr. v. Rivian Automotive, Inc. et al

margins, which Rivian had no duty to disclose.  (*See, e.g.*, *id.*; Rivian Mot at 10.)  Even the statements ascribed to FE-1 refer to continually deteriorating *forecasted*—not *actual*—margins and profitability projections.  (*See* Rivian Reply at 6, citing CC ¶¶ 78–80.)  And forecasts do not need to be disclosed under Regulation S-K.  (Rivian Reply at 4, 6–7.)

Last, the Rivian Defendants contend that Rivian was not required to disclose any anticipated price increases in the Prospectus because: (1) the Prospectus did not address the pricing of R1 EVs; (2) the Prospectus explicitly stated that vehicle prices were subject to change and may increase in the future; and (3) securities laws do not require disclosure of a company's future pricing strategy.  (Rivian Mot. at 3; Rivian Reply at 3.)

First, the Court addresses Plaintiffs' allegations that Rivian's senior managers had determined prior to the IPO that prices needed to be increased and whether that fact had to be disclosed pursuant to Item 105 or Item 303.  Plaintiffs' Consolidated Complaint states that, according to Laura Schwab, Rivian's former Vice President of Sales and Marketing, Rivian's Chief Growth Officer, Jiten Behl, initially "brushed off" concerns that Rivian needed to raise prices but eventually "agreed that [Rivian] would need to raise the vehicle prices after the IPO."  (CC ¶¶ 92, 95.)  Plaintiffs also allege that FE-1 stated that "the point at which Rivian would cut off current pricing shifted over time 'depending on our read of when the executive team was going to have the stomach to take pricing up.'"  (*Id.* at ¶ 246.)  Per the Consolidated Complaint, then, Rivian management knew that R1 prices would need to increase eventually, but the timing of price hikes was in flux, at least partly due to Rivian executives' reluctance to implement price increases.

The allegations in the Consolidated Complaint do not support an inference of a firm "plan" to increase prices—rather, they indicate that this was a sensitive strategy decision.  Taking these allegations as true, the Court is reluctant to interpret securities laws and regulations as requiring disclosure of a prospective pricing strategy or

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:22-cv-01524-JLS-E                          Date: February 16, 2023
Title:  Charles Larry Crews, Jr. v. Rivian Automotive, Inc. et al

challenging pricing decisions that a company is currently facing.  *Cf. San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 809 (2d Cir. 1996) (affirming district court's decision not to apply "securities laws to force companies to give their competitors advance notice of sensitive pricing information" and acknowledging "antitrust concerns raised by what could be considered price signaling if companies regularly issued such information"); *see also In re Canandaigua Sec. Litig.*, 944 F. Supp. 1202, 1205 (S.D.N.Y. 1996) ("Information concerning management decisions such as pricing plans properly falls outside of S-K 303 disclosure.  There is a significant difference between events and trends affecting 'operations,' such as the closure of a plant or the increase in costs of raw materials, and competitive marketing strategies and plans.").  Accordingly, the Court concludes that the Prospectus did not need to disclose that Rivian would increase R1 prices in the near term pursuant to Item 105 or Item 303.

Next, the Court addresses whether rising production costs for the R1 were a present reality that "had *already* come to fruition by the time of the IPO."  (Underwriters Opp. at 13.)  Plaintiffs claim that "Rivian's component prices *had been increasing* and the negative material effects on margins *had been known for years*."  (*Id.*)  "A trend under Item 303 requires an 'observed pattern that accurately reflects persistent conditions of the particular registrant's business environment.'"  *In re Restoration Robotics, Inc. Sec. Litig.*, 417 F. Supp. 3d 1242, 1263 (N.D. Cal. 2019) (quoting *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1191 (11th Cir. 2002)).  Here, the alleged known trend, per the Consolidated Complaint, is that "Rivian's COGS for R1s had consistently increased from 2018 to 2021 which in turn lead to increasingly negative R1 gross profit margins."  (CC ¶¶ 258, 264.)  According to Plaintiffs, the bill of materials cost for the R1 in particular "was a significant factor driving the negative gross profit margins for the R1s and the delays to the R1's inflection point"—*i.e.*, the point at which Rivian anticipated profit margins for the R1 would shift from positive to negative.  (*Id.* ¶ 83.)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:22-cv-01524-JLS-E                                    Date: February 16, 2023
Title:  Charles Larry Crews, Jr. v. Rivian Automotive, Inc. et al

Plaintiffs allege that "the bill of materials alone for R1 vehicles prior to and at the time of the IPO was around $90,000."  (*Id.* ¶ 84.)

Plaintiffs' allegations and arguments fall short.  As the Court has already noted, there were no known, actual margins for the R1 until approximately two months before the IPO.  Negative gross profit margins cannot have been increasing or worsening for years before the IPO.  What Plaintiffs allege had been deteriorating for years before the IPO were Rivian's internal estimates and projections for the R1's margins.  These estimates and projections from 2018 through 2021 were not a "persistent condition," but analyses of Rivian's profitability prospects.  Though Plaintiffs argue that increasing *component costs* were a known trend that Rivian should have disclosed, the Consolidated Complaint states in relevant part that Rivian knew that the R1's *COGS*—which includes, in addition to component costs, labor and overhead costs—had been increasing for years. (*Compare* Underwriters Opp. at 17 *with* CC ¶¶ 78–80, 82–83, 258, 264.)  What Plaintiffs claim Rivian should have disclosed is unclear, as they improperly conflate component costs with COGS.

If Plaintiffs' allegations here stem entirely from internal forecasts and pre-production estimates, "the alleged omission is nothing more than the nondisclosure of a future trend projection" that did not need to be disclosed.  *Belodoff v. Netlist, Inc.*, 2008 WL 2356699, at *8 (C.D. Cal. May 30, 2008) (citing *In re VeriFone Sec. Litig.*, 11 F.3d 865, 869 (9th Cir.1993)).  If Plaintiffs' contention is that Rivian should have disclosed specifically that the bill of materials cost for each R1 unit exceeded its purchase price leading up to the IPO, disclosure at that level of specificity was not necessary under either Item 105 or Item 303.  As discussed above, the Prospectus provided detailed information regarding the Rivian's history of losses, increasing costs, and that its margins would remain negative for the foreseeable future and might never turn positive.  Further, the Prospectus does not address pricing for the R1 anywhere.  Thus, that the R1's bill of

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:22-cv-01524-JLS-E                    Date: February 16, 2023
Title:  Charles Larry Crews, Jr. v. Rivian Automotive, Inc. et al

materials cost exceeded its purchase price at the time of the IPO was not a material fact that needed to be disclosed under Item 105 or Item 303.

For the reasons stated above, the Court DISMISSES Plaintiffs' Item 105 and Item 303 claims, with LEAVE TO AMEND.

**E.      Section 12(a)(2) Claims**

Additional Plaintiff Muhl asserts a separate claim Section 12(a)(2) claim against the Underwriter Defendants on behalf of all persons who purchased Rivian Class A common stock issued in or traceable to the IPO.  (CC ¶¶ 285–86.)  "Sections 11 and 12(a)(2) are 'Securities Act siblings' with similar elements.  *In re Velti PLC Sec. Litig.*, 2015 WL 5736589, at *31 (N.D. Cal. Oct. 1, 2015) (quoting *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010)).  "To plead a claim under Section 12(a)(2), the plaintiff must allege that (1) the defendant is a statutory seller; (2) the sale was effected by means of a prospectus or oral communication; and (3) the prospectus or oral communication contained a material misstatement or omission."  *Maine State Ret. Sys. v. Countrywide Fin. Corp.*, 2011 WL 4389689, at *8 (C.D. Cal. May 5, 2011).  "The 'misstatement or omission' requirement under Section 12(a)(2) is materially identical to that under Section 11."  *In re Velti PLC*, 2015 WL 5736589, at *31.

Here, Plaintiffs and the Underwriter Defendants agree that the Section 11 and Section 12(a)(2) stand or fall together.  (Underwriters Opp. at 19–20; Underwriters Reply at 9.)  Thus, because the Court has already dismissed Plaintiffs' Section 11 claims, the Court DISMISSES Muhl's Section 12(a)(2) claim as well on the same grounds.

The Underwriter Defendants also argue that Muhl's Section 12(a)(2) fails because Plaintiffs do not allege plausibly that any Underwriter Defendant sold Muhl Rivian stock or solicited a purchase from him.  (Underwriters Mot. at 15–18; Underwriters Reply at

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:22-cv-01524-JLS-E                               Date: February 16, 2023
Title:  Charles Larry Crews, Jr. v. Rivian Automotive, Inc. et al

10.)  In response, Plaintiffs note that the Consolidated Complaint states that Muhl purchased Rivian stock from an Underwriter and that the certification attached to the Consolidated Complaint as Exhibit B states that he purchased the stock on the date of the IPO at the IPO share price.  (Underwriters Opp. at 20, citing CC ¶¶ 286–92; CC Ex. B, Doc. 125-2.)  Plaintiffs also request that the Court consider a document showing that Muhl in fact purchased Rivian stock traceable to the S-1 from Morgan Stanley, one of the Underwriter Defendants.  (Underwriters Opp. at 20, citing Nirmul Decl. Ex. A, Doc. 139-2.)  The Court declines to allow Muhl to amend the Consolidated Complaint by way of an opposition brief.  *Cf. Frenzel v. AliphCom*, 76 F. Supp. 3d 999, 1009 (N.D. Cal. 2014) ("[T]he complaint may not be amended by the briefs in opposition to a motion to dismiss.") (cleaned up).  Nevertheless, the Court GRANTS Muhl LEAVE TO AMEND the Consolidated Complaint to plead specifically that he purchased Rivian shares from Morgan Stanley.

### F.    Section 15 Claims

Last, the Court addresses Plaintiffs' Section 15 claims against Baker, McDonough, Scaringe, and the Director Defendants.  Section 15 imposes secondary liability on someone who "controls" any person who is liable for a primary violation under either Section 11 or Section 12 of the 1933 Act.  *See, e.g.*, *In re ZZZZ Best Sec. Litig.*, 1994 WL 746649, at *6 (C.D. Cal. Oct. 26, 1994).  Like Section 20, Section 15 imposes "controlling person" liability that cannot survive absent allegations that would establish a primary violation.  *See, e.g.*, *In re Rigel Pharms.*, 697 F.3d at 886 ("Section 20(a) and section 15 both require underlying primary violations of the securities laws.") (citing 15 U.S.C. §§ 77o, 78t(a)).  Because, as explained above, Plaintiffs have failed to plead adequately violations of Section 11 and Section 12, the Court DISMISSES Plaintiffs' Section 15 claims as well, with LEAVE TO AMEND.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:22-cv-01524-JLS-E                              Date: February 16, 2023

Title:  Charles Larry Crews, Jr. v. Rivian Automotive, Inc. et al

## V.   <u>CONCLUSION</u>

For the foregoing reasons, Defendants' Motions to Dismiss are GRANTED. Plaintiffs are GRANTED LEAVE TO AMEND, correcting the deficiencies identified herein in a manner consistent with all Rule 11 obligations.  Plaintiffs may not add claims or new defendants to their pleading.  Should Plaintiffs elect to file an amended pleading, it shall be filed within **fourteen (14) days of the date of this Order.**  Failure to timely file an amended complaint will result in the dismissal of this action with prejudice and closing of the case without further notice.

Initials of Deputy Clerk:  vrv