**KESSLER TOPAZ**
**  MELTZER & CHECK, LLP**
JENNIFER L. JOOST (Bar No. 296164)
jjoost@ktmc.com
One Sansome Street, Suite 1850
San Francisco, CA 94104
Telephone: (415) 400-3000
Facsimile: (415) 400-3001

*Counsel for Lead Plaintiff Sjunde AP-Fonden*
*and additional Plaintiff James Stephen Muhl*
*and Lead Counsel for the Proposed Class*

[Additional Counsel on signature page.]

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| CHARLES LARRY CREWS, JR., Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> RIVIAN AUTOMOTIVE, INC., ROBERT J. SCARINGE, CLAIRE MCDONOUGH, JEFFREY R. BAKER, KAREN BOONE, SANFORD SCHWARTZ, ROSE MARCARIO, PETER KRAWIEC, JAY FLATLEY, PAMELA THOMAS-GRAHAM, MORGAN STANLEY & CO. LLC, GOLDMAN SACHS & CO., LLC, J.P. MORGAN SECURITIES LLC, BARCLAYS CAPITAL INC., DEUTSCHE BANK SECURITIES INC., ALLEN & COMPANY LLC, BofA SECURITIES, INC., MIZUHO SECURITIES USA LLC, WELLS FARGO SECURITIES, LLC, NOMURA SECURITIES INTERNATIONAL, INC., PIPER SANDLER & CO., RBC CAPITAL MARKETS, LLC, ROBERT W. BAIRD & CO. INC., WEDBUSH SECURITIES INC., ACADEMY SECURITIES, INC., BLAYLOCK VAN, LLC, CABRERA CAPITAL MARKETS LLC, C.L. KING & | Case No. 2:22-cv-01524-JLS-E <br><br> **CLASS ACTION** <br><br> **AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> **DEMAND FOR JURY TRIAL** <br><br> Judge: Hon. R. Josephine L. Staton |

ASSOCIATES, INC., LOOP CAPITAL
MARKETS LLC, SAMUEL A. RAMIREZ
& CO., INC., SIEBERT WILLIAMS
SHANK & CO., LLC, and TIGRESS
FINANCIAL PARTNERS LLC,

Defendants.

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES
LAWS

# <u>TABLE OF CONTENTS</u>

**Page**

I.   INTRODUCTION ................................................................................................ 1

II.  JURISDICTION AND VENUE FOR PLAINTIFFS' EXCHANGE ACT CLAIMS ............................................................................................................ 8

III. PARTIES .......................................................................................................... 9

    A.   Plaintiffs ................................................................................................ 9

    B.   Defendants ............................................................................................. 9

        1.   Corporate Defendant Rivian ...................................................... 9

        2.   Executive Defendants .............................................................. 10

    C.   Relevant Non-Parties—Former Rivian Employees ............................. 11

IV.  SUMMARY OF THE EXCHANGE ACT DEFENDANTS' FRAUD ................ 13

    A.   Rivian's Founding and Early Years ..................................................... 13

    B.   Rivian Builds the Hype for Its R1T and R1S ...................................... 14

    C.   Rivian Unveils the R1 Platform at the LA Auto Show ........................ 17

    D.   The Market Applauds Rivian's "No Compromises" and Reasonably-Priced R1 Platform ............................................................................... 20

    E.   Rivian's "Promotional Madness" Continues ....................................... 23

    F.   Rivian Lowers R1 "Base" Prices in January 2020 .............................. 24

    G.   After Several Delays, Rivian Begins Production and Delivers Its First Consumer Vehicles in September 2021 ................................................ 25

    H.   Rivian's IPO ........................................................................................ 26

    I.   Unbeknownst to Investors, the R1 Platform Was Severely Underpriced as of the Time of the IPO ............................................... 32

        1.   Overview of Relevant Cost Metrics ......................................... 32

        2.   By the Time of the IPO, the Cost of the R1 Platform's Bill of Materials Vastly Exceeded the Retail Prices of the R1S and R1T ..... 32

        3.   At the Time of the IPO, Company Insiders Recognized That R1 Prices Needed to Be Increased, But They Delayed Doing So Until After the IPO ................................................................... 35

        4.   The Exchange Act Defendants Misled Investors Regarding the Pricing and Profitability Assumptions for Rivian's Vehicles ........... 36

J.    The Relevant Truth Is Revealed ........................................................ 43

V.    THE EXCHANGE ACT DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ................................ 47

   A.    Registration Statement ....................................................... 47

   B.    December 16, 2021: 3Q21 Earnings Conference Call and 3Q21 10-Q ........ 49

VI.    ALLEGATIONS OF LOSS CAUSATION ............................................ 52

VII.    ADDITIONAL ALLEGATIONS OF THE EXCHANGE ACT DEFENDANTS' SCIENTER ........................................................ 57

VIII.    PRESUMPTION OF RELIANCE ....................................................... 62

IX.    THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE ..................................................... 63

X.    CAUSES OF ACTION UNDER THE EXCHANGE ACT ..................... 64

   COUNT I Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder Against the Exchange Act Defendants ...... 64

   COUNT II Violation of Section 20(a) of the Exchange Act Against the Executive Defendants ......................................................... 65

XI.    JURISDICTION AND VENUE FOR PLAINTIFFS' SECURITIES ACT CLAIMS ....................................................................................... 66

XII.    ADDITIONAL SECURITIES ACT DEFENDANTS ............................ 66

   A.    Director Defendants ........................................................... 66

   B.    Underwriter Defendants ..................................................... 67

XIII.    SECURITIES ACT DEFENDANTS' VIOLATIONS OF THE SECURITIES ACT ....................................................................... 70

   A.    Rivian's Blockbuster $13.7 Billion IPO ............................... 72

   B.    The R1 Platform Was Underpriced at the Time of the IPO ......... 73

      1.    Overview of Relevant Cost Metrics .................................. 73

      2.    By the Time of the IPO, the Cost of the R1 Platform's Bill of Materials Vastly Exceeded the Retail Prices of the R1S and R1T ..... 74

      3.    Senior Executives Knew That the Cost of the R1 Platform's Bill of Materials Was Rising ........................................... 76

      4.    Prior to the IPO, Company Insiders Acknowledged That R1T and R1S Prices Needed to Be Increased ............................ 77

C.  As Information Incorrectly Stated in, and Omitted From, the Registration Statement Is Gradually Disclosed, the True Value of Rivian Class A Common Stock Is Revealed ..................................... 78

D.  The Registration Statement Contained Untrue Statements of Material Fact and Material Omissions in Violation of Section 11 of the Securities Act ........................................................................................... 81

E.  The Registration Statement Failed to Disclose Information Required to Be Disclosed Under SEC Regulation S-K ....................................... 84

1.  Item 105 ............................................................................. 84

2.  Item 303 ............................................................................. 85

XIV.  THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE ......................................................... 87

XV.  CAUSES OF ACTION UNDER THE SECURITIES ACT ................................. 88

COUNT III Violation of Section 11 of the Securities Act Against the Securities Act Defendants ....................................................................... 88

COUNT IV Violation of Section 12(a)(2) of the Securities Act Against the Underwriter Defendants ....................................................................... 90

COUNT V Violation of Section 15 of the Securities Act Against the Executive and Director Defendants.................................................... 91

XVI.  CLASS ACTION ALLEGATIONS APPLICABLE TO ALL CLAIMS .............. 92

XVII. PRAYER FOR RELIEF ......................................................................... 94

XVIII. JURY DEMAND ................................................................................. 94

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Lead Plaintiff Sjunde AP-Fonden ("AP7") and additional plaintiff James Stephen Muhl ("Muhl," and together with AP7, "Plaintiffs"), by and through Plaintiffs' counsel, bring this action individually and on behalf of all other persons and entities who purchased or otherwise acquired Class A common stock of Rivian Automotive, Inc. ("Rivian" or the "Company") between November 10, 2021, and March 10, 2022, both dates inclusive (the "Class Period"), and who were damaged thereby.

Plaintiffs allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and upon information and belief as to all other matters, including the investigation of Plaintiffs' counsel, which included, among other things, interviews with former Rivian employees, a review of Rivian's United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by Rivian, analyst reports and advisories about the Company, media reports concerning the Company, judicial filings, and other publicly available information. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    __INTRODUCTION__

1.      Rivian, a new and highly-watched entrant in the booming electric vehicle ("EV") industry, completed its eagerly-awaited initial public offering ("IPO") on November 10, 2021. Through this IPO, which was underwritten by the largest and most prominent investment banks, Rivian raised $13.7 billion from investors—the seventh largest IPO in U.S. history. A key premise of Rivian's IPO valuation was its promise of feature-packed EVs at retail prices that were highly competitive with the existing and established competition, including Tesla. In the months leading up to the IPO, however, Rivian's management internally recognized that this premise was flawed, that the Company had vastly underestimated the cost of the parts needed to build its vehicles (which alone exceeded the retail prices of those vehicles), and that a material price increase and/or a significant reduction in features was necessary to ensure Rivian's viability as a business. They also knew that satisfying Rivian's pipeline of pre-orders at the prices promised to

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

customers would cause significant financial harm to the fledgling company. Because Rivian's IPO valuation rested on demand for its vehicles, and because demand for its vehicles was based on the Company's ability to offer world-class features at a reasonable price, Rivian executives resolved to wait until *after* the IPO to raise prices and reduce the standard features for the Company's vehicles to conform with the actual cost realities known about internally. Yet the Registration Statement (defined herein) failed to disclose these material facts and risks to investors despite being required to do so.

2.     Prior to and throughout the Class Period, Rivian promised prospective customers one of two "category defining" "flagship" EVs—an all-electric pickup truck dubbed the R1T, and a full-size sport utility vehicle ("SUV") dubbed the R1S (R1T and R1S collectively, the "R1 Platform" or "R1"). Both the R1T and R1S included quad-motors (i.e., one motor for each of the vehicles' four wheels), an impressive battery that delivered roughly 300 miles of range, and luxurious but functional interior and exterior finishes.

3.     After the Company publicly debuted the R1T and R1S at the Los Angeles Auto Show (the "LA Auto Show") in 2018, it set the R1T and R1S retail prices at $69,000 and $72,500, respectively, and accepted preorders immediately in exchange for a refundable $1,000 deposit. Then in 2020, on the heels of EV industry titan Tesla's announcement of its own future all-electric pickup truck, Rivian reduced the base prices for the R1T and R1S by a few thousand dollars, to $67,500 and $70,000, respectively. Notably, the R1's price reduction did not come with a corresponding reduction in the vehicles' touted features.

4.     The R1 Platform and its attractive price points drove significant consumer demand for Rivian's vehicles, generating more than 55,000 R1 Platform pre-orders leading into the IPO. However, by the time of the November 2021 IPO, it had become clear within the Company that the publicly announced R1 Platform pricing could not support Rivian's business model, as the cost of the R1 Platform's bill of materials—i.e., the roughly 3,000 parts required to build each R1—significantly exceeded Rivian's publicly-disclosed retail prices. More specifically, by no later than 2019, Rivian learned that its original retail prices

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

for the R1S and R1T had been predicated on erroneous (and materially understated) cost estimates developed in 2018.

5.     By no later than September 2021, as Rivian began building its vehicles, it knew that the actual cost of bill of materials for R1 was at least $110,000—far more than the retail prices of those cars. This meant that the revenues Rivian generated from each of the 55,000 R1S and R1T pre-order sales would not even cover the cost of the materials used to build those vehicles, let alone Rivian's significant investments in vehicle technology, manufacturing capacity, and charging infrastructure. Confronted with this reality, senior executives internally conceded that Rivian had to raise R1S and R1T prices, but they consciously chose to wait until after the IPO to do so. Highly-placed former employees confirm these core facts, all of which were concealed from investors.

6.     Despite knowing that Rivian's price structure for R1 Platform was predicated on stale and understated cost estimates, and that a material increase in pricing was necessary for Rivian to ever become profitable, the IPO Registration Statement and Prospectus—the documents that investors were told to exclusively rely upon in making their decision to invest in Rivian—failed to disclose these material facts to investors. Instead, the Registration Statement misleadingly warned investors that Rivian *could* suffer financial harm *if* its material costs increased and *if* it had to increase R1 retail prices. It also misleadingly informed investors that Rivian's profitability hinged upon its ability to increase production volumes, asserting that it expected to generate "a negative gross profit per vehicle for the near term *as our fixed costs from investments in vehicle technology, manufacturing capacity, and charging infrastructure are spread across a smaller product base until we launch additional vehicles and ramp production*." Rivian also stated that, over the long term, it expected to "*generate positive gross profit as production utilization increases and we leverage our investments*."

7.     These statements were materially false and misleading and omitted the key fact that absent a material increase in R1 retail prices and/or a significant reduction in material costs, no amount of scaling would make Rivian profitable. In truth, because the

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

cost of the R1S and R1T parts alone exceeded their retail prices, Rivian would continue losing money on *every* vehicle sold *regardless* of production volumes. It could not generate positive gross profits on R1S and R1T sales unless and until it materially raised the vehicles' retail prices or significantly reduced their material costs.

8. During Rivian's IPO roadshow, Rivian's senior executives, including Robert J. Scaringe ("Scaringe"), Rivian's Chief Executive Officer ("CEO"), made presentations to investors featuring the specifications for the R1T and R1S, the vehicles' pricing, and their pre-IPO demand. Investors were also treated to a 30-minute video and IPO slide deck containing similar content.

9. Rivian's IPO was a tremendous success. Although initially planning to sell 135 million shares at prices between $57 and $62 per share, Rivian upsized the offering to 153 million shares at $78 per share, implying a valuation of $66.5 billion. On the first day of trading, November 10, 2021, demand for Rivian's shares drove up its trading price to over $100.

10. Just a few weeks after the IPO, on December 16, 2021, during Rivian's first ever earnings call, the Company continued to mislead the market concerning the need for and timing of a price hike. In her prepared remarks, Claire McDonough ("McDonough"), Rivian's Chief Financial Officer ("CFO"), asserted that because of "the inflationary backdrop, we also continue to evaluat[e] the pricing for our vehicle[s]." Analysts immediately pressed Scaringe on McDonough's reference to a pricing review, to which Scaringe responded:

> Now with regards to pricing, it's certainly the backdrop of inflation that we're seeing and the very strong demand for products . . . has caused us to look at our pricing and really I'd say recognizing the set of product features that we've been able to put together into the vehicles . . . So in terms of the competitive step, we recognized they're very aggressively priced. That is something that we certainly considered and talk about quite a bit as a management team.

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

11.     These statements had the intended effect of misdirecting the market about the need for a price increase and the introduction of less-expensive features for the R1 Platform. Rather than disclosing the truth—that a price increase was necessary because Rivian's current pricing was generating a large loss per vehicle on the components alone (without regard to the massive overhead costs that could be mitigated by ramped production), Defendants' statements led the market to believe that it was demand for Rivian's vehicles that was prompting their pricing evaluation. As an analyst from Deutsche Bank reported after the call: "The momentum acceleration in vehicle reservations, now at 71k units up from 55k just 6 weeks ago, is very encouraging and is prompting management to consider price increases." In other words, Rivian conveyed to the market that the Company was considering retail price increases in order to increase its profits from the sale of each vehicle, when in truth Rivian executives determined *before* the IPO that the Company needed to raise prices to mitigate the losses that Rivian was suffering, and would continue to suffer, on each vehicle sold.

12.     In January 2022, GM unveiled the EV version of its most popular pickup truck, the Chevy Silverado, while Ford had previously publicly debuted its EV pickup truck, the Ford F-150 Lightning, in early 2021. Rivian's pricing relative to these vehicles was a critical competitive advantage in the eyes of market observers. Over the next two months, major analysts, including analysts associated with the investment banks that had underwritten Rivian's IPO, maintained their ratings for the Company's stock.

13.     Then, on March 1, 2022, after months of silence since its December 16 earnings call, Rivian dropped a truth bomb on its investors and R1 pre-order customers. Specifically, in an email to pre-order customers and through revised pricing available on its website, the Company revealed that its current retail pricing was unsustainable when it announced eye-popping *minimum* price hikes of roughly *17%* and *20%* to virtually all R1T and R1S vehicles. Shockingly, Rivian announced that the price increases would also apply to the more than 70,000 confirmed R1 pre-orders as of that date, unless those customers, who previously thought they were getting a quad-motor and at least a "Large" battery pack,

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

agreed to accept a vehicle with half as many motors and a smaller battery. According to Rivian, these price increases were necessary to address increases "on the cost of supplier components and raw materials"—cost increases that Rivian executives were aware of ***prior to the IPO***.

14.     As reported by numerous media outlets and industry analysts, many R1T and R1S pre-order customers were enraged by what they perceived as a "bait and switch" by Rivian. Indeed, pre-order customers expressed their outrage in online. For example, one such customer posted the following on the popular website RivianOwnersForum.com:

> My quoted price previously was $78,820 for an R1S after going through the configurator to get the same vehicle it's $92k. ***A 17k increase is not inflation – it means it wasn't priced appropriately to begin with***. Add-in the new 'option' for a dual motor which is position [sic] as a great new option but in reality it just means they are now charging you more for the quad motor which was previously the only option. ***This feels like a gigantic bait and switch***.[1]

15.     In response to news of the Company's substantial price increases on all vehicles, including pre-orders, Rivian's stock price fell $14, or more than 20%, from a close of $67.56 per share on February 28, 2022, to close at $53.56 per share on March 2, 2022.

16.     On March 3, 2022, after facing intense public pressure from customers, Scaringe reversed the Company's decision to extend its price hikes to customers who reserved their vehicles before March 1, 2022 (which was somewhere between approximately 71,000 and 83,000 orders). The reversal was communicated in an email to customers and published in a Business Wire article. Given Rivian's prior concession that these vehicles were underwater on their costs, analysts seized on the financial impact that this disclosure would have on Rivian going forward. For example, a March 3, 2022 report

---

[1]     All emphasis is added and all original emphasis is omitted unless otherwise noted.

from analyst RBC stated: "***The roll-back on pricing is costing it ~$850mm in revenue*** (assuming no cancelations) . . . ."

17.    On March 3, 2022, The Wall Street Journal stated that Rivian's share price had declined the previous day as a result of the Company's price-increase disclosure, and that "[s]hares fell further Thursday, down nearly 5% to $50.91." Reuters similarly wrote on March 3 that "Rivian stock, which plunged over 13% on Wednesday, extended losses on Thursday, down 4%."

18.    Over the next week—from the close of trading on March 2 through the close of trading on March 10—the price of Rivian's Class A common stock fell from $53.56 to $41.16. During this period, analysts digested the potential financial impact of Rivian's pricing disclosures, and the market braced itself for the additional news slated to be released on March 10 when Rivian disclosed its earnings. One analyst wrote on March 9: "We believe RIVN required a $12-$14k price increase in order to achieve their prior financial targets. Without the price increases, we think Consensus (for 2022-2023) will need to be lowered by at least $0.8-$1.4 bn (~70k-100k reservation holders x $12-$14k implied cost headwind)."

19.    After the market closed on March 10, 2022, the market finally learned the extent to which Rivian's long-term financial prospects had been impacted by its previously undisclosed need to reprice its vehicles, including existing orders. The Company disclosed that its projected adjusted EBITDA for FY2022 was a disappointing ($4,750 million), and it revealed that Rivian would face negative gross margins throughout 2022 "[a]s [it] continue[s] to ramp-up [its] manufacturing facility, manage supply chain challenges, face continued inflationary pressures, ***and minimize price increases to customers in the near term***."

20.    Reporting on this revised EBITDA guidance, J.P. Morgan noted that Rivian's pricing disclosures would result in bigger losses over the near term and lower demand for Rivian vehicles over the long term. In particular, J.P. Morgan stated:

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

The company reversed course for those who had placed deposits prior to March 1, which we estimate implies similarly lower gross profit margin for the first nearly 83,000 units delivered (which we now expect to occur during 1Q24). For future reservations, however, the material price hikes will still apply, and while this should offset currently foreseeable inflationary cost pressures (meaning dilution to gross profit margin but not dollars), it does imply also some demand destruction.

21. Meanwhile, Deutsche Bank noted "Rivian's soft 4Q results and weak 2022 outlook reflect largely predictable delays ramping up vehicle production amid challenges from its supply chain, but also steep cost pressures from input costs in the current inflationary environment, which it cannot offset with pricing following the backlash around its proposed price increase."

22. The market reaction to this revised scenario was swift and severe. On March 11, 2022, Rivian's stock price fell from March 10 almost 8%, from $41.16 to $38.05, and continued to fall further the next trading day on high volume, closing on March 14 at $35.83, or less than half of its $78 per share IPO price. In all, over the two-week period between February 28 and March 14, Rivian's share price declined by ***nearly $32 per share***.

23. This action seeks to recover these losses suffered by Rivian investors, which were a foreseeable consequence of Defendants' false statements and omissions alleged herein.

## II.    JURISDICTION AND VENUE FOR PLAINTIFFS' EXCHANGE ACT CLAIMS

24. Plaintiffs' claims arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

25. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

26.    Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), because Rivian is headquartered in this District, Rivian conducts business in this District, and many of the acts and conduct that constitute the violations of law complained of herein, including the dissemination to the public of materially false and misleading information, occurred in this District.

27.    In connection with the acts, conduct, and other wrongs alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications, and the facilities of the national securities markets.

## III.    PARTIES

### A.    Plaintiffs

28.    Lead Plaintiff AP7 is a Swedish public pension fund, established under law as a Swedish governmental agency, with over $90 billion in assets under management. As set forth in the certification attached as Exhibit A, incorporated by reference herein, AP7 purchased or otherwise acquired Rivian Class A common stock at artificially inflated prices during the Class Period, including Class A common stock traceable to the Registration Statement (defined ¶ 95), and has been damaged thereby.

29.    Additional plaintiff James Stephen Muhl is an individual investor who, as set forth in the certification attached as Exhibit B, incorporated by reference herein, purchased or otherwise acquired Rivian Class A common stock at artificially inflated prices during the Class Period from Morgan Stanley (defined ¶ 236), as indicated in the attached Exhibit C, including Class A common stock pursuant and/or traceable to the Registration Statement, and has been damaged thereby.

### B.    Defendants

#### 1.    Corporate Defendant Rivian

30.    Defendant Rivian is a Delaware corporation with principal executive offices at 14600 Myford Road, Irvine, California. Rivian designs, develops, and manufactures EVs and accessories and sells them directly to consumer and commercial customers. Rivian also

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

offers its customers a full suite of proprietary services addressing the entire lifecycle of the Company's EVs, including, among other things, financing, insurance, software, vehicle charging, and vehicle service. Rivian went public through an IPO on November 10, 2021. Since that date, Rivian's Class A common stock has traded on the Nasdaq under the ticker "RIVN." Each share of Class A common stock is entitled to one vote. Rivian also has unlisted Class B common stock, which is entitled to ten votes per share. Scaringe owns all of Rivian's Class B common stock.

### 2.    Executive Defendants

31.    Defendant Scaringe is, and during the Class Period was, Rivian's founder and CEO, and Chairman of the Company's Board of Directors. Scaringe signed Rivian's false and misleading Registration Statement and its false and misleading Form 10-Q for the third fiscal quarter of 2021 ("3Q21"). In addition, throughout the Class Period, Scaringe made statements in the Company's conference call as alleged herein.

32.    Defendant McDonough is, and during the Class Period was, Rivian's CFO. McDonough signed Rivian's false and misleading Registration Statement and its false and misleading Form 10-Q for 3Q21. In addition, throughout the Class Period, McDonough made statements in the Company's conference call as alleged herein. As CFO, McDonough reported directly to Scaringe.

33.    Defendant Jeffrey R. Baker ("Baker") is, and during the Class Period was, Rivian's Chief Accounting Officer. Baker signed the false and misleading Registration Statement.

34.    Scaringe, McDonough, and Baker are collectively referred to as the "Executive Defendants."

35.    The Executive Defendants, because of their positions within the Company, possessed the power and authority to control the contents of Rivian's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. Each Executive Defendant was provided with copies of the Company's SEC filings alleged herein to be misleading prior to, or shortly after, their

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of the Executive Defendants knew that the adverse facts specified herein had not been disclosed to, and/or were being concealed from, the public, and that the positive representations that were being made were then materially false and/or misleading.

36.    Together with Rivian, the Executive Defendants are collectively referred to as the "Exchange Act Defendants."

### C.    Relevant Non-Parties—Former Rivian Employees

37.    Laura Schwab is a former Rivian employee who sued Rivian for gender discrimination, unlawful retaliation, wrongful termination, and unfair competition. In her lawsuit against Rivian filed in California State Court in Orange County on November 4, 2021, and in a Statement of Claims to the American Arbitration Association,[2] Schwab has alleged that, starting in the spring of 2021, she "started to raise the alarm about concerns she had relating to Rivian's ability to deliver on its promises to investors." In particular, Schwab alleged that Rivian's vehicles were underpriced. She also alleged that she worked with Rivian's Finance Director, Dennis Lucey, to develop projections of how much the Company would lose if it did not raise vehicle prices, and raised this issue with several executives, including Rivian's Chief Growth Officer, Jiten Behl ("Behl").[3]

38.    Schwab served as Rivian's Vice President of Sales and Marketing from November 30, 2020, through October 15, 2021, when she was terminated by the Company. As Vice President of Sales and Marketing, Schwab reported to Behl. Prior to joining Rivian in November 2020, Schwab held management and executive roles for 15 years at Jaguar

---

[2]    After filing her complaint, Schwab's State Court case was stayed pending resolution of the arbitration proceedings in front of the American Arbitration Association. Schwab filed for a dismissal of her State Court action without prejudice on May 27, 2022, which was granted the same day.

[3]    On November 10, 2021, the day of Rivian's IPO, Scaringe publicly rejected Schwab's claims, telling the Financial Times: "We do fully disagree with any of the characterisations of our culture and how we work together."

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Land Rover, including as Director of Marketing for the U.K., and five years as President of Aston Martin Lagonda for the Americas.

39.    Former Employee #2 ("FE-2") was a senior executive with responsibility for vehicle quality from several years prior to the IPO until spring 2022. FE-2 reported to Rod Copes, Rivian's former Chief Operating Officer, from early 2021 until September 2021 in connection with Copes' retirement from Rivian in December 2021, at which time FE-2 began reporting to VP of Quality, Mike Smith. FE-2's responsibilities included, among others, manufacturing quality, warranty service, customer satisfaction, and metrology.

40.    Former Employee #3 ("FE-3") was a business analytics and finance manager at Rivian from prior to the IPO in the summer of 2021 until spring 2022. FE-3 reported to Dennis Lucey, Director of Commercial Finance (a role in which Lucey led Commercial Finance's vehicle sales and planning process for corporate inventory planning, and sales and gross margin management reporting), who reported to Gerard Dwyer, Vice President of Business Finance, who in turn reported to McDonough. FE-3 was involved with forecasting for Rivian's Commercial Finance group. FE-3 regularly saw what was known internally as the "Revenue and Margins Report." FE-3 explained that the Revenue and Margins Report was an internal PowerPoint presentation prepared by Finance Manager, Eric Socia, using forecasting information pulled from Adaptive Insights, where all of Rivian's forecasting information was loaded. FE-3 recalled that the Revenue and Margins Report was then integrated into a Tableau report for the Company's executives to access on demand. FE-3 attended meetings in the fall of 2021 wherein Eric Socia presented the Revenue and Margins Report to the Commercial Finance team, including FE-3's boss, Director of Commercial Finance Dennis Lucey.

41.    Former Employee #4 ("FE-4") was a member of Rivian's Cost Engineering Group, which was responsible for determining the cost of each part that made up the bill of materials for Rivian's R1T and R1S vehicles, from before the IPO until November 2022. During the Class Period, FE-4 reported to Jim Ward, Rivian's Cost Engineering Manager. As a Cost Engineer, FE-4 attended meetings wherein the cost of the bill of materials was

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

discussed, which included attendees from Engineering, Purchasing, and Finance like his manager, Ward, and Rivian's Vice President of Supply Chain Steve Gawronski.

42.    Former Employee #5 ("FE-5") was a member of Rivian's Cost Engineering Group, which was responsible for determining the cost of each part that made up the bill of materials for Rivian's R1T and R1S vehicles, from before the IPO until the fall of 2022. In this role, among other things, FE-5 attended a December 2019 meeting with Rivian's CFO and its Finance Director regarding the cost of the bill of materials for the R1T and R1S.

## IV.    SUMMARY OF THE EXCHANGE ACT DEFENDANTS' FRAUD

### A.    Rivian's Founding and Early Years

43.    Scaringe founded Rivian in Florida in 2009 as Mainstream Motors, Inc. Shortly thereafter, the Company changed its name to Avera Motors Inc. After an initial two-and-half year foray into developing a sports car, in 2011, the Company again changed its name, this time to Rivian, shelved its plans for an internal combustion engine sports car, and spent the next several years redefining its business model and securing investors.

44.    In 2012, Rivian secured a major investor, a Saudi Arabian auto distribution company named Abdul Latif Jameel. Rivian worked closely with Abdul Latif Jameel and the duo settled on developing an all-electric pickup truck, and eventually an all-electric SUV. The ultimate strategy was for Rivian to occupy what it identified as an "attractive whitespace, addressing large, fast-growing, and high-margin market segments" with a focus on "adventure and active lifestyles." During that same time period, Rivian moved its headquarters to the Detroit, Michigan suburbs to be closer to automotive industry talent and suppliers.

45.    Rivian maintained a low-profile during this time period. According to Scaringe, as later reported by WGLT, Bloomington-Normal's NPR member-station: "Because of frankly some of the things we talked too much about in the early days, we made the decision to go deep into stealth mode, and to avoid the distraction of committing to things and making statements that were highly likely to change." Indeed, indicative of

the Company's unsettled nature was the fact that it did not even have a sign on its headquarters during this time.

46.    But after years of keeping a low-profile, in January 2017, Rivian generated public attention when it purchased a former Mitsubishi Motors manufacturing plant in Normal, Illinois. The facility purchase was seen as a significant first step toward becoming a legitimate auto manufacturer.

### B.    Rivian Builds the Hype for Its R1T and R1S

47.    Even after garnering public attention for its purchase of the Mitsubishi facility, Rivian remained secretive of any details about its operations. It was not until almost a year later in December 2017 that Rivian announced a plan to introduce its first EV—a five-passenger truck—in 2020, followed by a second vehicle—a seven-passenger SUV—in 2021.

48.    As reported by electrive.com, an EV industry news source, on January 21, 2018: "[n]ot much has been said on the first two EVs by Rivian other than that they are targeting an out-door type of person and they will sit on a platform developed in-house." At the time, the only other detail to trickle out was that both Rivian vehicles would feature some level of autonomous driving capability.

49.    Rivian's secrecy was in sharp contrast to other wannabe-EV manufacturers that hyped their vehicle designs for years despite little to no manufacturing prospects. But as 2018 progressed—and the 2020 target launch date for Rivian's first EV loomed—the Company needed to quickly build demand for its vehicles.

50.    To do so, Rivian went into overdrive to produce drivable concept vehicles to debut at the November 2018 LA Auto Show. And in the lead up, Rivian strategically released design specifications and features to create hype for the vehicles.

51.    In mid-2018 Rivian invited Engadget, a Yahoo! tech blog network with 41 million monthly page views, for an "early look" at the A1T and A1C—the original names for the R1T and R1S, respectively. During the behind-the-scenes tour, Scaringe bragged "[t]here are only a few cars in the world that are going to be as fast as ours, and we

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

have a large five-passenger truck," leading Engadget to compare the vehicles to those of other luxury automakers like Lamborghini and Land Rover in its May 21, 2018 article.

52.    According to Engadget, Scaringe also boasted that "the A1T can handle 1.1 meters (3.6 feet) of water, has more than 360mm (14 inches) of ground clearance and will be capable of climbing 100-percent-grade (45-degree) inclines [and] it'll out-handle a Porsche Cayenne Turbo, too, and that it has a zero-to-60 time of 2.8 seconds." Engadget reported that while Rivian's truck "looks like a vehicle ripped straight out of *Halo*," the overall designed remained under wraps and Engadget was prohibited from snapping photos of the vehicles.

53.    One more detail that Rivian was not prepared to release: the vehicles' retail prices. As Engadget reported, the pricing was not yet final. Still, Rivian signaled to the tech blog "it could cost as much as a well-appointed F-150 at the low end ($50,000), or a Range Rover on the high end ($90,000)." Further, according to the article, "Scaringe says that keeping a narrow focus on the high-end off-road market, where Range Rover has dominated, allows Rivian to provide best-in-class batteries, controls and autonomous systems."

54.    Rivian's sneak-peek had its intended effect as other industry new sources picked up and republished the details released to Engadget. For example, another EV industry news source, Electrek, reported on May 24, 2018, that "Rivian Automotive has a much lower profile than what we are used to in the EV startup world, but we are starting to learn more about their plans to produce all-electric vehicles in the US *and it's certainly starting to get interesting*." Citing to the Engadget article, Electrek identified the following capabilities as some of "the most important details" released: (i) "Range: 200 miles to 450 miles depending on the battery configuration"; (ii) "Acceleration: 0 to 60 mph in 2.8 seconds for top version to less than five for the base version"; and (iii) "Price: $50,000 to $90,000." Electrek told its 20 million monthly readers to expect the concept vehicles to be unveiled later that year at the LA Auto Show.

55.    In another May 24, 2018 article published by Carbuzz, the automotive news outlet rhetorically asked readers, "Remember Rivian Automotive?" Answering its own question, Carbuzz stated: "We haven't heard about the electric startup company since it purchased a former Mitsubishi factory in Illinois last year, but now Rivian is preparing to enter the spotlight with the launch of a new electric truck that's faster than a Ferrari and more capable than a Tesla Model X." Carbuzz continued, "Rivian's CEO RJ Scaringe is making some bold claims," and then marveled at the same aforementioned features and specifications.

56.    Rivian's public relations hype campaign continued over the next several months. In July 2018, Scaringe participated in a Q&A with EV news source, EV Obsession, which reported: "Rivian Automotive is developing a highly differentiated product offering that targets a clear market whitespace." During the Q&A, Scaringe stated that "[Rivian's] products will leverage exceptional technology and ***deliver a unique combination of performance, efficiency, capability and utility that is significantly better than the existing options.*** This will enable Rivian to firmly establish itself as the de-facto leader of the adventure space and provide us with a solid brand platform for future growth."

57.    Scaringe teased prospective customers that Rivian "will be opening a reservation process and will be announcing the details of this shortly." In the meantime, Scaringe plugged the vehicles' big reveal at the LA Auto Show which would offer customers their first look at their design.

58.    With respect to pricing, EV Obsession asked Scaringe:

Your electric vehicles are expected to list for around $50,000, with top of the line versions going for more than $90,000. Buyers will have a choice of an 80 kWh battery good for around 200 miles of range or a larger battery with a range of 450 miles. Are these numbers still looking doable? With battery costs dropping might these performance numbers increase or the price drop?

59.    Scaringe sidestepped the pricing question, stating: "We continue to make progress and our base model will have approximately 250 miles of range. We haven't

announced the specifics on our battery configuration, but the largest pack will deliver up to 450 miles in range."

60.    In September 2018, a Rivian prototype was "spotted rocking a Ford F-150 body," according to multiple sources. As reported by HotCars, an automotive industry news source with ten million readers a month, Rivian's "website [was] still light on the details when it comes to any actual products, which had us wondering just what the heck this company has been doing since being formed almost a decade ago." After seeing the semi-disguised R1T prototype, however, HotCars was happy to report that as "it turns out [] Rivian is a little ahead of the curve."

### C.    Rivian Unveils the R1 Platform at the LA Auto Show

61.    As promised, Rivian debuted the R1T—its two-row, five-passenger pickup truck—on November 26, 2018, as part of the LA Auto Show. The next day, Rivian unveiled the R1S—a three-row, seven-passenger SUV. Rivian introduced the R1T and R1S as the "World's First Electric Adventure Vehicles," and it touted their "quad-motor system that delivers 147kW with precise torque control to each wheel, enabling active torque vectoring and maximum performance in every situation, from high-speed cornering to low-speed rock crawling."

62.    Rivian emphasized that the "vehicles have been developed to help customers get out and explore the world." Further appealing to outdoor enthusiasts, Rivian highlighted the vehicles' "400+ miles in electric range, a wading depth of 1 meter, lockable storage bins that can fit the bulkiest of gear" and again emphasized "the performance and precise control of quad-motor AWD."

63.    The R1T and R1S offered a unique proposition to consumers: all terrain specs without sacrificing luxury. That is, the vehicles would not only be able to low-speed rock crawl, but promised "truly world-class" interiors that were benchmarked "against those from Audi and Lincoln as well as Bentley and Lamborghini" according to the Company. As advertised at the launch, each Rivian vehicle had a "seamless interface" consisting of

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

multiple touchscreens and offered a "digital experience" that extended beyond the vehicle and into the cloud ecosystem.

64.    Rivian further described the R1T and R1S interior design as "welcom[ing] occupants into a premium environment that conveys craftsmanship yet invites rugged, daily use." Sophia Park, Rivian's Color and Material Designer, further explained that "[a] car is a second home . . . so you won't find the fake stuff inside our vehicles."







65.     Seizing on the vehicles' LA Auto Show debut, Rivian opened up reservations for the R1T and R1S, secured by refundable $1,000 deposits. Rivian set the initial retail pricing for the R1T and R1S base models at $69,000 and $72,500, respectively. The base model for each vehicle included a quad-motor, i.e., a motor to power each wheel of the vehicle, and a "Large," "mid-tier" battery pack with a roughly 300-mile range.

66.     Rivian received pre-orders almost instantaneously and Scaringe took to Twitter to thank those who had placed orders. In one such Tweet, Scaringe told customers "[y]ou are going to love it – the off road abilities are unlike anything you have ever seen!!"

67.     Days later on December 4, 2018, Rivian urged prospective customers to place their pre-order reservations citing "overwhelming excitement and massive interest in the #R1T and #R1S."

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**Rivian** ✓
@Rivian

What happens when you place a preorder?
You guarantee your place in line. Due to the overwhelming excitement and
massive interest in the #R1T and #R1S, those without a preorder could face
longer wait times — into 2021 or beyond. A preorder holds your place in
line.

(3/5)

3:57 PM · Dec 4, 2018

### D.    The Market Applauds Rivian's "No Compromises" and Reasonably-Priced R1 Platform

68.    It is no surprise that Rivian's debut of the R1T and R1S was met with tremendous excitement in the automotive industry. After all, the Company spent the months leading up to the LA Auto Show promising to deliver top-of-the-line all-terrain specs and world-class interiors, and it was now offering those features to consumers at a price that the market viewed to be reasonable.

69.    For example, Electrek wrote in a November 26, 2018 article titled, *Rivian unveils all-electric pickup truck with unbelievable specs*, "Rivian Automotive is coming out in a big way today by unveiling its all-electric pickup truck: the Rivian R1T. They are promising some unbelievable specs that would compete with any gas-powered pickup truck on the market." Electrek continued, and in particular, was focused the R1T's battery and quad motor design:

> Like almost every other company making electric vehicles these days, Rivian adopted the "skateboard" platform, but it put its own twist on it and integrated 4 small (but powerful) electric motors[.]
>
> Each motor has a 147 kW power capacity at the wheel and the total power output can be configured to different levels from 300 kW to 562 kW (input to gearbox).

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES
LAWS

The different power levels match different choices of battery packs, which are another impressive feature since they have the highest capacity of any other passenger electric vehicle out there: 105 kWh, 135 kWh, and 180 kWh.

Rivian says that it will translate to "230+ miles, 300+ miles, and 400+ miles" of range on a full charge.

70.    At bottom, Electrek concluded: "I am stunned by the specs here. We are talking about a best-case scenario for an all-electric pickup truck. It looks like those guys have really figured out how to take advantage of an electric powertrain and to get some great performance in a pickup truck package."

71.    Industry commentators also seized on the R1T's value proposition and purchase price as one of its key selling points. For example, following the debut of the R1T at the LA Auto Show, MotorTrend wrote:

Setting the R1T apart from other pickups, obviously, is its all-electric powertrain. . . . There are also four individual electric motors—one per wheel—maximizing traction and control in a variety of driving situations.

. . . .

Those electric motors preclude a low-range transfer case since all of the truck's torque will be available from zero RPM. Furthermore, each motor will be able to individually apply torque to its assigned wheel, eliminating the need for locking differentials or other torque-management solutions.

72.    With respect to its retail pricing, MotorTrend reported that Rivian's claim that: [It would] be able to bring the R1T to market for $61,500 after the federal tax credit . . . suggests the vehicle's retail price will be $69,000 in total. While that's a tough pill to swallow at first blush, many modern 1/2-ton trucks cost in excess of $60,000, and the Tesla Model X has a starting price well above $80,000. ***Viewed in that light, the Rivian R1T might be something of a bargain, especially given its modern, aggressive interior and exterior design***.

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

73.    Automotive website MotorAuthority.com similarly noted the R1 Platform's impressive debut and starting retail prices, writing on December 1, 2018:

> Rivian turned out to be a surprise star of this past week's 2018 LA Auto Show. The American electric car startup showed up with two production-bound vehicles: a crew cab pickup truck and related SUV with third-row seats. ***What's impressive is the no-nonsense nature of the vehicles and the world-beating specs, coupled with a very reasonable price tag***. Assuming Rivian can keep its promise, the R1T pickup truck will be priced from $69,000 and the R1S SUV from $72,500. Both prices are before incentives.

74.    Green Car Reports also reported that "Rivian is aiming for an attractive base price of $69,000 ($61,500 after the federal tax credit), and it previously pointed to a price of about $90,000 for the top-trim version." However, the industry guide warned Rivian that "luring in reservations based on a low target price is the best and worst way to approach such pent-up demand."

75.    An executive director of insights at auto-market researcher Edmunds noted the significance of the R1 Platform's debut, stating: "When Rivian showcased its electric trucks and SUVs, it gave the EV market hope in the sense that electric vehicles could evolve to meet more mainstream preferences[.]"

76.    The market's rapid acceptance of Rivian surpassed even its own internal expectations. And while the Company declined to disclose the exact number of R1T and R1S pre-orders it received in the two weeks following the LA Auto Show, a Rivian spokesperson stated that: "It's easily exceeded (our) best expectations."

77.    Notwithstanding the market's enthusiasm over the R1 Platform's world-class features, pricing was a material component of Rivian's value proposition to consumers and investors. While some consumers viewed the R1 price tag as reasonable, a WGLT survey of actual Rivian reservation holders who placed their pre-orders in the weeks following the LA Auto Show uncovered that others were "surprised by the price tag." One early-reservation holder, who had never heard of Rivian before its reveal at the LA Auto Show,

described the price tag as "a little high." Thus, as Rivian would later acknowledge in its Registration Statement, while consumers may have been willing to pay $69,000 and $72,000 for the base R1T and R1S models, respectively, if Rivian was to announce significant price increases, demand would suffer and the market's enthusiasm over the R1 Platform would wane.

### E.   Rivian's "Promotional Madness" Continues

78.   On December 20, 2018, TechCrunch provided additional insight into the method behind "Scaringe's promotional madness." In general, TechCrunch observed that it was "a tough time to launch an EV startup. With a recession lurking around the corner and mainstream automakers promising to accelerate into the space." Therefore, "Rivian needs to show more than just a stylish brand and a half-empty bank account."

79.   TechCrunch revealed that "Scaringe has a technology roadmap." Further, the "roadmap" included "regular reveals of new features, vehicles and partners, to lure in new business and keep pre-order customers happy while they wait for delivery in 2020."

80.   Staying true to Scaringe's promotional roadmap and after generating "the biggest buzz of the L.A. Auto Show," Rivian revealed its partnership with Amazon on February 15, 2019. The details of the partnership were few but for the fact that Amazon had invested $700 million in the Company and was "inspired by Rivian's vision for the future of electric transportation."

81.   Scaringe continued on Rivian's public relations hype tour, participating in a Q&A with Greentech Media's Julia Pyper ("Pyper") on February 20, 2019. Pyper reported that "Scaringe's vision is to eliminate the compromises that exist around vehicle performance, usability and energy efficiency – and to deliver that vision to customers by late 2020."

82.   In the Q&A, Scaringe reflected on the Company's decision to operate in stealth mode during the development of the R1T and R1S. Scaringe stated that the Company held off on commenting about the R1 Platform until it was sure it could deliver on its promises to the market. Specifically, Scaringe explained: "We want to sort of under-promise and

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

over-deliver. So we took the decision to not say anything until we were truly ready. […] ***And when we made those statements, to not be making statements that are hot air but rather be making statements of fact***." (alteration in original).

83.    Scaringe also acknowledged that the $69,000 and $72,500 price tags for the R1T and R1S seemed high to some consumers, stating:

> RS: I think that may seem high, but we have to take the context of really two things. First, we've strategically positioned ourselves to go after the aspirational side of this market. It's really important to make that note; we're not trying to compete with a $25,000 or $30,000 truck or SUV. This is a very high-performance [vehicle] and very technically advanced in terms of self-driving, in terms of connectivity architecture, in terms of battery size. The segment is going after the people who are spending $70,000 or $80,000 on a GMC Denali or a Chevy Suburban or a Land Rover Discovery or a fully loaded Ford F150.
>
> So we've intentionally made sure that we've architected the vehicle for that premium positioning. If you come into the bottom of the markets, it's very, very hard to push new technology.

84.    When asked whether the pricing had been announced for the 400-mile range truck and SUV, Scaringe told Pyper that "[w]e haven't yet. But we will have a version of the big-range vehicle that's sub-$90,000."

### F.    Rivian Lowers R1 "Base" Prices in January 2020

85.    By the end of 2019, a full year after Rivian became the toast of the town at the LA Auto Show, the market "wait[ed] with bated breath for the production version of the handsome Rivian R1T pickup and R1S SUV." In the meantime, however, Tesla unveiled its own fully-electric pickup truck on November 21, 2019. The Tesla "Cybertruck" hit the market with a base price of $39,900 and within five days, achieved ***250,000*** pre-orders.

86.    Just two months later, on January 25, 2020, Reuters reported that Rivian was ***decreasing*** the retail prices of its base R1T and R1S models. Specifically, Rivian stated that

the prices originally announced in 2018 for its "base" R1Ts and R1Ss would now be the retail prices of **well-equipped** R1T and R1S vehicles. Specifically, "Scaringe told Reuters the mid-range R1T pickup truck with a glass sky panel that can change from blue to clear was about $69,000. It can travel 300 miles on a full charge. A similar range R1S SUV will sell for about $72,000." The next day, EV industry news site Electrek reported on the price decrease, noting that a Rivian spokesperson confirmed that the "original listed prices represent a well-equipped vehicle," and that Rivian would "be releasing more details about pricing soon."

87.    By November 2020, Rivian confirmed that it was reducing the retail prices of the "base" R1T and R1S models to $67,500 and $70,000, respectively.

## G.    After Several Delays, Rivian Begins Production and Delivers Its First Consumer Vehicles in September 2021

88.    In April 2020, Rivian pushed its previously announced timeline for the delivery of the R1T and R1S to customers into 2021, citing construction delays at the Normal manufacturing plant due to COVID-related shutdowns. By May 2020, the Company told customers that it also planned to begin R1 deliveries in 2021. In a July 2020 email to customers, Scaringe provided additional specifics, stating that Rivian planned to begin deliveries of the R1T and R1S in June and August 2021, respectively.

89.    Then, on May 28, 2021, CNET.com reported that Rivian had told customers that it planned to begin deliveries of the R1T and R1S in July 2021. In July, CNET.com reported that Rivian had pushed back deliveries again, with the first R1T deliveries expected to occur in September 2021, and the first R1S deliveries to follow later in the fall.

90.    Finally, on September 14, 2021, the Company's first customer vehicle—an R1T—rolled off the production line. By September 30, 2021, the Company produced 12 R1Ts and delivered 11 of them to customers. On December 20, 2021, Rivian announced that it had finally delivered two R1Ss the previous week—one to Scaringe and one to McDonough.

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

91. Despite the delivery delays, interest in Rivian's R1 Platform remained strong, with CNET.com noting that Rivian "seem[ed] serious about finally getting its much-hyped EVs into the hands of buyers."

**H.    Rivian's IPO**

92. Reports of a Rivian IPO first surfaced on February 9, 2021, with Bloomberg reporting that an IPO could happen as early as September 2021 at a valuation of roughly $50 billion. On May 28, 2021, Bloomberg reported that Rivian had selected underwriters for its IPO and could seek a valuation as high as $70 billion.

93. Three months later, on August 24, 2021, Rivian filed a confidential draft registration statement and prospectus on Form DRS with the SEC for a proposed public offering of Rivian common stock. The Company publicly announced its intent to go public three days later, on August 27, 2021.

94. Thereafter, on October 1, 2021, Rivian filed a preliminary registration statement and prospectus for the IPO on Form S-1. Rivian subsequently filed amendments to the registration statement and prospectus with the SEC on Forms S-1/A on October 22, 2021, November 1, 2021, and November 5, 2021. The Executive Defendants and the Director Defendants (defined herein) signed the Registration Statement. Rivian also generated a Form 424(B)(4) Prospectus dated November 9, 2021, which it subsequently filed with the SEC on November 12, 2021.

95. The SEC declared the Registration Statement effective on November 9, 2021. Together with the November 9, 2021 prospectus, the Registration Statement offered 153,000,000 shares of Rivian's Class A common stock at a price of $78.00 per share (together, the "Registration Statement"). Rivian also granted its IPO underwriters a period of 30 days to purchase up to an additional 22,950,000 shares of Class A common stock from Rivian at the IPO price, less underwriting discounts and commissions.

96. In the Registration Statement, Rivian touted the purportedly ground-breaking nature of its R1 Platform, stating that it "design[ed], develop[ed], and manufacture[d] category-defining electric vehicles ('EVs') and accessories," and complemented its vehicles

with a "a full suite of proprietary, value-added services that address the entire vehicle lifecycle and deepen our customer relationships."

97.    Dubbed "Electric Adventure Vehicles," Rivian further stressed that the R1T and R1S were the Company's "flagship products" and its "handshake with the world," and it played-up the Company's prospects for growth and profitability, assuring investors that Rivian's "vehicles occupy an attractive whitespace, addressing large, fast-growing, and high-margin market segments, and are designed to accelerate the large-scale adoption of sustainable transportation."

98.    Rivian also emphasized the R1 Platform's impressive specifications stating that the R1T and R1S "deliver a high level of safety, premium feel, and outstanding on- and off-road capabilities, with more than 300 miles of range and 0-60 acceleration in approximately 3 seconds," and included the following graphic highlighting the vehicles' specifications and capabilities:

| | R1T | R1S |
|---|---|---|
| EPA Rated Range | 314 miles (400+ mi. targeted for 2022) | 316 miles |
| Wheelbase | 135 in. | 121 in. |
| Length | 217 in. | 201 in. |
| Storage | ~62 cu. ft. | ~105 cu. ft. |
| Powertrain | 800+ horsepower quad motor all-wheel drive | 800+ horsepower quad motor all-wheel drive |
| Acceleration | 0-60 mph in ~3 seconds | 0-60 mph in ~3 seconds |
| Towing Capacity | Up to 11,000 lbs. | Up to 7,700 lbs. |
| Wading Depth | Up to 3 ft. | Up to 3 ft. |

99.    In addition, the Company touted the R1 Platform's high-end finishes, emphasizing that "[f]rom seating design to ergonomics to audio systems, our team has delivered innovation wrapped in premium materials intended to always be highly functional." It also trumpeted the R1 Platform's "groundbreaking performance both on- and off-road," as well as its impressive "quad motor all-wheel drive configuration."

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

100. Rivian also told investors that it "expect[ed] to fill our preorder backlog of approximately 55,400 R1 vehicles by the end of 2023."

101. On or about November 10, 2021, Rivian commenced its IPO, and its Class A common stock began trading on the Nasdaq the same day.

102. The Company concluded its IPO on November 15, 2021, raising gross proceeds of more than $13.7 billion (prior to underwriting discounts and commissions, and estimated expenses) by selling 175,950,000 shares of its Class A common stock to the public at a price of $78.00 per share, which included the exercise in full by the underwriters of their option to purchase an additional 22,950,000 shares of the Company's Class A common stock. Rivian's IPO was one of the largest in U.S. history.

103. In connection with its IPO, Rivian and its underwriters conducted a roadshow in early November 2021. In a slide deck for the roadshow, which was made available to the public on the Rivian Owners Forum (www.rivianownersforum.com) on November 4, 2021, Rivian and the underwriters touted Rivian's R1 Platform, emphasizing the Company's offerings as being the "first" of their kind in the EV pickup truck and SUV space. The slide deck also highlighted the base purchase price and standard battery and motor configuration for the R1T and R1S:

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

# R1T – the first Electric Adventure Vehicle



Category-defining combination of on- and off-road performance, capability, and utility – expanding the markets for trucks and EVs

$67.5K starting price
314 miles EPA rated range (400+ mi targeted for 2022)
800+ horsepower
~3 sec 0-60 mph
Quad-motor all-wheel drive
Five passenger
~62 cu ft storage across front trunk, gear tunnel, and bed
Up to 11K lbs towing
L2+ Driver+ self-driving features




Innovative gear tunnel with optional camp kitchen
Full portfolio of adventure accessories

First customer vehicles delivered in September 2021




All specs refer to launch configuration

RIVIAN                                                    Proprietary and Confidential | Do Not Distribute | 10

# R1S – the first true full size electric SUV



3-row, 7-passenger SUV – the size and utility consumers want without compromising sustainability or performance

$70K starting price
316 miles EPA rated range
800+ horsepower
~3 sec 0-60 mph
Quad-motor all-wheel drive
~105 cu ft storage across front trunk and cabin
Up to 7.7K lbs towing
L2+ Driver+ self-driving features



Common drive unit, battery, chassis, and electronic systems to R1T

Deliveries scheduled to begin December 2021



All specs refer to launch configuration

RIVIAN                                                    Proprietary and Confidential | Do Not Distribute | 12

---

29                                    Case No. 2:22-cv-01524-JLS-E
AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES
LAWS

104.    Rivian and its underwriters also highlighted the praises the R1T received by auto-industry commentators, further hyping the Company's impending IPO and key first consumer offering during the roadshow:



105.    The Wall Street Journal noted the IPO underwriters' contributions to the hype around Rivian's IPO, including touting the Company's purportedly favorable prospects and drawing comparisons to EV industry stalwart, Tesla:

> On its roadshow pitch to investors, Rivian's bankers compared the company to electric-vehicle giant Tesla Inc., whose explosive share increase has handed it a market capitalization of more than $1 trillion. Though Rivian is at a much earlier stage, has big losses and had no revenue until very recently, investors were clearly receptive and drawn to the company's growth potential.

106.    Rivian's IPO was hotly anticipated by investors. For example, after Rivian filed its draft registration statement with the SEC, auto-industry news source MotorTrend wrote on August 27, 2021, that "[f]or a while now, followers, fans, and stock market speculators have been keeping their eyes on Rivian. The question on everyone's minds,

aside from whether the R1T is actually going to deliver on its promises or not, is whether the company would go public." In the run up to Rivian's IPO, The Financial Times noted "huge hype" around Rivian and its impending "blockbuster IPO," while also noting that some of the hype stemmed from the fact that Rivian's "prospects have been burnished by an order from Amazon for 100,000 electric delivery vans by 2025, and by the belief that Rivian's stylish pick-up trucks may attract the same fervour as Tesla's sports cars and sedans."

107. In a September 2021 article titled, *Rivian is coming. Here's why it matters*, E&E News, a subscription-based news organization that reports on energy and environment issues, quoted a policy analyst at Consumer Reports as stating, "[Rivian is] going to be the first to market with an electric pickup truck," "[t]hat's a big deal." The article continued, quoting an auto industry analyst as stating that "[Rivian] is one of the best-positioned new EV startups ever." The Wall Street Journal wrote on November 1, 2021, that Rivian's IPO was "one of the biggest and most-anticipated deals yet in a blockbuster year for new issues."

108. Similarly, MotorTrend, who Rivian gave two R1Ts to drive cross-country, reported that "[i]nvestors have had high expectations for the IPO since Rivian announced it would be filing one back in August." MotorTrend also proclaimed that the R1T was not only "the first quad-motor electric vehicle to go on sale," but "rocket[d] to the top of our list of fastest pickups we've ever tested." Further, MotorTrend described the quad-motor R1T as "like no other truck we've ever driven. Effortlessly powerful, incredibly comfortable, and supremely capable both on- and off-road."

109. The market's interest in Rivian did not end with its IPO. Despite being priced at $78 per share as part of the IPO, Rivian's Class A common stock opened for trading on the Nasdaq at more than $106 per share, catapulting the Company to a valuation of more than $100 billion—well north of the valuations of traditional and long-established automotive manufacturers like General Motors and Ford. In the days following its IPO, the hype over Rivian continued and in a post-IPO rally its Class A common stock reached a

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES
LAWS

Class Period high of nearly $180 per share—valuing Rivian at over $150 billion on November 16, 2021.

## I. Unbeknownst to Investors, the R1 Platform Was Severely Underpriced as of the Time of the IPO

### 1. Overview of Relevant Cost Metrics

110.  As set forth in its public filings, Rivian used the concept of "gross profit per vehicle" to assess the profitability—or lack thereof—of the R1 Platform. Gross profit per vehicle refers to the difference between Rivian's revenues per vehicle (i.e., the vehicle's retail price) and its Cost of Goods Sold ("COGS").

111.  According to FE-3, COGS, in turn, consists of the following inputs: (i) the cost of the R1 "bill of materials"; (ii) labor costs; (iii) certain factory-related manufacturing costs; and (iv) other related costs such as freight and warranty expenses. "Bill of materials" refers to the roughly 3,000 components or parts required to build the R1T and R1S vehicles.

112.  While certain fixed costs, like investments in vehicle technology and charging infrastructure, have a smaller per vehicle impact on gross profit as production volumes increase and those costs are spread across a larger base of vehicles, the same cannot be said for the cost of the bill of materials. Bill of materials costs apply to every vehicle sold. They are not spread across Rivian's vehicle base. Moreover, if the retail price of a vehicle is less than the cost of its bill of materials, then the "gross profit per vehicle" will always and necessarily be negative regardless of how many R1S and R1T vehicles Rivian produces.

### 2. By the Time of the IPO, the Cost of the R1 Platform's Bill of Materials Vastly Exceeded the Retail Prices of the R1S and R1T

113.  As noted above, in 2018, Rivian set its pricing for the R1T and R1S at $69,000 and $72,500, respectively, and began taking pre-orders. According to FE-5, Rivian set these original retail prices based on cost estimates obtained from a third-party consultant retained by Rivian to estimate the cost of each component or part of the bill of materials. FE-5 stated that the consultant's cost estimate for the R1 bill of materials was approximately $70,000. This $70,000 bill of materials total included a mixture of the consultant's cost estimates,

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

actual prices for those parts that had been sourced from a supplier (i.e., Rivian had an agreed-to price and signed purchase order with the supplier), and a small percentage of price estimates supplied by Rivian's engineering department for parts yet to be designed.

114.   According to FE-5, Rivian's purchasing department used the consultant's cost estimates as target prices when negotiating with suppliers to purchase vehicle parts that were not yet sourced. By 2019, Rivian purchasers came to understand that the consultant had vastly understated its cost estimates and Rivian would not be able to source parts at those prices. According to FE-5, suppliers complained that Rivian's proposed purchase prices for R1 parts were "not even in the ballpark" and "not realistic." Some suppliers even walked out of meetings with members of Rivian's purchasing department because the Company's purchase price proposals were so low, while others openly criticized Rivian for its inability to accurately estimate material costs for its vehicles' components. According to FE-5, the consultant's cost estimates (which Rivian used to set the R1 retail prices ahead of the LA Auto Show) understated the actual costs of R1S and R1T materials by as much as 20% to 30%.

115.   In light of these issues, in December 2019, Rivian's then-CFO, Ryan Green, convened a meeting to assess the validity of the consultant's cost estimates. FE-5 attended the meeting with Green, along with Rivian's Finance Director and representatives from the consultant. During the meeting, the consultant attempted to justify its cost estimates, while FE-5 presented information indicating that the consultant's estimates were too low.

116.   Shortly after this December 2019 meeting, Rivian terminated the consultant and brought its cost engineering operations fully in-house. Rivian expanded the size of its Cost Engineering Group, of which FE-4 and FE-5 were members, and placed it in charge of costing the entire vehicle, other than batteries. According to FE-5, following this transition, the Cost Engineering Group began reporting up through Steve Gawronski, Rivian's former head of purchasing and direct report of Scaringe. As the Cost Engineering Group built out the actual costs of materials for the R1S and the R1T, according to FE-4, it recorded those actual cost figures in a Rivian database known as "Project X," which tracked

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES
LAWS

material costs for the R1S and R1T vehicles. FE-4 stated that Rivian senior executives, including Scaringe, had access to Project X.

117.   As the Cost Engineering Group continued sourcing materials for the R1S and R1T, the cost of the bill of materials soared. For example, FE-4 and FE-5, two of the Lead Cost Engineers responsible for the bill of materials, both recalled that by 2020, the cost of the bill of materials exceeded *$100,000*—significantly more than the publicly disclosed retail prices of the R1S and R1T.

118.   FE-5 stated that by September 2021, when Rivian began manufacturing and delivering R1 vehicles, the entire bill of materials had been sourced and their costs were locked in with suppliers. At that time, according to FE-5, the total cost of the bill of materials for the R1 Platform was in the range of *$110,000 to $115,000* per vehicle. FE-4 stated that the cost was as high as $118,000 per vehicle and had been increasing each year. Thus, by the time of the November 2021 IPO, the cost of the R1S and R1T bill of materials was well in excess of the retail prices of those vehicles. FE-3 likewise confirmed that the cost of the R1S and R1T bill of materials alone exceeded their retail prices, and that at the time of the IPO, the R1 Platform bill of materials was reflected in the Revenue and Margins Reports that McDonough and other high-level executives received.

119.   The fact that the cost of the bill of materials drastically exceeded the R1T and R1S's retail prices was highly material information to investors because it guaranteed that Rivian would record a negative profit margin on each R1S and R1T vehicle sold *regardless* of production volumes. It also meant that Rivian's losses would continue to increase even as sales and production volumes of its flagship vehicles increased.

120.   Indeed, unlike other costs, Rivian could not significantly reduce its per vehicle bill of material costs through increased efficiencies and ramped production. FE-3 stated that the R1 production line would eventually gain efficiencies, thereby reducing certain inputs of the R1 COGS, like labor and manufacturing costs. In addition, increased production would lower Rivian's overall cost per vehicle, as its fixed costs were spread across a larger vehicle base. According to FE-3, however, because the cost of the bill of materials alone

exceeded the customer sale price of the R1 Platform, Rivian would continue to record negative gross profit margins on the R1 *even after* those cost benefits were realized. FE-4 noted Rivian may have gained some ability to negotiate its material costs downward once its production volumes doubled, but FE-4 also stated that those savings would be in the vicinity of just 5%. Thus, even if such cost efficiencies were realized, Rivian would still lose a significant amount of money on every R1S and R1T vehicle it sold. FE-4 further stated that it would be nearly impossible to reduce the bill of materials costs by even $20,000 without drastic changes in vehicle content.

121. Thus, as FE-3 indicated, the cost of the bill of materials would continue to exceed the retail prices of the R1T and R1S—and, as a result, Rivian would continue to generate negative gross profits on each R1T and R1S vehicle it sold—until Rivian could successfully source and implement less expensive components into its vehicles, including a cheaper dual motor. In the meantime, Rivian needed to significantly increase R1 prices if it had any hopes of generating positive gross profits on its R1S and R1T vehicles.

### 3. At the Time of the IPO, Company Insiders Recognized That R1 Prices Needed to Be Increased, But They Delayed Doing So Until After the IPO

122. Given their knowledge of the increasing cost of the R1 Platform's bill of materials and the fact that, prior to the IPO, it exceeded the R1 retail prices (which precluded the R1S and R1T from becoming profitable absent a significant increase in prices or reduction in material costs), Rivian's senior management privately acknowledged prior to the IPO that they needed to increase the R1S and R1T prices. However, according to Laura Schwab, Rivian's senior management deliberately delayed implementing this required price increase until *after* the Company's IPO, and they did not disclose the need for a price increase to investors in the IPO offering documents.

123. According to Schwab, after raising the issue of R1 pricing and that each unit sold to consumers would generate losses for the Company with a host of high-level

managers, including Behl, Behl finally "***agreed that [Rivian] would need to raise the vehicle prices after the IPO***."

> ### 4.    The Exchange Act Defendants Misled Investors Regarding the Pricing and Profitability Assumptions for Rivian's Vehicles

124.    In the Registration Statement, the Exchange Act Defendants recognized that vehicle pricing and customers' perception of the value of Rivian's vehicles were material elements of the Company's value. For example, in one of the Registration Statement's "Risk Factors," Rivian acknowledged:

> If our existing preorder and prospective customers do not perceive our vehicles and services to be of sufficiently high value and quality, cost competitive and appealing in aesthetics or performance, or if the final production version of the R1S is not sufficiently similar to the drivable design prototypes, we may not be able to retain our current preorder customers or attract new customers, and our business, prospects, financial condition, results of operations, and cash flows would suffer as a result.

125.    In another Risk Factor in Rivian's Registration Statement (and its 3Q21 Form 10-Q filed in December 2021), Rivian acknowledged the negative consequences that could arise if Rivian's materials costs increased and if Rivian attempted to increase prices to address increased material costs, stating:

> Substantial increases in the prices for such components, materials and equipment would increase our operating costs and could reduce our margins if we cannot recoup the increased costs. Any attempts to increase the announced or expected prices of our vehicles in response to increased costs could be viewed negatively by our potential customers and could adversely affect our business, prospects, financial condition, results of operations, and cash flows.

126.    Yet despite acknowledging the potential negative consequences that could occur ***if*** Rivian's material costs increased—and ***if*** Rivian decided to increase prices—the

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Exchange Act Defendants misleadingly failed to disclose in the Registration Statement the fact that significant increases in the cost of the bill of materials had, in fact, *already* occurred prior to the IPO as R1T and R1S components were sourced, and that Rivian had *already* resolved to increase R1T and R1S retail prices in response to those increased costs. In addition, the Exchange Act Defendants made further materially false and misleading statements and omitted material facts concerning the pricing and profitability of Rivian's R1 Platform and the cause of Rivian's negative gross profits. For example, in the Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") section of the Registration Statement, in a subsection titled, *Our Business Model*, Defendants specifically addressed the fact that Rivian was generating "a negative gross profit per vehicle" on the R1 Platform, but it attributed that loss to Rivian's high fixed costs and low production volumes:

> Our decision to deeply vertically integrate our ecosystem has required substantial upfront investments in capabilities, technologies, and services that are often outsourced by other manufacturers. For example, we are making investments in vehicle technology, manufacturing capacity, and charging infrastructure, and these expenses will appear in our cost of revenue. ***We expect to operate at a negative gross profit per vehicle for the near term as our fixed costs from investments in vehicle technology, manufacturing capacity, and charging infrastructure are spread across a smaller product base until we launch additional vehicles and ramp production**. **This dynamic will cause our gross profit losses to increase on a dollar basis even as our revenue increases from ramping production volumes over the short to medium term***.

127. In the same section of the Registration Statement, the Exchange Act Defendants stated that as production volumes increased over the long term, Rivian would improve its gross margin and would even begin generating positive gross profits:

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*Over the long term, we believe that we will be able to increase our gross
margin in the long term and generate positive gross profit as production
utilization increases and we leverage our investments*.

128.   The Exchange Act Defendants' failure to disclose that the cost of the R1 Platform bill of materials exceeded the retail prices of the R1T and R1S rendered the foregoing statements materially false and misleading when made. *First*, it was misleading for the Exchange Act Defendants to identify one driver of Rivian's "negative gross profit per vehicle"—the fact that its "fixed costs . . . are spread across a smaller product base"—while omitting the other significant driver of its "negative gross profit for vehicle"—the fact that the cost of the R1S and R1T bill of materials had been increasing since at least 2019 and significantly exceeded their retail prices at the time of the IPO. Because the cost of the R1 Platform's bill of materials exceeded its retail prices, Rivian would have operated at a negative gross profit per vehicle *even if* its fixed costs had been spread over a larger product base, and *even if Rivian's fixed costs were $0*.

129.   *Second*, it was misleading for the Exchange Act Defendants to suggest that "[t]his dynamic"—i.e., Rivian's high fixed costs—"will cause our gross profit losses to increase on a dollar basis even as our revenue increases from ramping production volumes over the short to medium term" without also disclosing that Rivian's gross profit losses would also increase on a dollar basis with every vehicle sold—over the near- *and* long-term—because the cost of the R1S and R1T bill of materials exceeded the retail prices of those vehicles.

130.   *Third*, it was false and misleading for the Exchange Act Defendants to indicate that Rivian could—and, in fact, expected to—"generate positive gross profit[s]" on the R1 Platform simply by increasing "production utilization" and "leverag[ing its] investments." In truth, that was not possible. The fact that the cost of the R1 Platform's bill of materials exceeded its retail price ensured that, regardless of how much Rivian increased R1 production utilization and/or leveraged its investments, it would continue generating

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

negative gross profits on each R1S and R1T vehicle sold unless and until it implemented a substantial price increase and/or a significant reduction in costs for the R1 Platform.

131.   This omitted information also was highly material to investors. As discussed above, Rivian's value proposition to consumers and investors centered on its ability to deliver "world-beating specs" at "a very reasonable price tag." The fact that the Exchange Act Defendants omitted from the Registration Statement that the R1 Platform's bill of materials cost more than the retail prices of the vehicles meant that Rivian could not become profitable without materially increasing that price tag or significantly compromising its vehicle specs. Moreover, the issue that the Exchange Act Defendants identified as causing Rivian's "negative gross profits per vehicle"—its high fixed costs being spread over low production volumes—is shared by nearly all startup companies and could be remedied with increased production volumes. By contrast, the issue that the Exchange Act Defendants omitted to disclose—that the R1S and R1T were being sold at prices that did not even cover the cost of their parts—was unique to Rivian, could not be fixed by ramping up production volumes, and ensured that Rivian *could not generate positive gross profits per vehicle* on the R1S and R1T unless and until it materially increased their prices and/or reduced the bill of material costs for those vehicles.

132.   In addition, the Exchange Act Defendants explicitly told investors to rely only on the information in the Registration Statement, stating:

> You should rely only on the information contained in this prospectus or contained in any free writing prospectus filed with the Securities and Exchange Commission (the "SEC"). Neither we nor any of the underwriters have authorized anyone to provide any information or make any representations other than those contained in this prospectus or in any free writing prospectus we have prepared. Neither we nor the underwriters take responsibility for, and can provide assurance as to the reliability of, any other information that others may give you. This prospectus is an offer to sell only the shares of Class A common stock offered by this prospectus, but only under

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

circumstances and in jurisdictions where it is lawful to do so. The information contained in this prospectus is accurate only as of the date of this prospectus, regardless of the time of delivery of this prospectus or of any sale of the Class A common stock. Our business, results of operations, financial condition, and prospects may have changed since such date.

133.   Following the IPO, several of Rivian's IPO underwriters and other market research analysts initiated coverage of Rivian. For example, Piper Sandler initiated coverage on December 5, 2021, with an overweight rating and price target of $148, which it noted "impl[ied] 40% upside potential." Piper Sandler called out Rivian's Tesla-like approach of "develop[ing] their own software, semiconductors, batteries, charging networks, and direct-to-consumer business models" as giving the Company an "upper hand." Piper Sandler also assumed Rivian's longer-term market share would reach 11%–12% and 7%–8% in the U.S. and Europe, respectively, with a "particular strength in the pickup and van markets," and specifically called out that it believed software and services were a key factor driving Piper Sandler's 40% upside.

134.   Wedbush also initiated coverage on December 5, 2021 with an outperform rating and a $130 price target. After touting Rivian's "unmatched" features, Wedbush gushed, stating:

> We believe Rivian is in the driver's seat for a golden opportunity as current market demand for electric vehicles has never been higher . . . . We believe Rivian has put together a product offering with such attention to detail, build quality, luxury, and performance not seen potentially at scale since Tesla's debut of the Model S years ago in our opinion.

135.   Wedbush continued, explaining additional considerations driving its price target, including that:

> [T]he company expects to sell more than 742,000 units cumulatively over the next five years, and its 2 flagship models, the R1S and R1T, have already collectively received 48,000 reservations. We believe Rivian is set to create a

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

new category in the EV space with its game-changing debuts, a massive
Normal, Illinois factory footprint, and create a major brand within the EV
market over the next decade.

136.    Similarly, Barclays initiated coverage on December 6, 2021, explaining that
"Rivian's differentiated consumer branding centered around adventure makes it unique in
the EV market and provides a solid foundation for recurring revenues," and also flagged
the Company's relationship with "premier last-mile customer" Amazon for Rivian's
commercial vans. In light of this, Barclays wrote that it was "confident that RIVN can grow
into a major, multi-product OEM." While Barclays issued a rating of equal weight, it did
so because, following Rivian's explosive stock price growth after the IPO, "much of this is
already priced in" to the Company's stock price.

137.    Rivian continued to mislead and conceal material facts from investors on
December 16, 2021, during the Company's 3Q21 earnings call and in its 3Q21 Form 10-Q.
In the Form 10-Q, Rivian made false or misleading risk disclosures that were substantially
identical to those made in the Registration Statement. Those risk disclosures again
addressed the negative consequences that could result *if* Rivian's material costs increased
and *if* Rivian decided to offset those costs by increasing prices when, in fact, as discussed
above: (i) the cost of the R1 bill of materials had increased significantly since the original
R1 retail prices were set (and greatly exceeded those retail prices); and (ii) Rivian had
already decided to increase the retail prices of its vehicles.

138.    The Exchange Act Defendants went even further during Rivian's 3Q21
earnings call. On that call, McDonough told investors, for the first time, that, "given the
inflationary market backdrop, we also continue to evaluat[e] the pricing for our vehicle[s]."
Later during the 3Q21 earnings call, an analyst pressed Scaringe on Rivian's pricing. In
response, Scaringe also attributed Rivian's pricing evaluations to increased demand for its
vehicles, stating: "Now with regards to pricing, it's certainly the backdrop of inflation that
we're seeing and the very strong demand for products not just looking our product
(inaudible) broadly within the electrified space has caused us to look at our pricing . . . ."

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES
LAWS

Scaringe continued, telling investors, "in terms of the competitive step, we recognized they're very aggressively priced. That is something that we certainly considered and talk about quite a bit as a management team."

139.   Scaringe's and McDonough's statements were materially false and misleading when made. In particular, they led the market to believe that post-IPO inflation and increased demand for its vehicles caused Rivian to consider a price increase. In truth, Defendants knew prior to the IPO that Rivian's current pricing was insufficient to cover the cost of the bill of materials alone (without regard to the massive overhead costs that could be mitigated by ramped production), and they had already determined that a price increase was necessary for Rivian to become profitable. In other words, Rivian had conveyed to the market that pricing increases were being considered in order to capitalize on increased market demand and to offset post-IPO inflation, when in fact Rivian had already resolved to raise R1 prices because its current pricing structure precluded it from ever becoming profitable—thereby concealing from investors the relevant truth.

140.   Analyst reports following these statements confirm that the market was misled and believed that Rivian was considering price increases due to the strong demand Rivian was seeing for its R1 Platform and in light of the competitive landscape. For example, as an analyst from Deutsche Bank noted in a report published after the call: "The momentum acceleration in vehicle reservations, now at 71k units up from 55k just 6 weeks ago, is very encouraging and is prompting management to consider price increases." Similarly, in a January 6, 2022 report following GM's official unveiling of its EV Silverado pickup truck, Wolfe Research compared the R1T against up-fitted versions of the EV Silverado and Ford's EV F-150 Lightning, the other dominating options in the EV pickup truck space. While acknowledging that the three vehicle platforms were strongly competitive, Wolfe's report is clear that the price point of Rivian's R1T was a significant competitive aspect of the R1T's value proposition and prospects in the burgeoning EV pickup truck market:

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**Exhibit 1: EV Pickup Specs Comparison**

| Truck | Chevy Silverado EV RST | Ford F150 Lightning Platinum | Rivian R1T |
|---|---|---|---|
| Size | Full-Size | Full-Size | Mid-Size |
| Power | 664 HP | 563 HP | 835 HP |
| Torque | 780 ft-lbs | 775 ft-lbs | 908 ft-lbs |
| 0-60 | 4.5s | 4.4s | 3s |
| Payload | 1300 lbs | 1800 lbs | 1760 lbs |
| Towing | 10,000 lbs | 10,000 lbs | 11,000 lbs |
| Suspension | Independent Front + Rear Air Suspension | Independent Rear Suspension | Independent Front + Rear Air Suspension |
| Range | 400 miles | 300 miles | 314-400 miles |
| Battery Pack Size | 200 kWh | 131 kWh | 135-185 kWh |
| Miles/kWh | 2 | 2.3 | 2.3 |
| Approximate Price | $80,000-$105,000 | $90,874 | $77,500-$83,000 |

*Source: Company Data*

## J.    The Relevant Truth Is Revealed

141.    On February 1, 2022, Rivian announced that it would release its fourth quarter and full year 2021 results on March 10, 2022. Then, on March 1, 2022, following months of silence after its 3Q21 earnings call held on December 16, 2021, Rivian publicly announced the price increases that it had privately discussed prior to the IPO.

142.    Specifically, in an email to reservation holders and through revised pricing available on its website, Rivian revealed that its previous pricing was unsustainable by dramatically increasing the price for R1Ts and R1Ss equipped with quad-motor and "Large" battery pack specifications (which were previously the only available "base" options for both vehicles) by approximately *17%* for the R1T (from roughly $67,500 to roughly $79,500) and approximately *20%* for the R1S (from roughly $70,000 to roughly $84,500). Whereas the quad-motor and "Large" battery pack were previously standard, the quad-motor option and the "Large" battery pack options now cost customers an extra $6,000 each. Rivian stated these price increases were the result of "inflationary pressure on the cost of supplier components and raw materials across the world."

143.    The new, significantly increased pricing would apply not only to all future pre-orders, but also to virtually all existing pre-orders, with the exception of those already in the final steps of completing their transaction with Rivian. The Company announced that it was introducing a new "Standard" battery size and a new dual-motor option for both

vehicles (which was intended to allow pre-order customers, all of whom previously had a quad-motor and at least a "Large" battery pack, to retain their original pricing), as well as increased prices for "certain options, upgrades and accessories."

144.  As described by InsideEVs.com, Rivian's price increase announcement effectively gave pre-order holders two options: "keep[] their original order and pay[] the extra 17% - 20%, which, with options may be between $12,000 and $14,000 extra," or "delay[] their delivery a year or two, accept[] a dual-motor version instead of the promised quad-motor setup, and also accept[] a smaller battery pack in order to keep the same price they believed they were getting from the start." Vice similarly reported that "[c]onfigurations that had previously been standard, or the only available option, now cost thousands of dollars extra. The end result is people who thought they were buying a car for approximately $75,000 are finding that car now costs closer to $100,000. Customers are furious, obviously."

145.  In a statement to Electrek, Behl stated the price increases were the result of "inflationary pressure, increasing component costs, and unprecedented supply chain shortages and delays for parts (including semiconductor chips). This rise in cost and complexity due to these challenging circumstances necessitate an increase to the prices of the R1T and R1S models we offer today – prices which were originally set in 2018."

146.  As reported by numerous media outlets and industry analysts, many customers who pre-ordered R1Ts and R1Ss were enraged and indicated that they had or were planning to cancel their pre-orders because of the price increases. As explained by Vice:

> Price increases are obviously a fact of life these days, especially with the car market, a key driver of inflation. But it is rare to see car companies apply price changes, especially such drastic ones, to existing preorders. For example, Tesla regularly changes vehicle prices, but only to new orders. Legacy automakers have been fighting with dealers who are charging much more than the sticker price for electric vehicle preorders, telling them to knock it off.

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

147.    Likewise, a March 3, 2022 report from RBC noted that "[a] scan of message boards and online postings indicated there was a lot of anger among reservation holder and cancelations," while a March 4, 2022 report by Deutsche Bank noted that the price increases led to "a very negative reaction in the market in which many reservation holders cancelled their orders." Indeed, pre-order holders expressed their outrage in online postings, with one user on the popular RivianOwnersForum.com stating:

> My quoted price previously was $78,820 for an R1S after going through the configurator to get the same vehicle it's $92k. ***A 17k increase is not inflation – it means it wasn't priced appropriately to begin with***. Add-in the new 'option' for a dual motor which is position [sic] as a great new option but in reality it just means they are now charging you more for the quad motor which was previously the only option. ***This feels like a gigantic bait and switch***.

148.    In response to news of the Company's substantial price increases on pre-orders, Rivian's stock price fell $14, or more than 20%, from a close of $67.56 per share on February 28, 2022, to close at $53.56 per share on March 2, 2022.

149.    Then, on March 3, 2022, after facing intense public pressure from customers, in an email to pre-order holders and in a letter published on Business Wire, both signed by Scaringe, the Company reversed its decision to hike prices on between 71,000 and 83,000 customers who ordered R1s before March 1, 2022. Given Rivian's concession that these pre-ordered vehicles were underwater on costs, analysts seized on the significant negative impact to Rivian's financial condition going forward. For example, a March 3, 2022 report from analyst RBC stated: "***The roll-back on pricing is costing it ~$850mm in revenue*** (assuming no cancelations) . . . ."

150.    On March 3, 2022, The Wall Street Journal noted that, following the prior day's share price decline due to the price hikes, "[s]hares fell further Thursday, down nearly 5% to $50.91." Reuters similarly wrote on March 3 that "Rivian stock, which plunged over 13% on Wednesday, extended losses on Thursday, down 4%."

151.   From the close of trading on March 2, 2022, through the close of trading on March 10, 2022, the price of Rivian's Class A common stock fell from $53.56 to $41.16. During this time, analysts digested the potential impact of Rivian's attempted price hike and what to expect from the additional news slated to be released during the Company's forthcoming earnings call on March 10. For example, Wolfe Research wrote on March 9: "We believe RIVN required a $12-$14k price increase in order to achieve their prior financial targets. Without the price increases, we think Consensus (for 2022-2023) will need to be lowered by at least $0.8-$1.4 bn (~70k-100k reservation holders x $12-$14k implied cost headwind)."

152.   Then, after trading closed on March 10, 2022, the market finally learned the full extent to which Rivian's long term financial prospects had been impacted by its previously undisclosed need to reprice its vehicles, including existing orders. According to the Company's disclosures, its projected adjusted EBITDA for FY2022 was a disappointing ($4,750 million) and reported that Rivian would face negative gross margins throughout "[a]s we continue to ramp-up our manufacturing facility, manage supply chain challenges, face continued inflationary pressures, *and minimize price increases to customers in the near term*."

153.   Reporting on this revised EBITDA guidance, J.P. Morgan noted in its coverage of the earnings release:

> The company reversed course for those who had placed deposits prior to March 1, which we estimate implies similarly lower gross profit margin for the first nearly 83,000 units delivered (which we now expect to occur during 1Q24). For future reservations, however, the material price hikes will still apply, and while this should offset currently foreseeable inflationary cost pressures (meaning dilution to gross profit margin but not dollars), it does imply also some demand destruction.

154.   Meanwhile, Deutsche Bank noted "Rivian's soft 4Q results and weak 2022 outlook reflect largely predictable delays ramping up vehicle production amid challenges

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

from its supply chain, but also steep cost pressures from input costs in the current inflationary environment, which it cannot offset with pricing following the backlash around its proposed price increase."

155.    The market reaction to this revised scenario was swift and severe. On March 11, 2022, Rivian's stock price fell almost 8%, from a close of $41.16 on March 10 to a close of $38.05 on March 11, and continued to fall further the next trading day on high volume, closing on March 14 at $35.83—less than half of its $78 per share IPO price.

## V.    THE EXCHANGE ACT DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

156.    As alleged below, the Exchange Act Defendants issued numerous false or misleading statements and omissions of material fact during the Class Period concerning Rivian's R1T and R1S vehicle pricing. The Exchange Act Defendants' misstatements and omissions were made in the Company's Registration Statement, 3Q21 10-Q, Shareholder Letter, and conference call with analysts and investors.

### A.    Registration Statement

157.    In the Risk Factor section of Rivian's Registration Statement, Rivian acknowledged the negative consequences that could occur if its materials costs increased and if Rivian attempted to increase prices to address increased material costs, stating:

> ***Substantial increases in the prices for such components, materials and equipment would increase our operating costs and could reduce our margins if we cannot recoup the increased costs. Any attempts to increase the announced or expected prices of our vehicles*** in response to increased costs could be viewed negatively by our potential customers and could adversely affect our business, prospects, financial condition, results of operations, and cash flows.

158.    The statements in Paragraph 157 above were materially false and misleading when made. The Exchange Act Defendants' failure to disclose that, by the time of the IPO, the cost of the R1S and R1T bill of materials significantly exceeded their retail prices

rendered false and misleading their disclosures regarding the material risk of potential negative consequences that ***could*** occur ***if*** materials costs increased. Additionally, the Exchange Act Defendants' omission of the fact that Rivian had already made the decision to increase retail prices of the R1T and R1S in advance of the IPO rendered false and misleading their disclosures regarding the material risk of potential negative consequences that ***could*** occur that ***if*** Rivian decided to raise prices.

159.    In the MD&A section of the Registration Statement, in a subsection titled, *Our Business Model*, the Exchange Act Defendants stated:

> Our decision to deeply vertically integrate our ecosystem has required substantial upfront investments in capabilities, technologies, and services that are often outsourced by other manufacturers. For example, we are making investments in vehicle technology, manufacturing capacity, and charging infrastructure, and these expenses will appear in our cost of revenue. ***We expect to operate at a negative gross profit per vehicle for the near term as our fixed costs from investments in vehicle technology, manufacturing capacity, and charging infrastructure are spread across a smaller product base until we launch additional vehicles and ramp production. This dynamic will cause our gross profit losses to increase on a dollar basis even as our revenue increases from ramping production volumes over the short to medium term***.

160.    In the same section of the Registration Statement, the Exchange Act Defendants stated: "***Over the long term, we believe that we will be able to increase our gross margin in the long term and generate positive gross profit as production utilization increases and we leverage our investments***."

161.    The statements in Paragraphs 159-160 above were materially false and misleading when made. It was misleading for the Exchange Act Defendants to identify one driver of Rivian's "negative gross profit per vehicle"—the fact that its "fixed costs . . . are spread across a smaller product base"—while omitting the other significant driver of its

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

"negative gross profit for vehicle"—the fact that the cost of the R1S and R1T bill of materials alone exceeded their retail prices. Because the cost of the R1 Platform's bill of materials (which had been fully sourced by the time this statement was made) exceeded its retail prices, Rivian would have operated at a negative gross profit per vehicle *even if* its fixed costs had been spread over a larger product base. In fact, ***even if Rivian's fixed costs were $0***, it still would have operated at a negative gross profit per vehicle.

162.   Moreover, it was misleading for the Exchange Act Defendants to suggest that "[t]his dynamic"—i.e., Rivian's high fixed costs—"will cause our gross profit losses to increase on a dollar basis even as our revenue increases from ramping production volumes over the short to medium term" without also disclosing that Rivian's gross profit losses would also increase with every vehicle sold—over the long term—because the cost of the R1 Platform bill of materials exceeded the retail prices of the R1S and R1T.

163.   In addition, it was materially false and misleading for the Exchange Act Defendants to state that Rivian could "generate positive gross profit[s]" on the R1 Platform simply by increasing "production utilization" and "leverag[ing its] investments." In truth, the fact that the cost of the R1 Platform's fully-sourced bill of materials exceeded its retail price ensured that, regardless of how much Rivian increased R1 production utilization and/or leveraged its investments, it would continue operating at a negative gross profit per vehicle unless and until it implemented a substantial price increase and/or a significant reduction in costs for the R1 Platform.

## B.    December 16, 2021: 3Q21 Earnings Conference Call and 3Q21 10-Q

164.   After the market closed on December 16, 2021, Rivian held an earnings conference call to discuss the Company's 3Q21 results. During the call, McDonough stated in her prepared remarks:

> ***In the near term, we expect that this dynamic of high fixed cost associated with operating and running our large scale, highly vertically integrated plan amortized over a small but growing number of vehicles produced across the R1 and RCV platform will continue to have a negative drag on gross profit***.

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

As a result, in the third quarter we generated a negative gross profit of $82 million.

165. The statement in Paragraph 164 was materially false and misleading when made. Specifically, it was misleading for Defendants to disclose one factor that was causing "a negative drag on gross profit" over the near term without also disclosing the other significant factor that would result in Rivian generating negative gross profits per vehicle over the near and long-term—the fact that the cost of the R1S and R1T bill of materials alone exceeded their retail prices. Because the cost of the R1 Platform's bill of materials exceeded its retail prices, Rivian would have operated at a negative gross profit per vehicle *even if* its "high fixed costs" had been amortized over a large number of vehicles produced. Indeed, Rivian would have generated negative gross profits per vehicle *even if its fixed costs were $0*, and even if it was operating at full production capacity.

166. During her prepared remarks, McDonough also stated, "*[a]nd given the inflationary market backdrop, we also continue to evaluation [sic] the pricing for our vehicle [sic]*."

167. During the Q&A portion of the 3Q21 earnings call, Wolfe Research analyst Robert Saltzman and Scaringe had the following exchange:

SALTZMAN: Claire mentioned that you're looking at opportunities to accelerate your strategy. Are there things that you can do to maybe accelerate the ramp that you originally envisioned for the TR1 platform, just given the response to the product or are you I think Claire alluded to, inflation and looking at pricing, are you looking at opportunities to adjust pricing just based on what the demand is for the product?

SCARINGE: *Now with regards to pricing, it's certainly the backdrop of inflation that we're seeing and the very strong demand for products not just looking our product (inaudible) broadly within the electrified space has caused us to look at our pricing and really I'd say recognizing the set of product features that we've been able to put together into the vehicles*. And

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

the vehicles are incredibly -- you had a chance to drive them, they're incredibly fun to drive, very capable, over 800-horsepower, 0 to 60, three seconds, great on-road, great off-road but also a great everyday vehicle. ***So in terms of the competitive step, we recognized they're very aggressively priced***. That is something that we certainly considered and talk about quite a bit as a management team.

168.   The statements in Paragraphs 166-167 were materially false and misleading when made. In particular, they led the market to believe that Rivian was considering a price increase because of post-IPO inflation and increased demand for its vehicles. In truth, the Exchange Act Defendants knew, well before the IPO, that Rivian's current pricing was insufficient to cover the cost of the bill of materials alone (without regard to the massive overhead costs that could be mitigated by ramped production), and that a price increase was necessary for Rivian to become profitable. In other words, Rivian had conveyed to the market that pricing increases were being considered in order to capitalize on market demand for its products, when in truth Rivian had already decided to increase prices in order to mitigate the losses that Rivian had been suffering (and would otherwise continue to suffer absent a price increase) on each vehicle sold, which Rivian's management knew to be the case.

169.   In addition, Scaringe's and McDonough's statements gave the misleading impression that the possibility of a price increase due to inflation was a new development, when they knew prior to the IPO that the cost of the R1 Platform's bill of materials vastly exceeded the retail prices of the R1S and R1T.

170.   The Company's 3Q21 Form 10-Q, which it filed with the SEC on December 17, 2021, repeated the risk disclosure set forth in the Registration Statement concerning the possible negative consequences that could occur if Rivian's costs and retail prices increased:

***Substantial increases in the prices for such components, materials and equipment would increase our operating costs and could reduce our***

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*margins if we cannot recoup the increased costs. **Any attempts to increase the announced or expected prices of our vehicles*** in response to increased costs could be viewed negatively by our potential customers and could adversely affect our business, prospects, financial condition, results of operations, and cash flows.

171.  The foregoing representation was materially misleading when made. Specifically, it was misleading for the Exchange Act Defendants to warn investors about the potential negative consequences that **could** occur **if** materials costs increased—and **if** Rivian decided to raise prices—when they knew that Rivian's bill of material costs **had, in fact**, increased significantly and substantially exceeded the R1S and R1T retail prices as of the time of the IPO. They also knew that Rivian **had, in fact**, decided prior to the IPO that it would increase R1S and R1T retail prices in response to those increased costs.

## VI.  ALLEGATIONS OF LOSS CAUSATION

172.  Class members were damaged as a result of the Exchange Act Defendants' fraudulent conduct as alleged herein. During the Class Period, the Exchange Act Defendants engaged in a scheme to deceive investors by issuing a series of material misrepresentations and omissions of material facts, trends, events, and uncertainties required to be disclosed, relating to, among other things, the pricing and profitability of Rivian's R1 Platform.

173.  As a direct result of the Exchange Act Defendants' scheme, misrepresentations of material fact, and omissions of material fact, Rivian's Class A common stock traded at artificially inflated prices throughout the Class Period.

174.  Unknowingly, and in reliance upon the Exchange Act Defendants' materially false or misleading statements and omissions, Class members purchased or otherwise acquired Rivian's Class A common stock at artificially inflated prices on the Nasdaq exchange. But for the Exchange Act Defendants' misrepresentations, omissions, and fraudulent scheme, Plaintiffs and other Class members would not have purchased or otherwise acquired Rivian's Class A common stock at the artificially inflated prices at which it traded during the Class Period.

175. The relevant truth was revealed beginning on March 1, 2022, when Rivian announced that it was dramatically increasing the price for R1Ts and R1Ss by "approximately 17%" for the R1T (from roughly $67,500 to roughly $79,500) and "approximately 20%" for the R1S (from roughly $70,000 to roughly $84,500). In addition, the Company announced that it was introducing a new "Standard" battery size and a new dual-motor option for both vehicles, as well as increased prices for "certain options, upgrades and accessories." Moreover, the new, significantly increased pricing would apply not only to all future pre-orders, but also to virtually all existing pre-orders, with the exception of those already in the final steps of completing their transaction with Rivian.

176. As described by InsideEVs.com, Rivian's price increase announcement effectively gave pre-order holders two options: "keep[] their original order and pay[] the extra 17% - 20%, which, with options may be between $12,000 and $14,000 extra," or "delay[] their delivery a year or two, accept[] a dual-motor version instead of the promised quad-motor setup, and also accept[] a smaller battery pack in order to keep the same price they believed they were getting from the start." Vice similarly reported that "[c]onfigurations that had previously been standard, or the only available option, now cost thousands of dollars extra. The end result is people who thought they were buying a car for approximately $75,000 are finding that car now costs closer to $100,000. Customers are furious, obviously."

177. In a statement to Electrek, Behl stated the price increases were the result of "inflationary pressure, increasing component costs, and unprecedented supply chain shortages and delays for parts (including semiconductor chips). This rise in cost and complexity due to these challenging circumstances necessitate an increase to the prices of the R1T and R1S models we offer today – prices which were originally set in 2018."

178. In response to news of the Company's substantial price increases on pre-orders, Rivian's stock price fell $14, or more than 20%, from a close of $67.56 per share on February 28, 2022, to close at $53.56 per share on March 2, 2022.

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

179.    Market analysts and commentators identified the price increases as driving the decline in the price of Rivian's Class A common stock. For example, a March 1, 2022 report from RBC stated:

> While price increases were expected and previously communicated by the company, we were under the impression that pre-orders before a certain date would be grandfathered in. It now appears that only customers who are in the final steps of completing the transaction will see the prior price honored. To be fair, pricing was initially established in 2018 and a lot has changed since then with regard to inflation and the supply chain world. Still, it will be interesting to see whether orders are canceled or deferred. We will look for color on next week's earnings call.

180.    An article titled, *EV Startup Rivian Walks Back Price Increase, Apologizes to Customers; Price rise on already-ordered electric trucks and SUVs sent Rivian's stock sliding this week*, published by The Wall Street Journal on March 3, 2022, noted "Rivian shares slid more than 13% Wednesday [i.e., March 2] following the price-increase disclosure, as angry customers aired their frustration on social media and online forums."

181.    Similarly, Bloomberg reported in a March 3, 2022 article titled, *Rivian Hits Record Low After Admitting 'Mistake' on Price Hikes*, noted Rivian stock price's "13.5% slide the day prior, driven by Rivian's late-Tuesday decision to raise prices." In a March 2, 2022 article titled, *Rivian Stock Is Falling Because EV Prices Are Rising. Investors Aren't Happy*, Barron's wrote that "Rivian Automotive's decision to raise prices has caused its stock to tumble."

182.    Then, on March 3, 2022, after facing intense public pressure from customers, in an email to pre-order holders and in a letter published on Business Wire, both signed by Scaringe, the Company reversed its decision to hike prices on pre-order holders who ordered R1s before March 1, 2022. Given Rivian's concession that these vehicles were underwater on costs, analysts seized on the significant negative impact to Rivian going

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

forward. For example, a March 3, 2022 report from analyst RBC stated: "***The roll-back on pricing is costing it ~$850mm in revenue*** (assuming no cancelations) . . . ."

183.   Market commentators explained that the Company's Class A common stock share price fell in light of this news. On March 3, 2022, The Wall Street Journal noted that, following the prior day's share price decline due to the price hikes, "[s]hares fell further Thursday, down nearly 5% to $50.91." Reuters similarly wrote on March 3 that "Rivian stock, which plunged over 13% on Wednesday, extended losses on Thursday, down 4%."

184.   From the close of trading on March 2, 2022, through the close of trading on March 10, 2022, the price of Rivian's Class A common stock fell from $53.56 to $41.16. During this time, analysts digested this news regarding the potential impact of Rivian's attempted price hike and what to expect from the additional news slated to be released during the Company's forthcoming earnings call on March 10. For example, Wolfe Research wrote on March 9: "We believe RIVN required a $12-$14k price increase in order to achieve their prior financial targets. Without the price increases, we think Consensus (for 2022-2023) will need to be lowered by at least $0.8-$1.4 bn (~70k-100k reservation holders x $12-$14k implied cost headwind)."

185.   Then, after trading closed on March 10, 2022, the market finally learned the extent to which Rivian's long term financial prospects had been impacted by its previously undisclosed need to reprice its vehicles, including existing orders. According to the Company's disclosures, its projected adjusted EBITDA for FY2022 was a disappointing ($4,750 million) and reported that Rivian would face negative gross margins throughout "[a]s we continue to ramp-up our manufacturing facility, manage supply chain challenges, face continued inflationary pressures, ***and minimize price increases to customers in the near term***."

186.   The market reaction to this revised scenario was swift and severe. On March 11, 2022, Rivian's stock price fell almost 8%, from a close of $41.16 on March 10 to a close of $38.05 on March 11, and continued to fall further the next trading day on high volume, closing on March 14 at $35.83—less than half of its $78 per share IPO price.

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

187.   Analysts focused on these negative disclosures in coverage of Rivian after the 3Q21 earnings call. For example, reporting on this revised EBITDA guidance, J.P. Morgan noted in its coverage of the earnings release:

> The company reversed course for those who had placed deposits prior to March 1, which we estimate implies similarly lower gross profit margin for the first nearly 83,000 units delivered (which we now expect to occur during 1Q24). For future reservations, however, the material price hikes will still apply, and while this should offset currently foreseeable inflationary cost pressures (meaning dilution to gross profit margin but not dollars), it does imply also some demand destruction.

188.   Meanwhile, Deutsche Bank noted "Rivian's soft 4Q results and weak 2022 outlook reflect largely predictable delays ramping up vehicle production amid challenges from its supply chain, but also steep cost pressures from input costs in the current inflationary environment, which it cannot offset with pricing following the backlash around its proposed price increase."

189.   Rivian's disclosures on March 1, March 3, and March 10, 2022, partially corrected or reflected the materialization of risks concealed by the Exchange Act Defendants' material misstatements and omissions of material facts alleged herein.

190.   The decline in the price of Rivian Class A common stock between the close of market on February 28, 2022, and March 14, 2022, is directly attributable to the market absorbing information that corrected, or reflected the materialization of risks concealed by, the Exchange Act Defendants' material misrepresentations or omissions.

191.   Plaintiffs and other Class members suffered economic losses as the price of Rivian Class A common stock fell in response to the disclosure of new information concealed by the Exchange Act Defendants' misstatements and omissions on these dates. These price declines were a direct result of the materially false or misleading statements and omissions alleged herein. It was foreseeable that these disclosures would cause the price of Rivian Class A common stock to decline. Thus, the Exchange Act Defendants' wrongful

conduct, as alleged herein, directly and proximately caused the damages suffered by Plaintiffs and other Class members.

## VII.  ADDITIONAL ALLEGATIONS OF THE EXCHANGE ACT DEFENDANTS' SCIENTER

192.   The Exchange Act Defendants were active and culpable participants in the fraud, as evidenced by their knowing or reckless issuance and/or control over the alleged materially false or misleading statements and omissions. The Exchange Act Defendants acted with scienter in that they knew or recklessly disregarded that the public statements set forth above in Part V were materially false or misleading when made, and knowingly or recklessly participated or acquiesced in the issuance or dissemination of such statements as primary violators of the Federal securities laws. In addition to the facts set forth in Part IV above, numerous additional facts give rise to the strong inference that, throughout the Class Period, the Exchange Act Defendants knew or recklessly disregarded that their statements were materially false and misleading when made.

193.   *First*, the Exchange Act Defendants knew or were deliberately reckless in not knowing that the cost of the bill of the materials exceeded the R1T and R1S retail prices because of their access to Project X. According to FE-4, Project X was a database that tracked the R1 Platform's bill of material costs. Both FE-4 and FE-5 had access to Project X, and this access forms the basis of their knowledge of the cost of the bill of materials for the R1 Platform beyond the cost of those parts and components that they were personally involved in estimating and sourcing. Additionally, while the cost of the battery was excluded from Project X at some point prior to the IPO, FE-4 and FE-5 indicated that, even excluding the battery, the R1 bill of materials costs in Project X still exceeded its retail prices by the time of the IPO. In addition, FE-4 and FE-5 each advised that they had knowledge of Rivian's battery costs even after it was removed from Project X. According to FE-4, everyone involved in Rivian's Finance, Cost Engineering, and Purchasing departments, as well as Rivian's senior executives, including Defendant Scaringe, had access to Project X.

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

194.   Likewise, the Exchange Act Defendants, as well as other high-level Rivian executives including Behl, Nick Kalayjian (Chief Product Development Officer), Jacob Kohn (Vehicle Line Director), Rod Copes (Company's former Chief Operating Officer), and Charly Mwangi (Company's former Executive Vice President of Manufacturing and Engineering), participated in "Gate Review" meetings prior to the IPO during which these executives received reporting that showed the cost increases of the R1 vehicles during the launch process. According to FE-2, there were nine "gates" in total that Rivian had to clear internally in order to successfully launch its vehicles. When a certain milestone was reached, which occurred at varying cadences, it prompted the internal Gate Review. As FE-2 explained, "[t]here was an accumulation of costs that were added since the prior [Gate] review." According to FE-2, as Rivian launched the vehicles and ramped up production, the Company "would identify more issues that needed to be addressed. The issues come at a cost. There were multiple cost adds, just based on the learning curve."

195.   Further, Rivian attempted to re-source components at lower prices or generate cost reductions, but those efforts went nowhere. FE-4 reported that the Cost Engineer Group came up with new ideas each month for cost reductions, but nothing was ever really done. For example, FE-4 recalled that the Cost Engineering Group identified proposed cost reductions of about $2,000 for the vehicle interior but only approximately $800 of that was ever realized because Scaringe wanted to use actual wood for the R1 interiors. FE-4 confirmed that Scaringe rejected any proposal to get rid of the wood used in the R1 interiors.

196.   In any event, both FE-4 and FE-5 explained that once production began, it was difficult to change suppliers. FE-5 explained that the materials are sourced prior to production and once that occurs, a purchase order is signed and the cost is locked in. FE-5 said that prior to the IPO, in the September 2021 timeframe, all the parts had been sourced and material costs had been set, unless there were quality issues which necessitated changes.

197.   Moreover, statements by former Rivian employee, Laura Schwab, corroborate the facts provided by other former Rivian employees, and underscore that Rivian's senior most executives knew that R1 Platform unit sales would generate losses for the Company

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

unless and until Rivian significantly increased prices and/or significantly reduced material costs. Specifically, Schwab has stated that, "[b]eginning in spring of 2021, [she] started to raise the alarm about concerns she had relating to Rivian's ability to deliver on its promises to investors." One such "promise to investors" was the price of the R1T and R1S vehicles. According to Schwab, "it was clear that the vehicles were underpriced, and each sale would result in a loss the company." Schwab stated that prior to the IPO, she "ultimately contacted Dennis Lucey, Rivian's Finance Director, and worked with him to develop projections showing how much of a loss the company would incur if Rivian did not raise prices."

198. Schwab has said that she "raised this issue with several executives, including Mr. Behl, Stuart Dixon (Director of Product Management), and Andy Zicheck (Principal Product Manager). Mr. Behl brushed her off." However, Behl finally "*agreed that [Rivian] would need to raise the vehicle prices after the IPO*." Schwab has recounted that she "criticiz[ed] and disclos[ed] the company's misleading and inaccurate messaging around its delivery schedule, pricing, vehicle readiness, and production rates." She also stated that she "voiced her concerns about the company making false commitments to customers and investors in multiple meetings with the company's senior leadership."

199. In addition, senior Rivian executives, including the Exchange Act Defendants, were aware of Schwab's concerns regarding the pricing of the R1 at the time the Registration Statement was deemed effective (November 9, 2021), as they publicly disputed her claims on November 10, 2021. Indeed, Schwab's lawsuit and Statement of Claims were filed on November 4, 2021, and Scaringe publicly disputed them on the day of the Company's IPO. However, at the time of the IPO—and unlike investors—the Exchange Act Defendants had access to the information necessary to confirm the accuracy of Schwab's statements. Further, the Company's termination of Schwab shortly after she raised with senior Rivian executives concerns about the price of Rivian's R1 vehicles and losses stemming from each R1 unit sold supports a strong inference of the Exchange Act Defendants' scienter.

200.    Based on the above, by the time of the IPO, the Exchange Act Defendants knew or were deliberately reckless in not knowing that the cost of the bill of materials for the R1 Platform had been increasing and substantially exceeded the retail prices of the R1T and R1S, and that the losses being generated by this growing gap *could not be offset by* any cost efficiencies Rivian expected to realize through increased production because the R1T and R1S materials were already sourced and costs set. *See* ¶¶ 118-121.

201.    ***Second***, the Exchange Act Defendants' fraud directly concerned Rivian's core business operation: the production, pricing, and sale of the R1T and R1S. *See* ¶¶ 47-109. Described by Rivian as "our handshake with the world, the first step in building a relationship with customers," the importance of these flagship vehicles cannot be overstated. ¶ 97. Indeed, throughout the Class Period, the R1T and R1S were Rivian's only commercialized consumer units. Moreover, prior to and throughout the Class Period, the Exchange Act Defendants repeatedly touted the R1T's and R1S's value proposition by advertising their top-of-the-line all-terrain features, world-class interiors, and very reasonable price tag. *See* ¶¶ 47-87. Thus, it is implausible and absurd that the Exchange Act Defendants were not aware that Rivian had sourced the parts of the R1T and R1S at a total cost that exceeded the vehicles' retail price. It is equally implausible and absurd that the Exchange Act Defendants were unaware of the negative impact to Rivian's financial position caused by the sale of the flagship vehicles.

202.    Additionally, Defendant Scaringe was intimately involved with and knowledgeable about all aspects of the R1T and R1S, including the vehicles' components, features, and pricing. Indeed, Scaringe spent years designing the R1T and R1S, and in the years leading up to the IPO, followed his strategic promotional "roadmap" to create market demand for the vehicles. *See* ¶¶ 47-84. Scaringe stated that he "took the decision" to keep the R1T and R1S under the radar until Rivian was "truly ready . . . to not be making statements that are hot air but rather be making statements of fact." ¶ 82. Moreover, when publicly addressing the R1T and R1S retail prices, Scaringe explained that Rivian "intentionally made sure that we've architected the vehicle for that premium positioning."

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

¶ 83. It is implausible and absurd that Defendant Scaringe was unaware that Rivian had sourced the parts of the R1T and R1S at a total cost that exceeded the vehicles' retail price.

203. The Exchange Act Defendants publicly acknowledged their focus on the R1T and R1S pricing by: (i) distributing presentations during Rivian's IPO roadshow that advertised the R1T and R1S retail prices alongside the vehicles' best-in-class specifications (*see* ¶¶ 94-104); (ii) stating that R1 vehicle pricing had been and continued to be a topic of regular focus and discussion (*see* ¶¶ 10, 138); and (iii) warning investors that an increase in the vehicles' retail prices could have a negative impact on Rivian's financials (*see* ¶¶ 124-125).

204. ***Third***, the temporal proximity between the Exchange Act Defendants' alleged misstatements and subsequent disclosures exposing the truth bolsters the strong inference that the Exchange Act Defendants knew, or were deliberately reckless in not knowing, the false and/or misleading nature of their statements. Throughout the Class Period, the Exchange Act Defendants failed to disclose that the cost of the R1T and R1S bill of materials exceeded the vehicles' retail prices. As late as December 16, 2021, Defendants continued to state publicly the R1T and R1S retail prices, with Scaringe telling the market that Rivian had "certainly considered [the price of the vehicles] and talk[ed] about [it] quite a bit as a management team." Then, as alleged in Paragraphs 141-155 above, approximately two months later, on March 1, 2022, shocked both existing pre-order customers and Rivian investors, by raising the retail prices of the R1T and R1S.

205. ***Finally***, by virtue of their high-level positions as the most senior officers of the Company, participation in and awareness of Rivian's day-to-day operations, and control over the issuance of the false or misleading statements alleged above in Part V, the knowledge or deliberate recklessness of the Exchange Act Defendants concerning their materially false or misleading statements and omission is imputed to Rivian. In addition, the knowledge or deliberate recklessness of other senior employees and managers concerning the pricing and costing of the Company's R1 Platform is also imputed to Rivian.

Accordingly, by the date of Rivian's IPO, Rivian knew about or deliberately recklessly disregarded the information alleged in Part IV, above.

## VIII. PRESUMPTION OF RELIANCE

206. At all relevant times, the market for Rivian's common stock was an efficient market for the following reasons, among others:

a.  Rivian's common stock met the requirements for listing, and was listed and actively traded on the Nasdaq, a highly efficient and automated market;

b.  As a regulated issuer, Rivian filed periodic public reports with the SEC and the Nasdaq;

c.  Rivian regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d.  Rivian was followed by several securities analysts employed by major brokerage firm(s) who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace.

207. As a result of the foregoing, the market for Rivian's Class A common stock promptly digested current information regarding Rivian from all publicly available sources and reflected such information in the price of Rivian's Class A common stock. Under these circumstances, all purchasers and acquirers of Rivian's Class A common stock during the Class Period suffered similar injury through their purchase or acquisition of Rivian's Class A common stock at artificially inflated prices and the presumption of reliance applies.

208. Further, at all relevant times, Plaintiffs and all other Class members reasonably relied upon the Exchange Act Defendants to disclose material information as required by law and in the Company's SEC filings. Plaintiffs and the other Class members would not have purchased or otherwise acquired Rivian common stock at artificially inflated prices if

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES
LAWS

the Exchange Act Defendants had disclosed all material information as required. Thus, to the extent that the Exchange Act Defendants concealed or improperly failed to disclose material facts with regard to the Company and its business, Plaintiffs and other Class members are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972).

## IX.   THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE

209.   The Private Securities Litigation Reform Act's statutory safe harbor and the bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements alleged herein.

210.   None of the statements complained of herein was a forward-looking statement. Rather, each was a historical statement or a statement of purportedly current facts and conditions at the time such statement was made.

211.   To the extent that any of the materially false and misleading statements alleged herein can be construed as forward-looking, any such statement was not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statement.

212.   To the extent that the statutory safe harbor does apply to any forward-looking statement alleged herein, the Exchange Act Defendants are liable for any such statement because at the time such statement was made, the particular speaker actually knew that the statement was false or misleading, and/or the statement was authorized and/or approved by an executive officer of Rivian who actually knew that such statement was false when made.

213.   Moreover, to the extent that any Exchange Act Defendant issued any disclosures purportedly designed to "warn" or "caution" investors of certain "risks," those disclosures were also materially false and/or misleading when made because they did not disclose that the risks that were the subject of such warnings had already materialized and/or because such Defendant had the requisite state of mind.

## X.    CAUSES OF ACTION UNDER THE EXCHANGE ACT

### COUNT I

### Violation of Section 10(b) of the Exchange Act and
### SEC Rule 10b-5 Promulgated Thereunder
### Against the Exchange Act Defendants

214.   Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

215.   During the Class Period, the Exchange Act Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and the Class; and (ii) cause Plaintiffs and the Class to purchase or otherwise acquire Rivian's Class A common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, the Exchange Act Defendants took the actions set forth herein.

216.   The Exchange Act Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers or acquirers of Rivian's Class A common stock in an effort to maintain artificially high market prices thereof in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5.

217.   During the Class Period, the Exchange Act Defendants made the false statements specified above, which they knew or deliberately recklessly disregarded to be false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

218.   The Exchange Act Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or deliberately recklessly disregarded the true facts that were available to them. The Exchange Act Defendants engaged in this misconduct to conceal Rivian's true condition from the investing public and to support the artificially inflated prices of Rivian's Class A common stock.

219.   Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid for or otherwise acquired Rivian's Class A common stock at inflated prices. Plaintiffs and the Class would not have purchased or otherwise acquired Rivian's Class A common stock at such prices, or at all, had they been aware that the market prices for Rivian's Class A common stock had been artificially inflated by the Exchange Act Defendants' fraudulent course of conduct.

220.   As a direct and proximate result of the Exchange Act Defendants' wrongful conduct, Plaintiffs and the Class suffered damages in connection with their respective purchases or acquisitions of Rivian's Class A common stock during the Class Period.

## COUNT II

### Violation of Section 20(a) of the Exchange Act
### Against the Executive Defendants

221.   Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

222.   The Executive Defendants acted as controlling persons of Rivian within the meaning of Section 20(a) of the Exchange Act. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations, and/or intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Executive Defendants had the power to influence and control—and did influence and control, directly or indirectly—the decision-making of the Company, including the content and dissemination of the various false and/or misleading statements alleged herein. The Executive Defendants were provided with or had unlimited access to copies of the Company's reports and other statements alleged by Plaintiffs to be false and misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

223.   In particular, each Executive Defendant had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

have had the power to control or influence the activities giving rise to the securities violations as alleged herein, and exercised the same.

224.  As described above, Rivian and the Executive Defendants each violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Executive Defendants are liable under Section 20(a) of the Exchange Act. As a direct and proximate result of this wrongful conduct, Plaintiffs and Class members suffered damages in connection with their purchases or acquisitions of Rivian's Class A common stock during the Class Period.

## XI.  JURISDICTION AND VENUE FOR PLAINTIFFS' SECURITIES ACT CLAIMS

225.  Plaintiffs' claims arise under Sections 11, 12, and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77*l*, and 77o.

226.  This Court has jurisdiction over the subject matter of this action under Section 22 of the Securities Act, 15 U.S.C. § 77v, and 28 U.S.C. § 1331.

227.  Venue is proper in this District under Section 22 of the Securities Act, 15 U.S.C. § 77v, and 28 U.S.C. § 1391(b) because Rivian is headquartered in this District, Rivian conducts business in this District, and many of the acts and conduct that constitute the violations of law complained of herein, including the dissemination to the public of materially false and misleading information, occurred in this District.

228.  In connection with the acts, conduct, and other wrongs alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications, and the facilities of the national securities markets.

## XII.  ADDITIONAL SECURITIES ACT DEFENDANTS

### A.  Director Defendants

229.  Defendant Karen Boone ("Boone") is, and during the Class Period was, a Rivian Director. Boone signed the false and misleading Registration Statement.

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

230.    Defendant Jay Flatley ("Flatley") is, and during the Class Period was, a Rivian Director. Flatley signed the false and misleading Registration Statement.

231.    Defendant Peter Krawiec ("Krawiec") is, and during the Class Period was, a Rivian Director. Krawiec signed the false and misleading Registration Statement.

232.    Defendant Rose Marcario ("Marcario") is, and during the Class Period was, a Rivian Director. Marcario signed the false and misleading Registration Statement.

233.    Defendant Sanford Schwartz ("Schwartz") is, and during the Class Period was, a Rivian Director. Schwartz signed the false and misleading Registration Statement.

234.    Defendant Pamela Thomas-Graham ("Thomas-Graham") is, and during the Class Period was, a Rivian Director. Thomas-Graham signed the false and misleading Registration Statement.

235.    Boone, Flatley, Krawiec, Marcario, Schwartz, and Thomas-Graham are collectively referred to as the "Director Defendants."

### B.    Underwriter Defendants

236.    Morgan Stanley & Co. LLC ("Morgan Stanley") served as a lead bookrunner for Rivian's IPO. As indicated in the attached Exhibit C, Morgan Stanley sold Class A common stock issued pursuant and/or traceable to the Registration statement to plaintiff James Stephen Muhl during the Class Period.

237.    Goldman Sachs & Co. LLC ("Goldman Sachs") served as a lead bookrunner for Rivian's IPO.

238.    J.P. Morgan Securities LLC ("J.P. Morgan") served as a lead bookrunner for Rivian's IPO.

239.    Barclays Capital Inc. ("Barclays") served as a bookrunner for Rivian's IPO.

240.    Deutsche Bank Securities Inc. ("Deutsche Bank") served as a bookrunner for Rivian's IPO.

241.    Allen & Company LLC ("Allen & Company") served as a bookrunner for Rivian's IPO.

242.    BofA Securities, Inc. ("BofA") served as a bookrunner for Rivian's IPO.

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

243.    Mizuho Securities USA LLC ("Mizuho") served as a bookrunner for Rivian's IPO.

244.    Wells Fargo Securities, LLC ("Wells Fargo") served as a bookrunner for Rivian's IPO.

245.    Nomura Securities International, Inc. ("Nomura") served as a co-manager for Rivian's IPO.

246.    Piper Sandler & Co. ("Piper Sandler") served as a co-manager for Rivian's IPO.

247.    RBC Capital Markets, LLC ("RBC") served as a co-manager for Rivian's IPO.

248.    Robert W. Baird & Co. Incorporated ("Robert W. Baird") served as a co-manager for Rivian's IPO.

249.    Wedbush Securities Inc. ("Wedbush") served as a co-manager for Rivian's IPO.

250.    Academy Securities, Inc. ("Academy") served as a co-manager for Rivian's IPO.

251.    Blaylock Van, LLC ("Blaylock Van") served as a co-manager for Rivian's IPO.

252.    Cabrera Capital Markets LLC ("Cabrera") served as a co-manager for Rivian's IPO.

253.    C.L. King & Associates, Inc. ("C.L. King") served as a co-manager for Rivian's IPO.

254.    Loop Capital Markets LLC ("Loop") served as a co-manager for Rivian's IPO.

255.    Samuel A. Ramirez & Company, Inc. ("Samuel A. Ramirez") served as a co-manager for Rivian's IPO.

256.    Siebert Williams Shank & Co., LLC ("Siebert Williams Shank") served as a co-manager for Rivian's IPO.

257.    Tigress Financial Partners, LLC ("Tigress") served as a co-manager for Rivian's IPO.

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

258. Morgan Stanley, Goldman Sachs, J.P. Morgan, Barclays, Deutsche Bank, Allen & Company, BofA, Mizuho, Wells Fargo, Nomura, Piper Sandler, RBC, Robert W. Baird, Wedbush, Academy, Blaylock Van, Cabrera, C.L. King, Loop, Samuel A. Ramirez, Siebert Williams Shank, and Tigress are collectively referred to as the "Underwriter Defendants."

259. The Underwriter Defendants facilitated the offer and sale of Rivian Class A common stock to the investing public through the IPO. As the following table demonstrates, each of the Underwriter Defendants sold the following number of Class A common stock in the IPO:

| Name | Number of Shares |
|---|---|
| Morgan Stanley & Co. LLC | 38,898,305 |
| Goldman Sachs & Co. LLC | 38,898,305 |
| J.P. Morgan Securities LLC | 32,415,254 |
| Barclays Capital Inc. | 7,331,250 |
| Deutsche Bank Securities Inc. | 7,331,250 |
| Allen & Company LLC | 9,319,386 |
| BofA Securities, Inc. | 4,143,750 |
| Mizuho Securities USA LLC | 4,143,750 |
| Wells Fargo Securities, LLC | 4,143,750 |
| Nomura Securities International, Inc. | 1,275,000 |
| Piper Sandler & Co. | 1,275,000 |
| RBC Capital Markets, LLC | 1,275,000 |
| Robert W. Baird & Co. Incorporated | 637,500 |
| Wedbush Securities Inc. | 637,500 |
| Academy Securities, Inc. | 159,375 |
| Blaylock Van, LLC | 159,375 |
| Cabrera Capital Markets LLC | 159,375 |
| C.L. King & Associates, Inc. | 159,375 |
| Loop Capital Markets LLC | 159,375 |

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

| Name | Number of Shares |
|---|---|
| Samuel A. Ramirez & Company, Inc. | 159,375 |
| Siebert Williams Shank & Co., LLC | 159,375 |
| Tigress Financial Partners, LLC | 159,375 |
| Total: | 153,000,000 |

260.   In addition, the Underwriter Defendants were granted, and exercised, the right to purchase an additional 22,950,000 shares of Rivian Class A common stock. This obligated each of the Underwriter Defendants, subject to certain conditions, to purchase roughly the same percentage of the additional shares of Class A common stock as the number listed next to each of the Underwriter Defendants' names in the preceding table bears to the total number of shares of Class A common stock listed next to the names of all Underwriter Defendants in the preceding table. For example, Morgan Stanley's and Goldman Sachs's 38,898,305 shares equated to roughly 25% of the total 153,000,000 shares of Class A common stock initially offered to the public, so each firm was obligated to purchase roughly 25% (approximately 5.8 million) of the additional 22,950,000 shares.

261.   Together with the Exchange Act Defendants, the Director Defendants, and the Underwriter Defendants are collectively referred to as the "Securities Act Defendants."

## XIII. SECURITIES ACT DEFENDANTS' VIOLATIONS OF THE SECURITIES ACT

262.   In this part of the Complaint, Plaintiffs assert a series of strict-liability and negligence claims under Sections 11, 12(a)(2), and 15 of the Securities Act on behalf of all persons or entities who purchased or otherwise acquired Rivian Class A common stock in or traceable to the IPO and pursuant to the Registration Statement.

263.   The Securities Act claims are asserted against Rivian, the Executive Defendants, the Director Defendants, and the Underwriter Defendants. Each of these defendants is statutorily liable under Section 11 of the Securities Act for the materially inaccurate statements contained in the Registration Statement (including the accompanying

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

prospectus). Additionally, Section 12(a)(2) claims are asserted against the Underwriter Defendants, including Morgan Stanley, who sold shares in the IPO pursuant to the Registration Statement (including the accompanying prospectus), on behalf of Class members who purchased Class A common stock in the IPO. Plaintiffs also assert control person liability under Section 15 of the Securities Act against the Executive Defendants and the Director Defendants.

264.  The Securities Act claims are based on the fact that the Registration Statement contained untrue statements of material fact and omitted material facts about the Company's business and operations, including misrepresentations and omissions regarding, among other things, the drivers of Rivian's negative gross profits, the fact that Rivian's R1 Platform was significantly underpriced, the fact that the cost of the R1 Platform's bill of materials alone was significantly higher than the retail prices of the R1S and R1T, and the fact that Rivian had to materially increase R1 prices and/or significantly reduce R1 material costs in order for the R1 Platform to ever become profitable.

265.  The Securities Act claims against the Executive, Underwriter, and Director Defendants are also premised upon their negligent failure to conduct a reasonable due-diligence investigation into the accuracy and completeness of the representations contained in the Registration Statement. Had the Executive, Underwriter, and Director Defendants not acted negligently, and had they conducted reasonable due-diligence investigations before the IPO, they would have uncovered that the Registration Statement contained untrue statements of fact and omitted material facts.

266.  Plaintiffs' Securities Act claims are not based on any knowing or deliberately reckless misconduct on the part of the Securities Act Defendants. Thus, for purposes of Counts III-V below, Plaintiffs' claims do not sound in fraud, and Plaintiffs expressly disclaim any allegations of fraud or intentional misconduct in connection with these non-fraud claims, which are pleaded separately in this Complaint from Plaintiffs' Exchange Act claims.

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

### A.    Rivian's Blockbuster $13.7 Billion IPO

267.    On August 24, 2021, Rivian filed a confidential draft version of the registration statement and prospectus on Form DRS with the SEC. On October 1, 2021, Rivian filed a preliminary version of the registration statement and prospectus on Form S-1. Rivian subsequently filed several amendments to the registration statement and prospectus with the SEC on Forms S-1/A on October 22, 2021, November 1, 2021, and November 5, 2021. The Executive Defendants and the Director Defendants signed the Registration Statement. Rivian also generated a Form 424(B)(4) Prospectus dated November 9, 2021, which it subsequently filed with the SEC on November 12, 2021.

268.    The SEC declared the Registration Statement effective on November 9, 2021. Together with the November 9, 2021 prospectus, the Registration Statement offered 153,000,000 shares of Rivian's Class A common stock at a price of $78.00 per share (collectively, the "Registration Statement"). Rivian also granted the Underwriter Defendants a period of 30 days to purchase up to an additional 22,950,000 shares of Class A common stock from Rivian at the IPO price, less underwriting discounts and commissions. The Underwriter Defendants exercised this option to purchase all of the additional 22,950,000 shares of Rivian's Class A common stock.

269.    The Securities Act Defendants explicitly told investors to rely only on the information in the Registration Statement, stating:

> You should rely only on the information contained in this prospectus or contained in any free writing prospectus filed with the Securities and Exchange Commission (the "SEC"). Neither we nor any of the underwriters have authorized anyone to provide any information or make any representations other than those contained in this prospectus or in any free writing prospectus we have prepared. Neither we nor the underwriters take responsibility for, and can provide assurance as to the reliability of, any other information that others may give you. This prospectus is an offer to sell only the shares of Class A common stock offered by this prospectus, but only under

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

circumstances and in jurisdictions where it is lawful to do so. The information contained in this prospectus is accurate only as of the date of this prospectus, regardless of the time of delivery of this prospectus or of any sale of the Class A common stock. Our business, results of operations, financial condition, and prospects may have changed since such date.

270.   On or about November 10, 2021, Rivian commenced its IPO, and its Class A common stock began trading on the Nasdaq the same day.

271.   On or about November 15, 2021, the Company completed its IPO, in total offering of 175,950,000 shares of Class A common stock and generating gross proceeds of more than $13.7 billion before deducting underwriting discounts and commissions and estimated offering expenses payable by the Company.

272.   The Underwriter Defendants reaped massive profits in connection with Rivian's IPO, which generated a total of more than *$195 million in fees* for the Underwriter Defendants.

**B.   The R1 Platform Was Underpriced at the Time of the IPO**

**1.   Overview of Relevant Cost Metrics**

273.   As set forth in its public filings, Rivian used the concept of "gross profit per vehicle" to assess the profitability—or lack thereof—of the R1 Platform. Gross profit per vehicle refers to the difference between Rivian's revenues per vehicle (i.e., the vehicle's retail price) and its Cost of Goods Sold ("COGS").

274.   According to FE-3, COGS, in turn, consists of the following inputs: (i) the cost of the R1 "bill of materials"; (ii) labor costs; (iii) certain factory-related manufacturing costs; and (iv) other related costs such as freight and warranty expenses. "Bill of materials" refers to the roughly 3,000 components required to build the R1T and R1S vehicles.

275.   While certain fixed costs, like investments in vehicle technology and charging infrastructure, have a smaller per vehicle impact on gross profit as production volumes increase and those costs are spread across a larger base of vehicles, the same cannot be said for the cost of the bill of materials. Bill of materials costs apply to every vehicle sold; they

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

are not spread across Rivian's vehicle base. Moreover, if the retail price of a vehicle is less than the cost of its bill of materials, then the "gross profit per vehicle" will always and necessarily be negative regardless of how many R1S and R1T vehicles Rivian produces.

### 2. By the Time of the IPO, the Cost of the R1 Platform's Bill of Materials Vastly Exceeded the Retail Prices of the R1S and R1T

276.   In 2018, Rivian set its pricing for the R1T and R1S at $69,000 and $72,500, respectively, and began taking pre-orders. According to FE-5, Rivian set these original retail prices based on cost estimates obtained from a third-party consultant retained by Rivian to estimate the cost of each component or part of the bill of materials. FE-5 stated that the consultant's cost estimate for the R1 bill of materials was approximately $70,000. This $70,000 BOM total included a mixture of the consultant's estimates, actual prices for those parts that had been sourced, and a small percentage of prices supplied by Rivian's engineering department for parts yet to be designed.

277.   According to FE-5, Rivian's purchasing department used the consultant's cost estimates as target prices when negotiating with suppliers to purchase vehicle parts that were not yet sourced. By 2019, Rivian purchasers came to understand that the consultant had vastly understated its cost estimates and that Rivian would not be able to source parts at those prices. According to FE-5, suppliers complained that Rivian's proposed purchase prices for R1 parts were "not even in the ballpark" and "not realistic." Some suppliers even walked out of meetings with members of Rivian's purchasing department because their purchase price proposals were so low, while others openly criticized Rivian for its inability to accurately estimate material costs. According to FE-5, the consultant's cost estimates (which Rivian used to set the R1 retail prices) understated the actual costs of R1S and R1T materials by as much as 20% to 30%.

278.   In light of these issues, in December 2019, Rivian's then-CFO, Ryan Green, convened a meeting to assess the validity of the consultant's cost estimates. FE-5 attended the meeting with Green, along with Rivian's Finance Director and representatives from the

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

consultant. During the meeting, the consultant attempted to justify its cost estimates, while FE-5 presented information indicating that the consultant's estimates were too low.

279.   Shortly after this December 2019 meeting, Rivian terminated the consultant and brought its cost engineering operations fully in-house. Rivian expanded the size of its Cost Engineering Group, of which FE-4 and FE-5 were members, and placed it in charge of costing the entire vehicle, other than batteries. Following this transition, the Cost Engineering Group began reporting up through Steve Gawronski, Rivian's former head of purchasing and direct report of Scaringe. As the Cost Engineering Group built out the actual costs of materials for the R1S and the R1T, according to FE-4, it recorded those actual cost figures in a Rivian database known as "Project X," which tracked all material costs for the R1S and R1T vehicles.

280.   As the Cost Engineering Group continued sourcing materials for the R1S and R1T, the cost of the bill of materials soared. For example, FE-4 and FE-5, two Lead Cost Engineers responsible for the bill of materials, both recalled that by 2020, the cost of the bill of materials exceeded ***$100,000***—significantly more than the publicly disclosed retail prices of the R1S and R1T.

281.   FE-5 stated that by September 2021, when Rivian began manufacturing and delivering R1 vehicles, the entire bill of materials had been sourced and their costs were locked in with suppliers. At that time, according to FE-5, the total cost of the bill of materials for the R1 Platform was in the range of ***$110,000 to $115,000*** per vehicle. FE-4 stated that the cost was as high as $118,000 per vehicle and had been increasing each year. Thus, by the time of the November 2021 IPO, the cost of the R1S and R1T bill of materials was well in excess of the retail prices of those vehicles. FE-3 likewise confirmed that the cost of the R1S and R1T bill of materials alone exceeded their retail prices.

282.   The fact that the cost of the bill of materials drastically exceeded the R1S and R1T retail prices was highly material information to investors because it guaranteed that Rivian would record a negative profit margin on each R1S and R1T vehicle sold ***regardless***

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

of production volumes. It also meant that Rivian's losses would continue to increase even as sales and production volumes of its flagship vehicles increased.

283.   Indeed, unlike other costs, Rivian could not significantly reduce its per vehicle bill of material costs through increased efficiencies and ramped production. FE-3 stated that the R1 production line would eventually gain efficiencies, thereby reducing certain inputs of the R1 COGS, like labor and manufacturing costs. In addition, increased production would lower Rivian's overall cost per vehicle, as its fixed costs were spread across a larger vehicle base. According to FE-3, however, because the cost of the bill of materials alone exceeded the customer sale price of the R1 Platform, Rivian would continue to record negative gross profit margins on the R1 *even after* those cost benefits were realized. FE-4 noted Rivian may have gained some ability to negotiate its material costs downward once its production volumes doubled, but FE-4 also stated that those savings would be in the vicinity of just 5%. Thus, even if such cost efficiencies were realized, Rivian would still lose a significant amount of money on every R1S and R1T vehicle it sold. FE-4 further stated that it would be nearly impossible to reduce the bill of materials costs by even $20,000 without drastic changes in vehicle content.

284.   Thus, as FE-3 indicated, the cost of the bill of materials would continue to exceed the retail prices of the R1S and R1T—and, as a result, Rivian would continue to generate negative gross profits on each R1S and R1T vehicle it sold—until Rivian could successfully source and implement less expensive components into its vehicles, including a cheaper dual motor in its base vehicles, rather than the quad motor option it had advertised as standard. In the meantime, Rivian needed to significantly increase R1 prices if it had any hopes of generating positive gross profits on its R1S and R1T vehicles.

### 3.   Senior Executives Knew That the Cost of the R1 Platform's Bill of Materials Was Rising

285.   According to FE-4, Project X was a database that tracked the R1 Platform's bill of material costs. Both FE-4 and FE-5 had access to Project X, and this access forms the basis of their knowledge of the cost of the bill of materials for the R1 Platform beyond

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

the cost of those parts and components that they were personally involved in estimating and sourcing. Additionally, while the cost of the battery was excluded from Project X at some point prior to the IPO, FE-4 and FE-5 indicated that, even excluding the battery, the R1 bill of materials costs in Project X still exceeded its retail prices by the time of the IPO. In addition, FE-4 and FE-5 each advised that they had knowledge of Rivian's battery costs even after it was removed from Project X. According to FE-4, everyone involved in Rivian's Finance, Cost Engineering, and Purchasing departments, as well as Rivian's senior executives, including Defendant Scaringe, had access to Project X.

286.   In addition, Scaringe and McDonough, as well as other high-level Rivian executives including Behl, Nick Kalayjian (Chief Product Development Officer), Jacob Kohn (Vehicle Line Director), Rod Copes (Company's former Chief Operating Officer), and Charly Mwangi (Company's former Executive Vice President of Manufacturing and Engineering), participated in "Gate Review" meetings prior to the IPO during which these executives received reporting that showed the cost increases of the R1 vehicles during the launch process. According to FE-2, there were nine "gates" in total that Rivian had to clear internally in order to successfully launch its vehicles. When a certain milestone was reached, which occurred at varying cadences, it prompted the internal Gate Review. As FE-2 explained, "[t]here was an accumulation of costs that were added since the prior [Gate] review." According to FE-2, as Rivian launched the vehicles and ramped up production, the Company "would identify more issues that needed to be addressed. The issues come at a cost. There were multiple cost adds, just based on the learning curve."

### 4.   Prior to the IPO, Company Insiders Acknowledged That R1T and R1S Prices Needed to Be Increased

287.   Prior to the IPO, Rivian's senior management acknowledged they needed to increase the R1 prices. According to Schwab, after raising the issue of R1 pricing and that each unit sold to consumers would generate losses for the Company with a host of high-level managers, including Behl, Behl finally "***agreed that [Rivian] would need to raise the vehicle prices after the IPO***."

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

288.   The Securities Act Defendants did not disclose the need for a price increase to investors in the IPO offering documents.

**C.    As Information Incorrectly Stated in, and Omitted From, the Registration Statement Is Gradually Disclosed, the True Value of Rivian Class A Common Stock Is Revealed**

289.   As set forth below, the Registration Statement contained untrue statements of material fact and omissions of material fact that rendered the statements made in the Registration Statement misleading, as well as material omissions in violation of the affirmative disclosure obligations applicable to the Registration Statement. As a result of these misstatements and omissions, the information disclosed in the Registration Statement did not accurately reflect the true state of affairs within the Company or the risks associated with investments in Rivian's Class A common stock, and therefore the initial offering price set for the IPO did not reflect the true value of Rivian's Class A common stock.

290.   As the information misstated in or omitted from the Registration Statement was gradually disclosed to the market, the disclosure of this new information revealed the true value of Rivian's Class A common stock, causing the trading price of Rivian's Class A common stock to decline, thereby damaging Plaintiffs and the other members of the Class.

291.   The following events, among others, revealed the relevant truth concealed by the misstatements and omissions in the Registration Statement:

a.   On March 1, 2022, in an email to pre-order holders and through revised pricing available on its website, Rivian announced that it was introducing new battery and motor options and configurations for the R1T and R1S, and also implementing other price increases on the R1T and R1S, that applied to all current and future R1T and R1S reservations. The result was a dramatic price increase to the original R1T and R1S base configuration price by about 17% for the R1T (to approximately $79,000 from $67,500), and by about 20% for the R1S (to approximately $84,500 from $70,000), which the Company said were the result "of inflationary pressure on the cost of supplier components

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1    and raw materials across the world." In a statement to EV industry news site

2    Electrek, Behl claimed that the price increases were due to "inflationary

3    pressure, increasing component costs, and unprecedented supply chain

4    shortages and delays for parts (including semiconductor chips)." The backlash

5    was immediate and severe, with media outlets reporting that many Rivian

6    customers indicated that they cancelled, or planned to cancel, their pre-orders

7    as a result of the sizeable price hikes. On this news of the Company's

8    substantial price increases on pre-orders, Rivian's stock price fell $14, or more

9    than 20%, from a close of $67.56 per share on February 28, 2022, to close at

10    $53.56 per share on March 2, 2022.

11    b.    Between the close of trading on March 2 and March 10, the price of Rivian's

12    Class A common stock continued to decline as the market digested the

13    potential impact of Rivian's attempted price hike and partial reversal. On

14    March 3, 2022, in an email to customers and a letter published on Business

15    Wire, both signed by Scaringe, the Company reversed its decision to hike

16    prices on between 71,000 and 83,000 customers who ordered R1s before

17    March 1, 2022. Analysts seized on the significant negative impact this

18    decision would have on Rivian going forward, with one analyst explaining,

19    for example, that: "The roll-back on pricing is costing it ~$850mm in revenue

20    (assuming no cancelations) . . . ." Rivian's Class A common stock price

21    continued its decline from the prior day, dropping from a close of $53.56 per

22    share on March 2, to a close of $50.91 per share on March 3. Thereafter,

23    Rivian's stock price continued to fall as analysts continued to mull over the

24    potential impact of Rivian's attempted price hike and what to expect from the

25    additional news slated to be released during the Company's forthcoming

26    earnings call on March 10. For example, Wolfe Research wrote on March 9:

27    "We believe RIVN required a $12-$14k price increase in order to achieve

28    their prior financial targets. Without the price increases, we think Consensus

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES
LAWS

(for 2022-2023) will need to be lowered by at least $0.8-$1.4 bn (~70k-100k reservation holders x $12-$14k implied cost headwind)." All told, from the close of trading on March 2, 2022, through the close of trading on March 10, 2022, the price of Rivian's Class A common stock fell from $53.56 to $41.16.

c.  After the market closed on March 10, the Company disclosed disappointing projected adjusted EBITDA for FY2022 of ($4,750 million) and reported that Rivian would face negative gross margins throughout "[a]s we continue to ramp-up our manufacturing facility, manage supply chain challenges, face continued inflationary pressures, and minimize price increases to customers in the near term." The market seized on Rivian's recent price increase and subsequent walk-back as contributing to this negative EBITDA outlook. For example, Deutsche Bank noted "Rivian's soft 4Q results and weak 2022 outlook reflect largely predictable delays ramping up vehicle production amid challenges from its supply chain, but also steep cost pressures from input costs in the current inflationary environment, which it cannot offset with pricing following the backlash around its proposed price increase." J.P. Morgan noted in its coverage of the earnings release:

> The company reversed course for those who had placed deposits prior to March 1, which we estimate implies similarly lower gross profit margin for the first nearly 83,000 units delivered (which we now expect to occur during 1Q24). For future reservations, however, the material price hikes will still apply, and while this should offset currently foreseeable inflationary cost pressures (meaning dilution to gross profit margin but not dollars), it does imply also some demand destruction.

292.  In response to this news, on March 11, 2022, Rivian's stock price fell almost 8%, from a close of $41.16 on March 10 to a close of $38.05 on March 11, and continued

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES
LAWS

to fall further during the next trading day on high volume, closing on March 14 at $35.83—less than half of its $78 per share IPO price.

293.   These events, among others, revealed to the market that the Registration Statement contained untrue statements of material fact and omitted material facts concerning, among other things, the fact that prior to the IPO, the cost of the R1T and R1S bill of materials exceeded their retail prices and the Company decided to increase R1T and R1S prices after the IPO.

**D.    The Registration Statement Contained Untrue Statements of Material Fact and Material Omissions in Violation of Section 11 of the Securities Act**

294.   In the Risk Factor section of Rivian's Registration Statement, Rivian stated the negative consequences could occur if its materials costs increased and if Rivian attempted to increase prices to address increased material costs, stating:

> ***Substantial increases in the prices for such components, materials and equipment would increase our operating costs and could reduce our margins if we cannot recoup the increased costs. Any attempts to increase the announced or expected prices of our vehicles*** in response to increased costs could be viewed negatively by our potential customers and could adversely affect our business, prospects, financial condition, results of operations, and cash flows.

295.   The statement in Paragraph 294 above contained untrue statements of material fact and omitted to state material facts necessary to make the statements not misleading. The Registration Statement's failure to disclose that, by the time of the IPO, the cost of the R1S and R1T bill of materials had, in fact, increased and significantly exceeded their retail prices rendered untrue and misleading its disclosures regarding the material risk of potential negative consequences that ***could*** occur ***if*** materials costs increased. Additionally, the Registration Statement's omission of the fact that Rivian had already made the decision to increase retail prices of the R1T and R1S in advance of the IPO rendered untrue and

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

misleading its disclosure regarding the material risk of potential negative consequences that *could* occur that *if* Rivian decided to raise prices.

296.    In the MD&A section of the Registration Statement, in a subsection titled *Our Business Model*, Rivian stated:

> Our decision to deeply vertically integrate our ecosystem has required substantial upfront investments in capabilities, technologies, and services that are often outsourced by other manufacturers.  For example, we are making investments in vehicle technology, manufacturing capacity, and charging infrastructure, and these expenses will appear in our cost of revenue. ***We expect to operate at a negative gross profit per vehicle for the near term as our fixed costs from investments in vehicle technology, manufacturing capacity, and charging infrastructure are spread across a smaller product base until we launch additional vehicles and ramp production. This dynamic will cause our gross profit losses to increase on a dollar basis even as our revenue increases from ramping production volumes over the short to medium term.***

297.    In the same section of the Registration Statement, Defendants stated: "***Over the long term, we believe that we will be able to increase our gross margin in the long term and generate positive gross profit as production utilization increases and we leverage our investments***."

298.    The statements in Paragraphs 296-297 above contained untrue statements of material fact and omitted to state material facts necessary to make the statements not misleading. Specifically, it was misleading to identify one driver of Rivian's "negative gross profit per vehicle"—the fact that its "fixed costs . . . are spread across a smaller product base"—while omitting the other significant driver of its "negative gross profit for vehicle"—the fact that the cost of the R1S and R1T bill of materials alone exceeded their retail prices. Because Rivian sourced the parts for the R1 Platform's bill of materials at a total cost that exceeded its retail prices, Rivian would have operated at a negative gross

profit per vehicle *even if* its fixed costs had been spread over a larger product base. In fact, *even if Rivian's fixed costs were $0*, it still would have operated at a negative gross profit per vehicle.

299.   Moreover, it was misleading for Rivian to suggest that "[t]his dynamic"—i.e., Rivian's high fixed costs—"will cause our gross profit losses to increase on a dollar basis even as our revenue increases from ramping production volumes over the short to medium term" without also disclosing that Rivian's gross profit losses would also increase on a dollar basis with every vehicle sold—over the long term—because the cost of the R1 Platform bill of materials exceeded the retail prices of the R1S and R1T.

300.   In addition, the Registration Statement's representation that Rivian could "generate positive gross profit[s]" on the R1 Platform simply by increasing "production utilization" and "leverag[ing its] investments" was untrue. In truth, the fact that the cost of the R1 Platform's fully-sourced bill of materials exceeded its retail price ensured that, regardless of how much Rivian increased R1 production utilization and/or leveraged its investments, it would continue operating at a negative gross profit per vehicle unless and until it implemented a substantial price increase or a significant reduction in costs for the R1 Platform.

301.   This omitted information also was highly material to investors. For example, the Registration Statement recognized that vehicle pricing and customers' perception of the value of Rivian's vehicles were material elements of the Company's value. In one of the Registration Statement's "Risk Factors," Rivian acknowledged:

> If our existing preorder and prospective customers do not perceive our vehicles and services to be of sufficiently high value and quality, cost competitive and appealing in aesthetics or performance, or if the final production version of the R1S is not sufficiently similar to the drivable design prototypes, we may not be able to retain our current preorder customers or attract new customers, and our business, prospects, financial condition, results of operations, and cash flows would suffer as a result.

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

302.    Further, the fact that R1 Platform's bill of materials cost more than the retail price of the vehicles was material because it was unique to Rivian, could not be fixed by ramping up production volumes, and ensured that Rivian *could not generate positive gross profits per vehicle* on the R1S and R1T unless and until it materially increased their prices and/or reduced the bill of material costs for those vehicles.

### E.    The Registration Statement Failed to Disclose Information Required to Be Disclosed Under SEC Regulation S-K

#### 1.    Item 105

303.    Pursuant to Item 3 of Form S-1, the Registration Statement was required to furnish the information required by Item 105 of Regulation S-K, which requires the registrant to disclose under the caption "Risk Factors," "a discussion of the material factors that make an investment in the registrant or offering speculative or risky" and "[c]oncisely explain how each risk affects the registrant or the securities being offered." 17 C.F.R. § 229.105. Nevertheless, the Registration Statement failed to disclose information regarding material risks pursuant to Item 105. The disclosures in the Registration Statement therefore failed to adequately alert investors to the actual risks associated with an investment in Rivian.

304.    As set forth herein, the Registration Statement omitted material information required to be stated therein, including that, at the time of the IPO, the cost of the R1 Platform's bill of materials exceeded its retail prices, that unless Rivian implemented material price increases and/or material cost reductions, the R1 Platform would never achieve profitability, and that the Company had decided to increase R1T and R1S prices after the IPO.

305.    As a result, the Securities Act Defendants had a duty to disclose the following adverse factors that made Rivian's IPO risky: (i) the bill of materials for the R1T and R1S vastly exceeded their retail prices as of the date of the IPO; (ii) Rivian's decision to increase R1T and R1S prices; (iii) absent a significant reduction in material costs and/or a material price increases on current and future R1 pre-orders, Rivian could not become profitable and

would continue to lose money on each R1 sale. Because the Registration Statement failed to make the requisite disclosures, the Securities Act Defendants violated Item 105.

### 2.    Item 303

306.    Pursuant to Item 303 and the SEC's related interpretive releases thereto, an issuer is required to identify (i) "any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way," and "[i]f a material deficiency is identified, indicate the course of action that the registrant has taken or proposes to take to remedy the deficiency;" and (ii) "any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing." 17 C.F.R. § 229.303(b)(1)(i), (b)(2)(ii). Such disclosures are required to be made by an issuing company in registration statements filed in connection with public stock offerings.

307.    In May 1989, the SEC issued an interpretive release on Item 303 (the "1989 Interpretive Release"), stating, in pertinent part, as follows:

> Required disclosure is based on *currently known trends, events, and uncertainties that are reasonably expected to have material effects*, such as: A reduction in the registrant's product prices; erosion in the registrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract.
>
> . . . .
>
> A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.

308.    Furthermore, the 1989 Interpretive Release provided the following test to determine if disclosure under Item 303(a) is required:

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:

(1) Is the known trend, demand, commitment, event or uncertainty likely to come to fruition? If management determines that it is not reasonably likely to occur, no disclosure is required.

(2) If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition. Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur.

309. On April 7, 2003, the SEC issued a final rule addressing registrants' disclosure obligations under Item 303 ("2003 Rule"), and modified it on May 7, 2003. It emphasizes that MD&A disclosures are "of paramount importance in increasing the transparency of a company's financial performance and providing investors with the disclosure necessary to evaluate a company and to make informed investment decisions." The 2003 Rule further states that the MD&A provides "a unique opportunity for management to provide investors with an understanding of its view of the financial performance and condition of the company, an appreciation of what the financial statements show *and do not show*, as well as *important trends and risks* that have shaped the past *or are reasonably likely to shape the future*."

310. The "Objective" of Item 303 is as follows:

The objective of the discussion and analysis is to provide material information relevant to an assessment of the financial condition and results of operations of the registrant including an evaluation of the amounts and certainty of cash flows from operations and from outside sources. The discussion and analysis must focus specifically on material events and uncertainties known to management that are reasonably likely to cause

1  reported financial information not to be necessarily indicative of future
2  operating results or of future financial condition. This includes descriptions
3  and amounts of matters that have had a material impact on reported
4  operations, as well as matters that are reasonably likely based on
5  management's assessment to have a material impact on future operations.

6  17 C.F.R. § 229.303(a).

7  311.  The Registration Statement failed to disclose the following known trends,
8  demands, commitments, events or uncertainties, which existed at the time of the IPO, in
9  violation of Item 303: (i) the cost of the bill of materials for the R1 Platform had
10  significantly increased in the years leading up to the IPO and materially exceeded the retail
11  prices of the R1S and R1T at the time of the IPO, and its reasonably likely impact on
12  Rivian's profitability and financial condition; (ii) absent a material price increase and/or
13  significant reductions in material costs applicable to current and future R1 pre-orders, the
14  R1 Platform could not become profitable and would continue to lose money on each R1
15  sale; and (iii) Rivian's decision to increase R1S and R1T retail prices following the IPO
16  and the reasonably likely impact it would demand for its vehicles.

17  312.  Because the Registration Statement failed to make the requisite disclosures,
18  the Securities Act Defendants failed to comply with Item 303.

19  **XIV.  THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION**
20  **DOCTRINE ARE INAPPLICABLE**

21  313.  The Private Securities Litigation Reform Act's statutory safe harbor and the
22  bespeaks caution doctrine applicable to forward-looking statements under certain
23  circumstances does not apply to any of the materially false and misleading statements
24  alleged herein.

25  314.  None of the statements complained of herein was a forward-looking statement.
26  Rather, each was a historical statement or a statement of purportedly current facts and
27  conditions at the time such statement was made.

28

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES
LAWS

315.    To the extent that any of the materially false and misleading statements alleged herein can be construed as forward-looking, any such statement was not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statement.

316.    To the extent that the statutory safe harbor does apply to any forward-looking statement alleged herein, the Securities Act Defendants are liable for any such statement because at the time such statement was made, the particular speaker actually knew that the statement was false or misleading, and/or the statement was authorized and/or approved by an executive officer of Rivian who actually knew that such statement was false when made.

317.    Moreover, to the extent that any Securities Act Defendant issued any disclosures purportedly designed to "warn" or "caution" investors of certain "risks," those disclosures were also materially false and/or misleading when made because they did not disclose that the risks that were the subject of such warnings had already materialized and/or because such Defendant had the requisite state of mind.

## XV.    CAUSES OF ACTION UNDER THE SECURITIES ACT

### COUNT III

### Violation of Section 11 of the Securities Act

### Against the Securities Act Defendants

318.    Plaintiffs incorporate by reference the allegations in the paragraphs in Sections XI–XIV by reference. This claim is premised on the remedies available under Section 11 of the Securities Act and does not assert that the Director or Underwriter Defendants acted with fraudulent intent.

319.    The Registration Statement contained untrue statements of material fact, omitted to state other facts necessary to make the statements made therein not misleading, and omitted facts required to be stated therein.

320.    Each of the Executive and Director Defendants signed the Registration Statement and caused it to be declared effective by the SEC on or about November 9, 2021.

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

321.    Rivian is the registrant for the IPO and as issuer of the Class A common stock sold in the IPO is strictly liable to Plaintiffs and the Class for the misstatements and omissions contained in the Registration Statement.

322.    Each of the defendants named in this Count is responsible for and is liable for the contents and dissemination of the Registration Statement.

323.    As a result of their roles with Rivian and their direct access to information contradicting the statements in the Registration Statement, the Executive Defendants reasonably should have known of the untrue and misleading statements of material fact contained in the Registration Statement.

324.    The Director Defendants likewise had access to internal reports and information which, had they conducted reasonable due diligence, would have put them on notice of the untrue and misleading statements of material fact contained in the Registration Statement.

325.    The Underwriter Defendants were obligated to conduct an adequate due diligence investigation, and their negligent failure to do so was a substantial factor leading to the harm complained of in this Count.

326.    Together, the defendants named in this Count caused the Registration Statement to be filed with the SEC and to be declared effective, resulting in the issuance and sale of Rivian Class A common stock, which was purchased by Plaintiffs and other Class members.

327.    None of the defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and did not omit any material facts required to be stated in the Registration Statement or facts that were necessary to make the statements made in the Registration Statement not false or misleading. By reason of the conduct alleged in this Count, each Defendant named in this Count violated Section 11 of the Securities Act.

328.    Plaintiffs acquired Rivian Class A common stock in or traceable to the IPO.

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

329.   Plaintiffs and the Class have sustained damages as a result of the Securities Act violations alleged in this Count.

330.   At the time of Plaintiffs' purchases or acquisitions of Rivian Class A common stock, Plaintiffs and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged in this Count and could not have reasonably discovered those facts.

331.   Less than one year elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which the initial complaint filed in this action is based and the time that complaint was filed. Less than three years have elapsed between the time that the securities upon which this claim is brought were bona fide offered to the public and the time that the initial complaint and this Complaint were filed.

## COUNT IV
### Violation of Section 12(a)(2) of the Securities Act
### Against the Underwriter Defendants

332.   Plaintiffs incorporate by reference the allegations in the paragraphs in Sections XI–XIV by reference. This claim is premised on the remedies available under Section 12(a)(2) of the Securities Act and does not assert that the Underwriter Defendants, including Morgan Stanley, acted with fraudulent intent.

333.   This claim is asserted by additional plaintiff Muhl against the Underwriter Defendants, including Morgan Stanley, on behalf of all persons who purchased from the Underwriter Defendants, including Morgan Stanley, Rivian Class A common stock issued in or traceable to the IPO.

334.   By means of the Registration Statement (which, as defined herein included Rivian's Form 424(B)(4) Prospectus dated November 9, 2021, which it subsequently filed with the SEC on November 12, 2021), the Underwriter Defendants, including Morgan Stanley offered, promoted, and sold Rivian Class A common stock in the IPO, and therefore are liable under Section 12(a)(2) of the Securities Act for the untrue statements of material fact and omissions of material fact in the Registration Statement.

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

335.   The Underwriter Defendants, including Morgan Stanley, failed to conduct a reasonable investigation and did not possess a reasonable basis for the belief that the statements contained in the Registration Statement were true and without omissions of material fact.

336.   By reason of the conduct alleged in this Count, the Underwriter Defendants, including Morgan Stanley, violated Section 12(a)(2) of the Securities Act.

337.   Additional plaintiff Muhl and other Class members who purchased Rivian Class A common stock from the Underwriter Defendants, including Morgan Stanley, that were issued pursuant or traceable to the IPO or have sustained damages because the value of their Rivian Class A common stock has declined precipitously.

338.   Additional plaintiff Muhl, individually and on behalf of the Class who purchased Rivian Class A common stock from the Underwriter Defendants, including Morgan Stanley, that were issued pursuant or traceable to the IPO, seeks the remedies available under Section 12(a)(2) of the Securities Act for the Underwriter Defendants' and Morgan Stanley's violations.

339.   At the time of their purchases of Rivian Class A common stock in or traceable to the IPO from the Underwriter Defendants, including Morgan Stanley, additional plaintiff Muhl and the Class were without knowledge of the wrongful conduct alleged in this Count and could not have reasonably discovered those facts more than one year before the filing of the initial complaint in this action. The initial complaint was filed within three years of the time that the Underwriter Defendants, including Morgan Stanley, first sold Rivian Class A common stock to the investing public.

## COUNT V

### Violation of Section 15 of the Securities Act

### Against the Executive and Director Defendants

340.   Plaintiffs incorporate by reference the allegations in the paragraphs in Sections XI–XIV by reference. This claim is premised on the remedies available under

Section 15 of the Securities Act and does not assert that the Executive or Director Defendants acted with fraudulent intent.

341. This Count is brought under Section 15 of the Securities Act against the Executive and Director Defendants.

342. Each of the Executive and Director Defendants was a control person of Rivian by virtue of his or her position as a director or senior officer of Rivian.

343. The Executive and Director Defendants oversaw all operations at Rivian and Rivian could not have completed the IPO without these defendants signing or authorizing their signatures on the Registration Statement.

344. Less than one year elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which the initial complaint filed in this action is based and the time that this Complaint was filed. Less than three years has elapsed between the time that the securities upon which this claim is brought were bona fide offered to the public and the time that the initial complaint and this Complaint were filed.

## XVI. CLASS ACTION ALLEGATIONS APPLICABLE TO ALL CLAIMS

345. Plaintiffs bring this action as a class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class consisting of all persons and entities who purchased Rivian Class A common stock between November 10, 2021, and March 10, 2022, both dates inclusive, including those who purchased Rivian Class A common stock pursuant and/or traceable to the Registration Statement (collectively, the "Class"). Excluded from the Class are Defendants and their families, the officers, directors and affiliates of Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

346. The members of the Class are so numerous that joinder of all members is impracticable. Rivian Class A common stock is actively traded on the Nasdaq. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

members in the proposed Class because over 892 million shares of Class A common stock were outstanding as of December 13, 2021. Record owners and other members of the Class may be identified from records maintained by Rivian or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

347.    Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law as complained of herein.

348.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

349.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.    whether the Securities Act Defendants violated the Securities Act of 1933 Act, or the Exchange Act Defendants violated the Securities Exchange Act of 1934 Act and Rule 10b-5 promulgated thereunder;

b.    whether the Registration Statement contained untrue statements of material fact or omitted material information required to be stated therein;

c.    whether the Registration Statement omitted material facts necessary in order to make the statements made therein not misleading;

d.    whether the Exchange Act Defendants made false or misleading statements of material fact during the Class Period;

e.    whether the Exchange Act Defendants knew or recklessly disregarded that their statements were false and misleading during the Class Period;

f.    whether the price of Rivian Class A common stock was artificially inflated;

g.    whether the market for Rivian Class A common stock was efficient; and

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

h.   the extent of damage sustained by Class members, and the appropriate measure of damages.

350.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XVII. <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

a.   Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

b.   Awarding compensatory damages and equitable relief in favor of Plaintiffs and other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c.   Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d.   Such other and further relief as the Court may deem just and proper.

## XVIII.   <u>JURY DEMAND</u>

Plaintiffs hereby demand a trial by jury.

Dated:  March 2, 2023             **KESSLER TOPAZ
                                    MELTZER & CHECK, LLP**

                                 /s/ *Jennifer L. Joost*
                                 JENNIFER L. JOOST (Bar No. 296164)
                                 jjoost@ktmc.com One
                                 Sansome Street, Suite 1850
                                 San Francisco, CA 94104
                                 Telephone: (415) 400-3000
                                 Facsimile: (415) 400-3001

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

-and-

SHARAN NIRMUL (admitted *pro hac vice*)
snirmul@ktmc.com
RICHARD A. RUSSO, JR. (admitted *pro hac vice*)
rrusso@ktmc.com
EVAN R. HOEY (admitted *pro hac vice*)
ehoey@ktmc.com
ALEX B. HELLER (admitted *pro hac vice*)
aheller@ktmc.com
AUSTIN W. MANNING (admitted *pro hac vice*)
amanning@ktmc.com
280 King of Prussia Road
Radnor, PA 19807
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

*Counsel for Lead Plaintiff Sjunde AP-Fonden and additional Plaintiff James Stephen Muhl and Lead Counsel for the Proposed Class*

**LARSON LLP**
STEPHEN G. LARSON (Bar No. 145225)
slarson@larsonllp.com
PAUL A. RIGALI (Bar No. 262948)
prigali@larsonllp.com
555 South Flower Street, Suite 4400
Los Angeles, CA 90071
Telephone: (213) 436-4888
Facsimile: (213) 623-2000

*Liaison Counsel for Lead Plaintiff Sjunde AP-Fonden and additional Plaintiff James Stephen Muhl and Liaison Counsel for the Proposed Class*

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS