# EXHIBIT 2

**Exhibit 2**
**Page 167**

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| CHARLES LARRY CREWS, JR., Individually and on Behalf of All Others Similarly Situated,<br><br>    Plaintiffs,<br><br>  v.<br><br>RIVIAN AUTOMOTIVE, INC., et al.,<br><br>    Defendants. | Case No. 2:22-cv-01524-JLS-E<br><br>**CLASS ACTION** |

**EXPERT REPORT OF**

**PROFESSOR JOSHUA MITTS, PH.D.**

**December 1, 2023**

**Exhibit 2
Page 168**

# TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................................... 1

    A.    Qualifications ........................................................................................ 1

    B.    Summary of Conclusions ...................................................................... 2

II.   FACTUAL OVERVIEW .............................................................................................. 4

III.  I HAVE NOT IDENTIFIED ANY EVIDENCE INDICATING THAT UNREGISTERED
SHARES OF RIVIAN CLASS A COMMON STOCK WERE SOLD DURING THE
CLASS PERIOD ....................................................................................................... 7

IV.   EVEN IF UNREGISTERED SECURITIES WERE SOLD DURING THE CLASS PERIOD,
OWNERSHIP OF SECURITIES IN "FUNGIBLE BULK" FORM DOES NOT PRECLUDE
TRACING PURCHASES TO THE REGISTRATION STATEMENT USING STANDARD
ACCOUNTING METHODS THAT DO NOT AMOUNT TO "STATISTICAL TRACING" ................ 10

V.    TRACING PURCHASES IS AMENABLE TO CLASS-WIDE PROOF ............................................ 12

VI.   CONCLUSION ......................................................................................................... 13

**Exhibit 2**
**Page 169**

## I.    INTRODUCTION

### A.    Qualifications

1.    I am the David J. Greenwald Professor of Law at Columbia University.  I am also the principal of M Analytics LLC, a consulting firm specializing in financial economics.  I hold a Ph.D. in Finance & Economics from Columbia University, a J.D. from Yale University, and a B.A. in Liberal Studies from Georgetown University.

2.    I have published extensively in the fields of economics, finance, and law.  My articles have appeared in peer-reviewed journals, including the *Journal of Finance* (winner of the Dimensional Fund Advisors Distinguished Paper Prize (2020)), the *Journal of Law and Economics*, the *Journal of Legal Studies*, the *Journal of Institutional and Theoretical Economics*, the *International Review of Law and Economics*, the *Journal of Financial Regulation*, the *Business Lawyer*, and the *Harvard Business Law Review*, among others.

3.    I have been invited to present my research at numerous conferences and workshops in finance and law and economics, including the Annual Meeting of the American Finance Association, the Annual Meeting of the American Law & Economics Association, the Conference on Empirical Legal Studies, the Columbia Business School Conference on News and Finance, and the 8th Symposium on Intelligent Investing at Ivey Business School, and at workshops at Harvard University, Columbia University, New York University, The University of Texas at Austin, and Vanderbilt University.

4.    I have reviewed articles for peer-reviewed journals in finance and law and economics, including *The Review of Financial Studies*, *The Journal of Law and Economics*, *The Journal of Legal Studies*, *International Review of Law and Economics*, and *Journal of*

1

**Exhibit 2**
**Page 170**

*Empirical Legal Studies*.  My research and commentary have been featured in *The Wall Street Journal*, *Reuters*, *Bloomberg*, *The Washington Post*, *MarketWatch*, *Law360*, *Bloomberg Law*, *Bloomberg View*, *Bloomberg BNN*, and *The Globe and Mail*.

5.    In addition to my research and teaching and academic responsibilities, I advise on the analysis of trading data in connection with securities violations.  I have extensive experience supporting the U.S. Department of Justice.  My research and expert opinions have been presented to the U.S. Securities and Exchange Commission and other regulatory bodies.

6.    At Columbia University, I have taught courses on securities regulation, law and economics, data science, and contracts.  My courses encompass economic theory, quantitative methods of valuation, asset pricing, investments, and data analytics as well as the economics of securities fraud, market manipulation, and insider trading.

7.    My qualifications, publications, and expert witness testimony over the past five years are summarized in detail in my *curriculum vitae*, attached to this report as Appendix A.

**B.    Summary of Conclusions**

8.    I have been retained by the Plaintiffs in this matter to opine on the following questions:

i.    ***First***, whether I have identified any evidence indicating that unregistered shares of Rivian Class A common stock were sold between November 10, 2021, and March 10, 2022 (the "Class Period");

ii.    ***Second***, even if unregistered shares were sold during the Class Period, whether ownership of securities in "fungible bulk" form precludes tracing purchases of Rivian

2

**Exhibit 2**
**Page 171**

Class A common stock to the registration statement using standard accounting methods and whether those methods amount to "statistical tracing" or employ probabilistic reasoning; and

iii. ***Third***, whether tracing purchases of Rivian Class A common stock to the registration statement is amenable to Class-wide proof.

9.    In reaching these opinions, I have relied upon various publicly available materials, which are cited in this report.  The research and analysis upon which my opinions are based has been conducted by me with the assistance of personnel working under my direction and supervision.  I reserve the right to modify this report and my conclusions based on additional information and materials I might review, including materials that have not yet been made available for review.  I am being compensated at a rate of $1,500 per hour for my work in this matter.  I have been assisted in this matter by staff at M Analytics LLC working under my direction, and I receive further compensation based on those billings. M Analytics LLC and my compensation are not dependent on my opinions expressed in this report or the outcome of this matter.

10.   Based on my analysis to date, my review of available materials, my experience, and my professional judgment, I have formed the opinion that: (i) I have not identified any evidence based on publicly available information indicating that unregistered shares of Rivian Class A common stock were sold during the Class Period; (ii) even if unregistered shares were sold during the Class Period, ownership of securities in "fungible bulk" form does not preclude tracing purchases of Rivian Class A common stock to the registration statement using standard accounting methods that do not amount to "statistical tracing" or

3

**Exhibit 2**
**Page 172**

employ probabilistic reasoning; and (iii) tracing purchases of Rivian Class A common stock to the registration statement is amenable to Class-wide proof.  The remainder of this report discusses these opinions in detail.

## II.    FACTUAL OVERVIEW

11.    In this section, I describe the relevant facts underlying this case as I understand them based on Plaintiffs' amended consolidated complaint filed on March 2, 2023[1] and the July 3, 2023 opinion of the U.S. District Court for the Central District of California on Defendants' motions to dismiss.[2]

12.    In Fall 2021, the electric vehicle ("EV") company Rivian went public via an initial public offering ("IPO").[3]  The IPO commenced on November 10, 2021—with Class A common stock in the company beginning to trade on the Nasdaq that day—and concluded on November 15, 2021.[4]  Rivian hired underwriters to help facilitate the IPO.  While its pre-IPO registration statement (made effective November 9, 2021) (hereinafter, the "Registration Statement") offered 153,000,000 shares of Class A common stock, Rivian also "granted its IPO underwriters a period of 30 days to purchase up to an additional

---

[1] Amended Consolidated Complaint for Violations of the Federal Securities Laws, Mar. 2, 2023, ECF No. 150 (hereinafter "Amended Compl."); Unless otherwise noted, emphasis is in the original.

[2] *Crews v. Rivian Auto., Inc.*, 2023 WL 4361098 (C.D. Cal. July 3, 2023).

[3] Amended Compl. at ¶ 30.

[4] *Id.* at ¶¶ 101-102.

**Exhibit 2
Page 173**

22,950,000 shares of Class A common stock from Rivian at the IPO price ($78), less underwriting discounts and commissions."[5]

13.    In what was a historically large IPO, Rivian ultimately sold 175,950,000 shares and raised more than $13.7 billion in gross proceeds from going public.[6]

14.    Rivian does not just manufacture and design its EVs but "sells them directly to consumer and commercial customers."[7]   In December 2017, four years prior to its IPO, Rivian debuted two EVs—the R1T and the R1S—and "began taking pre-orders for the R1T and R1S almost immediately after their debut at the Los Angeles Auto Show" in November 2018.[8]   With initial retail prices of $69,000 (for the R1T) and $72,500 (for the R1S), the cars were considered "something of a bargain" in the EV market.[9]   In the run-up to going public, Rivian touted the consumer demand for its EVs, noting in the pre-IPO Registration Statement that it had a backlog of "approximately 55,400" pre-orders.[10]   Rivian also stated its value and market position would suffer if their vehicles did not remain "cost competitive."[11]

---

[5] *Id.* at ¶ 95.

[6] *Id.* at ¶ 102.

[7] *Id.* at ¶ 30.

[8] *Crews*, 2023 WL 4361098, at *2.

[9] *Id.*

[10] *Id.* at *4.

[11] *Id.*

**Exhibit 2
Page 174**

15.    Less than four months later, that very scenario came to pass:  On March 1, 2022, Rivian "dropped a truth bomb on its investors and R1 pre-order customers . . . when it announced eye-popping minimum price hikes of roughly 17% and 20% to virtually all R1T and R1S vehicles."[12]  Following the announcement, Rivian's stock began to fall—closing at $35.83 on March 14, 2022, more than 50% below its IPO price.[13]

16.    I understand that Plaintiffs allege the Registration Statement contained untrue statements of material fact and omitted material facts required to be stated concerning, among other things, "the fact that the cost of the R1 Platform's bill of materials alone was significantly higher than the retail prices of the R1S and R1T."[14]  A "bill of materials" is the total price of a car's component parts.  Plaintiffs claim that since, at the time of the IPO, both the R1S and R1T had a bill of materials more expensive than the car itself (in terms of retail price), it was already a fait accompli by the time of the Registration Statement that retail prices would have to increase.[15]  Plaintiffs thereby allege the "Registration Statement's warning to investors regarding the financial harm that Rivian might suffer if its material costs increased [and retail prices had to be raised] was misleading because it characterized as a 'risk' a problem that had already come to fruition."[16]

---

[12] Amended Compl. at ¶ 13.

[13] *Id.* at ¶ 22.

[14] *Id.* at ¶ 264.

[15] *Crews*, 2023 WL 4361098, at *8.

[16] *Id.* at *4.

**Exhibit 2**
**Page 175**

17.     The Court held that Plaintiffs had adequately pled their Securities Act claims based on three materially false or misleading statements included in the Registration Statement, and based on Defendants' failure to disclose information that was required to disclose pursuant to Items 105 and 303 of SEC Regulation S-K.[17]  Plaintiffs brought Section 11 claims—and other Securities Act claims—on behalf of "all persons or entities who purchased or otherwise acquired Rivian Class A common stock in or traceable to the IPO and pursuant to the Registration Statement."[18]

## III.    I HAVE NOT IDENTIFIED ANY EVIDENCE INDICATING THAT UNREGISTERED SHARES OF RIVIAN CLASS A COMMON STOCK WERE SOLD DURING THE CLASS PERIOD

18.     The pool of shares of Rivian Class A common stock which were eligible to be sold during the Class Period can be logically divided into two groups: shares which were registered under the Registration Statement or required to be registered after completion of the offering prior to resale ("Registered Shares"); and shares which were not registered under the Registration Statement and were not required to be registered after completion of the offering prior to resale ("Unregistered Shares").

19.     According to the Registration Statement filed by Rivian, 99.6% of the outstanding Class A common stock prior to the IPO was subject to so-called "lock-up" or "market standoff" agreements that prevented the sale or resale of those shares for 180 days following the date

---

[17] *Id.* at *15.

[18] Amended Compl. at ¶ 262.

**Exhibit 2
Page 176**

of the IPO, which was May 9, 2022.[19]  As explained on page 64 of the Registration Statement (the "Lock-Up and Market Standoff Disclosure"):

> We and all of our directors and executive officers and certain other record holders that together represent approximately 99.6% of our outstanding Class A common stock and securities directly or indirectly convertible into or exchangeable or exercisable for our Class A common stock ("Other Securities") are subject to lock-up agreements and/or market standoff agreements that restrict our and their ability to sell or transfer shares of our capital stock for a period of 180 days from the date of this prospectus, subject to certain exceptions. Holders of approximately 3.6 million shares of Other Securities, issued under our equity incentive plans, are not subject to a market standoff agreement. In addition, Morgan Stanley & Co. LLC, Goldman Sachs & Co. LLC and J.P. Morgan Securities LLC (the "representatives") may release certain stockholders from the lock-up agreements prior to the end of the lock-up period.[20]

20.     As the Class Period ends before May 9, 2022, it follows that 99.6% of Rivian's outstanding Class A common stock prior to the IPO was not eligible for sale during the Class Period. There are several indications that every share issued during the Class Period was a Registered Share, including the shares offered in the IPO[21] and shares to be issued upon the exercise of stock options and pursuant to employee benefit plans and various other registration rights.[22]   I have not identified any publicly available information which

---

[19] While the Registration Statement does not specify as of which date this calculation was performed, the financial statements in the Registration Statement are reported as of June 30, 2021. I have not identified any evidence, based on publicly available information, indicating that the volume of outstanding shares had changed by the IPO date.

[20] Rivian Automotive, Inc., Amendment No. 3 to Form S-1 Registration Statement (Nov. 5, 2021), https://www.sec.gov/Archives/edgar/data/1874178/000119312521321716/d157488ds1a.htm at 64.

[21] *See id.* at 64 ("All of the shares of Class A common stock sold in this offering will be freely tradable without restrictions or further registration under the Securities Act, except that any shares held by our affiliates, as defined in Rule 144 under the Securities Act, would only be able to be sold in compliance with Rule 144 and any applicable lock-up agreements described below.").

[22] *Id.* at 65 ("All of the shares of Class A common stock issuable upon the exercise of stock options, and the shares reserved for future issuance under our equity incentive plans, will be registered for

**Exhibit 2**
**Page 177**

indicates that there were Unregistered Shares other than the outstanding shares of Class A common stock at the time of the IPO, 99.6% of which were unavailable for resale until May 9, 2022.

21.    The Lock-Up and Market Standoff Disclosure provides that the representatives may release certain stockholders from the lock-up agreements prior to the end of the lock-up period.  I have not received any nonpublic evidence indicating any such releases had occurred. Moreover, I have reviewed SEC filings and press statements by Rivian during the Class Period and have not identified any publicly available evidence which indicates that any stockholders were released from lock-up agreements prior to the end of the lock-up period.

22.    While the 3.6 million shares of Unregistered Securities issued pursuant to equity incentive plans (0.4% of outstanding shares Class A common stock) were not subject to a market standoff agreement at the time of Rivian's IPO, the Registration Statement provided that these securities were deemed "restricted securities" and thus eligible for resale only pursuant to Rule 144 under the Securities Act.[23]  I have reviewed the SEC filings and other publicly available information, including Form 144 filings, and have not identified any

---

public resale under the Securities Act. Accordingly, these shares will be able to be freely sold in the public market upon issuance subject to existing lock-up or market standoff agreements and applicable vesting requirements.  Further, based on shares outstanding as of June 30, 2021, holders of 574,805,808 shares of our common stock will have rights after the completion of this offering, subject to certain conditions, to require us to file registration statements for the public resale of shares of our Class A common stock or to include such shares in registration statements that we may file for us or other stockholders.").

[23] *Id.* at 205.

**Exhibit 2**
**Page 178**

publicly available evidence indicating that any of these Unregistered Securities were sold during the Class Period.

23.     Moreover, Rule 144 sets out several conditions that must be satisfied before restricted securities may be resold in the public market, including various holding periods depending on the issuer's status under the federal securities laws and the relationship between the issuer and the shareholder.  For example, restricted securities may only be sold by non-affiliates without complying with any of the conditions set out in Rule 144 if they have been held for at least one year.  Because many of these Unregistered Shares were subject to lengthy holding periods under Rule 144, it is less likely that any were sold than if the entire 3.6 million shares of Unregistered Securities not subject to a market standoff agreement had not been subject to a holding period.

IV.     **EVEN IF UNREGISTERED SECURITIES WERE SOLD DURING THE CLASS PERIOD, OWNERSHIP OF SECURITIES IN "FUNGIBLE BULK" FORM DOES NOT PRECLUDE TRACING PURCHASES TO THE REGISTRATION STATEMENT USING STANDARD ACCOUNTING METHODS THAT DO NOT AMOUNT TO "STATISTICAL TRACING"**

24.     Even if Unregistered Securities were sold during the Class Period, records maintained by the Depository Trust Company ("DTC") and the Financial Industry Regulatory Authority ("FINRA") permit identifying and segregating those transfers.  It is true that "securities deposited at DTC . . . are maintained in 'fungible bulk;' *i.e.*, each Participant to whose DTC

10

**Exhibit 2**
**Page 179**

account securities of that issue have been credited has a *pro rata* (proportionate) interest in DTC's entire inventory of that issue."[24]

25.     However, it is straightforward to trace purchases using records produced in discovery along with an accounting method such as first-in-first-out ("FIFO") or last-in-first-out ("LIFO").[25]  Based on my professional experience, broker-dealers, exchanges, FINRA, and DTC maintain detailed, time-stamped transactional records which can be obtained through discovery.[26]  These records show when securities in one account are transferred to another account, whether within the same broker-dealer or between different broker-dealers.  This makes it possible to reconstruct a reliable "chain of title" using standard accounting methods like first in-first out (FIFO) or last in-first out (LIFO).

---

[24] Br. of the Depository Tr. Co. as *Amicus Curiae* Not In Supp. of Any Party at 10, *In re Petrobras Securities Litigation*, No. 16-1914 (2d. Cir. Sep. 16, 2016), ECF No. 293.

[25] My opinions in this regard are consistent with the Br. for *Amicus Curiae* Law and Business Professors ISO Resp't, *Slack Techs., LLC v. Pirani*, 143 S. Ct. 1433 (2023), https://www.supremecourt.gov/DocketPDF/22/22-200/256386/20230306171423271_22-200%20Amicus%20Brief.pdf. Along with Jack C. Coffee, Jr., the Adolf A. Berle Professor of Law at Columbia University, I served as co-counsel to those amici.  *Id.*; *see also* Decl. of Dr. Jonathan A. Brogaard, Ex. J to Decl. of Matthew S. Kahn ISO Defs.' Opp'n to Pls.' Mot. for Class Certification - Public Redacted Version at 21, *In re Slack Technologies Inc. Stockholder Litigation*, Lead Case No. 19-Civ-05370 (Cal. Sup. Ct., San Mateo Cnty., Jan. 18, 2022), Doc. No. 273 (conceding that it may be "theoretically possible to trace a single putative class member's purchases of Slack Stock to a seller who held the shares prior to the Direct Listing").

[26] *See, e.g.*, DEPOSITORY TRUST COMPANY, *Security Position Reports Templates*, https://www.dtcc.com/settlement-and-asset-services/issuer-services/security-position-reports-templates (last accessed Nov. 30, 2023) (listing participant holdings of a security on a date); 17 CFR § 240.17a-3(a)(6)(i)(A) (requiring broker-dealers to maintain detailed records on individual orders including "the time the order was received, the time of entry, the price at which executed, the identity of each associated person, if any, responsible for the account . . . and, to the extent feasible, the time of execution or cancellation").

**Exhibit 2**
**Page 180**

26.   Accounting methods like FIFO and LIFO do not amount to "statistical tracing" nor do they involve probabilistic reasoning.  They do not make inferences regarding specific purchases from statistics about the population as a whole.  Rather, the application of an accounting method yields a single conclusion regarding who owns each share at each point in time.  Nor is it the case that every aftermarket purchaser would have standing for every share—rather, only those who purchased the securities issued in Rivian's IPO, as determined by a deterministic tracing analysis.

27.   Moreover, here, these accounting methods are likely to yield the same, unambiguous conclusion regarding virtually all of the Class, regardless of which accounting method is chosen, because the volume of Unregistered Shares that may have entered the market is likely to be exceedingly small relative to overall trading volume in Rivian's Class A common stock because, based on publicly available information that I have reviewed (which has not revealed any lock-up releases), only 0.4% of Rivian's Class A common stock was potentially eligible for resale under Rule 144.

## V.   TRACING PURCHASES IS AMENABLE TO CLASS-WIDE PROOF

28.   Critically, these methods can be applied on a Class-wide basis using data readily available in discovery and do not require an individualized inquiry into the circumstances of each purchase and sale.  For example, DTC produces a daily "participant daily activity statement" for individual participant accounts, which list individual custodial transfers between accounts as well as to and from the National Securities Clearing Corporation ("NSCC").  These statements are available from DTC and NSCC in discovery.  Similarly, time-stamped transactional records are maintained by FINRA, exchanges and broker-

**Exhibit 2**
**Page 181**

dealers, which are also available in discovery.  These records may be used to reach a conclusive determination regarding who holds the shares issued pursuant to the Registration Statement without engaging in an individualized inquiry into the facts and circumstances of purchases by individual members of the Class.

29.    Moreover, accounting methods like FIFO and LIFO do not depend on facts and circumstances which are unique to each Plaintiff.  In my professional experience, records produced in discovery often show that no matter which accounting method is chosen, a given member of the Class holds shares registered under the Registration Statement.  That is especially likely to be the case here because, based on publicly available information that I have reviewed (which has not revealed any lock-up releases), only 0.4% of Rivian's Class A common stock was potentially eligible for resale under Rule 144.

30.    Even if different methods yield different conclusions regarding who holds those shares, the choice of an appropriate tracing methodology is a Class-wide determination which does not turn on individualized facts and circumstances of each member of the Class.

## VI.    CONCLUSION

31.    Based on my analysis to date, review of materials, my experience, and my professional judgment, it is my opinion that I have not identified any publicly available evidence indicating that Unregistered Shares of Rivian Class A common stock were sold during the Class Period.  Moreover, even if Unregistered Shares were sold during the Class Period, ownership of securities in "fungible bulk" form does not preclude tracing purchases of Rivian Class A common stock to the registration statement using standard accounting methods that do not amount to "statistical tracing" or employ probabilistic reasoning.

13

**Exhibit 2**
**Page 182**

Finally, tracing purchases of Rivian Class A common stock to the registration statement is amenable to Class-wide proof.

32.    I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

_____

JOSHUA R. MITTS, PH.D.

December 1, 2023

14

**Exhibit 2
Page 183**

# Appendix A

# C.V.

15

**Exhibit 2**
**Page 184**

# JOSHUA R. MITTS

435 West 116 Street • New York, NY 10027 • (202) 460-0003 • joshua.mitts@law.columbia.edu

Professor Joshua Mitts uses advanced data science for his research on corporate and securities law. Mitts employs empirical methods, including statistical analysis and machine learning, to study short selling, insider trading on cybersecurity breaches and corporate disclosures, and information leakage following hedge-fund activism. Professor Mitts also advises on the analysis of trading data in connection with high-frequency market manipulation and securities violations. He has extensive experience supporting the U.S. Department of Justice.

## ACADEMIC APPOINTMENTS

**Columbia University**, New York, NY
*David J. Greenwald Professor of Law* (July 1, 2023 – present)
*Professor of Law* (July 1, 2022 – June 30, 2023)
*Associate Professor of Law* (2017 – 2022)
*Milton Handler Fellow* (2020-22)
Member, *Advisory Committee on Socially Responsible Investing* (2021-present)
         Subcommittees: Racial Justice, Fossil Fuels

## EDUCATION

**Columbia Business School**, Ph.D. in Finance & Economics, 2018

**Yale Law School**, J.D., 2013

**Georgetown University**, B.A in Liberal Studies, *summa cum laude*, 2010

## PUBLICATIONS & WORKING PAPERS

Post-Appointment (2017 – present)

***Slack v. Pirani and the Future of Section 11 Claims*** (with John C. Coffee, Jr.) (working paper, 2023), https://ssrn.com/abstract_id=4644888

***Passive Exit***, 28 STAN. J.L. BUS. & FIN. 155 (2023), https://ssrn.com/abstract_id=3716249

***Calamity: Event-Driven Suits and the Rethinking of Securities Litigation*** (with Merritt B. Fox), 78 BUS. LAW. 1 (2023).

***Index-Fund Governance: An Empirical Study of the Lending-Voting Tradeoff*** (revise & resubmit, J. LEG. STUD., 2021) (with Edwin Hu & Haley Sylvester), https://ssrn.com/abstract_id=3673531

***Insider Trading and Strategic Disclosure*** (working paper, 2020), https://ssrn.com/abstract_id=3741464

***Short and Distort,*** 49 J. LEG. STUD. 287 (2020), https://ssrn.com/abstract_id=3198384

***A Legal Perspective on Technology and the Capital Markets: Social Media, Short Activism and the Algorithmic Revolution*** (conference article, COLUM. / FINRA TECH. CONF., 2019), https://ssrn.com/abstract_id=3447235

***Trading Against the Random Expiration of Private Information: A Natural Experiment***, 75 J. FIN. 5 (2020) (with Mohammadreza Bolandnazar, Robert J. Jackson, Jr. & Wei Jiang), https://ssrn.com/abstract_id=2544128

         *Winner, Journal of Finance Dimensional Fund Advisors Distinguished Paper Prize (2020)*

***Asking the Right Question: The Statutory Right of Appraisal and Efficient Markets***, 74 BUS. LAW. 1015 (2019) (with Jonathan R. Macey), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3279838

         Cited and relied upon by the Delaware Supreme Court in *Fir Tree v. Jarden* (2020).

***I Promise to Pay***, 62 J. L. & ECON. 117 (2019), https://ssrn.com/abstract_id=2994192

1

**Exhibit 2**
**Page 185**

***What Can we Learn from Stock Prices?: Cash Flow, Risk and Shareholder Welfare,*** 175 J. INST. & THEO. ECON. 178 (2019) (conference issue), https://ssrn.com/abstract_id=3285605

***Trial by Skype: A Causality-Oriented Replication Exploring the Use of Remote Video Adjudication in Immigration Removal,*** 59 INT'L REV. L. & ECON. 82 (2019) (with Dane Thorley) (replication issue), https://www.sciencedirect.com/science/article/abs/pii/S0144818818303326

***Informed Trading and Cybersecurity Breaches,*** 9 HARV. BUS. L. REV. 1 (2019) (with Eric Talley), https://www.hblr.org/wp-content/uploads/sites/18/2019/11/Final_MittsTalley.pdf

***Activist Directors and Agency Costs: What Happens When an Activist Director Goes on the Board?***, 104 CORNELL L. REV. 381 (2019) (with Robert Bishop, John C. Coffee, Jr. & Robert J. Jackson, Jr.), https://www.cornelllawreview.org/2019/01/15/activist-directors-and-agency-costs-what-happens-when-an-activist-director-goes-on-the-board/

One of the Top 10 Corporate and Securities Articles of 2019 Chosen By *Corporate Practice Commentator*

***The Cost of Transparency*** (2019) (with Yifeng Guo)

Pre-Appointment (2012-2017)

***The 8-K Trading Gap*** (2016) (with Alma Cohen & Robert J. Jackson, Jr.)

***Systemic Risk and Managerial Incentives in the Dodd-Frank Orderly Liquidation Authority***, 1 J. FIN. REG. 51 (2015)

***Finding Order in the Morass: The Three Real Justifications for Piercing the Corporate Veil***, 100 CORNELL L. REV. 99 (2014) (with Jonathan R. Macey)

***Anti-Herding Regulation***, 5 HARV. BUS. L. REV. 1 (2014) (with Ian Ayres)

***Mechanism Design in M&A Auctions***, 38 DEL. J. CORP. L. 873 (2014) (with Steven J. Brams), *cited in* In re *Appraisal of Dell Inc.*, C.A. No. 9322-VCL (Del. Ch., May 31, 2016)

***Three Proposals for Regulating the Distribution of Home Equity***, 31 YALE J. ON REG. 77 (2014) (with Ian Ayres)

***Law and Mechanism Design: Procedures to Induce Honest Bargaining***, 68 NYU ANN. SURV. AM. L. 729 (2013) (with Steven J. Brams)

***Snake Oil Salesmen or Purveyors of Knowledge: Off-Label Promotions and the Commercial Speech Doctrine***, 23 CORNELL J. L. & PUB. POL'Y 337 (2013) (with Constance E. Bagley & Richard Tinsley)

***A Private Ordering Solution to Blockholder Disclosure***, 35 N.C. CENT. L. REV. 203 (2013)

Comment, ***Recoupment Under Dodd-Frank: Punishing Financial Executives and Perpetuating "Too Big to Fail,"*** 122 YALE L.J. 507 (2012)

## RULEMAKING PETITIONS

***SEC Rulemaking Petition on Short and Distort*** (filed on February 12, 2020) (co-drafted with John C. Coffee, Jr.), https://www.sec.gov/rules/petitions/2020/petn4-758.pdf

**Other Signatories: James D. Cox**, Brainerd Currie Professor of Law, Duke University School of Law;  **Edward F. Greene**, General Counsel, Securities & Exchange Commission (1981-82); Director, Division of Corporation Finance (1979-81); Senior Counsel, Cleary Gottlieb Steen & Hamilton, Co-Director, Program on Law, Economics & Capital Markets, Columbia Law School; **Meyer Eisenberg**, Deputy General Counsel and Acting Director, Division of Investment Management Securities & Exchange Commission (1998-2006); **Colleen Honigsberg**, Associate Professor of Law, Stanford Law School; **Donald Langevoort**, Thomas Aquinas Reynolds Professor of Law, Georgetown University Law Center; **Peter Molk**, Associate Professor of Law, University of Florida Levin College of Law; **Randall Thomas**, John S. Beasley II Chair in Law and Business, Vanderbilt Law School, Professor of Management. Owen Graduate School of Management; **Robert B. Thompson**, Peter P. Weidenbruch, Jr. Professor of Business Law, Georgetown University Law Center; **Andrew Verstein**, Professor of Law, Wake Forest University School of Law; and **Charles K. Whitehead**, Myron C. Taylor Alumni Professor of Business Law, Cornell Law School.

**Exhibit 2**
**Page 186**

OTHER PUBLICATIONS

*Petition for Rulemaking on Short and Distort*, COLUM. LAW SCH. BLUE SKY BLOG (Feb. 18, 2020) (with John C. Coffee, Jr.)

*Long-Run Short Selling*, COLUM. LAW SCH. BLUE SKY BLOG (Dec. 9, 2019) (with John C. Coffee, Jr.)

*Short Selling and the New Market Manipulation*, COLUM. LAW SCH. BLUE SKY BLOG (Mar. 18, 2019) (with John C. Coffee, Jr.)

*Why Investors Pay So Much for Dual Class Firms*, COLUM. LAW SCH. BLUE SKY BLOG (Jan. 2, 2019)

*What Can We Learn From Stock Prices?*, COLUM. LAW SCH. BLUE SKY BLOG (Dec. 18, 2018)

*Short and Distort*, COLUM. LAW SCH. BLUE SKY BLOG (Nov. 13, 2018)

*Asking the Right Question: The Statutory Right of Appraisal and Efficient Markets*, HARV. LAW SCH. FORUM ON CORP. GOV. & FIN. REG. (Nov. 12, 2018) (with Jonathan Macey)

*A Data-Driven Defense to "Short and Distort"*, NEW YORK LAW JOURNAL (Sep. 13, 2018)

*Quarterly Reporting and Market Liquidity*, COLUM. LAW SCH. BLUE SKY BLOG (Aug. 27, 2018)

*What Happens When an Activist Goes on the Board?*, COLUM. LAW SCH. BLUE SKY BLOG (Jan. 29, 2018) (with John C. Coffee, Jr.)

*Informed Trading and Cybersecurity Breaches*, HARV. LAW SCH. FORUM ON CORP. GOV. & FIN. REG. (Jan. 26, 2018) (with Eric Talley)

*Proactive Regulation*, REGBLOG: PENN PROGRAM ON REGULATION (Jun. 23, 2014)

*The Three Justifications for Piercing the Corporate Veil*, HARV. L. SCH. FORUM ON CORP. GOV. & FIN. REG. (Mar. 27, 2014) (with Jonathan R. Macey)

*Why the CFPB's Qualified Mortgage Rule Misses the Mark*, FREAKONOMICS BLOG (Jan. 17, 2014), *republished in* COLUM. L. SCH. BLUE SKY BLOG (Feb. 10, 2014) (with Ian Ayres)

*An Incentive-Compatible Alternative to "Don't Ask Don't Waive" Standstills*, COLUM. L. SCH. BLUE SKY BLOG (May 28, 2013) (with Steven J. Brams)

TEACHING EXPERIENCE

**Columbia Law School**, New York, NY                                       2017 – present
*Data and Predictive Coding for Lawyers (January 2018, January 2019, May 2021)*
*Corporations (Fall 2022, Fall 2023)*
*Securities Regulation (Spring 2018, Spring 2019, Spring 2020, Spring 2021, Spring 2022)*
*Contracts (Fall 2018, Fall 2019)*

PROFESSIONAL EXPERIENCE

**Sullivan & Cromwell LLP**, New York, NY                                       2013 – 2014
*Associate*

PRESENTATIONS

**2021-22**

Conference on Empirical Legal Studies Harvard Law School and the Program on International Financial Systems (PIFS) for Comissão de Valores Mobiliários (CVM); IOSCO/PIFS-Harvard Law School Global Certificate Program for Regulators of Securities Markets (GCP); Reichman University (Israel); Regulatory Fundamentals Group; Ira M. Millstein Center for Global Markets and Corporate Ownership

**2019-20**

**Exhibit 2**
**Page 187**

2020 UF Business Law Conference; 2020 George A. Leet Symposium, Columbia Law School Blue Sky Workshop; Harvard-NYU Corporate Law Academic Workshop Series; Junior Corporate Law Academic Workshop; Columbia Law School Faculty Workshop; American Law & Economics Association Annual Meeting; Cornell Law & Tech Workshop; Cadwalader, Wickersham & Taft, New York, NY; Richards, Layton & Finger, Wilmington, DE; Columbia Business School News and Finance Conference, New York, NY; Texas Law & Economics Workshop, Austin, TX; Securities Law Roundtable at Tulane Corporate Law Institute, New Orleans, LA; Vanderbilt Law & Economics Workshop, Nashville, TN; 8th Symposium on Intelligent Investing at Ivey Business School, Toronto, Canada

**2017-18**

Conference on Empirical Legal Studies; Junior Corporate Law Scholars Workshop at Columbia Law School; American Law & Economics Association Annual Meeting; Securities & Exchange Commission; Seminar on Corporate and Capital Markets Law and Policy at Harvard Law School (February 2018 and October 2018); Experimental Methods in Legal Scholarship III Conference at Columbia Law School; Law, Economics & Organization Workshop at Harvard Law School; Penn Law School Corporate Roundtable; Symposium of Journal of Institutional and Theoretical Economics; UVA/Santa Fe. Institute Conference on Computational Study of the Law; Columbia Law Faculty Workshop; Columbia Law Blue Sky Workshop; Journal Corporate Law Scholars Workshop at NYU Law School

**2013-16**

American Law & Economics Association Annual Meeting (2016, 2015, 2014, 2013); Conference on Empirical Legal Studies (2015, 2014, 2013); Columbia Finance Faculty Workshop (2016); American Finance Association Annual Meeting (2016); Minnesota Law & Economics Seminar (2015); Georgetown Law & Economics Workshop (2014); Virginia Law Symposium on Disclosure (2014); Federal Reserve Conference on Community Banking in the 21st Century (2014); Symposium on Crises-Driven Regulation, University of St. Thomas School of Law (2014); University of Connecticut School of Law, Junior Scholars Workshop (2013)

## EXPERT TESTIMONY (PUBLIC)

In re *Hewlett Packard Enterprise Co. Shareholder Litigation* (Ca. Sup. Ct., County of Santa Clara, 2023)
In re *Bayer Securities Litigation* (N.D.C.A., 2022)
*Set Capital v. Credit Suisse* (S.D.N.Y., 2022)
In re *Tesla Inc. Securities Litigation*, Case No. 3:18-cv-04865-EMC (N.D.C.A)
*Brookfield v. IPL,* Alberta Securities Commission (2021)
*Burford v. LSE,* CL-2019-000604 (Business and Property Courts of England and Wales Commercial Court (QBD))
*Farmland Partners v. Fortunae*, No. 1:18-cv-02351-KLM (D. Colo.)
Additional nonpublic matters

## PEER REVIEW

Journal of Legal Studies
Journal of Law, Economics & Organization
International Review of Law & Economics
Review of Law & Economics
Review of Financial Studies
Conference on Empirical Legal Studies

## GRANTS, FELLOWSHIPS & AWARDS

Columbia Brown Institute for Media Innovation, 2016-17 Magic Grant (with Colleen Honigsberg)

Columbia Business School, Paul and Sandra Montrone Doctoral Fellowship, 2016

Yale Law School, Oscar M. Ruebhausen Fund, 2014 (with Ian Ayres)

## BAR ADMISSION

New York

**Exhibit 2**
**Page 188**

# Appendix B

# Documents Considered

**Exhibit 2
Page 189**

**Cases**

1. *Crews v. Rivian Auto., Inc.*, 2023 WL 4361098 (C.D. Cal. July 3, 2023).

**Court Filings**

1. Amended Consolidated Complaint For Violations of the Federal Securities Laws, *Crews v. Rivian Auto., Inc.*, No. 2:22-cv-015424-JLS-E, (C.D. Cal. Mar. 2, 2023), EFC No. 150.

2. Brief of the Depository Trust Corporation as *Amicus Curiae* Not In Support of Any Party, *In re* Petrobras Securities Litigation, No. 16-1914-cv (2d. Cir. Sep. 16, 2016), ECF No. 293-1.

3. Brief for *Amicus Curiae* Law and Business Professors In Support of Respondent, *Slack Techs., LLC v. Pirani*, 2023 WL 2439655 (U.S.).

4. Declaration of Dr. Jonathan A. Brogaard, Exhibit J To Declaration of Matthew S. Kahn Iso Defendants' Opposition To Plaintiffs' Motion for Class Certification - Public Redacted Version, *In re* Slack Technologies Inc. Stockholder Litigation, Lead Case No. 19-Civ-05370 (Ca. Sup. Ct., Jan. 18, 2022).

**Publications**

1. DEPOSITORY TRUST COMPANY, *Security Position Reports Templates*, https://www.dtcc.com/settlement-and-asset-services/issuer-services/security-position-reports-templates (last accessed Nov. 7, 2023).

**SEC Filings**

1. Rivian Automotive, Inc., Amendment No. 3 to Form S-1 Registration Statement (Nov. 5, 2021), https://www.sec.gov/Archives/edgar/data/1874178/000119312521321716/d157488ds1a.htm.

**Statutes**

1. 17 CFR § 240.17a-3(a)(6)(i)(A).

**Exhibit 2**
**Page 190**