UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

CHARLES LARRY CREWS, JR., ET AL.,

Plaintiffs,

v.

RIVIAN AUTOMOTIVE, INC., ET AL.,

Defendants.

CASE NO. 2:22-cv-01524-JLS-E

**ORDER GRANTING PLAINTIFFS'
MOTION FOR CLASS
CERTIFICATION (DOC. 218)**

Before the Court is a Motion for Class Certification filed by Plaintiffs.  (Mot., Doc. 218; Mem., Doc. 218-1.)  Defendants opposed and Plaintiffs responded.  (Opp., Doc. 251; Reply, Doc. 298.)  Defendants also filed a Motion for Leave to File a Sur-Reply and attached the proposed Sur-Reply.[1]  (Sur-Reply Mot., Doc. 299; Sur-Reply, Doc. 300-1.)  Having considered the parties' briefs and held oral argument, the Court now GRANTS Plaintiff's Motion for the reasons stated below.

## I.   BACKGROUND

This is a federal securities class action against the publicly traded company Rivian, several of its top executives, and underwriters for Rivian's initial public offering ("IPO"). (Amended Consolidated Complaint ("ACC") ¶¶ 24–36, 225–61, Doc. 150).  Lead Plaintiff Sjunde AP-Fonden ("AP-7") and Additional Plaintiff James Stephen Muhl (together, "Plaintiffs") purchased Rivian stock during or shortly after Rivian's IPO, which took place on November 10, 2021.  (*Id.* ¶¶ 28, 29.)

Plaintiffs allege that various Defendants violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated by the Securities and Exchange Commission (collectively referred to as "the 1934 Act claims"); and Sections 11, 12(a)(2) and 15 of the Securities Exchange Act of 1933 and Regulation S-K promulgated by the Securities and Exchange Commission (collectively referred to as "the 1933 Act claims"). (*Id.* ¶¶ 214–24, 318–44.)  The 1934 Act claims allege that the Rivian Defendants made materially false and misleading statements in Rivian's IPO prospectus and during a December 16, 2021, earnings call regarding Rivian's financial results for the third quarter of 2021.  Those claims also allege that Defendants knowingly concealed that material costs for each R1 EV far exceeded its sale price and that substantially raising prices was inevitable.  (*Id.* ¶¶ 156–71.)  The 1933 Act claims allege that: 1) Rivian's directors and executives violated Regulation S-K by failing to disclose in Rivian's

---

[1] As the Court explained on the record at the hearing on the Motion for Class Certification, it accepts the Sur-Reply and relies on it in this Order.

1   Registration Statement a known trend of material costs far exceeding the EVs' retail

2   prices; and 2) the Underwriter Defendants failed to conduct an adequate due diligence

3   investigation.  (*Id.* ¶¶ 294–312.)

4       **A. Rivian's Alleged Misrepresentations**

5           Rivian designs and manufactures electric vehicles ("EVs") and accessories and sells

6   them directly to consumers and businesses.  (*Id.* ¶ 30.)  Plaintiffs allege that Rivian

7   promised "feature-packed EVs at retail prices that were highly competitive with the

8   existing and established competition, including Tesla."  (*Id.* ¶ 1.)  Rivian marketed both a

9   pickup truck model, known as the R1T, for a base price of $69,000 and an SUV model,

10  known as the R1S, for a base price of $72,000.  (*Id.* ¶¶ 61, 65.)  Rivian began preparing to

11  go public in 2021.  (*Id.* ¶ 92.)  Although Rivian acknowledged in advance of its IPO that it

12  would experience near-term "negative gross profit per vehicle" due to high "fixed costs

13  from investments in vehicle technology, manufacturing capacity, and charging

14  infrastructure," Plaintiffs allege that this was not the full truth.  (*Id.* ¶ 296.)  In the years

15  since Rivian set its base prices, rising material costs (referred to as bill of material, or

16  BOM, costs) significantly changed its near-term and long-term financial outlook; by

17  September 2021, Rivian had locked in prices that ensured that it would lose over $40,000

18  per EV sold on BOM costs alone. (*Id.* ¶¶ 113, 118–21.)  Because the BOM costs alone far

19  exceeded the EVs' retail price and could not be spread across Rivian's production base,

20  Rivian could not rely on increased production volumes to turn its gross profits positive on

21  each R1 sale.  (*Id.* ¶¶ 119–21.)  According to Plaintiffs, Rivian knew by September 2021

22  that it was going to have to change the R1's features significantly or raise prices.  (*Id.*)

23          But, as Plaintiffs allege, this reality was not fully disclosed in the months before and

24  after the IPO.  Quoting Plaintiffs, the Court explained in its Order denying Defendants'

25  Motion to Dismiss:

26          For IPO investors, investing $13 billion in a company that could become

27              profitable by scaling production volumes presents one set of risks, while

28              investing in a company that sells $110,000 worth of car parts to consumers

for just $70,000 presents a wildly different and far more severe set of risks. It is these severe risks that were hidden from investors.

(Order Denying MTD at 33, Doc. 172.)

Specifically, Plaintiffs identified seven statements that the Court found to have been plausibly pleaded as false or misleading. The Court further grouped those seven statements into three types of alleged misrepresentations: (1) statements that made it seem as though price hikes were a possibility rather than an inevitability; (2) statements that misattributed Rivian's lack of profitability to high fixed costs or made positive gross profits seem attainable through product utilization and investment leveraging, thereby obscuring the role that BOM costs were playing in profit losses; and (3) statements that attributed possible price hikes to post-IPO inflation rather than a years-long reality of excessive BOM costs. (*See generally* Order Denying MTD.)

Rivian's IPO commenced on November 10, 2021, and concluded on November 15, 2021, raising $13.7 billion selling 175,950,000 shares of Rivian stock at a fixed price of $78 per share. (ACC ¶¶ 101–02.) Rivian stock began trading on the NASDAQ as early as November 10, 2021. (*Id.* ¶ 101.) Plaintiffs allege that the identified misrepresentations inflated Rivian's stock prices during subsequent trading, through the post-IPO quiet period that lasted until December 5, 2021, and until the truth was revealed in March 2022. (*Id.* ¶¶ 206–07.)

**B. Rivian's Corrective Disclosures**

These misrepresentations were allegedly corrected by two disclosures. First, on March 1, 2022, Rivian publicly announced that it would increase base prices on the R1T and the R1S by 17% and 20% respectively. (ACC ¶¶ 141–42.) Significantly, these price increases applied even to existing pre-orders. (*Id.* ¶ 143.) The customer backlash was substantial and Rivian's stock price fell more than 20% following the news of the large price hikes. (*Id.* ¶¶ 147–48.) Rivian ultimately reversed course on its decision to apply the price increases to pre-orders but, as market analysts made clear, the inability to recoup the

additional money on pre-orders was going to hurt Rivian's revenue projections.  (*Id.* ¶ 149.)  Rivian's stock price fell from March 2 to March 10, 2022, as the market digested Rivian's likely inability to meet its financial targets.  (*Id.* ¶ 151.)

A further corrective disclosure was allegedly made on March 10, 2022, when Rivian announced its full year 2021 financial results and its 2022 projections.  These disclosures revealed that Rivian had adjusted its projected earnings before interest, taxes, depreciation, and amortization to a "disappointing" $4,750 million and expected negative gross margins through 2022.  (*Id.* ¶ 152.)  Analysts noted that the weak 2022 outlook reflected "steep cost pressures from input costs," which Rivian would be unable to offset.  (*Id.* ¶ 154.)  Rivian's stock price fell further and closed at a low of $35.83 per share on March 14, 2022.

Plaintiffs now seek to certify the following Class as to all claims: "All [] persons and entities who purchased or otherwise acquired Rivian Class A common stock ["Rivian stock"] between November 10, 2021, and March 10, 2022, inclusive, ["Class Period"] and were damaged thereby."  (Mot. at 2.)  Plaintiffs also seek to be appointed Class Representatives, to have Kessler Topaz Meltzer & Check, LLP appointed as Class Counsel, and to have Larson LLP appointed as Liaison Counsel.  (*Id.*)  Defendants oppose class certification on the basis that "individual issues predominate on multiple elements of Plaintiffs' claims" and that both the proposed Class Representative, AP-7, and proposed Class Counsel cannot adequately protect the interests of the proposed Class.  (Opp. at 7–8.)

## II.   **LEGAL STANDARD**

"A party seeking class certification must satisfy the requirements of Federal Rule of Civil Procedure 23(a) and the requirements of at least one of the categories under Rule 23(b)."  *Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 542 (9th Cir. 2013).  Rule 23(a) "requires a party seeking class certification to satisfy four requirements: numerosity, commonality, typicality, and adequacy of representation."  *Id.* (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011)); *see also* Fed. R. Civ. P. 23(a).  "Rule 23 does not set forth a mere pleading standard.  A party seeking class certification must affirmatively

demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." *Dukes*, 564 U.S. at 350.  This requires a district court to conduct a "rigorous analysis" that frequently "will entail some overlap with the plaintiff's underlying claim." *Id*. at 350–51.

"Second, the proposed class must satisfy at least one of the three requirements listed in Rule 23(b)." *Id*. at 345.  Here, Plaintiffs seek certification of the class under Rule 23(b)(3), which permits maintenance of a class action if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

The Supreme Court has explained that Rule 23(b)(3) "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997).  "Implicit in the satisfaction of the predominance test is the notion that the adjudication of common issues will help achieve judicial economy." *Valentino v. Carter-Wallace, Inc*., 97 F.3d 1227, 1234 (9th Cir. 1996). "When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." *Hanlon v. Chrysler Corp*., 150 F.3d 1011, 1022 (9th Cir. 1998) (cleaned up).

III.    **ANALYSIS**

Here, Defendants challenge the sufficiency of Plaintiffs' showings as to only two of the necessary elements: adequacy and predominance.  Therefore, while the Court evaluates all the elements under both Rules 23(a) and 23(b)(3), it focuses the bulk of its analysis on these two areas of dispute.

   **A. Numerosity**

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1).  The Court is persuaded by other district court

holdings that "[a]s a general rule, classes of forty or more are considered sufficiently numerous." *Mazza v. Am. Honda Motor Co.*, 254 F.R.D. 610, 617 (C.D. Cal. 2008), *vacated on other grounds*, 555 F.3d 581 (9th Cir. 2012). Here, Plaintiffs contend that there are thousands of investors who are members of the proposed class (Mem. at 15), and Defendants do not contest the numerosity of the proposed class (*see generally* Opp.). Accordingly, Rule 23(a)(1)'s numerosity requirement is satisfied.

### B. Commonality

Rule 23(a)(2) requires that "there [be] questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'" *Dukes*, 564 U.S. at 349–50 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 (1982)). The plaintiff must allege that the class's injuries "depend upon a common contention" that is "capable of classwide resolution." *Id.* at 350. In other words, the "determination of [the common contention's] truth or falsity [must] resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* "What matters to class certification … is not the raising of common questions—even in droves—but, rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.* (internal quotations and citations omitted).

Here, Plaintiffs contend that this case involves numerous common questions of law and fact, including whether Defendants misrepresented or omitted material facts, whether the 1934 Act Defendants acted with scienter, whether Rivian's stock valuewas artificially inflated (and by how much), and whether the Executive Defendants and Director Defendants had control over Rivian. (Mem. at 16.) Securities class actions typically satisfy Rule 23(a)(2) because the cases "involve the same basic legal claims: securities frauds," and the "legal claims are based on the same nucleus of operative facts: the alleged misrepresentations and omissions." *Connecticut Ret. Plans & Tr. Funds v. Amgen, Inc.*, 2009 WL 2633743, at *5 (C.D. Cal. Aug. 12, 2009). And again, Defendants do not contest

1  that the commonality requirement is met.  (*See generally* Opp.)  Accordingly, Rule

2  23(a)(2)'s commonality requirement is satisfied.

3      **C. Typicality**

4      Rule 23(a)(3) requires "the claims or defenses of the representative parties [to be]

5  typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  "[U]nder the

6  rule's permissive standards, representative claims are 'typical' if they are reasonably

7  coextensive with those of absent class members; they need not be substantially identical."

8  *Dukes v. Wal-Mart Stores, Inc*., 603 F.3d 571, 613 (9th Cir. 2010) (en banc) (quoting

9  *Hanlon v. Chrysler Corp*, 150 F.3d 1011, 1020 (9th Cir. 1998)), *rev'd on other grounds,*

10  564 U.S. 338 (2011).  As to the representative, "[t]ypicality requires that the named

11  plaintiffs be members of the class they represent." *Id.*

12      Plaintiffs argue that typicality is met because Plaintiffs, "like the other Class

13  members, purchased Rivian stock during the Class Period at prices artificially inflated by

14  Defendants' misconduct and suffered damages when the relevant truth concealed by

15  Defendants' misrepresentations was disclosed to the market and the price of Rivian

16  Common Stock declined."  (Mem. at 17.)  This shows that Plaintiffs and Class Members

17  have similar claims, resting on similar legal theories, and alleging similar harm.

18  Defendants do not argue otherwise.  (*See generally* Opp.)  Therefore, Rule 23(a)(3)'s

19  typicality requirement is met.

20      **D. Adequacy**

21      Rule 23(a)(4) permits certification of a class action only if "the representative

22  parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P.

23  23(a)(4).  "Resolution of two questions determines legal adequacy: (1) do the named

24  plaintiffs and their counsel have any conflicts of interest with other class members and (2)

25  will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the

26  class?"  *Hanlon*, 150 F.3d at 1020.

27      Plaintiffs argue that there are no conflicts of interest between Plaintiffs and the

28  Class or with counsel; Plaintiffs add that they and their Counsel have demonstrated

adequacy in their prosecution of this action.  (Mem. at 18.)  Defendants respond that

adequacy is not met because (1) proposed Class Counsel have engaged in "troubling

investigative tactics," (2) the longstanding relationship between AP-7 and Class Counsel

creates conflict of interest, and (3) AP-7 has not been a diligent in overseeing the case.

(Opp. at 24–26.)  The Court addresses each of Defendants' arguments.

First, the Court concludes that Class Counsel's investigation has been sufficient.

Defendants take issue with what they characterize as "dishonesty" in the allegations of the

ACC, which Defendants say mischaracterizes testimony from former employees.  (Opp. at

24–25.)  But as Class Counsel made clear at the hearing on the Motion, former employees

were questioned about the allegations in the ACC at depositions that took place very early

in the action and without the benefit of discovery; this meant that Class Counsel could not

refresh the recollection of any of the former employees or use documents to contradict

their attempts to backtrack from the allegations that were attributed to them in the ACC.

Further, the bulk of the allegations in the ACC were corroborated by those depositions.

(Reply at 28.)  The Court is not troubled, at this stage, by Class Counsel's investigation or

how it has attributed statements to former employees.

Second, the Court concludes that there is no conflict of interest between AP-7 and

Class Counsel.  Defendants cite an inapposite case for the proposition that a longstanding

relationship between Counsel and a Class Representative creates a conflict of interest.

(*See* Opp. at 25.)  In *Woods v. Google LLC*, the proposed class representative became an

equity partner at the law firm that was representing him and initiated the putative class

action on his own behalf; though that law firm was terminated and new proposed class

counsel were litigating the case, the court noted that it remained unclear whether the

original law firm had relinquished all financial interest in the case or was still poised to

receive referral fees or some share of fee recovery, creating a clear conflict of interest.

2018 WL 4030570, at *5 (C.D. Cal. Aug. 23, 2018).  Further, the court was wary because,

even if the class representative's law firm had relinquished all financial interest, it "had

and continues to have a lucrative business relationship" with proposed class counsel.  *Id.* at

9

*6. It was this longstanding, *fee-sharing* relationship that concerned the court because the class representative might still seek to recover a large fee award on behalf of closely associated attorneys. *Id.* No similarly conflicting financial relationship is at play here; Class Counsel have simply represented AP-7 in several prior securities actions and have done so "zealously" and to the benefit of the class. (*See* Reply at 27.) Defendants have identified nothing problematic about AP-7's relationship with Class Counsel other than the fact that it has been ongoing, and this is not enough to create a conflict of interest.

Third, AP-7 has been sufficiently diligent to serve as an adequate Class Representative. The CEO of AP-7 averred that AP-7 has "reviewed the Complaint and various pleadings," and "received periodic updates and other correspondence" from Class Counsel. (Bergstrom Decl. ¶ 5, Doc. 218-10.) A representative from AP-7 also traveled to the United States for a deposition. (Reply at 25.) Defendants' cherry-picked examples of AP-7's corporate representative being somewhat under-informed in his responses to questions during a deposition does not undermine the evidence of AP-7's willingness to prosecute this action with the necessary diligence. (*See* Opp. at 26–27.) Defendants complain that AP-7 did not know it invested in Rivian securities until Class Counsel informed it of this lawsuit, but "[t]here is nothing inherently improper with the recruitment of class representatives." *Zaklit v. Nationstar Mortg. LLC*, 2017 WL 3174901, at *14 (C.D. Cal. July 24, 2017). And again, Defendants' cited case law is not persuasive; in no case did a handful of flubbed responses in a deposition lead to finding of inadequacy. (*See* Opp. at 26.) Accordingly, the Court concludes that Rule 23(a)(4)'s adequacy requirement is met.

### E. Predominance

The Rule 23(b)(3) predominance inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Windsor*, 521 U.S. at 623. It "asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (quotations omitted). "An

1  individual question is one where members of a proposed class will need to present

2  evidence that varies from member to member, while a common question is one where the

3  same evidence will suffice for each member to make a prima facie showing or the issue is

4  susceptible to generalized, class-wide proof." *Id.* (cleaned up).  "Implicit in the

5  satisfaction of the predominance test is the notion that the adjudication of common issues

6  will help achieve judicial economy." *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227,

7  1234 (9th Cir. 1996).

8          "Considering whether 'questions of law or fact common to class members

9  predominate' begins … with the elements of the underlying cause of action." *Erica P.*

10  *John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011) ("*Halliburton I*").  Here,

11  Plaintiffs bring five claims that can be sorted, based on overlapping elements or theories of

12  derivative liability, into two categories: the 1934 Act claims and the 1933 Act claims.  As

13  to their 1934 Act claims, Plaintiffs must prove "(1) a material misrepresentation or

14  omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or

15  omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or

16  omission; (5) economic loss; and (6) loss causation." *Amgen Inc. v. Connecticut Ret.*

17  *Plans & Tr. Funds*, 568 U.S. 455, 460–61 (2013) (quoting *Matrixx Initiatives, Inc. v.*

18  *Siracusano,* 563 U.S. 27, 37–38 (2011)).  Meanwhile, for their 1933 Act claims, "[i]f a

19  plaintiff purchased a security issued pursuant to a registration statement," as Plaintiffs

20  allege happened here, "he need only show a material misstatement or omission to establish

21  his *prima facie* case." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983).

22          Because of the overlap between the elements of the claims, Defendants' arguments

23  for why predominance is not met for the 1934 Act claims resemble their arguments

24  regarding the 1933 Act claims.  (*See* Sur-Reply at 18.)  And generally, due to the overlap

25  in elements, if predominance is met for the 1934 Act claims, it must be met for the 1933

26

27

28

Act claims.  Therefore, because the Court determines that predominance *is* met for the 1934 Act claims, it need not separately evaluate the 1933 Act claims.[2]

Turning then to predominance and the 1934 Act claims, Defendants argue that Plaintiffs cannot establish that the element of reliance is "capable of resolution on a common, classwide basis." *Halliburton I*, 563 U.S. at 810.  "The traditional (and most direct) way a plaintiff can demonstrate reliance is by showing that he was aware of a company's statement and engaged in a relevant transaction—*e.g.,* purchasing common stock—based on that specific misrepresentation." *Id.*  But the Supreme Court has recognized two presumptions of reliance—known as the *Affiliated Ute* presumption and the *Basic* presumption—that assist a plaintiff in establishing reliance on a class-wide basis. Plaintiffs argue that they are entitled to the *Affiliated Ute* presumption or, in the alternative, that they have met the elements necessary to invoke the *Basic* presumption.  The Court considers each presumption in turn and concludes that Plaintiffs are entitled to only the *Basic* presumption.  The Court then addresses whether Defendants were able to rebut the *Basic* presumption.

### 1. *Affiliated Ute* Presumption

"[In] circumstances … involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision." *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153–54 (1972).  This *Affiliated Ute* presumption of reliance applies where a plaintiff alleges "violations of section 10(b) based on omissions of material fact[,] … because of the difficulty of proving a 'speculative negative'—that the plaintiff relied on what was not

---

[2] Specifically, Defendants argue that if Plaintiffs knew of the alleged untruths or omissions at the time they acquired Rivian stock, then class certification should be denied as to the 1933 Act claims.  (Sur-Reply at 18.)  Additionally, Defendants argue that if they prove that the corrective disclosure had no price impact on the value of Rivian stock, then there are no damages and class certification for the 1933 Act claims must be denied.  (*Id.*)  These arguments are discussed in detail in the course of evaluating the 1934 Act claims.

said." *Binder v. Gillespie*, 184 F.3d 1059, 1063, 1064 (9th Cir. 1999) (quoting *Blackie v. Barrack,* 524 F.2d 891, 908 (9th Cir.1975)).

Plaintiffs argue in their Reply brief that they are entitled to the *Affiliated Ute* presumption because their 1934 Act claims are premised on alleged omissions.[3] (Reply at 13.) "[B]inding circuit precedent makes clear that the *Affiliated Ute* presumption is limited to cases that primarily allege omissions," rather than "mixed" cases with both omissions and misrepresentations. *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, 2 F.4th 1199, 1204 (9th Cir. 2021) ("*In re Volkswagen*"). Even where there is a "loom[ing]" omission in a case, additional allegations of affirmative misrepresentations will "push [the] case outside *Affiliated Ute*'s narrow presumption." *Id.* at 1206.

Here, as in *In re Volkswagen*, there is a looming omission: Rivian failed to disclose that it was installing $110,000 worth of car parts into vehicles that it was selling for just $70,000. (*See* Order Denying MTD at 33.) But, also as in *In re Volkswagen*, that omission is accompanied by "pages of affirmative misrepresentations that were made by [Defendants] *and relied upon* by Plaintiff[s]." 2 F.4th at 1206. Those misrepresentations included statements that made it seem as though increases to material costs *might* affect profitability even though BOM costs were already making profitability impossible, statements that made it appear as though a price hike was not inevitable, statements that misrepresented ramped production and a greater spread of fixed overhead costs as possible paths to profitability, and statements construing inflation as the reason prices would have to reevaluated. (*See generally* Order Denying MTD.)

Because Plaintiffs have alleged reliance on several affirmative misrepresentations, the *Affiliated Ute* presumption is not available. Plaintiffs appear to argue that Defendants should be held to prior statements in which they characterized this case as being about

---

[3] Typically, the Court would treat this argument as waived because Plaintiffs make it for the first time in reply. *Padilla v. City of Richmond*, 509 F. Supp. 3d 1168, 1180 (N.D. Cal. 2020) ("As a general rule, courts do not consider arguments raised for the first time on reply."). But the Court permitted Defendants' sur-reply, giving Defendants an opportunity to respond to this line of argument, and the issue was discussed by both sides at the hearing on the Motion.

non-disclosures. But Plaintiffs cite no case law suggesting that those prior characterizations bind the parties here. (*See* Reply at 13–14.) Furthermore, it is not enough to recast the affirmative misrepresentations as omissions; "[a]ll misrepresentations are also nondisclosures, at least to the extent that there is a failure to disclose which facts in the representation are not true." *Little v. First Cal. Co.*, 532 F.2d 1302, 1304 n.4 (9th Cir. 1976). As *In re Volkswagen* makes clear, the Court cannot allow the overlap between omissions and misrepresentations to permit an improper use of the *Affiliated Ute* presumption. 2 F. 4th at 1208–09. The Court concludes that *Affiliated Ute* does not apply.

### 2. *Basic* Presumption and Market Efficiency

Plaintiffs argue that, even if the *Affiliated Ute* presumption does not apply, they have shown that they are entitled to the fraud-on-the-market presumption, also called the *Basic* presumption. (Reply at 14.) In *Basic Inc. v. Levinson*, the Supreme Court recognized a rebuttable presumption premised on the "fraud-on-the-market theory," which posits "that the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations." 485 U.S. 224, 246 (1988). Pursuant to that theory, "where materially misleading statements have been disseminated into an impersonal, well-developed market for securities, the reliance of individual plaintiffs on the integrity of the market price may be presumed." *Id.* at 247. To invoke that presumption, "plaintiffs must demonstrate [1] that the alleged misrepresentations were publicly known …, [2] that the stock traded in an efficient market, and [3] that the relevant transaction took place 'between the time the misrepresentations were made and the time the truth was revealed.'" *Halliburton I*, 563 U.S. at 811 (quoting *Basic*, 485 U.S. at 248).

Defendants do not challenge Plaintiffs' showing as to the first and third elements, but they contend that Plaintiffs have not proven that the market for Rivian stock was efficient for the entire Class Period. (Opp. at 12–13.) "To assess whether a market was efficient, the Ninth Circuit refers to the factors outlined in *Cammer v. Bloom*, 711 F. Supp.

1264 (D.N.J. 1989)." *In re FibroGen Sec. Litig.*, 2024 WL 1064665, at *8 (N.D. Cal. Mar. 11, 2024) (collecting cases).  The five *Cammer* factors consider:

> [F]irst, whether the stock trades at a high weekly volume; second, whether securities analysts follow and report on the stock; third, whether the stock has market makers and arbitrageurs; fourth, whether the company is eligible to file SEC registration form S–3, as opposed to form S–1 or S–2; and fifth, whether there are 'empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price.'

*Binder*, 184 F.3d at 1065 (quoting *Cammer*, 711 F. Supp. at 1286–87).[4]

Defendants concede that the market for Rivian stock was efficient beginning on December 5, 2021, but the Class Period begins on November 10, 2021; therefore, the question for the Court is whether that market was also efficient when the IPO price was set and during the first month of trading following the IPO.  (*See* Opp. at 15.)

Defendants argue that even though the Class Period begins on November 10, 2021—the day of Rivian's IPO—Plaintiffs cannot show that the "IPO price was set in an efficient market."  (Opp. at 12.)  Defendants emphasize that Plaintiffs' expert as to market efficiency, Zachary Nye, admitted in his deposition that he did not analyze "the IPO price and whether it was set in an efficient market."  (*Id.*; Ex. 6 to Leong Decl., Nye Deposition at 13, Doc. 251-8.)  As the Second Circuit observed: "[A] primary market for newly issued [securities] is not efficient or developed under any definition of these terms. … The fraud-on-the-market presumption [cannot] logically apply when plaintiffs allege fraud in

---

[4] There are other factors that courts consider when evaluating market efficiency.  For example, "[c]ourts in this Circuit also consider the three factors from *Krogman v. Sterritt*, 202 F.R.D. 467, 474 (N.D. Tex. 2001): (1) the capitalization of the company; (2) the bid-ask spread of the stock; and (3) the percentage of stock not held by insiders, [also known as the float]."  *In re FibroGen Sec. Litig.*, 2024 WL 1064665, at *11 (N.D. Cal. Mar. 11, 2024).  But because Defendants make no arguments as to these additional factors (*see* Opp. at 13–14), the Court finds the *Cammer* factors sufficient for its analysis of market efficiency.

1    connection with an IPO, because in an IPO there is no well-developed market in offered

2    securities." *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 42 (2d Cir. 2006) ("*In re*

3    *IPO*") (citations and quotations omitted).  Indeed, given that "underwriters generally set a

4    price that is fixed for the offering," the set IPO price cannot react to or incorporate new

5    material information as is required of an efficient market.  (*See* Ex. 14 to Leong Decl.,

6    Tabak Report ¶ 13, Doc. 251-16.)

7         Plaintiffs argue that "whether the IPO price itself was set in an efficient market is a

8    factual question that could be impacted by ongoing discovery."  (Reply at 15.)  But

9    Plaintiffs have the burden *now*, at the class certification stage, to show that the market was

10   efficient throughout their proposed Class Period.  *See Halliburton Co. v. Erica P. John*

11   *Fund, Inc.*, 573 U.S. 258, 275–76 (2014) ("*Halliburton II*") (explaining that plaintiffs

12   "must actually *prove*—not simply plead—that their proposed class satisfies each

13   requirement of Rule 23" and have the "burden of proving[,] before class certification[,]

14   that [predominance] is met … by proving the prerequisites for invoking the [*Basic*]

15   presumption").

16        Plaintiffs also argue that the Ninth Circuit has not endorsed the Second Circuit's

17   reasoning and that other courts in the Ninth Circuit have found market efficiency during an

18   IPO.  (*See* Reply at 15 (citing *In re Infineon Techs. AG Sec. Litig.*, 266 F.R.D. 386, 396

19   (N.D. Cal. 2009).)  The Court acknowledges that it is not bound by any Ninth Circuit

20   authority on this issue; nor does the Court embrace the Second Circuit's presumption that a

21   market remains inefficient throughout the quiet period following an IPO.  *See In re IPO*,

22   471 F.3d at 42–43.  But the Court finds persuasive the commonsense assertion that the

23   *fixed* price of an initial offering is not responsive to market information and, therefore, is

24   not set in an efficient market.  As a result, the Court must exclude the date of the IPO,

25   November 10, 2021, from the Class Period for 1934 Act claims because, at the start of the

26

27

28

1   IPO, all initial purchasers of Rivian stock bought at a fixed price.[5]  Similarly, Class

2   Members who bought stock only at the fixed price of $78 per share are not part of the

3   Class for the 1934 Act claims.  Plaintiffs have identified no way for reliance to be proven

4   on a class-wide basis as to Class Members who purchased Rivian stock at a fixed price;

5   rather, each fixed-price purchaser would have to show that he or she relied on the

6   identified material misrepresentations when choosing to buy Rivian stock, meaning

7   individual questions predominate.

8           Having addressed whether IPO prices are set in an efficient market, the Court must

9   next determine when the market for Rivian stock became efficient after November 10,

10  2021.  To do so, the Court considers the five *Cammer* factors.

11                          a.    *Weekly Volume*

12          "[T]he existence of an actively traded market, as evidenced by a large weekly

13  volume of stock trades, suggests there is an efficient market [] because it implies

14  significant investor interest in the company."  *Cammer*, 711 F. Supp. at 1286.  *Cammer*

15  reasoned that "average weekly trading of two percent or more of the outstanding shares"

16  would support a finding of market efficiency.  *Id.*  Here, Plaintiffs showed that the average

17  weekly share trading as a percentage of outstanding shares was 19 percent during the quiet

18  period, several times more than the threshold set in *Cammer*.  (Ex. 10 to Nirmul Reply

19  Decl., Nye Reply Report ¶ 62, Doc. 298-02.)[6]  The high trading volume existed throughout

20  the first days of the quiet period.  (*See* Ex. 1 to Nirmul Decl., Nye Report at 53, Doc. 218-

21  3.)  This factor supports a finding that there was an efficient market throughout the quiet

22  period, beginning on November 11, 2021.

---

24          [5] It may be argued that the market quickly became efficient after Rivian stock began being
25  openly traded on November 10, 2021, but the Court will not split hairs and declare market
    efficiency at a certain hour of the day on November 10, 2021.  Therefore, the earliest that market
26  efficiency could begin is November 11, 2021.

27          [6] Again, because the Court considers Defendants' Sur-Reply, Defendants had an opportunity
28  to respond to the evidence that was newly proffered by Nye in Reply and the Court finds it proper
    to rely on the Nye Reply Report.

1           b.    *Analyst Following*

2          Another factor supporting market efficiency is where "a significant number of

3    securities analysts followed and reported on a company's stock during the class period."

4    *Cammer*, 711 F. Supp. at 1286.  Defendants argue that analysts cannot publish reports

5    during the quiet period and so this factor cannot weigh in favor of market efficiency.

6    (Opp. at 13.)  But Plaintiffs have shown that several sources did publish research reports

7    during the quiet period, with insights from analysts; excerpts from reports dated between

8    November 4 and November 30, 2021, were cited in the Nye Reply Report.  (*See* Ex. 10 to

9    Nirmul Reply Decl., Nye Reply Report ¶ 63.)  Further, Plaintiffs have shown that there

10   was extensive news coverage of Rivian during the quiet period and that all of Rivian's

11   SEC filings were publicly available at no cost.  (*See id.* ¶¶ 64–65.)  This suggests that there

12   was sufficient "financial information" circulating about Rivian and being "interpreted by

13   securities analysts" throughout November.  Though perhaps not as exhaustive as coverage

14   after the quiet period, this factor is at least neutral as to the market's efficiency.

15           c.    *Market Makers and Arbitrageurs*

16          The next *Cammer* factor is the "existence of market makers and arbitrageurs" who

17   "react swiftly to company news and reported financial results."  711 F. Supp. at 1286–87.

18   "The more market-makers for a particular security (and, relatedly, the greater the volume

19   of the security the market-makers are prepared to handle), the more reasonable it is to infer

20   that the security is liquid, and, therefore, more likely the market for that security is

21   efficient."  *Petrie v. Elec. Game Card, Inc.*, 308 F.R.D. 336, 351 (C.D. Cal. 2015) (quoting

22   *In re Countrywide Fin. Corp. Sec. Litig.*, 273 F.R.D. 586, 614 (N.D. Cal. 2009)).  Though

23   *Cammer* also mentions the presence of arbitrageurs, "most courts consider only the

24   number of market makers."  *Id.*  Here, Plaintiffs have shown that there were over 100

25   active market makers who traded Rivian stock during November 2021.  (*See* Ex. 10 to

26   Nirmul Reply Decl., Nye Reply Report ¶ 67.)  This number of market makers supports a

27   finding that the market was efficient.  *See Carpenters Pension Tr. Fund v. Barclays PLC*,

28

18

310 F.R.D. 69, 92 (S.D.N.Y. 2015) ("Courts … have found that anywhere between six and twenty market makers is sufficient to support a finding of market efficiency.").

      d.  *Eligibility to File a Form S-3 Registration Statement*

  The fourth *Cammer* factor is eligibility "to file an S-3 Registration Statement in connection with public offerings." 711 F. Supp. at 1287. Plaintiffs concede that Rivian was not eligible to file a Form S-3 during the Class Period. (*See* Ex. 10 to Nirmul Reply Decl., Nye Reply Report ¶ 72.) But "such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met." *Cammer*, 711 F. Supp. at 1287. Therefore, this factor is neutral as to market efficiency.

      e.  *Causal Effect on Stock Price*

  The final *Cammer* factor is the existence of "a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price." *Id.* at 1287. Plaintiffs provide evidence that, on November 19, 2021, a date within the quiet period, Rivian's stock price dipped in a statistically significant manner in response to news that Ford and Rivian would no longer be partnering on development of an electric vehicle. (*See* Ex. 10 to Nirmul Reply Decl., Nye Reply Report ¶ 75.) This shows that, even during the quiet period, the market was digesting and responding to new information about Rivian, which is "the foundation for the fraud on the market theory." *Cammer*, 711 F. Supp. at 1287. This factor weighs in favor of market efficiency and has been described as "the most direct measure of market efficiency." *In re FibroGen Sec. Litig.*, 2024 WL 1064665, at *10. Ultimately, three of the five factors weigh in favor of market efficiency and two are neutral.

  Defendants argue that this evidence is not enough to meet the "'heavy burden' of showing efficiency in markets for newly-issued securities." (Sur-Reply at 11 (quoting *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, 2018 WL 1142884, at *8 (N.D. Cal. Mar. 2, 2018)).) Specifically, Defendants contend that Plaintiffs have not made as strong a showing as the plaintiffs in *In re Infineon Technologies AG*

*Securities Litigation*, 266 F.R.D. 386 (N.D. Cal. 2009).  (Sur-Reply at 11.)  It is true that *In re Infineon* is Plaintiffs' best legal support for the proposition that market efficiency can be established in the quiet period.  But it is not true that Plaintiffs' showing is weaker.  As in *In re Infineon*, Plaintiffs have shown that: (1) Rivian stock "traded at a high volume each week," including the weeks immediately after the IPO; (2) Rivian was covered by "at least" 15 analysts and had extensive additional news coverage; and (3) hundreds of market makers traded Rivian stock.  266 F.R.D. at 397.  This is a similar showing to the one in *In re Infineon*, and perhaps even stronger since much of the evidence in *In re Infineon* "[did] not come from the quiet period."  *Id.*

Based on this analysis, the Court determines that the market was efficient beginning on November 11, 2021.  Plaintiffs may invoke the fraud-on-the-market presumption from November 11, 2021, and onwards, meaning that reliance may be proven on a class-wide basis for those dates.

### 3.  Defendants' Rebuttal of the *Basic* Presumption

Though Plaintiffs have made a sufficient showing to invoke the fraud-on-the-market presumption, Defendants may rebut the presumption with "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price."  *Basic*, 485 U.S. at 248.  "[*Basic*] held [] that a defendant could rebut this presumption in a number of ways, including by showing that the alleged misrepresentation did not actually affect the stock's price—that is, that the misrepresentation had no 'price impact.'"  *Halliburton II*, 573 U.S. at 263–64.  "[T]he defendant bears the burden of persuasion to prove a lack of price impact," and "the defendant must carry that burden by a preponderance of the evidence."  *Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*, 594 U.S. 113, 126 (2021).  "In most securities-fraud class actions, as in this one, the plaintiffs and defendants submit competing expert evidence on price impact.  The district court's task is simply to assess all the evidence of price impact—direct and indirect—and determine whether it is more likely than not that the alleged misrepresentations had a price impact."  *Id.* at 126–27.

Here, Defendants argue that they can disprove price impact in three ways: (1) showing that the market already knew about the information that Plaintiffs allege was withheld by the at-issue misrepresentations; (2) showing the mismatch between the at-issue misrepresentations and the corrective disclosures, thereby weakening Plaintiffs' theory that there is a causal relationship; and (3) showing that the disclosures were not corrective and had no statistically significant effect on the stock price. The Court addresses each argument in turn.

### a.  *Market Knowledge*

"The [*Basic*] presumption [] is rebuttable … by showing that the market was already aware of the truth behind the defendant's supposed falsehoods and thus that those falsehoods did not affect the market price (the so-called 'truth-on-the-market' defense)." *Connecticut Ret. Plans & Tr. Funds v. Amgen Inc.*, 660 F.3d 1170, 1173–74 (9th Cir. 2011). Here, Defendants argue that the market already knew that Rivian was losing money on every car sold and could not dig itself out of that hole just by spreading fixed costs over more vehicles; Defendants add that analysts anticipated price hikes before the March 1, 2022, announcement that Rivian was raising prices. (Opp. at 16–18, 20.)

Before addressing Defendants' arguments about what the market knew, it is helpful to refocus on the alleged omissions and misrepresentations that form the basis of Plaintiffs' case. Plaintiffs have focused on seven statements that misled investors in three primary ways: (1) by representing that BOM cost increases were a possibility rather than a known problem that Rivian had already been addressing for years; (2) by representing that Rivian could get on a path to profitability by scaling up production and spreading out fixed costs across a larger product base without disclosing the major obstacle to profitability—that BOM costs to make each R1 unit exceeded the retail price; and (3) by blaming inflation for possible price increases, which obfuscated the fact that a price increase was *inevitable* because Rivian would lose $40,000 on every R1 sold, even if overhead and fixed costs were reduced to zero. (*See* Order Denying MTD at 18, 22, 26.) According to Plaintiffs' theory of the case, investors needed to know either the extent to which Rivian's BOM

21

1   costs exceeded its sales price or the scope of inevitable price hikes; otherwise, the market

2   did not know the full truth.

3          Filtered through this understanding of how investors were misled, it becomes clear

4   that Defendants' evidence of market knowledge does not establish that the market had the

5   information that Plaintiffs allege was withheld.  Defendants argue that Rivian already

6   disclosed that it lost money on every R1 because Rivian revealed in its Prospectus that

7   "much of our current inventory has a lower net realizable value than its cost" and "we

8   expect in the near term that we will continue to have significant LCNRV[7]-related charges."

9   (Opp. at 17; Ex. 1 to Leong Decl., Final Prospectus at 101, Doc. 251-3.)  But Defendants

10  fail to mention that these statements in the Prospectus are immediately surrounded by the

11  language that "[o]ver the long term, we believe that we will be able to increase our gross

12  margin in the long term [sic] and generate positive gross profit as production utilization

13  increases and we leverage our investments."  (Ex. 1 to Leong Decl., Final Prospectus at

14  101.)  Read in context with that language, this portion of the Prospectus maintains the

15  position that something other than a price hike could address Rivian's profitability woes.

16         Defendants also argue through their expert, Lawrence Smith, that Rivian's 2021

17  10-Q for the third quarter disclosed that "the cost of its then-current inventory balance was

18  attributable almost exclusively to raw materials."  (Opp. at 17; Corrected Ex. 15 to Leong

19  Decl., Smith Report ¶ 25, Doc. 293-1.)  Smith adds that in the 10-Q, Rivian revealed "an

20  LCNRV adjustment of $31 million … to reflect that the net realizable value of that

21  inventory was lower than its cost."  (Corrected Ex. 15 to Leong Decl., Smith Report ¶ 27.)

22  According to Smith, the disclosure that the inventory costs exceeded their value would

23  have revealed that "the total cost of production would exceed the vehicle sale price and

24  [Rivian] would lose money on every car."  (*Id.* ¶ 30.)

25

26  _____

27      [7] LCNRV stands for Lower of Cost or Net Realizable Value; businesses record the value of
    their inventory at either the amount paid for the inventory or the value of the inventory in the
28  market, whichever is lower.

The Court is not persuaded by Smith's opinion.  Inventory costs consist of more than BOM costs and include inputs such as labor and overhead.  And, as Plaintiffs point out, Smith admitted in his deposition that "[a]n investor does not have the details in order to determine the component parts of the calculation of net realizable value" and "would not know what manufacturing overhead costs are being allocated … to the inventory."  (Ex. 12 to Nirmul Reply Decl., Smith Deposition at 15–16, Doc. 298-4.)  These disclosures, therefore, suffer from the same vagueness as the disclosures in the Prospectus—they show that Rivian was going to lose money on each car sold but do not reveal the extent to which BOM costs exceeded sales prices, and investors could not have inferred that information from the available disclosures.

Next, Defendants argue that Rivian had already disclosed that spreading fixed costs alone would not put Rivian on a path to profitability.  (Opp. at 18.)  According to Defendants, in a 2021 third quarter earnings call, Rivian's CFO Claire  McDonough revealed that LCNRV adjustments to write-down the value of inventory would "negatively impact[] gross profit in the third quarter" and was expected to "impact upcoming quarters in the near future."  (Ex. 8 to Leong Decl., 2021 Earnings Call at 5, Doc. 251-10.) Defendants claim that this would have revealed that Rivian could not fix its profitability problems without addressing the BOM costs that were driving inventory adjustments. (Opp. at 18.)

But Defendants overstate what an investor could have gleaned from this disclosure. Furthermore, the statement is surrounded by the same alleged misrepresentations that distract from the primary obstacle to profitability.  In the paragraph prior, McDonough blames high fixed costs for the continued drag on gross profit, and in the next paragraph, McDonough explains that the "inflationary market backdrop" may lead to "evaluation [of] the pricing for our vehicle."  (Ex. 8 to Leong Decl., 2021 Earnings Call at 5.)  Read in context, this disclosure does not reveal the gap between BOM costs and vehicle sales price or the scope of the needed price hikes.

Nor is the Court convinced, by a preponderance of the evidence, that the market digested this information, incorporated it into Rivian's stock price, or anticipated the scope of Rivian's coming price hikes.  Defendants cite a Wells Fargo report that lowered the estimated earnings forecast and fourth quarter delivery forecast due to the reported LCNRV adjustments discussed above.  (*See* Ex. 14 to Leong Decl., Tabak Report ¶ 66.)  But that same report asserts that "the gross margins largely reflect the unabsorbed overhead of the +150k capacity plant."  (*Id.*)  Therefore, it is not clear that Wells Fargo had reported on and adjusted for Rivian's high BOM costs.

Defendants also point to analyst reports that identified BOM reduction as a way to "improve Rivian's then negative margins by 34%."  (Corrected Ex. 15 to Leong Decl., Smith Report ¶ 44.)  But there is still no indication that these analyst reports revealed either that BOM costs exceeded the R1's sales price or the scope of inevitable price hikes.  And since those same reports also identified "Conversion Cost Reduction" and "Depreciation Reduction," meaning reduction in labor and overhead costs, as methods by which Rivian might improve its margins, it is not obvious that analysts understood the extent to which BOM costs exceeded sale price.

Defendants next point to analysts who anticipated that Rivian would have to raise prices.  (Opp. at 20.)  Analysts explained that they expected price hikes due to industry-wide inflation.  (*Id.*)  But as Plaintiffs point out, Defendants over-simplify analyst expectations.  Some analysts who reported on expected price increases were focused on increases in average selling prices.  (*See* Ex. 10 to Nirmul Reply Decl, Nye Reply Report ¶ 35.)  Average selling prices can increase over time due to available upgrades and the expectation that future consumers will purchase more expensive Rivian models; an increase in average selling price does not necessarily reveal an increase in *base* price.  (*See id.*)  Additionally, some analysts expected price increases but in much more modest increments.  (*Id.* ¶ 38.)  And several analysts treated Rivian's ultimate price increase, particularly the size of the increase, as surprising.  (*Id.* ¶¶ 33, 34.)  Defendants have not persuaded the Court that analysts anticipated the magnitude of Rivian's price hike.  The

1  fact that analysts were anticipating a price hike that would be driven just by inflationary

2  pressures further convinces the Court that they did not know the extent to which BOM

3  costs impeded Rivian's profitability.  Ultimately, Defendants have not shown that the

4  market and investors already knew the allegedly withheld information.

5              b. *Statement Mismatch*

6         "[P]rice impact can be observed on the 'front-end' (*i.e.*, misstatements causing or

7  maintaining inflation) or on the 'back-end' (*i.e.*, a decline in price caused by the corrective

8  disclosures)."  *In re Apple Inc. Sec. Litig.*, 2022 WL 354785, at *7 (N.D. Cal. Feb. 4, 2022)

9  (quoting *Plymouth Cnty. Ret. Sys. v. Patterson Cos., Inc.*, 2020 WL 5757695, at *11 (D.

10  Minn. Sept. 28, 2020)).  "[W]hen there is a mismatch between the contents of the

11  misrepresentation and the corrective disclosure," the Supreme Court has warned that "it is

12  less likely that the specific disclosure actually corrected the generic misrepresentation,

13  which means that there is less reason to infer front-end price inflation—that is, price

14  impact—from the back-end price drop."  *Goldman Sachs*, 594 U.S. at 123.[8]  According to

15  Defendants, the corrective disclosures Plaintiffs have identified do not match Plaintiffs'

16  alleged misrepresentations, meaning there is less reason to infer that Rivian's stock prices

17  were inflated on the front end by those misrepresentations.  (Opp. at 21–23.)

18         First, Defendants argue that there is no evidence that Rivian's base price increases

19  for the R1 "were required for profitability"; thus, according to Defendants, there is no

20  evidence that the price increase was connected to a "revelation" about Rivian's business

21  model.  (Opp. at 21.)  But that argument is dispelled by the evidence; certain market

22  analysts identified the price increase "as genuinely driven by necessity."  (Ex. 17 to Nirmul

23  _____

24       [8] As this quote from *Goldman Sachs Group v. Arkansas Teachers Retirement Systems* makes
25  clear, front-end and back-end price impact are linked; if a defendant disproves back-end price
    impact, it means that one can infer a lack of front-end impact as well because the alleged
26  misrepresentations must not have been the cause of an artificially inflated stock price.  Therefore,
    the Court does not agree with Plaintiffs that "Defendants failure to analyze [] price increases is
27  fatal to their price impact challenge."  (Reply at 17.)  If Defendants convince the Court that there
    was no back-end price impact, it will be strong and persuasive evidence that there was no price
28  impact at all.

1    Reply Decl., Morgan Stanley Report, Doc. 298-9.)  Furthermore, because Rivian decided

2    to increase prices on pre-orders as well, investors could reasonably have inferred that

3    Rivian was in a sizeable financial hole.  (Reply at 20.)

4         Second, Defendants claim that the generality of the alleged misrepresentations does

5    not match the specific information revealed by the price hike.  (Opp. at 21–22.)

6    Defendants explain that the price increases to existing pre-orders and the backlash by

7    existing pre-order customers were what caused Rivian's stock price to drop and that the

8    risk of a retroactive price increase has nothing to do with the misrepresentations about

9    Rivian's path to profitability.  (*Id.* at 22.)  But, as a threshold matter, that argument

10   requires Defendants to prove that Rivian's stock price dropped *only* because of customer

11   outrage and lost goodwill due to the retroactive price increase and not because of investor

12   concern about what price hikes meant for Rivian's overall business model.  Defendants

13   have not proven that.  Plaintiffs cite to several analyst reports expressing concern about the

14   "significant[]" increase in base prices and future demand destruction.  (*See* Ex. 10 to

15   Nirmul Reply Decl., Nye Reply Report ¶ 33.)  And analysts attributed the stock price drop

16   to the decision to raise prices by 20%, not only to lost goodwill.  (*Id.* ¶ 34.)  Further, as

17   Plaintiffs argue, if it was only the retroactive price increase that caused Rivian stock to dip,

18   then Defendants should be able to point to some positive movement in Rivian stock price

19   after it reversed course on the retroactive price increase.  (Reply at 20–21.)  Defendants

20   have not identified any such movement.

21        Because the Court does not accept Defendants' argument that Rivian's stock price

22   was affected exclusively by the lost goodwill engendered by a retroactive price increase,

23   the Court is not persuaded that the misrepresentations and the disclosures are mismatched.

24   Both the forward-looking and the retroactive prices increases provided an explanation for

25   the size of Rivian's financial hole.  And analyst coverage that the price increase was driven

26   by necessity shows that the market gained more information about Rivian's obstacles to

27   profitability, including that a price hike was inevitable.  "There is no requirement that the

28   disclosure take a particular form or be of a particular quality, such that it be a mirror image

tantamount to a confession of fraud." *Pelletier v. Endo Int'l PLC*, 338 F.R.D. 446, 483 (E.D. Pa. 2021) (quoting *Pearlstein v. BlackBerry Ltd.*, 2021 WL 253453, at *18 (S.D.N.Y. Jan. 26, 2021)).  Here, the Court finds that the corrective disclosure of raising prices on March 1, 2022, is sufficiently related to the alleged misrepresentations.

Finally, Defendants complain that they are being held to a different standard than Plaintiffs as it pertains to market knowledge because they must show that that such knowledge mapped exactly onto the allegedly withheld information whereas Plaintiffs can use corrective disclosures that are not an exact match.  (Sur-Reply at 15.)  But the lack of symmetry is of no moment; the question is whether Defendants have shown that the mismatch weakens the inference that the initial misrepresentation inflated stock prices. Defendants have not convinced the Court that the misrepresentations about Rivian's path to profitability are so unrelated to the March 2022 price hikes that the relationship between those misrepresentations and Rivian's stock price has been severed.

Based on this conclusion, the March 1, 2022, price increase amounts to a corrective disclosure.  And because Defendants concede that there was a statistically significant stock price drop following the March 1 announcement, Defendants have failed to prove a lack of price impact as to that disclosure.  Plaintiffs have shown that reliance can be adjudicated on a class-wide basis from November 11, 2021, to, at least, March 1, 2022.  The only remaining question is whether the Class Period should extend through March 10, 2022, to encompass Plaintiffs' second alleged corrective disclosure.

c. *Nature and Effect of March 10 Disclosure*

"[R]evelations that are not 'corrective' cannot form the basis for a corrective disclosure." *In re FibroGen*, 2024 WL 1064665, at *12.  To be corrective, the disclosed information must "correct[] one or more prior false statements or omissions," and be "'value relevant' (*i.e.*, cause[] at least some of the stock price decline)." *Id.*  Defendants argue that the disclosure on March 10, 2022, did not correct any previous statements and did not have a statistically significant effect on the stock price.  (Opp. at 23–24.)

27

Plaintiffs allege that the March 10, 2022, disclosure revealed "a disappointing" earnings projection with continued negative gross margins.  (ACC ¶ 152.)  But as Defendants point out, analysts picked up on several new pieces of information from this earnings report, not just disclosures related to the profitability hurdles created by Rivian's high BOM costs.  The other information that analysts digested included: (1) a "disappointing 2022 production outlook … given difficulty in [] ramping production"; (2) lowered production expectations due to "pervasive supply chain constraints/disruptions"; (3) the persistence of "margin headwinds" because Rivian would be limited in its options to offset costs with price increases following the backlash to its March 1, 2022, announcement; (4) supply chain problems; and (5) continued demand that was holding up "better than some may have expected."  (Ex. 14 to Leong Decl., Tabak Report ¶ 35; *see also* Ex. 1 to Nirmul Decl., Nye Report at 123–40 (describing analyst reports on Rivian's earnings disclosure).)  Nevertheless, several analysts did identify steep cost pressures and limited ability to raise base prices as the reason for Rivian's weak financial projections, which corrected the misrepresentations about Rivian's ability to generate profit.  (*See* Ex. 10 to Nirmul Reply Decl., Nye Reply Report ¶¶ 57–59.)  While the mixed nature of the March 10 disclosure makes it harder to isolate the corrective disclosure as it is alleged by Plaintiffs, Plaintiffs have shown that the disappointing earnings projection, which provided further information about the size of Rivian's financial hole due to its high BOM costs, does correct the alleged misrepresentations.

Defendants next argue that there is no statistically significant price drop associated with the March 10 disclosure, which disproves price impact.  (Opp. at 23.)  However, as other courts have noted, while a statistically significant price drop after a corrective disclosure is evidence of price impact, the converse is not necessarily true.  *See Monroe Cnty. Emps.' Ret. Sys. v. Southern Co.*, 332 F.R.D. 370, 395 (N.D. Ga. 2019) ("[T]he absence of a statistically significant price adjustment does not show the stock price was unaffected by the misrepresentation." (quoting *Rooney v. EZCORP, Inc.*, 330 F.R.D. 439, 450 (W.D. Tex. 2019)))  And the proposition Defendants quote from *In re Novatel*

28

*Wireless Securities Litigation* about the need for a statistically significant decline in stock price relates to the loss causation standard. 830 F. Supp. 2d 996, 1019 (S.D. Cal. 2011). Plaintiffs' burden to prove loss causation later in this action is not at issue and does not alter Defendants' present burden to prove lack of price impact.

Therefore, the Court need not pinpoint a statistically significant price drop to certify the class through March 10, 2022. Though the absence of clear statistical significance and the mixed nature of the disclosures may affect Plaintiffs' success at later stages of the litigation, they are not enough at this stage to establish a lack of price impact. As a result, the Court concludes that the March 10, 2022, earnings announcement is a corrective disclosure related to the alleged misrepresentations, and reliance on those misrepresentations is susceptible to class-wide proof through that date.

### 4. Conclusions Regarding Predominance, Reliance, and Class Period

To summarize, the Court finds that Plaintiffs have met the predominance requirement of Rule 23(b)(3). Specifically, Plaintiffs have shown that, as to their 1934 Act claims, all elements are susceptible to proof on a class-wide basis, including reliance, from November 11, 2021, to March 10, 2022. The market was efficient during that period and Defendants were not able to establish lack of price impact as to the declines in Rivian stock value that occurred on March 1 and March 10, 2022. Defendants do not challenge Plaintiffs' ability to meet the predominance requirement as to any other element. (*See generally* Opp.) Additionally, because there is predominance for the 1934 Act claims, the Court concludes that predominance is also met as to the 1933 Act claims; Defendants raised the same contentions that the Court found unpersuasive. (*See* Sur-Reply at 18.)

Plaintiffs seek to certify a Class "consisting of all persons and entities who purchased or otherwise acquired Rivian Class A common stock [] between November 10, 2021, and March 10, 2022, inclusive." (Mem. at 10.) But the Court found that reliance could be proven on a class-wide basis *beginning on* November 11, 2021. Since reliance is not an element of the 1933 Act claims, it is still proper to certify the Class Period as it is defined by Plaintiffs, but Class Members will not be able to recover under the 1934 Act as

to Rivian stock that was purchased on November 10, 2021, or at the IPO's fixed price of $78 per share.

### F. Superiority

"The superiority inquiry under Rule 23(b)(3) requires determination of whether the objectives of the particular class action procedure will be achieved in the particular case." *Hanlon*, 150 F.3d at 1023. "This determination necessarily involves a comparative evaluation of alternative mechanisms of dispute resolution." *Id.* Here, each member of the class pursuing a claim individually would burden the judiciary and run afoul of Rule 23's focus on efficiency and judicial economy. *See Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 946 (9th Cir. 2009) ("The overarching focus remains whether trial by class representation would further the goals of efficiency and judicial economy."). Further, litigation costs would likely "dwarf potential recovery" if each class member litigated individually. *Hanlon*, 150 F.3d at 1023. "[W]here the damages each plaintiff suffered are not that great, this factor weighs in favor of certifying a class action." *Zinser v. Accufix Rsch. Inst. Inc.*, 253 F.3d 1180, 1198 n.2 (9th Cir. 2001) (quoting *Haley v. Medtronic, Inc.*, 169 F.R.D. 643, 652 (C.D. Cal. 1996)). Defendants do not contest this factor. (*See* Opp.)

Considering the non-exclusive factors under Rule 23(b)(3), the Court further finds that Class Members' potential interests in individually controlling the prosecution of separate actions and the potential difficulties in managing the class action do not outweigh the desirability of concentrating this matter in one action. *See* Fed. R. Civ. P. 23(b)(3)(A), (C), (D). The Court is also not aware of any litigation concerning the controversy already commenced by or against Class Members. *See* Fed. R. Civ. P. 23(b)(3)(B). The Court concludes that the superiority requirement is met.

## IV.   CONCLUSION

For the foregoing reasons, the Court GRANTS Plaintiffs' Motion for Class Certification. The following Classes are certified under Rule 23(a) and 23(b)(3):

- **For 1934 Act Claims**: All persons and entities who purchased or otherwise acquired Rivian Class A common stock between November 11, 2021, and

30

1  March 10, 2022, inclusive, and were damaged thereby.  The Class excludes

2  those who purchased Rivian Class A common stock at the fixed IPO price.

3  • **For 1933 Act Claims**: All persons and entities who purchased or otherwise

4  acquired Rivian Class A common stock between November 10, 2021, and

5  March 10, 2022, inclusive, and were damaged thereby.

6  Both Classes exclude Defendants and their families, the officers, directors and

7  affiliates of Defendants, at all relevant times, members of their immediate families and

8  their legal representatives, heirs, successors or assigns, and any entity in which Defendants

9  have or had a controlling interest.

10  Plaintiffs Sjunde AP-Fonden and James Stephen Muhl are appointed as Class

11  Representatives.  Kessler Topaz Meltzer & Check, LLP is appointed as Class Counsel and

12  Larson LLP is appointed as Liaison Counsel to the Class.  Specifically, any attorney from

13  those firms identified on the docket in this case as a "Lead Attorney" may not substitute

14  out absent specific approval by the Court.

15  The Court directs the parties to meet and confer and to submit an agreed-upon form

16  of class notice that will advise Class Members of, among other things, the damages sought

17  and their rights to intervene, opt out, submit comments, and contact Class Counsel.  The

18  parties shall also jointly submit a plan for the dissemination of the proposed notice.  The

19  parties must work together to generate a class list to be used in disseminating class notice,

20  and they must work together to create a notice that satisfies Rule 23.  The proposed notice

21  and plan of dissemination, as well as a proposed order granting approval, shall be filed

22  with the Court on or before **August 23, 2024.**

23

24  DATED:  July 17, 2024

25  # JOSEPHINE L. STATON

26  HON. JOSEPHINE L. STATON
UNITED STATES DISTRICT JUDGE

27

28