BORIS FELDMAN, State Bar No. 128838
boris.feldman@freshfields.com
DORU GAVRIL, State Bar No. 282309
doru.gavril@freshfields.com
EUNICE LEONG, State Bar No. 320499
eunice.leong@freshfields.com
REBECCA E. LOCKERT, State Bar No. 348810
rebecca.lockert@freshfields.com
FRESHFIELDS US LLP
855 Main Street
Redwood City, CA 94063
Telephone: (650) 618-9250

*Attorneys for Defendants Rivian Automotive, Inc.,
Robert J. Scaringe, Claire McDonough, Jeffrey R.
Baker, Karen Boone, Sanford Schwartz, Rose
Marcario, Peter Krawiec, Jay Flatley, and
Pamela Thomas-Graham*

*Additional Counsel Listed on Signature Block*

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| CHARLES LARRY CREWS, JR., Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> RIVIAN AUTOMOTIVE, INC., ROBERT J. SCARINGE, CLAIRE MCDONOUGH, JEFFREY R. BAKER, KAREN BOONE, SANFORD SCHWARTZ, ROSE MARCARIO, PETER KRAWIEC, JAY FLATLEY, PAMELA THOMAS-GRAHAM, MORGAN STANLEY & CO., LLC, GOLDMAN SACHS & CO., LLC, J.P. MORGAN SECURITIES LLC, BARCLAYS CAPITAL INC., DEUTSCHE BANK SECURITIES INC., ALLEN & COMPANY LLC, BOFA SECURITIES, INC., MIZUHO SECURITIES USA LLC, WELLS FARGO SECURITIES, LLC, NOMURA SECURITIES INTERNATIONAL, INC., PIPER | Case No.: 2:22-cv-01524-JLS-E <br><br> **DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** <br><br> Date:      September 12, 2025 <br> Time:     10:30 a.m. <br> Judge:    Hon. Josephine L. Staton <br> Ctrm:     8A, 8th Floor <br><br> **REDACTED VERSION OF DOCUMENT FILED PROVISIONALLY UNDER SEAL** |

1
2
3
4
5
6

SANDLER & CO., RBC CAPITAL
MARKETS, LLC, ROBERT W. BAIRD &
CO. INC., WEDBUSH SECURITIES
INC., ACADEMY SECURITIES INC.,
BLAYLOCK VAN, LLC, CABRERA
CAPITAL MARKETS LLC, C.L. KING &
ASSOCIATES, INC., LOOP CAPITAL
MARKETS LLC, SAMUEL A.
RAMIREZ & CO., INC., SIEBERT
WILLIAMS SHANK & CO., LLC, and
TIGRESS FINANCIAL PARTNERS LLC,

7

Defendants.

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TABLE OF CONTENTS**

INTRODUCTION....................................................................................................1

WHAT DISCOVERY ESTABLISHED..................................................................3

    A. BOM Was Not "Locked" Pre-IPO ...............................................................3

    B. Profitability Even Without Price Increases...................................................4

    C. Post-IPO Economic Instability .....................................................................5

    D. No Pricing Decisions Until February 2022..................................................5

    E. Market Reacts to Price Increase and Reversal..............................................6

SUMMARY JUDGMENT IS APPROPRIATE ON ALL CLAIMS...............................6

    I. NO SECTION 10(b) SECURITIES FRAUD..............................................7

    A. No Evidence of Fraudulent Intent................................................................7

        1. Individual Defendants Bought Stock in the IPO...................................7

        2. Individual Defendants Held Their Stock ...............................................8

        3. Individual Defendants Consistently Acted in Good Faith for Shareholders'
          Interests.................................................................................................9

    B. No Material Misrepresentation or Omission ...............................................10

        1. No Misrepresentation or Omission in Rivian's Prospectus.........................11

          a. No Misrepresentation or Omission Regarding BOM............................11

            i) BOM Was Not "Locked In," and Declined as Production Scaled.....11

            ii) BOM "Costs" Were Estimates, Not Actuals.....................................13

            iii) No Misleading BOM Statement.........................................................14

          b. No Falsity Regarding Profitability.........................................................15

            i) No Duty to Disclose Forecasts of BOM Impact on Profitability.......15

            ii) Rivian Warned It Was Not and May Never Be Profitable...............16

            iii) Rivian Projected Profitability Without a Price Increase.................17

          c. No Falsity Regarding Pricing................................................................17

        2. No Misrepresentation or Omission in Q3'21 Earnings Call......................18

          a. No False or Misleading Statements.......................................................19

          b. Each Statement Is Protected by the Safe Harbor...................................19

    C. Plaintiffs Cannot Prove Fraud Caused Stock Drop Losses..............................20

        1. The Market Already Knew the Alleged Corrective Information.................21

a. The Market Knew Rivian's Vehicles Were Not Initially Profitable........21

b. The Market Expected a Price Increase.....................................................21

c. The Market Did Not Assume Rivian's Profitability Required R1
Profitability...................................................................................................22

2. Plaintiffs Have Not Shown Upfront Inflation................................................23

3. Factors Unrelated to the Alleged Misrepresentations or Omissions
Caused the Stock Price Declines....................................................................23

II. EVIDENCE SHOWS NO VIOLATION OF SECTIONS 11 AND 12.................25

A. No Evidence of Known Material Trend About BOM Required to Be Disclosed
Under Item 303................................................................................................26

1. Item 303 Limits Information Required for Disclosure..............................26

2. Forward-Looking Estimates Are Not a Known Trend...............................27

B. No Evidence of Material Factors Required for Item 105.................................27

1. Item 105 Does Not Require Disclosure of Generic Risks or Proprietary
Strategies.........................................................................................................27

2. Rivian Was Not Required to Engage in Doomsday Speculation.................28

III. EVIDENCE SHOWS THAT INDEPENDENT DIRECTORS ACTED
DILIGENTLY.......................................................................................................28

A. Independent Directors' Investigation Exceeded Standard of Care.................29

1. Dialogue with Management and Each Other................................................29

a) Board and Audit Committee Meetings.....................................................29

b) Engagement on Relevant Topics.............................................................29

2. Reputational Intermediaries........................................................................30

3. Careful Prospectus Review..........................................................................30

B. Independent Directors Had Reasonable Grounds to Believe the Prospectus
Was Materially Accurate................................................................................31

C. Independent Directors Believed the Prospectus Was Materially Accurate......31

IV. NO INDEPENDENT DIRECTOR WAS A CONTROL PERSON.....................31

A. Independent Directors Did Not Control Operations or Prospectus.................32

B. Independent Directors Acted in Good Faith...................................................32

CONCLUSION............................................................................................................32

# TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page(s)**

*Akerman v. Oryx Commc'ns,*
   810 F.2d 336 (2d Cir. 1987) …………………...…………….……..………….... 24

*In re Avant-Garde Computing Sec. Litig.,*
   1989 WL 103625 (D.N.J. Sept. 5, 1989) ……………………….……….… 29

*In re Canandaigua Sec. Litig.,*
   944 F. Supp. 1202 (S.D.N.Y. 1996) …………………………...…………….… 18

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986) ……………………………………….…………………………6

*In re Cirrus Logic Sec. Litig.,*
   946 F. Supp. 1446 (N.D. Cal. 1996) ………………………………..…….… 15

*In re Clorox Sec. Litig.,*
   238 F. Supp. 2d 1139 (N.D. Cal. 2002),
   *aff'd* 353 F.3d 1125 (9th Cir. 2004) …………………….……….…..… 20

*In re Countrywide Fin. Sec. Litig.,*
   588 F. Supp. 2d (C.D. Cal. 2008) …………..…………..….…..……… 26, 28

*In re Cypress Semiconductor Sec. Litig.,*
   891 F. Supp. (N.D. Cal. 1995) …………………….………………...….… 19, 21

*Davidoff v. Farina,*
   2005 WL 2030501 (S.D.N.Y. Aug. 22, 2005) …………………….…………………… 8

*Dura Pharm. v. Broudo,*
   544 U.S. 336 (2005) ………………………………………….…..…………….7, 23

*Far Out Prods., Inc. v. Oskar,*
   247 F.3d 986 (9th Cir. 2001) ……………………………..……………….... 7

*Farhar v. Ontrak,*
   714 F. Supp. 3d 1198 (C.D. Cal. 2024) ………..………………...….………20

*Feit v. Leasco Data Processing Equip.,*
   332 F. Supp. 544 (E.D.N.Y. 1971) ……………………………….….………30

**Page(s)**

*In re Finisar Sec. Litig.*,
    2013 WL 211206 (N.D. Cal. Jan. 16, 2013)..........................................16

*Flynn v. Sientra*,
    2016 WL 3360676 (C.D. Cal. June 9, 2016)..........................................32

*In re Foxhollow Techs. Sec. Litig.*,
    2008 WL 2220600 (N.D. Cal. May 27, 2008),
    *aff'd* 359 F. App'x 802 (9th Cir. 2009) ..................................................18

*Gasner v. Bd. of Sup'rs*,
    103 F.3d 351 (4th Cir. 1996) ..................................................................16

*Hoang v. ContextLogic*,
    2023 WL 6536162 (N.D. Cal. Mar. 10, 2023) .......................................27

*Hollinger v. Titan Cap.*,
    914 F.2d 1564 (9th Cir. 1990) ................................................................32

*In re Homestore.com Sec. Litig.*,
    347 F. Supp. 2d 790 (C.D. Cal. 2004) ....................................................32

*In re Imperial Credit Indus. Sec. Litig.*,
    252 F. Supp. 2d 1005 (C.D. Cal. 2003) ..................................................25

*In re Infonet Servs. Secs. Litig.*,
    310 F. Supp. 2d 1080 (C.D. Cal. 2003) ..................................................19

*Kapps v. Torch Offshore*,
    379 F.3d 207 (5th Cir. 2004) ..................................................................26

*Laven v. Flanagan*,
    695 F. Supp. 800 (D.N.J. 1988) ..................................................28, 29, 31

*In re LexinFintech Holdings Sec. Litig.*,
    2021 WL 5530949 (D. Or. Nov. 24, 2021) ............................................15

*Lilley v. Charren*,
    17 F. App'x 603 (9th Cir. 2001) ...........................................7, 8, 10, 25

*Lilley v. Charren*,
    936 F. Supp. 708 (N.D. Cal. 1996) .........................................................32

*In re Merrill Lynch Sec. Litig.*,
    272 F. Supp. 2d 243 (S.D.N.Y. 2003) ......................................................8

1

2                                                      **Page(s)**

*In re Nektar Therapeutics Sec. Litig.*,
  34 F.4th 828 (9th Cir. 2022) ...................................................................21

*In re Noah Educational Holdings Sec. Litig.*,
  2010 WL 1372709 (S.D.N.Y. Mar. 31, 2010) ........................................16

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda*,
  730 F.3d 1111 (9th Cir. 2013) ...........................................................20, 23

*In re Nuveen Sec. Litig.*,
  2011 WL 1842819 (N.D. Cal. May 16, 2011)....................................24

*In re Oracle Corp. Sec. Litig.*,
  627 F.3d 376 (9th Cir. 2010) ................................................................22

*Oxford Asset Mgmt. v. Jaharis*,
  297 F.3d 1182 (11th Cir. 2002) ...........................................................27

*Paracor Fin. v. Gen. Elec. Cap.*,
  96 F.3d 1151 (9th Cir. 1996) ...............................................................31

*In re PetSmart Sec. Litig.*,
  61 F. Supp. 2d 982 (D. Ariz. 1999) ................................................... 22

*Picard Chem. v. Perrigo*,
  940 F. Supp. 1101 (W.D. Mich. 1996) .................................................32

*Police Ret. Sys. of St. Louis v. Intuitive Surgical*,
  759 F.3d 1051 (9th Cir. 2014) .............................................................20

*In re Progenity Sec. Litig.*,
  2023 WL 219345 (S.D. Cal. Jan. 13, 2023) ....................................... 27

*In re REMEC Inc. Securities Litigation*,
  702 F.Supp.2d (S.D. Cal. 2010) ................................................... 8, 9, 24

*In re Restoration Robotics Sec. Litig.*,
  417 F. Supp. 3d 1242 (N.D. Cal. Oct. 18, 2019) ...................... 26, 27

*Royal Oak Ret. Sys. v. Juniper Networks*,
  2013 WL 2156358 (N.D. Cal. May 17, 2013) ............................... 14

*In re Salesforce.com Sec. Litig.*,
  2005 WL 6327481 (N.D. Cal. Dec. 22, 2005) ................................13

**Page(s)**

*SEC v. Present,*
    2017 WL 11901157 (D. Mass. July 31, 2017) …………………...……………….9

*Shields v. Citytrust Bancorp, Inc.,*
    25 F.3d 1124 (2d Cir. 1994) …………………………………………………..28

*Shuster v. Symmetricom,*
    35 F. App'x 705 (9th Cir. 2002) …………………………………………7, 10

*Soremekun v. Thrifty Payless,*
    509 F.3d 978 (9th Cir. 2007) …………………………………………………..20

*In re Stac Elecs. Sec. Litig.,*
    89 F.3d 1399 (9th Cir. 1996) …………………………………………………28

*Steckman v. Hart Brewing,*
    143 F.3d 1293 (9th Cir. 1998) …………………………………………………..26

*Sundaram v. Freshworks Inc.,*
    2025 WL 1083168 (N.D. Cal. Apr. 10, 2025) …………………...……………… 6

*In re Symbol Techs. Class Action Litig.,*
    950 F. Supp. 1237 (E.D.N.Y. 1997) …………………………………………...17

*In re Syntex Sec. Litig.,*
    855 F. Supp. 1086 (N.D. Cal. 1994) ………………………………………… 32

*In re Textainer Sec. Litig.,*
    2005 WL 3801596 (N.D. Cal. Dec. 12, 2005) …………………………………..27

*In re Velti Sec. Litig.,*
    2015 WL 5736589 (N.D. Cal. Oct. 1, 2015) ………………………………… 26

*In re Verifone Sec. Litig.,*
    784 F. Supp. 1471 (N.D. Cal. Feb. 21, 1992),
    *aff'd* 11 F.3d 865 (9th Cir. 1993) …………………………………………18, 22

*Waswick v. Torrid Holdings,*
    2023 WL 9197563 (C.D. Cal. Dec. 1, 2023) …………………………………14

*Webb v. Solarcity,*
    884 F.3d 844 (9th Cir. 2018) …………………………………………………7

*Weinberger v. Jackson,*
    1990 WL 260676 (N.D. Cal. Oct. 11, 1990) ………………………...……… 29, 30

Page(s)

*Welgus v. TriNet Grp.*,
   2017 WL 6466264 (N.D. Cal. Dec. 18, 2017) …………………………………...16

*Weston Fam. Partnership v. Twitter*,
   29 F.4th 611 (9th Cir. 2022) ………………………………….…...14, 20

*In re Worlds of Wonder Sec. Litig.*,
   35 F.3d 1407 (9th Cir. 1994) ………………………………….…...18

**Statutes**

15 U.S.C. §77k(a) ………………………………………………… 25

15 U.S.C. §77k(b)(3) ……………………………………...………… 28

15 U.S.C. §77k(e) ……………………………………...…………… 20

15 U.S.C. §77l(b) …………………………………...……………… 20

15 U.S.C. §78u-4(b)(4) ………………………………………… 20

15 U.S.C. §78u-5(c)(1)(A) ………………………………………… 19

**Other Authorities**

17 C.F.R. § 229.303(b) ………………………………………… 26

Fed. R. Civ. P. 56(a) ………………………………………… 6, 7

## TABLE OF ABBREVIATIONS

| Abbreviation | Definition |
|---|---|
| | Plaintiffs' Amended Consolidated Complaint for Violations of the Federal Securities Laws (March 2, 2023), ECF No. 150 |
| Baker | Defendant Jeffrey Baker |
| BOM | Bill of materials |
| Boone | Defendant Karen Boone |
| Defendants | Rivian Defendants, Morgan Stanley & Co., LLC, Goldman Sachs & Co., LLC, J.P. Morgan Securities LLC, Barclays Capital Inc., Deutsche Bank Securities Inc., Allen & Company LLC, BofA Securities Inc., Mizuho Securities USA LLC, Wells Fargo Securities, LLC, NomuraSecurities International, Inc., Piper Sandler & Co., RBC Capital Markets, LLC, Robert W. Baird & Co. Inc., Wedbush Securities Inc., Academy Securities Inc., Blaylock Van, LLC, Cabrera Capital Markets LLC, C.L. King & Associates, Inc., Loop Capital Markets LLC, Samuel A. Ramirez & Co., Inc., Siebert Williams Shank & Co., and Tigress Financial Partners LLC |
| DSP | Directed Share Program |
| Director Defendants | Scaringe, Boone, Schwartz, Marcario, Krawiec, Flatley, and Thomas-Graham |
| EDV | Electric delivery van |
| Flatley | Defendant Jay Flatley |
| Goldman Sachs | Defendant Goldman Sachs & Co. LLC |
| Independent Directors | Boone, Schwartz, Marcario, Krawiec, Flatley, and Thomas-Graham |

| Individual Defendants | Scaringe, McDonough, Baker, Boone, Schwartz, Marcario, Krawiec, Flatley, and Thomas-Graham |
|---|---|
| IPO | Initial public offering |
| J.P. Morgan | Defendant J.P. Morgan Securities LLC |
| Krawiec | Defendant Peter Krawiec |
| Latham | Latham & Watkins LLP |
| LCNRV | Lower of cost or net realizable value |
| LRP | Long range plan |
| Marcario | Defendant Rose Marcario |
| McDonough | Defendant Claire McDonough |
| Morgan Stanley | Defendant Morgan Stanley Securities LLC |
| OEM | Original equipment manufacturer |
| Prospectus | Rivian's Prospectus Rule 424(b)(4), filed with the SEC on November 12, 2021 |
| R1 | R1S and R1T |
| Rivian or the Company | Defendant Rivian Automotive, Inc. |
| Rivian Defendants | Rivian, Scaringe, McDonough, Baker, Boone, Schwartz, Marcario, Krawiec, Flatley, and Thomas-Graham |
| Scaringe | Defendant Robert J. Scaringe |
| Schwartz | Defendant Sanford Schwartz |
| SOP | Start of R1 production in September 2021 |
| Thomas-Graham | Defendant Pamela Thomas-Graham |

Emphasis is added unless otherwise noted. Certain quotation marks, alteration marks, citations, and emphases have been omitted.

## INTRODUCTION

Discovery has made this case simple. It has also generated a lot of evidence. It unequivocally supports summary judgment for Defendants.

Plaintiffs' initial complaint claimed Rivian should have disclosed in advance that it would raise prices in March 2022. ECF 125 at 2-4. The Court dismissed it: Companies have no obligation to disclose pricing strategy. ECF 149 at 25. Plaintiffs amended with a different theory: that Rivian should have disclosed that its BOM (vehicle component costs) exceeded the R1 selling price and, because the BOM was "locked," Rivian could never achieve profitability without increasing prices. ECF 172 at 5. Crediting allegations attributed to two anonymous former employees, the Court allowed this new theory to survive. It held that, if true, the pleaded facts would render misleading Rivian's statement that it hoped to improve its negative gross margins by increasing scale. *Id.* at 21-22. The Court reasoned that Plaintiffs' allegations meant "scaling up would drive Rivian's gross losses up because each R1 EV's component costs far exceeded its retail price." *Id.* at 22.

Discovery shows the opposite. BOM was not locked. Rivian did not make a decision to raise prices until February 2022. And, at IPO, Rivian forecasted profitability even without price increases. The evidence points decisively against Plaintiffs' now-unsupported allegations on three elements essential to their claims.

**Falsity.** First, contemporary documents show that BOM was not "locked" at SOP. As is common in manufacturing, material costs for initial vehicles exceed the sale price of those vehicles. This reality is intuitive, and widely known: early on, components are being refined and redesigned to account for production workflows, machinery is still using prototype tooling that wears out quickly, and suppliers charge a "start-up" premium to offset their own costs and risks. Before and after the IPO (which coincided with SOP), Rivian forecasted its BOM would decline considerably with scale. Rivian identified multiple ways of achieving these savings, based on practices at Tesla and elsewhere. This was not wishful thinking: In Q4'24, Rivian achieved profitability, in large part because BOM declined with scale. Just like Rivian said.

DEFS' MEMO OF POINTS
AND AUTHORITIES ISO MSJ
CASE NO. 2:22-cv-01524-JLS-E

1

Second, the evidence also shows that pre-SOP, all Rivian knew about its BOM were estimates. What had changed over the years, up and down, were Rivian's BOM *forecasts*, not actual costs, which were *nonexistent*. Companies need not disclose their future prognostications and how they change. Ultimately, post-IPO developments—war, pestilence, supply shortages—rendered those forecasts obsolete anyway. One thing those estimates did share, though, was the firm expectation that BOM would decline with scale.

Third, the evidence establishes that every pre-IPO forecast showed Rivian becoming profitable (overall and at vehicle level), including without a price increase. Rivian's management and Board frequently discussed optimal vehicle pricing. Developing the right pricing strategy would be tricky: the R1 was a desirable product and had not yet launched. Rivian modeled extensively how prices would affect demand, with various teams advocating for an increase, and others opposing it. This debate continued well post-IPO, but spiking key commodity prices after December 2021, price gouging by third-party suppliers affected by COVID, and historic inflation made increasing prices inevitable, just like at other car manufacturers. The evidence shows that Rivian decided to increase prices only in February 2022 after considerable internal discussion. The March 2022 price increase was not some nefarious pre-IPO plan, but the result of this new supply-chain reality.

This is not a case where the evidence is mixed. The evidence points only in one direction. All percipient witnesses, current and former employees at all levels, testified to the same realities. Rivian made no false or misleading statements.

**Scienter.** Without falsity, Plaintiffs' case collapses. But Plaintiffs claim fraud: that Rivian's management knowingly and intentionally lied to shareholders. Again, the evidence shows the opposite. Emails, deposition testimony, and chats all show leaders committed to transparency, worried about evolving circumstances, and loyal to customers, employees, and investors. That these individuals would have committed fraud is implausible for another reason. Using their own money, officers and directors ***bought shares in the IPO worth millions of dollars***. They were not required to. They did it

because they believed in Rivian. They then held on to those shares for years, even to today. They lost more money than the lead plaintiff when the stock declined in March 2022: $179 million. No evidence indicates that these high-integrity, intelligent business leaders made the bewildering decision to defraud themselves. The Court should dismiss all fraud-related claims.

**Loss causation**. Without loss causation, there is no fraud claim. As their expert conceded, Plaintiffs no longer claim any loss except for the March 1 stock drop. That seems prudent, since the stock did not show statistically significant declines on subsequent days. But on March 1, no BOM information came out. The only new information in the market was the price increase and the reaction of a small, but passionate subreddit. It created anxiety among investors that Rivian would see mass cancellations of its ~90,000 vehicle backlog. That did not happen. Two days later, Rivian reversed the price increase for pre-orders—hardly a move suggesting long-planned fraud. No analyst thought they had been misled: they expected a price increase and were just surprised by its magnitude and application to pre-orders. Given that the quantum and scope of the increase had been decided only weeks earlier, there was no way to disclose those facts in November 2021.

This is a big case: Plaintiffs claim damages in the billions. Discovery exposed that the lawsuit survived only because Plaintiffs twisted the words of former employees, whose depositions rejected Plaintiffs' theory. SUF 313-316. This meritless case has burdened one of America's leading EV manufacturers, even as it has delivered over 100,000 vehicles and achieved profitability under conditions of unparalleled difficulty. The case deserves a resolution through summary judgment, unlike the scores of securities class actions that are forced to settle every year.

## WHAT DISCOVERY ESTABLISHED

### A.    BOM Was Not "Locked" Pre-IPO

BOM was not locked when Rivian went public. SUF 130. Contracts often ████ ████████████████████████████. SUF 132. Others featured ███████████

█████████████████████████████. SUF 131. Rivian had ████████
███████████████ and anticipated reducing BOM by removing suppliers' "startup premium[s]," DEx. 3 at 85:24-86:1, "design improvements," DEx. 4 at 160:5-25, and vertical integration (e.g., making motors in-house). SUF 108.

Rivian's forecasts showed BOM declining with scale:

- March 2021: "improving unit margin [through] BOM cost reductions from volume-based discounts, introduction of LFP batteries, and insourcing, along with more efficient plant utilization." DEx. 5 at 19.

- June 2021: "[m]argin expansion [through] vertical integration, manufacturing economies of scale, and improving supplier terms." DEx. 6 at 22.

- September 2021 Analyst Day: "BOM reduction" through "savings in materials costs, design costs, and their transaction costs, e.g., contractual step-downs, introduction of new cell chemistries, efficiencies from design improvements, and higher negotiating power from increased scale." DEx. 7 at 22.

Employees "believe[d BOM] would decline over time," DEx. 8 at 277:18-20, based on "decades of experience [in] engineering, commercial, [and] manufacturing," DEx. 9 at 201:18-22, including at Tesla, which had achieved such reductions. SUF 114. Rivian succeeded, reducing BOM by more than $20,000 just in the last year. SUF 126.

## B. Profitability Even Without Price Increases

Pre-IPO, Rivian projected profitability in ████, SUF 138, 141-42, 145-47, even without increasing prices. DEx. 12 at 190:21-25 ("[O]ur view was always that the R1 vehicles would be profitable at the GAAP gross profit level by the time we had scaled production."); SUF 139-40, 143-44. Price increases were one "key margin expansion driver" to *accelerate* profitability, along with reductions in BOM, conversion, and logistics costs. DEx. 7 at -9898; SUF 137. This reflected "the fundamental truth about auto": "[A]s you get production volumes up, costs go down." DEx. 13 at 72:6-19.

## C.    Post-IPO Economic Instability

Rivian went public on November 10, 2021. DEx. 14 at 1. Economic conditions deteriorated rapidly. By late November, inflation was no longer "transitory." SUF 163-64. Prices of lithium, nickel, and cobalt spiked 134%, 29%, and 25% between November 10, 2021 and March 1, 2022. SUF 170. "Cobalt and Lithium [were] driving battery cell prices up," and steel, aluminum, and copper increased BOM after October 2021. DEx. 17 at -642797-98. COVID's Omicron variant and Russia's invasion of Ukraine led to supply shortages. SUF 165-66, 172. Rivian had to "buy[] [microchips] at exorbitant rates on [the] spot market." DEx. 17 at -642796; SUF 177.

In February 2022, Rivian's Vice President of Supply Chain described suppliers as "losing their minds." DEx. 18 at -1869915. Rivian recognized "either we pay millions of dollars to a party that is openly taking advantage of us or we build less cars." DEx. 19 at -1807062.

## D.    No Pricing Decisions Until February 2022

Rivian has "always been discussing [R1 pricing] from the day [it] announced pricing" in 2018. DEx. 20 at 117:20-25. Because Rivian's vehicles "were the first of their kind," pricing analyses were "difficult." DEx. 3 at 32:20-33:2; DEx. 16 ¶20. Rivian made "assumptions as to how the market [would] evolve[]" without having "sold one vehicle" and "had no idea how customers were going to react." DEx. 4 at 110:22-111:10; DEx. 16 ¶25. Employees ran "hundreds of scenarios" pre-IPO assessing pricing. DEx. 21 at 190:22-24; SUF 148-450. Scaringe deferred pricing decisions until after Rivian produced more vehicles. DEx. 3 at 235:2-16.

In early 2022, management resumed price discussions. DEx. 23 at -1893613. ███
███████████████████████████████████████████. SUF 157. In late February, Rivian considered and then adopted $12,000-$14,500 price increases on existing and future orders. SUF 159-60, 221.

### E.    Market Reacts to Price Increase and Reversal

On March 1, 2022, Rivian announced price increases. Customers reacted swiftly, expressing they "expected a price increase, but not this much," DEx. 26 at -1807963, and calling it a "bait & switch" for pre-orders. *Id.* at -1807965. For management, the response was "brutal online" and "[p]ainful to read." DEx. 27. Customers contacted Scaringe in disbelief. DEx. 28 at -1276439; SUF 222. Rivian's stock price dropped.

On March 2, Scaringe consulted with officers and directors. SUF 225. On March 3, Rivian reversed price increases on pre-orders. SUF 226. Scaringe explained: "[w]e failed to appreciate how preholder customers viewed their configuration as price locked … we broke trust with our customers." DEx. 32 at -95. Directors acknowledged the backlash: Boone told Scaringe she "woke up this morning feeling so relieved and happy with the decision … You absolutely did the right thing here." *Id.*

## SUMMARY JUDGMENT IS APPROPRIATE ON ALL CLAIMS

Plaintiffs bring claims under Sections 10(b) and 20(a) of the Exchange Act against Rivian, Scaringe, McDonough, and Baker, under Sections 11 and 15 of the Securities Act against those defendants plus Rivian's Directors, and under Sections 11 and 12 of the Securities Act against Underwriters.

Summary judgment is appropriate: "there is no genuine dispute as to any material fact and [Defendants are] entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Because Defendants meet their "initial burden of identifying" evidence "that demonstrate[s] the absence of a genuine dispute of material fact," the burden shifts to Plaintiffs. *Sundaram v. Freshworks Inc.*, 2025 WL 1083168, at *2 (N.D. Cal. Apr. 10, 2025). But Plaintiffs cannot "set forth specific facts showing that there is a genuine issue for trial," *Far Out Prods. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001), "on [every] essential element of [their] case," *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Defendants produced 876,024 documents from 53 custodians, the parties took 47 depositions, and Rivian Defendants responded to 106 document requests and 35 interrogatories. SUF 317-323. Discovery overwhelmingly refutes Plaintiffs' allegations.

There is no dispute of material fact, Fed. R. Civ. P. 56(a), and no "reasonable fact finder [could] find for" Plaintiffs, *Oskar Inc.*, 247 F.3d at 992.

## I.    NO SECTION 10(b) SECURITIES FRAUD

Plaintiffs' Section 10(b) fraud claim fails because they cannot establish scienter, falsity, materiality, or loss causation. *Dura Pharm. v. Broudo*, 544 U.S. 336, 346 (2005).

### A.    No Evidence of Fraudulent Intent

Section 10(b) requires a defendant to "intentionally or with deliberate recklessness" make "false or misleading statements to investors." *Shuster v. Symmetricom*, 35 F. App'x 705, 707 (9th Cir. 2002). No Rivian Defendant did so.

#### 1.    Individual Defendants Bought Stock in the IPO

Individual Defendants' share purchases during the Class Period refute scienter. *Lilley v. Charren*, 17 F. App'x 603, 608 n.2 (9th Cir. 2001); *Webb v. Solarcity*, 884 F.3d 844, 856 (9th Cir. 2018) (no scienter where "rather than selling shares, [defendants] purchased additional stock").

| Individual Defendant | Shares ($78/share) | Investment |
|---|---|---|
| Scaringe | 128,175 | $9,997,650 |
| Baker | 20,000 | $1,560,000 |
| Boone | 20,000 | $1,560,000 |
| Flatley | 20,000 | $1,560,000 |
| Thomas-Graham | 12,821 | $1,000,038 |
| Marcario | 12,000 | $936,000 |
| Schwartz | 8,500 | $663,000 |
| Krawiec | 3,590 | $280,020 |
| McDonough | 2,450 | $191,100 |

DEx. 34-41. Individual Defendants spent $17,747,808 to purchase 227,536 shares.[1]

Post-IPO, Individual Defendants continued buying: In May 2022, Scaringe, Baker, Flatley, and McDonough collectively bought 82,204 shares for $2,258,862. SUF 76-79. "[I]t would have made no economic sense for defendants to invest" millions into Rivian if they did not believe the company would succeed. *Davidoff v. Farina*, 2005 WL 2030501, at *11 n.19 (S.D.N.Y. Aug. 22, 2005).

### 2.    Individual Defendants Held Their Stock

Lack of sales "dispels an inference of scienter." *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1246 (S.D. Cal. 2010); *Lilley*, 17 F. App'x at 608 n.2 (no scienter where "no evidence of suspicious stock sales").

Except for automatic sales to cover taxes, Individual Defendants held their stock post-IPO:

- McDonough sold only in November 2022, 12,500 shares under a predetermined Rule 10b5-1 plan at $35/share, a loss compared to the $78 IPO price. SUF 82.

- Baker sold only in June 2023, 30,798 shares for $14.70/share. SUF 83.

- Scaringe did not sell until ***31 months post-IPO*** when he exercised options at $2.83/share and sold 71,429 shares at $11.49/share under a Rule 10b5-1 plan. SUF 84.

Remarkably, ***Independent Directors have not yet sold any shares***. SUF 86.

Rather than benefiting from the alleged fraud, Individual Defendants suffered harm far exceeding that of Plaintiffs. Using Plaintiffs' own damages calculations, Individual Defendants collectively lost ***$178,825,504*** due to Rivian's stock decline throughout the Class Period. SUF 87. Scienter is incompatible with defendants' "informed self-interest." *In re Merrill Lynch Sec. Litig.*, 272 F. Supp. 2d 243, 263 (S.D.N.Y. 2003).

---

[1] Other stakeholders invested heavily in Rivian's IPO. Amazon, for which Krawiec led the initial investment into Rivian, spent $199,999,956 to acquire 2,564,102 shares. SUF 75.

### 3. Individual Defendants Consistently Acted in Good Faith for Shareholders' Interests

Courts consider whether a defendant's "overall conduct is inconsistent with a fraudulent intent." *REMEC*, 702 F. Supp. 2d at 1257-58 ("undisputed evidence of" no scienter where defendant discussed with auditor and held stock). Transparency "negate[s] an inference [of] a scheme to defraud investors." *Id.* at 1246.

**Accuracy.** Rivian instructed employees to "[p]rovide accurate information about the business," DEx. 43 at -416348, that is "consistent with the S-1, ready to be publicly shared, and does not create unrealistic expectations." DEx. 44 at -109838. Scaringe affirmed the importance of presenting accurate and truthful information. DEx. 3 at 30:9-31:6.

**Transparency.** Scaringe told potential investors that Rivian "need[ed] to be transparent on supply chain," DEx. 45 at -1564275, and that Rivian would "build[] trust" with suppliers through transparency. DEx. 46 at -1805335. Rivian needed to "be direct/straight with capital requirements, difficulty with tech or ramp challenges." *id.* at -1805264. Employees were told: "Everything we tell our customers, suppliers and other business partners must be truthful … Do not engage in any unfair, deceptive or misleading practices." DEx. 47 at -601245.

Individual Defendants' conduct *post*-IPO underscores these values. After the March 1 customer backlash, Scaringe emailed employees, committing to rebuild "broke[n] trust with our customers." DEx. 32 at -1284896. To customers, he wrote: "The most important aspect of what we are building is our relationship with all of you … We made a mistake in how we approached our pricing changes, and what is important now is that we fix it." DEx. 48 at -6427. This is not how fraudsters act.

**Professional Advisors.** Courts consider defendants' interactions with advisors as evidence of good faith. *SEC v. Present*, 2017 WL 11901157, at *1 (D. Mass. July 31, 2017) (allowing evidence that advisors "reviewed and approved" materials for good faith and/or due care). In September 2020, EY began an IPO readiness assessment. SUF 24. In

December 2020, Rivian engaged PwC on IPO preparation, continuing through IPO closing. SUF 25.

After interviewing multiple firms and consulting its Board, Rivian engaged experienced counsel to navigate IPO complexities. SUF 28. Lead Underwriters also had extensive automotive experience. SUF 18-23. Morgan Stanley included the bank's global automotive head, who oversees "probably 100" automotive clients and has "extensive experience" with automotive companies. DEx. 13 at 18:2-5, 21:2-4. Goldman Sachs included a managing director who worked with over 50 automotive companies, including GM, Nissan, Lucid, Fisker, Nikola, Stellantis, and Ford. DEx. 54 at 29:24-30:16. J.P. Morgan included its global automotive head, drawing on "overall experience with a variety of players across the automotive industry," including "most, if not all, the major OEMs." DEx. 55 at 74:23-75:4, 92:14-21. Even Plaintiffs concede Underwriters "staffed their teams with experienced bankers." DEx. 57 ¶61.

**Review and Drafting.** Pre-IPO, Rivian management held biweekly working group sessions and the Audit Committee assessed public company risk management. SUF 26, 29. Subject-matter experts helped draft the Prospectus. SUF 233. Each Individual Defendant reviewed and discussed drafts of the Prospectus. SUF 234-35. All evidence shows that defendants "chipped in to make [the Prospectus] as 100 percent accurate as we could make it. Everyone took this very seriously." DEx. 61 at 92:9-12.

Scienter in this Circuit demands "deliberate recklessness." *Shuster*, 35 F. App'x at 706. This means "not merely negligence, but an ***extreme departure from the standards of ordinary care*** which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id.* at 707. No such evidence exists here.

## B.    No Material Misrepresentation or Omission

Plaintiffs' claims fail under Sections 10(b) and 11 because "there [are] no genuine issues of material fact regarding the allegedly false or misleading statements." *Lilley*, 17 Fed. App'x. at 607.

### 1.    No Misrepresentation or Omission in Rivian's Prospectus

### a.    No Misrepresentation or Omission Regarding BOM

Statement 1, a risk factor in Rivian's Prospectus, warns:

> Substantial increases in the prices for such components, materials and equipment would increase our operating costs and could reduce our margins if we cannot recoup the increased costs. Any attempts to increase the announced or expected prices of our vehicles in response to increased costs could be viewed negatively by our potential customers and could adversely affect our business, prospects, financial condition, results of operations, and cash flows.

¶157.[2]

The Court permitted this lawsuit to proceed based on allegations that Rivian "[mis]represented material cost increases as a possibility rather than a known problem with which Rivian had been contending for years" and "that production at scale would not resolve another critical obstacle to profitability: that [BOM] for each R1 far exceeded its retail price." ECF 172 at 18-19. The evidence contradicts both allegations.

### i)    BOM Was Not "Locked In," and Declined as Production Scaled

***BOM Not "Locked In."*** Undisputed evidence disproves Plaintiffs' allegations that pre-IPO, "the entire [BOM] had been sourced and their costs were locked in," ¶281, and would remain higher than retail prices barring a price increase, ¶¶118, 196, 281; SUF 130. Many supply contracts contained ████████████████████ ██████████. SUF 131. Others included ████████████████████ █████████. SUF 132. Rivian expected "higher negotiating power from increased scale" would also result in "BOM reduction[s]." DEx. 7 at -9898; SUF 110, 117, 120. "[D]esign improvements" and vertical integration efforts were also expected to reduce BOM. DEx. 4 at 160:5-25; SUF 108, 133.

---

[2] Plaintiffs also challenge Statement 7—identical to Statement 1. This too fails because no material facts changed between Rivian's IPO and December 17, 2021, *infra* 19.

Rivian forecasted declining BOM based on "industry benchmarks," "data sets from consulting firms," and "industry experts," which showed "cost down[s] year over year." DEx. 21 at 28:1-5; SUF 113. Rivian planned to reduce BOM after SOP through commercial negotiations, redesigns, and vertical integration. DEx. 64 at -879553 ("First Company Priority After Launching R1T/R1S" was reducing BOM); SUF 134. Steve Gawronski, who cut costs at Tesla, led Rivian's supply chain team. DEx. 21 at 28:8-18 ("Tesla … had reduced their [BOM] on the Model S by 25 percent over their first two years in production."). Rivian's former R1 controller knew from experience at Ford that "once you get into production … there are multiple levers you can use to change [vehicle] cost," including "[BOM], labor and overhead." DEx. 9 at 108:8-109:20; SUF 114.

***Scale Expected to Decrease BOM.*** "[T]he question about whether you are going to get [BOM] down is almost entirely based on if you're going to get to scale." DEx. 13 at 72:5-73:1; SUF 111. Contrary to Plaintiffs' allegation that scale does not impact BOM, ¶112, scale allows spreading fixed costs *and* drives efficiencies in variable costs, including BOM. SUF 109. Rivian's forecasts that estimated BOM at SOP above selling prices *also* estimated BOM below selling prices once production scaled. SUF 127. The evidence reflects the universal expectation that scale leads to both decreased BOM *and* increased profitability:

- Analysts understood that scaling drives profitability. DEx. 65 at -428112 ("vehicle volumes ramp allow[s] for both variable margin improvement and sufficient coverage of the fixed portion of Cost of Goods Sold"); SUF 111.

- Management knew that, as production ramped, "the cost to make … parts and the cost of the equipment … gets spread across more volume" and "the unit economics then flip to becoming positive." DEx. 3 at 85:8-86:1; SUF 115.

- Underwriters knew "███████████████████████████," DEx. 55 at 73:24-75:4; and "███████████████████" for Rivian than for "████████████ ████," DEx. 13 at 117:22-118:6; SUF 115.

Undisputed evidence shows that scale—not price increases—would drive profitability and reduce BOM. In fact, "that's exactly what happened." DEx. 4 at 55:3-4; SUF 138. In Q4'24, Rivian reported its first gross margin positive quarter, driven by "a steady reduction in [its BOM] cost over time." DEx. 4 at 55:6-8; SUF 129.

### ii) BOM "Costs" Were Estimates, Not Actuals

No evidence supports Plaintiffs' theory that it was misleading to represent BOM increases as only a "possibility." ¶158; ECF 172 at 18.

Pre-SOP, there were only "estimates of what [BOM] would be at a point in time in the future." DEx. 21 at 280:4-14. Those estimates were "volatile" with "█████" "ups and downs." DEx. 9 at 163:2-20; SUF 91. As Rivian's former Vice President of Supply Chain testified, even "five, six months" before SOP, "there were certainly still engineering changes … being implemented." DEx. 66 at 126:1-6. Defendants' industry expert, a former supply chain and purchasing executive at Lucid, Tesla, and Ford, confirmed: any new "overall vehicle BOM cost defined early in the product development and prior to SOP is best considered a 'target' or a very broad 'estimate' or 'projection' because of the lack of product maturity and the limited data available at the time." DEx. 15 ¶19; *id.* ¶¶13-18; *supra* 2-3. Plaintiffs' industry expert agreed. DEx. 67 at 62:19-21 ("[S]hould costs," i.e., estimated costs for parts, "are not set in stone. They have to be adjusted.").

Evidence showing BOM was an estimate until production matured disproves Plaintiffs' theory that Rivian misleadingly failed to disclose that BOM was higher than retail prices at its IPO. ¶158. Rivian had "no duty to disclose" BOM estimates or any other "internal forecasts in the context of an [IPO]." *In re Salesforce.com Sec. Litig.*, 2005 WL 6327481, at *5 (N.D. Cal. Dec. 22, 2005).

Based on his experience at Lucid, Tesla, and Ford, Defendants' expert noted that BOM is competitively sensitive and he could "not identify any examples of [automotive] companies providing their BOM cost amounts." DEx. 15 ¶¶62-63. Even Plaintiffs' industry expert testified that "any company is going to closely guard individual BOM cost elements." DEx. 67 at 123:21-24. He, too, was unaware of any automotive

companies disclosing BOM. *Id.* 122:22-123:1. Even after years of litigation, Plaintiffs cannot cite any example of an automotive company disclosing BOM.

### iii)    No Misleading BOM Statement

Plaintiffs must establish that "a statement [is] false or misleading" because it "'directly contradict[s] what the defendant knew at that time' or 'omit[s] material information.'" *Weston Fam. P'ship v. Twitter*, 29 F.4th 611, 619 (9th Cir. 2022). No evidence supports the allegation that Statement 1 was misleading because Rivian did not disclose that pre-IPO BOM estimates would temporarily exceed retail prices.

***Risk Disclosure Not Misleading.*** Statement 1 warned of *potentially* rising input costs, which *could* lead to price increases and negative customer reactions. But "a risk disclosure is not misleading as a matter of law where it concerns a risk that is inherent in running a business," such as "[f]luctuating input costs [that] are a part of everyday life for businesses." *Waswick v. Torrid Holdings*, 2023 WL 9197563, at *7 (C.D. Cal. Dec. 1, 2023). Evidence shows Rivian knew only *estimated* BOM, not actuals. The disclosure was properly phrased.

***Rivian Disclosed Losing Money on Each R1.*** Rivian disclosed (1) its R1 inventory costs were greater than what it would recover at sale, (2) that discrepancy would continue for the near future, and (3) it was taking a $31 million LCNRV charge, "substantially all" of which was raw material costs (i.e., BOM). DEx. 70 ¶¶31-34. The market understood this to mean Rivian's BOM exceeded what it would recover from R1 sales. *Infra* 20-25. Because neither the securities laws nor market efficiency require financial disclosures to be understood by *lay* investors, Rivian's disclosures were sufficient for the market price of its securities to reflect that disclosure. *Royal Oak Ret. Sys. v. Juniper Networks*, 2013 WL 2156358, at *9 (N.D. Cal. May 17, 2013) (no misrepresentation because "disclosures compl[ied] with FASB guidelines" and company had no "obligation to spell out" accounting practices); DEx. 72 ¶23 (in efficient market, "stock's price" incorporates "disclosure of new value-relevant information … regardless of who released the information").

### b.    No Falsity Regarding Profitability

Plaintiffs next challenge two statements in Rivian's Prospectus:

- Statement 2: "We expect to operate at a negative gross profit per vehicle for the near term as our fixed costs from investments in vehicle technology, manufacturing capacity, and charging infrastructure are spread across a smaller product base until we launch additional vehicles and ramp production. This dynamic will cause our gross profit losses to increase on a dollar basis even as our revenue increases from ramping production volumes over the short to medium term." ¶¶159, 296.

- Statement 3: "Over the long term, we believe that we will be able to increase our gross margin in the long term and generate positive gross profit as production utilization increases and we leverage our investments." ¶¶160, 297.

Plaintiffs claim first that Rivian misled investors by "identif[ying] one driver of Rivian's 'negative gross profit per vehicle'—that its 'fixed costs … are spread across a smaller product base,'" while omitting "that the cost of the R1 BOM alone exceeded retail prices." ¶¶161, 298. Second, Plaintiffs claim it was misleading for Rivian to indicate it could "generate positive gross profit" by increasing "production utilization" and "leverag[ing its] investments" because Rivian would keep generating negative gross profits on each R1 "unless and until it" increased prices or reduced BOM. ¶130. Discovery disproved both theories.

### i)    No Duty to Disclose Forecasts of BOM Impact on Profitability

Plaintiffs claim Rivian hid *why* it would operate at a negative gross profit per vehicle, ¶128, but ignore that Rivian complied with all its GAAP reporting obligations. SUF 191. GAAP does not require disclosure of BOM estimates. SUF 192. Failure to disclose BOM cannot ground liability because Rivian was not "required to make any [such] disclosures." *In re LexinFintech Holdings Sec. Litig.*, 2021 WL 5530949, at *11 (D. Or. Nov. 24, 2021); *In re Cirrus Logic Sec. Litig.*, 946 F. Supp. 1446, 1459 (N.D. Cal. 1996) ("[O]ngoing adjustments to reserves that otherwise comply with GAAP need not

be disclosed."). Under the securities laws, "companies are not required to disclose internal forecasts," *id.* at 1455, and Plaintiffs can "offer[] no evidence that [D]efendants were aware of any adverse *facts* … undermin[ing] the validity of their public statements" about profitability. *Id.* at 1473; *In re Finisar Sec. Litig.*, 2013 WL 211206, at *1, *6 (N.D. Cal. Jan. 16, 2013) (rejecting argument that "Defendants misled investors as to the nature of [its] growth" because "a statement will not mislead even if it is incomplete or does not include all relevant facts"). Rivian's officers, directors, employees, *and* underwriters all expected that Rivian would achieve profitability at scale. SUF 115, 140. It *did*. SUF 138, 141.

Plaintiffs' theory is "little more than an end-run around the carefully delineated SEC regulations that specify what financial data must be disclosed in offering documents." *In re Noah Educational Holdings Sec. Litig.*, 2010 WL 1372709, at *7 (S.D.N.Y. Mar. 31, 2010).

### ii)    Rivian Warned It Was Not and May Never Be Profitable

Plaintiffs also ignore Rivian's risk disclosures that "[w]e do not expect to be profitable for the foreseeable future … ***and we cannot assure you that we will ever achieve or be able to maintain profitability***." DEx. 14 at 20. "These were not merely vague, boilerplate disclaimers." *Gasner v. Bd. of Sup'rs*, 103 F.3d 351, 359 (4th Cir. 1996). They "describe[d] in specific detail the risks which a purchaser would assume." *Id.* Plaintiffs cannot argue that Rivian misleadingly omitted profitability risks while simultaneously "turn[ing] a blind eye to [its] disclosures in the same Registration Statement that [profitability] bore serious risk." *Welgus v. TriNet Grp.*, 2017 WL 6466264, at *24 (N.D. Cal. Dec. 18, 2017).

Nor has discovery borne out Plaintiffs' theory that Rivian knew BOM exceeding price would *increase* losses as production grew. ECF 172 at 22. Discovery established that Rivian expected BOM to *decrease* with scale below price: a strategy team member explained "we always knew that we would be unprofitable at the point of production,

[but] we would [subsequently,] as [BOM] and the cost of goods sold both decrease, have a pathway to profitability." DEx. 12 at 193:8-13; *supra* 11-13.

### iii)    Rivian Projected Profitability Without a Price Increase

***Rivian Always Forecasted Profitability.*** Contrary to Plaintiffs' allegation that Rivian would continue losing money on every vehicle sold regardless of scale, ¶7, the evidence shows Rivian forecasted profitability in ████, SUF 138-39:

- An August 2021 LRP—shown to Scaringe and McDonough—forecasted that the R1 program would become profitable per unit in ████. DEx. 11 at Slide 23; DEx. 74 at -764271.

- Financial cases shown to Rivian's Board in September 2021 similarly projected profitability in ██████████████████████████████. DEx. 75 at Slides 24-25.

Pre-IPO, Rivian forecasted profitability even without a price increase. DEx. 22 at Slide 4 (forecasting ████████████████ without price increase); SUF 139. Employees working on Rivian's financial forecasts firmly believed that, "at the prices we launched, … we could be and would be profitable." DEx. 21 at 62:8-10; SUF 140. Witnesses confirmed that profitability did not depend on increasing prices. DEx. 20 at 279: 25-280:6 ("As we start producing more and more, we will get the cost down, and at some point we are going to get to positive gross margins."); SUF 137. "[A] rational jury could not conclude that [Rivian's] internal [profitability] projection[s] [were] inconsistent with [its] public statement[s]." *In re Symbol Techs. Class Action Litig.*, 950 F. Supp. 1237, 1243 (E.D.N.Y. 1997).

### c.    No Falsity Regarding Pricing

Plaintiffs have argued that Rivian should have disclosed pre-IPO that it was going to raise prices on March 1, 2022. But pre-IPO, Rivian had not decided when, how much, or on which vehicles/orders it would change prices. █████████████████████████ ███████████████. DEx. 21 at 190:22-24. ██████████████████████

████████████████████. DEx. 20 at 117:20-25. Employees ██████████
██████████████████████████████████████████████████████████████.
SUF 148. Pre-IPO, no definitive agreement as to pricing existed. SUF 151. Scaringe
███████████████████████████████████████████████████████████
██████████████████████ DEx. 3 at 235:2-16. Ultimately, the price increase *post*-IPO
differed in scope from analyses *pre*-IPO. SUF 161.

Rivian was "not obligated to disclose every detail of its … business strategy," particularly when that business strategy had not yet been decided. *In re Foxhollow Techs. Sec. Litig.*, 2008 WL 2220600, at *23 (N.D. Cal. May 27, 2008), *aff'd* 359 F. App'x 802 (9th Cir. 2009). This Court already held that companies need not reveal "pricing information," as that may "forc[e] a company to damage its own interests [and] those of its shareholders." *In re Canandaigua Sec. Litig.*, 944 F. Supp. 1202, 1211 (S.D.N.Y. 1996); *In re Verifone Sec. Litig.*, 784 F. Supp. 1471, 1483 (N.D. Cal. 1992), *aff'd* 11 F.3d 865 (9th Cir. 1993) (no "[m]andatory disclosure" of "internal forecasts"); ECF 149 at 25. Because Rivian had neither a duty to disclose its pricing considerations, nor a firm pricing decision to announce, Plaintiffs' theory fails.[3]

## 2.    No Misrepresentation or Omission in Q3'21 Earnings Call

No evidence supports Plaintiffs' claim that any statement at Rivian's Q3'21 earnings call was false or misleading. Defendants are entitled to summary judgment for Statements 4-6:

- Statement 4: McDonough addressed negative gross profit for the quarter and said Rivian expected "this dynamic of high fixed cost associated with operating and running our large scale, highly vertically integrated plan amortized over a small but growing number of vehicles produced across the R1 and RCV platform will continue to have a negative drag on gross profit." ¶164.

---

[3] The same statements are insulated from Section 11 liability by the "bespeaks caution" doctrine for the same reasons as *infra* at 20-21. *See In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1413-15 (9th Cir. 1994).

- Statement 5: McDonough stated, "given the inflationary market backdrop, we also continue to evaluat[e] the pricing for our vehicle[s]." ¶166.

- Statement 6: Scaringe explained that regarding "pricing, it's certainly the backdrop of inflation that we're seeing and the very strong demand for products not just looking [at] our product … broadly within the electrified space has caused us to look at our pricing and really I'd say recognizing the set of product features that we've been able to put together into the vehicles." ¶167.

### a.   No False or Misleading Statements

There is no evidence that Statement 4 implied that "Rivian would be able to achieve positive gross profits simply by scaling up, when in fact [BOM] made that impossible." ECF 172 at 23; *supra* 11-13. Analysts linked scale and profitability—six of nine analysts mentioned ramp. SUF 194.

Plaintiffs' theory that Statements 5-6 misled "because they characterized the possibility of a price increase as a new development resulting from recent inflationary pressures when Rivian was already aware of pricing pressures and had committed to increase R1 prices" pre-IPO, ECF 172 at 12, fails for the reasons *supra* at 18. Messages between Rivian's CFO and supply chain head *the day before the earnings call* show Rivian assessing "inflationary impact[s] on auto supply chain." DEx. 80.

Statements 4-6 were not "false when made," and Defendants are entitled to summary judgment. *In re Cypress Semiconductor Sec. Litig.*, 891 F. Supp. at 1369, 1375 (N.D. Cal. 1995).

### b.   Each Statement Is Protected by the Safe Harbor

"The safe harbor provision provides that a forward-looking statement cannot be the basis of liability" if the statement is (1) "identified as forward-looking" and (2) "accompanied by sufficient cautionary statements." *In re Infonet Servs. Secs. Litig.*, 310 F. Supp. 2d 1080, 1103 (C.D. Cal. 2003); 15 U.S.C. §78u-5(c)(1)(A). Statements 4-6 meet each requirement.

First, Rivian's earnings call "identified" these "as forward-looking" statements. *In re Clorox Sec. Litig.*, 238 F. Supp. 2d 1139, 1145 (N.D. Cal. 2002), *aff'd* 353 F.3d 1125 (9th Cir. 2004); SUF 196. Each was also facially forward-looking:

- Statement 4 was an opinion about "future economic performance" and underlying "assumptions" and is "exempt[ed]" under the Safe Harbor. *Police Ret. Sys. of St. Louis v. Intuitive Surgical*, 759 F.3d 1051, 1058 (9th Cir. 2014).

- Statements 5 and 6, concerning potential *future* price increases, are forward-looking because they concern "plans, objectives, and assumptions for the future." *Farhar v. Ontrak*, 714 F. Supp. 3d 1198, 1210 (C.D. Cal. 2024).

Second, the earnings call "incorporated by reference" robust risk disclosures from Rivian's Form 10-Q. *Clorox*, 238 F. Supp. 2d at 1142; SUF 213, 218. These warnings spoke directly to the subject of Statements 4-6—that Rivian may never be profitable and inflation could impact retail prices. *Farhar*, 714 F. Supp. 3d at 1210-11 (disclosures concerning ability to "execute our business plan" related to forward-looking statements concerning "further expansions").

Because the Safe Harbor applies, Statements 4-6 are inactionable "even if [they were] objectively false or misleading." *Weston*, 29 F.4th at 620.

## C.    Plaintiffs Cannot Prove Fraud Caused Stock Drop Losses

Discovery affirmatively establishes negative causation. 15 U.S.C. §78u-4(b)(4); *id.* §§ 77l(b), 77k(e) (Sections 11 and 12 affirmative defenses). Absent evidence "demonstrat[ing] a causal connection between the alleged [misstatements] and the economic loss [allegedly] suffered," "Defendant[s are] entitled to summary judgment" on Section 10(b) claims, *Nuveen Mun. High Income Opportunity Fund v. City of Alameda*, 730 F.3d 1111, 1121, 1123 (9th Cir. 2013), and finding of negative causation warrants the same on the Section 11 and 12 claims, *Soremekun v. Thrifty Payless*, 509 F.3d 978, 984 (9th Cir. 2007); *infra* 26 & n.3.

### 1.    The Market Already Knew the Alleged Corrective Information

A corrective disclosure must "reveal new information to the market," *In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 839 (9th Cir. 2022), but Rivian "made credibly available to the market" "specific information about" its BOM, profitability path, and pricing before any allegedly corrective disclosure revealed it. *Cypress*, 891 F. Supp. at 1379.

### a.    The Market Knew Rivian's Vehicles Were Not Initially Profitable

Companies must take an LCNRV charge when inventory costs more to produce than it sells for. DEx. 70 ¶18. The parties agree that Rivian's LCNRV charge, disclosed in the Prospectus and reiterated in Rivian's 3Q'21 10-Q, alerted the market that R1 production was not profitable. *Supra* 14-15. It is indisputable that:

- By Q3'21, Rivian had only produced and delivered R1Ts, DEx. SUF 200;
- Rivian did not account for EDV inventory before January 2022, SUF 201;
- Rivian's LCNRV charge disclosed that Rivian lost money on every R1T, SUF 189;
- Rivian's inventory was "substantially all" raw materials, SUF 184;
- Analysts understood BOM was over 80% of R1 costs, SUF 202.

The market already recognized that the LCNRV charge was driven by R1 BOM exceeding its price. SUF 187.

### b.    The Market Expected a Price Increase

Plaintiffs' economic expert cites analyst reports conveying the market's expectation of "a potential price increase." DEx. 77 ¶35 (December 2021 analyst reports). Analysts and Plaintiffs' economic expert attributed the market's March 1 reaction to the "timing" and "size" of the increase, DEx. 82 at 131:23-25, 132:22-24, and that pre-orders were not "grandfathered-in," DEx. 83, and *not* to the revelation that Rivian had already decided to raise prices pre-IPO. SUF 203. Post-announcement, one analyst wrote that "price increases were expected and previously communicated by" Rivian but the market did not expect price increases on pre-orders, a decision made in February. DEx. 84

¶¶48-50; SUF 225. Both sides rely on economic evidence of "backlash" and "irked" and "angry" pre-order customers, demonstrating that the March 1 "news" was not the price increase itself, but its size and application to pre-orders—decisions made in February. DEx. 84 ¶58.

"As a matter of law, the price of [a company's] stock cannot be overinflated based on an omission if the market was otherwise aware of the information." *In re PetSmart Sec. Litig.*, 61 F. Supp. 2d 982, 996 (D. Ariz. 1999).

### c.    The Market Did Not Assume Rivian's Profitability Required R1 Profitability

The market understood that beyond the flagship R1, Rivian was targeting a "$***9T TAM*** in transition" that new models like the RT and R2 would unlock. DEx. 86 at -161 (December 2021). Wedbush explained Rivian's value was its long-term potential to "capture the massive influx of current and future EV demand, capitalizing on a unique global TAM … We believe [Rivian] will be a leader and major player in both the consumer luxury and commercial front." DEx. 86 at -156 (December 2021); SUF 205.

Discovery confirmed that Rivian's value reflected the market's belief it could "unlock" "***$2.5 trillion of market share***," DEx. 86 at -154, "over a long period," DEx. 24 at 71:9-72:8; *id.* at 41:23-42:5 ("Tesla, despite struggling for quite some time, almost going bankrupt[,] now [is] worth a lot of money."). Evidence does not support Plaintiffs' theory that alleged revelations about the R1's early unprofitability precipitated a market reaction. DEx. 87 at -10562 ("Our longer-term thesis on Rivian remains intact."); SUF 206.

Although Plaintiffs' own economic expert cites 14 analyst reports about the price increase, he does not claim any analyst viewed any prior disclosure as fraudulent. SUF 208. At least one analyst explicitly stated that the increase was due to "industry wide" drivers, rather than understated costs. DEx. 87 at -10562. Because analysts are important arbiters of the "valuation of corporate securities," *Verifone*, 784 F. Supp. at 1481-82, silence regarding any purported fraud supports summary judgment, *cf. In re*

*Oracle Corp. Sec. Litig.*, 627 F.3d 376, 393-94 (9th Cir. 2010) (analysts evidencing market knowledge).

### 2.    Plaintiffs Have Not Shown Upfront Inflation

No evidence supports Plaintiffs' claim that any challenged statement inflated Rivian's stock price. Plaintiffs' economic expert provides "*no analysis whatsoever*" supporting price inflation. DEx. 72 ¶17. His attempt to impute front-end price inflation based on back-end deflation is unavailing. Supreme Court precedent that "the logical link between the inflated share purchase price and any later economic loss is not invariably strong," *Dura*, 544 U.S. at 342, undermines his assertion that "the March 2, 2022 decline in Rivian stock price reflects investors' loss per share on account of artificial inflation," DEx. 84 ¶13. "The mere fact that Rivian's stock price declined does not establish … artificial[] inflat[ion] at an earlier point." DEx. 72 ¶5.

Evidence demonstrates a mismatch between challenged statements and alleged corrective disclosures, foreclosing back-end price declines as a proxy for price inflation. First, Plaintiffs' expert has not provided economic evidence of a link between *any* specific challenged statement and *any* alleged corrective disclosure. DEx. 84 ¶¶53, 61, 75 (arguing each alleged corrective disclosure "relates" to *all* challenged statements *collectively*); SUF 211. Second, he neglects to disaggregate from his loss causation analysis his various explanations for the market's March 2 reaction that are unrelated to any challenged statement. DEx. 84 ¶¶39, 53-54 (attributing decline to "cash flows," "customer backlash," and harm to "brand equity" and "prospects for growth," which appear nowhere in Plaintiffs' theory of fraud); SUF 212; *infra* 24.

### 3.    Factors Unrelated to the Alleged Misrepresentations or Omissions Caused the Stock Price Declines

Loss causation requires "a causal connection between the alleged [misrepresentations] and the economic loss" alleged. *Nuveen*, 730 F.3d at 1121. With no evidence of this "critical link," Plaintiffs cannot carry their burden under Section 10(b). *Id.* By contrast, Defendants "carr[y] their burden of negative causation under section

11(e)" by proving "factors other than the material misstatement in the registration statement" caused depreciation in value. *Akerman v. Oryx Commc'ns*, 810 F.2d 336, 340-341 (2d Cir. 1987).

**March 1:** No evidence shows the price increase corrected any challenged statement. The parties' economic experts agree that (1) applying the price increase to preorders, (2) fears of consumer backlash, and (3) the price increase's *size, date, and scope* drove market reaction. *Supra* 21-22; DEx. 82 at 132:22-24 ("[W]hat matters is the size of the price increase relative to expectations and the timing, too."); SUF 203.

Plaintiffs offer no economic evidence that the March 1 price increase revealed that BOM exceeded sale prices, that Rivian could never be profitable without increasing prices, or that, pre-IPO, Rivian had decided to raise prices. Instead, their expert:

- Declined to opine that the March 1 disclosure explicitly told the market that BOM exceeded sale prices, or that any commentary following the price increase *addressed BOM at all*, *supra* 21-22;
- Conceded the market did not view Rivian as structurally unprofitable, SUF 214;
- Conceded the "alleged corrective disclosure on March 1[]," did not reveal to the market that Rivian decided pre-IPO to increase prices, DEx. 82 at 117:8-118:14. Plaintiffs fail to prove the March 1 announcement caused any loss.

**March 3**: Plaintiffs' economic expert effectively recognizes the evidence cannot support loss causation on March 3, by choosing not to factor that date into calculating loss. SUF 216. Both experts agree the March 3 stock drop is not, as it "must be[,] statistically significant." *REMEC*, 702 F. Supp. 2d at 1266; DEx. 72   10.

Plaintiffs' expert also offers "no economic evidence to support," DEx. 72 ¶10, that the price increase *reversal* was corrective as a "foreseeable consequence" of an alleged risk, DEx. 84 ¶61. Even if the "foreseeable consequence[]" test were widely-accepted in the Ninth Circuit—it is not—the absence of economic analysis is fatal because this approach requires plaintiffs to "disaggregate the declines … from losses resulting from other, non-fraud-related events." *In re Nuveen Sec. Litig.*, 2011 WL 1842819, at *11.

Although Plaintiffs' expert cites alternative factors contributing to Rivian's stock price decline, *supra* 23, he does not disaggregate them from a drop resulting from alleged fraud, DEx. 84 ¶¶60-62, and "fails to quantify any price inflation … attributable to the insignificant abnormal declines in Rivian's stock price between March 3-10," DEx. 72 ¶10 n.20.

Plaintiffs' expert took no position whether the March 3 reversal, which *undid* the allegedly corrective March 1 announcement, constitutes an independent corrective disclosure. DEx. 82 at 175:24-176:5. His failure to "eliminate that portion of the price decline … which is unrelated to the alleged wrong" and is instead attributable to "market events for which Defendants cannot be held responsible," warrants summary judgment for Defendants. *In re Imperial Credit Indus. Sec. Litig.*, 252 F. Supp. 2d 1005, 1016 (C.D. Cal. 2003).

**March 10**: The economic evidence does not support loss causation on March 10, and Plaintiffs' expert does not factor it into his loss calculation. *Supra* 24; DEx. 84 ¶¶89-90. He acknowledges but does not disaggregate alternative explanations in his economic analysis of that date. *Id.* ¶69 ("disappointment with Rivian's business outlook *for 2022*" and "lowered … production expectations" were other potential causes of a price decline).

Plaintiffs' counsel conceded in a deposition that Plaintiffs' economic expert does not consider the March 10 disclosure corrective, defeating loss causation. DEx. 89 at 234:5-17 ("[Plaintiffs' expert] does not claim [March 10] as a corrective disclosure.").

## II.    EVIDENCE SHOWS NO VIOLATION OF SECTIONS 11 AND 12

Under Section 11 of the Securities Act, Plaintiffs must prove the registration statement "(a) contained an untrue statement of material fact or (b) omitted … a material fact required to be stated therein or necessary to make the statements therein not misleading." *Lilley*, 17 F. App'x at 606 (citing 15 U.S.C. §77k(a)). They do not. *See also*

*supra* 10-20.[4]

### A.    No Evidence of Known Material Trend About BOM Required to Be Disclosed Under Item 303

Plaintiffs allege that Defendants failed to disclose a trend under Item 303 of Regulation S-K:

- Rivian's BOM purportedly "increased in the years leading up to the IPO" and exceeded sales prices;
- Without a price increase or redesign, Rivian would lose money on every vehicle sold;
- Pre-IPO, Rivian "deci[ded] to increase prices after the IPO." ¶311.

These are not disclosable trends. They are a rehash of falsity allegations.

### 1.    Item 303 Limits Information Required for Disclosure

Item 303 requires disclosure of "known trends … reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way" and "any known trends … reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(b).

Item 303 "mandates not only knowledge of an adverse trend … and material impact," but also a reasonable likelihood of "the future material impacts" based on "present-day perspective." *Steckman v. Hart Brewing*, 143 F.3d 1293, 1297 (9th Cir. 1998). An Item 303 "trend" thus requires "an observed pattern that accurately reflects **persistent** conditions of the particular registrant's business environment." *In re Restoration Robotics Sec. Litig.*, 417 F. Supp. 3d 1242, 1263 (N.D. Cal. 2019). A nascent or temporary condition cannot be a trend. *Kapps v. Torch Offshore*, 379 F.3d 207, 218

---

[4] The Section 12(a)(2) claim against Underwriters fails for the same reasons as the Section 11 claim regarding falsity, loss causation, and Items 303 and 105. *Supra* 11-18. It alleges the same misstatements as Plaintiffs' Section 11 claim, none of which are false or misleading. ¶¶332-38; *In re Velti Sec. Litig.*, 2015 WL 5736589, at *31 (N.D. Cal. Oct. 1, 2015) (same standard for §§ 11 and 12). The undisputed facts also affirmatively establish negative causation for both claims. *In re Countrywide Fin. Sec. Litig.*, 588 F. Supp. 2d at 1132, 1183 C.D. Cal. 2008); *supra* 24-25.

(5th Cir. 2004) (five-month decline in natural gas prices not a trend); *Oxford Asset Mgmt. v. Jaharis*, 297 F.3d 1182, 1192 (11th Cir. 2002) (no violation where "changed revenue projection did not render [defendant]'s previously reported results unreliable").

### 2. Forward-Looking Estimates Are Not a Known Trend

The evidence shows Rivian's BOM estimates were projections, not a trend; it was not "known" pre-IPO how they would evolve. *Supra* 11-14. Item 303 trends must reflect actual "persistent **conditions**" rather than forward-looking estimates, *Restoration Robotics*, 417 F. Supp. 3d at 1263, because Regulation S-K "governs the disclosure of **known historic** trends, but does not provide a basis of liability where a corporation fails to 'disclose' the **future**," *In re Progenity Sec. Litig.*, 2023 WL 219345, at *15 (S.D. Cal. Jan. 13, 2023). But Rivian's BOM "costs" were highly variable estimates, not actual costs. *Supra* 11-14. Item 303 did not require inclusion of "future projections" in their Prospectus. *Progenity*, 2023 WL 219345 at *15. While some conditions, i.e., the chip shortage, existed before the IPO, no evidence suggests Rivian believed those pressures would persist—or grow—post-IPO. SUF 168.

### B. No Evidence of Material Factors Required for Item 105

Plaintiffs allege Defendants violated Item 105 by "omitting material information regarding the cost of R1's increasing [BOM], the required price increases and cost reductions, and the related negative impact on Rivian's margins and profitability." ¶¶256-57. This claim fails.

### 1. Item 105 Does Not Require Disclosure of Generic Risks or Proprietary Strategies

"To state a claim under Item 105, a plaintiff must allege that an issuer knew, at the time of the IPO, but did not disclose, a material factor that made an investment in the registrant or offering speculative or risky." *Hoang v. ContextLogic*, 2023 WL 6536162, at *13 (N.D. Cal. Mar. 10, 2023). The securities laws do not mandate that issuers disclose "general industry-wide trends" that are "easily discernable." *In re Textainer Sec. Litig.*, 2005 WL 3801596, at *6 (N.D. Cal. Dec. 12, 2005).

Rivian had no obligation to disclose a well-known industry-wide truth: At SOP, costs of production are typically significantly higher than at scaled production. *Supra* 12-13. That does not make an investment in Rivian riskier than one in any other OEM. Rivian reasonably believed—consistent with industry practice and employees' experiences—that BOM would fall below retail prices with scale. *Supra* 12-13.

### 2. Rivian Was Not Required to Engage in Doomsday Speculation

Rivian disclosed in its Prospectus risks that made investment in *Rivian* specifically risky: it was not profitable and that it may never be profitable, it had never manufactured vehicles at scale, and many of its supply contracts had variable pricing for key components based on factors outside of Rivian's control. *Supra* 3-4. Rivian was not required to disclose something untrue: that profitability would require a price increase. *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1406 (9th Cir. 1996) ("not required to forecast future events or to caution that 'future prospects may not be … bright'"); *see Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129-30 (2d Cir. 1994) ("People in charge of an enterprise are not required to take a gloomy, fearful, or defeatist view of the future."). Rivian projected profitability, even without price increases. *Supra* 17. Plaintiffs cannot identify how Rivian's disclosure concealed material facts that made investment in *Rivian* risky.

## III. EVIDENCE SHOWS THAT INDEPENDENT DIRECTORS ACTED DILIGENTLY

The Independent Directors are also not liable under Section 11 because the material facts support that they conducted (1) a "reasonable investigation," resulting in (2) "reasonable ground to believe," and (3) an actual belief, that "the registration statement [was materially accurate when it] became effective." 15 U.S.C. §77k(b)(3). "Reasonableness" is "calibrated to the objective reasonable person *in each defendant's position*." *Countrywide*, 588 F. Supp. 2d at 1174. "[O]utside directors … [a]re under a lesser obligation to conduct a painstaking investigation than an inside director." *Laven v. Flanagan*, 695 F. Supp. 800, 812 (D.N.J. 1988).

### A.    Independent Directors' Investigation Exceeded Standard of Care

The Independent Directors' investigation exceeded the standard for reasonable outside directors performing due diligence for an IPO prospectus. DEx. 90 ¶¶24, 137; SUF 254. They engaged with company personnel and colleagues to learn about Rivian, endeavored to confirm management representations, and carefully reviewed the Prospectus for accuracy. *E.g.*, *In re Avant-Garde Computing Sec. Litig.*, 1989 WL 103625, at *8-9 (D.N.J. Sep. 5, 1989); *Weinberger v. Jackson*, 1990 WL 260676, at *1 (N.D. Cal. Oct. 11, 1990); SUF 255.

### 1.    Dialogue with Management and Each Other

#### a)  Board and Audit Committee Meetings

Eleven pre-IPO 2021 Board meetings reflect near-perfect attendance and robust discussion of the IPO and other topics: "Business Overview[s]"; manufacturing, plant, and vehicle updates; customer engagement; forecasting; and auditing. SUF 241-42, 244, 256, 294. "[R]egular[] attend[ance at] [B]oard and meetings at which the [B]oard discussed *every aspect* of the company's business" supports due diligence. *Weinberger*, 1990 WL 260676, at *4.

The Audit Committee reviewed early drafts of the Prospectus's F-pages and MD&A, *infra* 31, and engaged Rivian's disclosure committee and auditor on their processes for ensuring accuracy. SUF 244-46, 258, 260-61, 266, 268-69; *Laven*, 695 F. Supp. at 812 ("reliance on the representations of … management" is not "unreasonable, particularly when it was confirmed by the investigations of [auditors] and [bankers]"). The Independent Directors' engagement with management mirrors that of the director in *Avant-Garde* who "interviewed company personnel, including members of senior management," "to assure himself that, as an outside director, he understood Avant-Garde's business." 1989 WL 103625, at *8 (summary judgment on due diligence defense).

#### b)  Engagement on Relevant Topics

Directors engaged with *specific* topics underlying Plaintiffs' allegations.

**Pricing.** Pricing "was among discussions [Directors] had all of the time[;] what the market would bear, what people could afford, what costs would be." DEx. 61 at 64:1-22; SUF 263. They "frequently would discuss the [vehicle] pricing environment," including "conversion costs, … BOM forecast, and the cell localization efforts." DEx. 24 at 65:3-6.

**BOM.** Directors discussed estimates and reductions in BOM. SUF 264. The Board was "vigilant about the [BOM and] understood [their] fiduciary responsibilities and took them very seriously." DEx. 61 at 59:3-61:7. Pre-IPO, the forecasted BOM "was one of the things that [the] [B]oard … talked about consistently." *Id.* at 45:22-46:5.

**Profitability.** Directors reviewed profitability forecasts, including gross margin, "on a regular basis." DEx. 24 at 33:8-9; SUF 257, 265. The Board "stress tested that forecast" and discussed it "with the CEO and the CFO and … [finance] team at the time." DEx. 24 at 33:3-7. The Board "assess[ed] financial information" at least "quarterly." *Id.* at 33:12-13. "The key to reasonable investigation … is independent verification of the registration statement by reference to original written records." *Feit v. Leasco Data Processing Equip.*, 332 F. Supp. 544, 576 (E.D.N.Y. 1971). The Directors did just that.

## 2.    Reputational Intermediaries

Directors engaged outside counsel advising on responsibilities and liability for the Prospectus and Underwriters to "understand" Rivian's "value proposition … in the marketplace." DEx. 61 at 126:12-16; SUF 237-39, 270-71. The Directors could take "comfort by the fact that the [P]rospectus and the information in it were reviewed by underwriters, counsel and accountants." *Weinberger*, 1990 WL 260676, at *4; DEx. 90 ¶27; SUF 268, 272.

## 3.    Careful Prospectus Review

Directors carefully reviewed multiple drafts of the Prospectus, focusing on the Risk Factors and MD&A containing Statements 1-3. SUF 234-35, 245. *Avant-Garde*, 1989 WL 103625, at *8 (defense applied where director "received and reviewed a draft preliminary prospectus, the filed preliminary prospectus, and the final prospectus"). For example:

- In April 2021, Boone reviewed the Risk Factors. DEx. 162. The Audit Committee reviewed drafts of the MD&A and "F-pages" in July 2021. SUF 245-46.

- In August, Audit Committee members Boone and Flatley reviewed the pre-confidential filing draft and provided detailed feedback on the F-Pages, MD&A, and Business sections. SUF 247-48. Krawiec provided feedback on the MD&A section. *Id.*

- Directors reviewed and approved the filing of the near-final draft. SUF 249-50. Nearly all Directors re-affirmed they reviewed the final version sent the night before the public filing, with blackline showing changes. SUF 251-53.

### B.    Independent Directors Had Reasonable Grounds to Believe the Prospectus Was Materially Accurate

The Directors' diligence *directly contradicted* Plaintiffs' contentions (1) that BOM was "locked in," ¶¶158, 281, (2) that Rivian already decided to raise prices, ¶311, and (3) that Rivian could never achieve profitability without a price increase, ¶¶118, 196, 281; *supra* 11-20; SUF 229-30. They had reasonable grounds to believe that the Prospectus was materially accurate.

### C.    Independent Directors Believed the Prospectus Was Materially Accurate

The Directors believed the Prospectus was accurate. *Laven*, 695 F. Supp. at 811 (summary judgment where "affidavits and actions" showed "they actually, if mistakenly, believed Western Union to be a company in robust health"). They invested their own money in the IPO and retained shares through the Class Period. *Supra* 7-8. To date, none have sold shares. *Supra* 8. They also believed all the assumptions underlying Statements 1-3. SUF 229-30.

### IV.    NO INDEPENDENT DIRECTOR WAS A CONTROL PERSON

Section 15 control person liability requires that Directors were "involved in" Rivian's "day-to-day business" *and* "the preparation of the" Prospectus. *Paracor Fin. v. Gen. Elec. Cap.*, 96 F.3d 1151, 1163 (9th Cir. 1996). Mere positions, ¶342, and

signatures, ¶¶229-235, 343, are insufficient. *Lilley v. Charren*, 936 F. Supp. 708, 717 (N.D. Cal. 1996) ("status alone" is "insufficient"); *Picard Chem. v. Perrigo*, 940 F. Supp. 1101, 1134 (W.D. Mich. 1996) (similar).

## A.    Independent Directors Did Not Control Operations or Prospectus

"By definition, outside directors do not participate in … day-to-day affairs." *In re Syntex Sec. Litig.*, 855 F. Supp. 1086, 1100 (N.D. Cal. 1994); *In re Homestore.com Sec. Litig.*, 347 F. Supp. 2d 790, 810 (C.D. Cal. 2004) ("Advice does not amount to control."); SUF 311-12. Directors' contributions to the Prospectus did not exceed due diligence. *E.g.*, DEx. 24 at 78:1-6 (Directors provided "*feedback*"). No Directors owned controlling stakes. SUF 88; *Perrigo*, 940 F. Supp. at 1135 ("2-5%" insufficient).

## B.    Independent Directors Acted in Good Faith

Each Director acted in good faith. *Flynn v. Sientra*, 2016 WL 3360676, at *17 (C.D. Cal. June 9, 2016) ("[D]efendant may assert a 'good faith' defense."). Directors defend their contributions to the Prospectus, *supra* 29-32, and bought and retained IPO shares. No evidence shows Directors participated in the alleged primary violation through "direct[] or indirect[] induce[ment]." *Hollinger v. Titan Cap.*, 914 F.2d 1564, 1575 (9th Cir. 1990). Rather, they aimed for accuracy. *Supra* 29-31.

## CONCLUSION

For these reasons, summary judgment for Defendants is appropriate.


Dated: July 3, 2025                          FRESHFIELDS US LLP


                                             By: */s/ Doru Gavril*
                                                 Doru Gavril**


                                             *Attorneys for Defendants Rivian Automotive, Inc., Robert J. Scaringe, Claire McDonough, Jeffrey R. Baker, Karen Boone, Sanford Schwartz, Rose Marcario, Peter Krawiec, Jay Flatley, and Pamela Thomas-Graham*

Dated: July 3, 2025

ORRICK HERRINGTON & SUTCLIFFE
LLP

By: */s/ Darrell S. Cafasso*

JAMES N. KRAMER (SBN 154709)
jkramer@orrick.com
ORRICK, HERRINGTON
& SUTCLIFFE LLP
405 Howard Street
San Francisco, California 94105
Telephone: (415) 773-5700
Facsimile: (415) 773-5759

DARRELL S. CAFASSO
(*Admitted Pro Hac Vice*)
dcafasso@orrick.com
JENNIFER KEIGHLEY
(*Admitted Pro Hac Vice*)
jkeighley@orrick.com
ORRICK, HERRINGTON
& SUTCLIFFE LLP
51 West 52nd Street
New York, New York 10019
Telephone: (212) 506-5000
Facsimile: (212) 506-5151

*Attorneys for Defendants Morgan Stanley &
Co., LLC, Goldman Sachs & Co. LLC, J.P.
Morgan Securities LLC, Barclays Capital
Inc., Deutsche Bank Securities Inc., Allen &
Company LLC, BofA Securities Inc., Mizuho
Securities USA LLC, Wells Fargo Securities,
LLC, NomuraSecurities International, Inc.,
Piper Sandler & Co., RBC Capital Markets,
LLC, Robert W. Baird & Co. Inc., Wedbush
Securities Inc., Academy Securities Inc.,
Blaylock Van, LLC, Cabrera Capital Markets
LLC, C.L. King & Associates, Inc., Loop
Capital Markets LLC, Samuel A. Ramirez &
Co., Inc., Siebert Williams Shank & Co., and
Tigress Financial Partners LLC*

\*\*Pursuant to Local Rule 5-4.3.4(2)(i), the
electronic filer hereby attests that all
signatories concur in the filing's content and
have authorized this filing

1

## CERTIFICATE OF COMPLIANCE

2    The undersigned, counsel of record for Rivian Defendants, certifies that this

3    brief contains 9,995 words, which complies with the word limit set by court order

4    dated June 23, 2025.

5

6    Dated: July 3, 2025              FRESHFIELDS US LLP

7                                     By: /s/ Doru Gavril
                                         Doru Gavril
8
                                     *Attorneys for the Rivian Defendants*
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28