UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHARLES LARRY CREWS, JR., ET AL., <br><br> Plaintiffs, <br><br> v. <br><br> RIVIAN AUTOMOTIVE, INC., ET AL., <br><br> Defendants. | CASE NO. 2:22-cv-01524-JLS-E <br><br> **ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY APPROVAL OF PROPOSED SETTLEMENT AND AUTHORIZATION TO DISSEMINATE NOTICE TO THE CLASSES (DOC. 750)** |

Before the Court is an unopposed Motion for Preliminary Approval of a Class Action Settlement filed by Counsel for Class Representatives Sjunde AP-Fondren and James Stephen Muhl, (Mot., Doc. 750), and an attached Memorandum of Points and Authorities in support, (Mem., Doc. 750-1).  Plaintiffs ask the Court to: (1) preliminarily approve the terms of the class action settlement; (2) approve the form and manner of providing notice of the Settlement to the Court-certified Classes; (3) approve Verita Global, LLC as Claims Administrator for the settlement; and (4) schedule the final fairness hearing and various deadlines in connection with the Settlement.  (Mot. at 2.)

Having considered the briefs and held an in-person hearing, the Court now GRANTS Plaintiffs' Motion for the reasons stated below.  The Court SETS a Final Fairness Hearing for May 15, 2026, at 10:30 a.m.

## I. BACKGROUND

### A. Factual Background

This is a federal securities class action against the publicly-traded company Rivian, several of its top executives, and underwriters for Rivian's initial public offering ("IPO").  (Amended Consolidated Complaint ("ACC") ¶¶ 24–36, 225–61, Doc. 150.)  Lead Plaintiff Sjunde AP-Fonden ("AP-7") and Additional Plaintiff James Stephen Muhl (together, "Plaintiffs") purchased Rivian stock during or shortly after Rivian's IPO, which took place on November 10, 2021. (*Id.* ¶¶ 28, 29.)

The ACC alleges violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated by the Securities and Exchange Commission (collectively referred to as "Exchange Act claims"); and Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 and Regulation S-K promulgated by the Securities and Exchange Commission (collectively referred to as "Securities Act claims").  (*Id.* ¶¶ 214–24, 318–44.)  The Exchange Act claims allege that the Defendants made materially false and misleading statements in Rivian's IPO prospectus and during a December 16, 2021 earnings call regarding Rivian's financial results for the third quarter of 2021.  Those

claims also allege that Defendants knowingly concealed that material costs for each R1 EV far exceeded its sale price and that substantially raising prices was inevitable. (*Id.* ¶¶ 156–71). The Securities Act claims allege that (1) Rivian's directors and executives violated Regulation S-K by failing to disclose in Rivian's Registration Statement a known trend of material costs far exceeding the EV's retail prices; and (2) the Underwriter Defendants failed to conduct an adequate due diligence investigation. (*Id.* ¶¶ 294–312.)

1. **Rivian's Alleged Misrepresentations**

Rivian designs and manufactures electric vehicles ("EVs") and accessories and sells them directly to consumers and businesses. (*Id.* ¶ 30.) Rivian began preparing to go public in 2021. (*Id.* ¶ 92.) Although Rivian acknowledged in advance of its IPO that it would experience near-term "negative gross profit per vehicle" due to high "fixed costs from investments in vehicle technology, manufacturing capacity, and charging infrastructure," Plaintiffs allege that this was not the full truth. (*Id.* ¶ 296.) In the years since Rivian set its base prices, rising material costs (referred to as bill of material, or BOM, costs) significantly changed its near-term and long-term financial outlook. (*Id.* ¶¶ 113, 118–21.) According to Plaintiffs, Rivian knew by September 2021 that it was going to have to change the R1's features significantly or raise prices. (*Id.* ¶¶ 119–21.)

But Plaintiffs allege that this reality was not fully disclosed in the months before and after the IPO. Rivian's IPO commenced on November 10, 2021, and concluded on November 15, 2021, raising $13.7 billion selling 175,950,000 shares of Rivian stock at a fixed price of $78 per share. (ACC ¶¶ 101–02.) Rivian stock began trading on the NASDAQ as early as November 10, 2021. (*Id.* ¶ 101.) Plaintiffs allege that the identified misrepresentations inflated Rivian's stock prices during subsequent trading, through the post-IPO quiet period that lasted until December 5, 2021, and until the truth was revealed in March 2022. (*Id.* ¶¶ 206–07.)

### 2. **Rivian's Corrective Disclosures**

These misrepresentations were allegedly corrected by two disclosures. First, on March 1, 2022, Rivian publicly announced that it would increase base prices on the R1T and the R1S by 17% and 20% respectively. (ACC ¶¶ 141–42.) Significantly, these price increases applied even to existing pre-orders. (*Id.* ¶ 143.) The customer backlash was substantial and Rivian's stock price fell more than 20% following the news of the large price hikes. (*Id.* ¶¶ 147–48.) Rivian ultimately reversed course on its decision to apply the price increases to pre-orders but, as market analysts made clear, the inability to recoup the additional money on pre-orders was going to hurt Rivian's revenue projections. (*Id.* ¶ 149.) Rivian's stock price fell from March 2 to March 10, 2022, as the market digested Rivian's likely inability to meet its financial targets. (*Id.* ¶ 151.)

A further corrective disclosure was allegedly made on March 10, 2022, when Rivian announced its full year 2021 financial results and its 2022 projections. These disclosures revealed that Rivian had adjusted its projected earnings before interest, taxes, depreciation, and amortization to a "disappointing" $4,750 million and expected negative gross margins through 2022. (*Id.* ¶ 152.) Analysts noted that the weak 2022 outlook reflected "steep cost pressures from input costs," which Rivian would be unable to offset. (*Id.* ¶ 154.) Rivian's stock price fell further and closed at a low of $35.83 per share on March 14, 2022.

### B. **Procedural History**

On July 3, 2023, the Court denied Defendants' Motions to Dismiss the ACC. (Doc. 172.) Following Defendants' Answers, (Docs. 183, 184), a lengthy discovery process began. Plaintiffs represent that over the course of discovery they: (1) issued document requests and interrogatories to Defendants; (2) served subpoenas on 36 parties; (3) reviewed and analyzed over 3.5 million pages of documents; (4) prepared for, took, or defended 48 depositions; (5) exchanged expert reports; (6) reviewed privilege log entries,

produced documents, and prepared discovery responses. (Mem. at 10.) The Parties also briefed 13 discovery-related motions. (*Id.*)

On July 17, 2024, after holding a hearing, the Court issued an order granting Plaintiffs' motion for class certification. ("Class Cert. Order," Doc. 392.) The Court certified two classes:

> **For 1934 Act Claims:** All persons and entities who purchased or otherwise acquired Rivian Class A common stock between November 11, 2021, and March 10, 2022, inclusive, and were damaged thereby. The Class excludes those who purchase Rivian Class A common stock at the fixed IPO price.
> **For 1933 Act Claims:** All persons and entities who purchased or otherwise acquired Rivian Class A common stock between November 10, 2021, and March 10, 2022, inclusive, and were damaged thereby.

(Class Cert. Order at 30–31.) On November 5, 2024, the Court approved the form and manner of notice to the Classes. (Doc. 408.) On November 12, 2024, notice was sent to potential Class Members. (Cavallo Decl., Doc. 750-4 ¶ 3.) The notice included procedures for requesting exclusion from the class, and 131 individuals requested such exclusion. (Mem. at 11 n.7.) On October 30, 2024, the parties participated in their first mediation session with Judge Layn Phillips (Ret.), which was unsuccessful. (Mem. at 11.)

On July 3, 2025, Defendants moved for Summary Judgment. ("MSJ," Doc. 591.) Plaintiffs opposed, and Defendants replied. (Docs. 614, 687.) The parties additionally filed seven *Daubert* motions to exclude testimony of two plaintiff experts and five defense experts. (Docs. 666–67, 670–71, 674–76.) As the briefing on the MSJ proceeded, the parties reengaged with mediation efforts and ultimately accepted Judge Phillips' recommendation to resolve the action for $250 million. (Mem. at 11–12.) On October 23, 2025, the parties filed the present Motion for Preliminary Approval of Proposed Settlement (Doc. 750), an attached Memorandum of Points and Authorities in support, (Doc. 750-1), and the associated Stipulation and Agreement of Settlement ("Settlement Agreement," Doc. 750-3.) Following a hearing, the Court requested that Plaintiffs provide revised drafts of the Postcard Notice, Notice, and Summary Notice, which would direct objections

to the Settlement Administrator rather than the Court.  Plaintiffs timely submitted the revised Notice documents.  ("Revised Notice," Doc. 755-1.)

### C. Settlement Agreement

The Settlement Agreement provides that Rivian will pay or cause its insurers to pay $250 million into an Escrow Account (the "Settlement Fund").  (Settlement Agreement ¶ 8.)  The Settlement Fund will pay: (1) Taxes; (2) Administration Costs; (3) Court-awarded Litigation Expenses not in excess of $6.9 million; (4) Court-awarded Attorney's Fees not in excess of 24% of the Settlement Fund; and (5) any other costs and fees.  (*Id.* ¶ 10.)   The remaining funds ("Net Settlement Fund") will be distributed to valid Claimants.  (*Id.*)  The Settlement Agreement provides for no reversion of any of the Settlement Fund to Rivian.  (*Id.* ¶ 14.)  A Settlement Administrator will determine whether submitted claims are valid and the amount of each claim according to the stipulated Plan of Allocation.  (*Id.* ¶ 21.)

Plaintiffs and Class Members release all claims associated with "(i) the purchase or sale or other acquisition or disposition, or holding of Rivian Class A common stock during the period between November 10, 2021 and March 10, 2022, inclusive; and (ii) the allegations, acts, facts, matters, occurrences, disclosures, filings, representations, statements, or omissions that were or could have been alleged by Class Representatives and all other members of the Classes in the Action."  (*Id.* ¶¶ 1.mm, 5.)  By entering into the settlement, Defendants do not admit any wrongdoing.  (*Id.* ¶ 37.)

### D. Class Notice and Disbursement

The Settlement Administrator will notify Class Members of the Settlement by a mailed postcard, posted Notice on the Settlement Website, publication of Summary Notice in *The Wall Street Journal*, and transmission of the Summary Notice over *PR Newswire*.  (Mem. at 23; *See also* Revised Notice.)  Class Members may submit claim forms via the website or by mail.  (*See* Revised Notice at 2, 8.)   The Settlement Administrator determines whether claims are valid.  (Settlement Agreement ¶ 21.)

6

Valid claims are then distributed via the Plan of Allocation. (*Id.*) Under the plan, each Claimant's "Recognized Loss Amount" will be calculated differently according to whether their recovery is authorized under the Exchange Act or the Securities Act. (Mem. at 22.) Losses under the Exchange Act will be calculated according to a number of factors including the shares' purchase date, whether and at what price the shares were sold, and limitations on recoverable damages. (*Id.*) Losses under the Securities Act will be calculated using the statutory damages formula. (*Id.*) If recovery is available under both, the Recognized Loss Amount will be the greater of the two calculations. (*Id.*) Claimants will then receive a *pro rata* share of the Net Settlement Fund according to the percentage of their Recognized Loss Amount out of the total of all Recognized Loss Amounts. (*Id.* at 22–23.) Class counsel estimates the average recovery to be about $1.18 per share. (Ex. A-2 to Settlement Agreement, Doc. 750-2, at 66.)

## II.   LEGAL STANDARD

To preliminarily approve a proposed class action settlement, Federal Rule of Civil Procedure 23(e)(2) requires the Court to determine whether the proposed settlement is fair, reasonable, and adequate. Fed. R. Civ. P. 23(e)(2). Review of a proposed settlement typically proceeds in two stages, with preliminary approval followed by a final fairness hearing. Manual for Complex Litigation, § 21.632 (4th ed. 2004). "The decision to [grant preliminary approval and] give notice of a proposed settlement to the class is an important event. It should be based on a solid record supporting the conclusion that the proposed settlement will likely earn final approval after notice and an opportunity to object." Fed. R. Civ. P. 23 advisory committee's note to 2018 Amendment.

Although there is a "strong judicial policy that favors settlements, particularly where complex class action litigation is concerned," *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1238 (9th Cir. 1998), "[t]he purpose of Rule 23(e) is to protect the unnamed members of the class from unjust or unfair settlements affecting their rights," *In re Syncor*

*ERISA Litig.*, 516 F.3d 1095, 1100 (9th Cir. 2008).  Rule 23(e) provides that a "court may approve" a class action settlement proposal "after considering whether:"

> (A) the class representatives and class counsel have adequately represented the class;
> (B) the proposal was negotiated at arm's length;
> (C) the relief provided for the class is adequate, taking into account:
>> (i) the costs, risks, and delay of trial and appeal;
>> (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
>> (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
>> (iv) any agreement required to be identified under Rule 23(e)(3)[1];
>
> and (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).

These factors were codified in the Federal Rules of Civil Procedure in 2018 in recognition of the fact that "[c]ourts have generated lists of factors to shed light on" the fairness, reasonableness, and adequacy of the proposed settlement.  Fed. R. Civ. P. 23 advisory committee's note to 2018 Amendment.  Indeed, the Ninth Circuit's articulated list of factors has governed settlement approvals in the Circuit for over forty years.  *See Officers for Justice v. Civil Service Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982).  Those factors overlap in many ways with the Rule 23(e)(2) factors, and include: "[1] the strength of plaintiffs' case; [2] the risk, expense, complexity, and likely duration of further litigation; [3] the risk of maintaining class action status throughout the trial; [4] the amount offered in settlement; [5] the extent of discovery completed, and the stage of the proceedings; [6] the experience and views of counsel; [7] the presence of a governmental participant; and [8] the reaction of the class members to the proposed settlement." *Staton*

---

[1] Under Rule 23(e)(3), "[t]he parties seeking approval must file a statement identifying any agreement made in connection with the proposal."

*v. Boeing Co.*, 327 F.3d 938, 959 (9th Cir. 2003) (cleaned up). "The relative degree of importance to be attached to any particular factor will depend upon and be dictated by the nature of the claim(s) advanced, the type(s) of relief sought, and the unique facts and circumstances presented by each individual case." *Officers for Justice*, 688 F.2d at 625. Here, the Court relies on the Rule 23(e)(2) factors but uses some of the developed guidance regarding the application of the Ninth Circuit's factors where relevant.

In addition to these factors, the Court must also satisfy itself that "the settlement is not the product of collusion among the negotiating parties." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946–47 (9th Cir. 2011) (cleaned up). Though it is perhaps most important to look for signs of collusion in "settlements struck before class certification" because "counsel may collude … to strike a quick settlement without devoting substantial resources to the case," the Ninth Circuit has made clear that the "heightened inquiry [also] applies to *post-class certification* settlements." *Briseno v. Henderson*, 998 F.3d 1014, 1023–24 (9th Cir. 2021). Accordingly, in any class action settlement, the Court must look for explicit collusion and "more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations." *In re Bluetooth*, 654 F.3d at 947. Such signs include (1) "when counsel receive a disproportionate distribution of the settlement"; (2) "when the parties negotiate a 'clear sailing' arrangement providing for the payment of attorneys' fees separate and apart from class funds"; and (3) "when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund." *Id.* (cleaned up).

### III. DISCUSSION

#### A. Adequate Representation

"Under Rule 23(e)(2)(A), the first factor to be considered is whether the class representative and class counsel have adequately represented the class." *Hang v. Old Dominion Freight Line, Inc.*, 2024 WL 2191930, at *4 (C.D. Cal. May 14, 2024). Whether the class representation was adequate depends on (1) conflicts of interest between the

named plaintiffs and their counsel and class members; and (2) whether the named plaintiffs and their counsel will prosecute the action vigorously on behalf of the class. *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011). But the analysis also involves "'procedural' concerns" and requires "looking to the conduct of the litigation and of the negotiations leading up to the proposed settlement." Fed. R. Civ. P. 23 advisory committee's note to 2018 Amendment. Therefore, the Court must consider "the nature and amount of discovery in this or other cases, or the actual outcomes of other cases, [which] may indicate whether counsel negotiating on behalf of the class had an adequate information base." *Id.*

The need for an adequate information base is important: A plaintiff will not be able to broker a fair settlement without having been "armed with sufficient information about the case to have been able to reasonably assess its strengths and value." *Acosta v. Trans Union, LLC*, 243 F.R.D. 377, 396 (C.D. Cal. 2007). And for a court to be able to approve a settlement, "the parties must have engaged in sufficient investigation of the facts to enable the court to intelligently make an appraisal of the settlement." *Id.* (cleaned up). A court considering a proposed settlement has a duty "to evaluate the scope and effectiveness of the investigation plaintiffs' counsel conducted prior to reaching an agreement." *Id.* (citing *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000)).

The Class Representatives and Class Counsel have adequately represented the class. In its prior Order Granting the Motion for Class Certification, this Court rejected a variety of Defendants' arguments regarding conflicts of interest and vigorous prosecution, and ultimately found the Class Counsel and Representatives adequate. (Class Cert. Order at 9–10.) The Court sees no reason to deviate from that conclusion here.

Further, this Settlement Agreement was reached after Class Counsel obtained an adequate information base. Plaintiff represents that it engaged in "extensive fact and expert discovery" including interrogatories, subpoenas to 36 third parties, reviewing millions of pages of documents, taking/defending 48 depositions, and briefing 13

discovery-related motions before the Magistrate Judge. (Mem. at 10.) Given the extensive discovery record, the Court concludes that the parties possess enough information to make an informed settlement decision. Accordingly, this factor weighs in favor of granting preliminary settlement approval.

### B. Arm's Length Negotiation

Rule 23(e)(2)(B) asks whether "the proposal was negotiated at arm's length." As with the adequacy of representation, this is a "'procedural' concern[]" and "the involvement of a neutral or court-affiliated mediator or facilitator in those negotiations may bear on whether they were conducted in a manner that would protect and further the class interests." Fed. R. Civ. P. 23 advisory committee's note to 2018 Amendment. "The Ninth Circuit, as well as courts in this District, 'put a good deal of stock in the product of an arms-length, non-collusive, negotiated resolution' in approving a class action settlement." *In re Stable Rd. Acquisition Corp.*, 2024 WL 3643393, at *6 (C.D. Cal. Apr. 23, 2024) (quoting *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009)).

The parties represent that they began mediation with Judge Layn R. Phillips following the class certification proceedings, which lasted one day and ended unsuccessfully. (Mem. at 11.) Nearly a year later, the parties resumed mediation with Judge Phillips and eventually accepted the mediator's settlement recommendation. (*Id.* at 11–12.) Especially given the parties' longstanding reliance on a neutral arbiter, there is no evidence to suggest that the negotiations were not conducted at arms-length. Accordingly, this factor weighs in favor of granting preliminary approval.

### C. Adequacy of Relief

Having addressed possible procedural concerns, the Court next turns to a "'substantive' review of the terms of the proposed settlement." Fed. R. Civ. P. 23 advisory committee's note to 2018 Amendment. Rule 23(e)(2)(C) requires that "the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class,

11

including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees …; and (iv) any agreement required to be identified under Rule 23(e)(3)."

### 1. Costs, Risks, and Delay of Trial and Appeal

Courts are instructed to "balance the risks of continued litigation, including the strengths and weaknesses of plaintiff's case, against the benefits afforded to class members, including the immediacy and certainty of recovery." *Knapp v. Art.com, Inc.*, 283 F. Supp. 3d 823, 831 (N.D. Cal. 2017). To conduct this analysis, "courts may need to forecast the likely range of possible classwide recoveries and the likelihood of success in obtaining such results." Fed. R. Civ. P. 23 advisory committee's note to 2018 Amendment. Indeed, many district courts—including this Court—require that motions for preliminary approval of class settlements include estimates of the defendant's maximum potential liability. *See, e.g.*, *Chen v. Western Digit. Corp.*, 2020 WL 13587954, at *3 (C.D. Cal. Apr. 3, 2020) (Staton, J.).

Here, the Court evaluates the value of the Settlement, measured against Plaintiffs' estimated maximum trial recovery and the risk of continued litigation. Plaintiffs maintain that they faced risks at the summary judgment stage, as Defendants adamantly denied wrongdoing and advanced a litany of arguments challenging the merits of Plaintiffs' position. (Mem. at 17.) Further, Plaintiff represents that there was significant risk in establishing whether Rivian's March 1 and March 10 disclosures were corrective, which was crucial to their damages and causation arguments. (*Id.* at 18.) The Court accepts that there were significant risks, and the maximum recovery heavily depended on the Court's acceptance of many legal arguments that Defendants adamantly opposed.

The value of the Settlement is $250 million. (Settlement Agreement ¶ P.) Plaintiffs represent that their damages expert has estimated the potential damages at trial to range from $1.87 billion to $2.04 billion. (Mem. at 18.) Plaintiffs maintain that the final award depended on the Court's findings as to Rivian's two corrective disclosures and the price

impacts of other confounding information. (*Id.*) The Court accepts this range as an approximate maximum trial recovery and therefore finds that the Settlement is approximately 12.3% to 13.4% the potential award. This is well within the range of recovery this Court has accepted for prior securities litigation settlements. *See In re Biolase, Inc. Securities Litigation*, 2015 WL 12720318, at *4 (C.D. Cal. Oct. 13, 2015) (Staton, J.) (accepting 8% of the maximum recoverable damages as an amount that "equals or surpasses" the recovery in many other securities class actions). Therefore, given the sizeable risk and meaningful recovery, this factor weighs in favor of granting preliminary approval.

## 2. Effectiveness of Proposed Distribution Method and Claims Processing

Next, the adequacy of the relief depends on "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims." Fed. R. Civ. P. 23(e)(2)(C)(ii). "Often it will be important for the court to scrutinize the method of claims processing to ensure that it facilitates filing legitimate claims." Fed. R. Civ. P. 23 advisory committee's note to 2018 Amendment. "A claims processing method should deter or defeat unjustified claims, but the court should be alert to whether the claims process is unduly demanding." *Id.*

Here, the Settlement Agreement provides that the Claims Administrator will send notice to all Class Members who may be located through reasonable efforts via mail and/or email. (Mem. at 23.) Class Members may easily submit claim forms via the settlement website or by mail. (*See* Revised Notice at 2, 8.) The Settlement Administrator is tasked with determining whether claims are valid, then determining the share of the Net Settlement Fund based on guidelines clearly laid out in the Plan of Allocation. (Settlement Agreement ¶ 21.) The distribution and claims processing method outlined in the Settlement Agreement effectively balances the need to filter out illegitimate claims without being overly burdensome. This factor weighs in favor of preliminary approval.

### 3. Proposed Attorney's Fees

The "terms of any proposed award of attorney's fees" also affects the adequacy of the relief. Fed. R. Civ. P. 23(e)(2)(C)(iii). The Ninth Circuit explained that, when considering this factor, "district courts must apply the *Bluetooth* factors to scrutinize fee arrangements," meaning the Court should look for a disproportionate distribution of attorney's fees, clear sailing provisions, and "reverter" or "kicker" clauses that return undistributed funds to the defendant. *Briseno*, 998 F.3d at 1026–27. "[C]ourts typically calculate 25% of the fund as the 'benchmark' for a reasonable fee award." *In re Bluetooth*, 654 F.3d at 942.

Class Counsel maintains that they will not seek an award of attorney's fees that is greater than 24% of the Settlement Fund. (Mem. at 20.) At that time, Class Counsel will also submit their lodestar amounts. (*Id.* at 20 n.16.) The 24% fee is not clearly disproportionate and falls within the Ninth Circuit's "benchmark." The Court must also consider the amount of money paid out for claimed out-of-pocket expenses. Class Counsel maintains that they will not seek more than $6.9 million in litigation expenses, including charges for experts, mediation, data hosting, depositions, the Class Notice campaign, travel, online research, and other costs. (Mem. at 20.) The Court reserves full consideration of the fee proportionality until final approval, when it will have the benefit of Plaintiffs' Counsel's briefing about the fees and expenses sought. Plaintiffs should plan to submit detailed billing records, in the form required by this Court's procedures published on the court's website, so that the Court may conduct a proper lodestar crosscheck of any requested fee.

As to the other collusive factors in *In re Bluetooth*, the settlement does not allow reversion of the Settlement Fund to Rivian if the Settlement becomes final. (Settlement Agreement ¶ 14.) Further, the attorney's fees are paid solely from the settlement fund, and "[a]n award of attorneys' fees and/or Litigation Expenses is not a necessary term of the

14

Settlement and is not a condition of the Settlement." (*Id.* ¶ 16, 17.) Therefore, the Court does not find any evidence of collusion. This factor weighs in favor of approval.

### 4. Agreements in Connection with the Proposal

Plaintiffs have entered into a Confidential Supplemental Agreement that applies should the Court require a second opportunity for Class Members to opt-out of the Classes. (*Id.* ¶ 35.) The agreement provides conditions relating to future excluded Class Members which, if satisfied, allow Defendants to terminate the Settlement. (*Id.*) Because the Court is satisfied that a second opt-out period is not necessary in this case, it need not review the agreement to determine whether there is any public—or class member—interest in the disclosure of its terms. *See Hefler v. Wells Fargo & Co.*, 2018 WL 4207245, at *11 (N.D. Cal. Sept. 4, 2018) ("The existence of a termination option triggered by the number of class members who opt out of the Settlement does not by itself render the Settlement unfair"). This factor is neutral.

### D. Equitable Treatment of Class Members Relative to Each Other

The last factor to consider under Rule 23(e)(2) is whether "the proposal treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(D). "Matters of concern could include whether the apportionment of relief among class members takes appropriate account of differences among their claims, and whether the scope of the release may affect class members in different ways that bear on the apportionment of relief." Fed. R. Civ. P. 23 advisory committee's note to 2018 Amendment.

The Court concludes that the Settlement Agreement proposes equitable treatment of the Class Members. The Agreement sets forth a Plan of Allocation by which Class Members who have valid claims will receive funds. (Mem. at 21–23.) Under the plan, Claimants' "Recognized Loss Amounts" will be calculated differently according to which statute authorizes a Claimant's recovery (the Exchange Act or the Securities Act). (*Id.* at 22.) Losses under the Exchange Act will be calculated according to a number of factors including the shares' purchase date, whether and at what price the shares were sold, and

15

limitations on recoverable damages. (*Id.*) Losses under the Securities Act will be calculated using the statutory damages formula. (*Id.*) If recovery is available under both, the Recognized Loss Amount will be the greater of the two calculations. (*Id.*)

Following the calculation of each Claimant's Recognized Loss Amount, they will receive a *pro rata* share of the Net Settlement Fund according to the percentage of their Recognized Loss Amount out of the total of all Claimants' Recognized Loss Amounts. (*Id.* at 22–23.) Having reviewed this Plan of Allocation, the Court finds that it does not favor certain class members.

Lastly, Class Counsel notes that they may request costs associated with compensating the named class representatives. (*Id.* at 19 n.15.) The Court reserves any ruling on an award of such costs until they have been submitted to the Court for approval.

Overall, the treatment of Class Members relative to each other warrants preliminary approval.

### E.  Conclusion as to Preliminary Approval

Considering the factors established by Rule 23(e), the Court preliminarily concludes that the Settlement Agreement is fair, reasonable, and adequate, and appears to be the product of serious, informed, non-collusive negotiations. The Court will preliminarily APPROVE the proposed Settlement.

### IV.  SETTLEMENT ADMINISTRATOR

The parties agree to appoint Verita Global, LLC ("Verita") to serve as Settlement Administrator. (Settlement Agreement ¶ 19.) The Court previously approved Verita to serve as Class Notice Administrator. (Order Approving Class Notice, Doc. 406.) The bulk of notice and administration costs will be paid out of the Settlement Fund, while Defendants will bear the notice and administration costs required by CAFA. (Settlement Agreement ¶¶ 15, 39.) Verita has submitted a declaration stipulating that, prior to its retention as settlement administrator, it submitted a proposal setting forth its fees and expenses. (Cavallo Decl. ¶ 9.) Further, Verita represents that it will not receive any

additional revenue beyond what is detailed in the proposal, and that it does not have any financial arrangements with third parties related to the Settlement administration. (*Id.*) The Court therefore APPROVES the appointment of Verita as Settlement Administrator.

## V. CLASS NOTICE FORM AND METHOD

For a class certified under Rule 23(b)(3), "the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). Under Rule 23, the notice must include, in a manner that is understandable to potential class members: "(i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3)." Fed. R. Civ. P. 23(c)(2)(B).

The Court approves the form and method of notice. As to the method of notice, Plaintiffs propose that the Settlement administrator will:

- Mail Postcard Notice to all potential Class Members who have previously received notice or can be located through reasonable efforts.
- Post notice on the Settlement Website maintained by the Settlement Administrator
- Publish the Summary Notice in *The Wall Street Journal* and transmit it over *PR Newswire*.

(Mem. at 23.)

Given the combination of individual notice and general publication, the Court concludes that this proposed method of notice is "reasonably calculated . . . to apprise interested parties of the pendency of the action." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950). Beyond notice to Class Members, the Class Action Fairness Act of 2005 ("CAFA") requires that certain government authorities receive notice

of any class action settled in federal court. *See* 28 U.S.C. § 1715(b). The Settlement provides that the Defendants, at their own cost, will ensure compliance with this statutory obligation. (Settlement Agreement ¶ 39.)

As to the form of notice, the revised Notice contains all the information that Rule 23(c)(2)(B) requires, while the revised Postcard and Summary Notice contain the essential information and easily understandable links to the full Notice. The Court APPROVES them. (*See* Revised Notice.) The Court also APPROVES the procedure for submitting a claim form via the Settlement Website or by mail, as well as the 90-day window following notice for claim submission. (*See* Mem. at 29.)

## VI. SETTLEMENT DEADLINES

| EVENT | DEADLINE |
|---|---|
| Deadline for mailing/emailing Postcard Notice to Class Members (which date shall be the "Notice Date") and posting Notice and Claim Form on the Website | No later than 20 business days following the date of this Order. |
| Deadline for publishing the Summary Notice | No later than 10 business days after the Notice Date. |
| Deadline for filing papers supporting final approval of the Settlement, Plan of Allocation, and Class Counsel's motion for attorneys' fees and Litigation Expenses | No later than 56 calendar days prior to the Settlement Hearing. |
| Deadline for submitting objection to Settlement (receipt date) | No later than 21 calendar days prior to the Settlement Hearing. |
| Deadline for submitting Claim Forms | No later than 90 calendar days after the Notice Date. |
| Deadline for filing reply papers | No later than 14 calendar days prior to the Settlement Hearing. |
| Settlement Hearing | **May 15, 2026 at 10:30 AM** |

## VII. CONCLUSION

For the foregoing reasons, the Court GRANTS Plaintiffs' Motion for Preliminary Approval of a Class Action Settlement and authorizes dissemination of notice to the class members.

DATED: December 18, 2025

_____
HON. JOSEPHINE L. STATON
UNITED STATES DISTRICT JUDGE