**KESSLER TOPAZ
  MELTZER & CHECK, LLP**
SHARAN NIRMUL (*pro hac vice*)
snirmul@ktmc.com
280 King of Prussia Road
Radnor, PA 19807
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

*Counsel for Class Representatives Sjunde AP-Fonden and James Stephen Muhl and*
*Class Counsel for the Classes*

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| CHARLES LARRY CREWS, JR., Individually and on Behalf of All Others Similarly Situated, | Case No. 2:22-cv-01524-JLS-E |
| Plaintiffs, | **CLASS ACTION** |
| v. | **DECLARATION OF SHARAN NIRMUL IN SUPPORT OF (I) PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT AND PLAN OF ALLOCATION; AND (II) CLASS COUNSEL'S MOTION FOR ATTORNEYS' FEES AND LITIGATION EXPENSES** |
| RIVIAN AUTOMOTIVE, INC., et al., | |
| Defendants. | |

Date:       May 15, 2026
Time:       10:30 a.m.
Ctrm.:      8A, 8th Floor
Judge:      Hon. Josephine L. Staton

Case No. 2:22-cv-01524-JLS-E

NIRMUL DECL. ISO PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, & CLASS COUNSEL'S ATTORNEYS' FEES & EXPENSES

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION .................................................................................................3

II.    BACKGROUND OF THE ACTION AND THE SETTLEMENT .........................6

    A.    Summary of the Classes' Claims ...............................................................6

    B.    Commencement of the Action and Appointment of AP7 as Lead Plaintiff and Kessler Topaz as Lead Counsel .................................................10

    C.    Plaintiffs' Filing of the Consolidated Complaint........................................12

    D.    Defendants' Motions to Dismiss the Consolidated Complaint and the Court's Ruling Thereon.................................................13

    E.    Plaintiffs' Filing of the Operative Amended Complaint.............................19

    F.    Defendants' Motions to Dismiss the Amended Complaint, the Court's Ruling Thereon, and Defendants' Answer........................................20

    G.    The Parties Extensive Discovery Efforts ..................................................22

        1.    Rule 26(f) Report, Initial Disclosures, Protective Order, and ESI Protocol ...................................................23

        2.    Plaintiffs' Discovery Propounded on Defendants .............................24

        3.    Defendants' Discovery Propounded on Plaintiffs .............................26

        4.    The Parties' Negotiations Regarding Plaintiffs' Discovery Requests ...................................................27

        5.    Third Party Discovery.................................................................30

        6.    Plaintiffs' Discovery Motions.......................................................33

        7.    Implementation of Review Protocol and Document Review ............36

        8.    Merits Depositions ....................................................................38

    H.    Plaintiffs' Motion to Certify and the Class Notice Campaign.....................43

        1.    Plaintiffs' Motion to Certify .......................................................43

        2.    Class Notice Campaign...............................................................46

    I.    Defendants' Summary Judgment Motion and the Parties' *Daubert* Motions...................................................................47

NIRMUL DECL. ISO PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, & CLASS COUNSEL'S ATTORNEYS' FEES & EXPENSES

1.    Defendants' Summary Judgment Motion ..................................... 47

2.    The Parties' *Daubert* Motions .................................................... 49

    a)    Defendants' *Daubert* Motions............................................ 49

    b)    Plaintiffs' *Daubert* Motions ............................................. 50

J.    Work with Plaintiffs' Experts ................................................... 53

K.    Preparation for Trial ................................................................. 55

III.    THE SETTLEMENT.......................................................................... 55

A.    The Parties' Mediation and Settlement Negotiations ................ 55

B.    Preparation of Settlement Documentation and Preliminary Approval Motion ..................................................................................... 56

IV.    RISKS OF CONTINUED LITIGATION AND DAMAGES .............. 57

A.    Risks to Establishing Defendants' Liability............................... 58

B.    Risks Concerning Loss Causation and Damages ........................ 61

C.    Jury Risks and Risks on Appeal................................................ 63

D.    Insolvency Risk for Rivian ....................................................... 64

E.    Estimated Damages .................................................................. 64

V.    COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER AND REACTION OF THE CLASSES TO DATE ................. 65

VI.    THE PROPOSED PLAN OF ALLOCATION IS FAIR, REASONABLE, AND ADEQUATE ............................................................................. 68

VII.    CLASS COUNSEL'S FEE AND EXPENSE APPLICATION ............ 72

A.    The Fee Request Is Fair and Reasonable and Warrants Approval................ 73

1.    Plaintiffs Have Authorized and Support the Fee Request ................. 73

2.    The Favorable Settlement Achieved........................................ 73

3.    The Time and Labor Devoted to the Action ...................................... 74

4.    The Experience and Standing of Plaintiffs' Counsel......................... 76

5.    The Standing and Caliber of Defendants' Counsel .......................... 76

NIRMUL DECL. ISO PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, & CLASS COUNSEL'S ATTORNEYS' FEES & EXPENSES

6.    The Risks of Litigation and Need to Ensure Availability of Competent Counsel in High-Risk Contingent Securities Cases .........77

7.    The Reaction of the Classes to the Fee Request ...............................78

B.    Class Counsel's Request for Litigation Expenses Is Fair and Reasonable and Warrants Approval ..............................................................79

1.    Class Counsel Seeks Payment of Plaintiffs' Counsel's Reasonable and Necessary Litigation Expenses from the Settlement Fund ...............................................................................79

2.    Reimbursement to Plaintiffs Is Fair and Reasonable.........................82

VIII.   CONCLUSION.................................................................................................83

NIRMUL DECL. ISO PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, & CLASS COUNSEL'S ATTORNEYS' FEES & EXPENSES

I, Sharan Nirmul, hereby declare as follows pursuant to 28 U.S.C. § 1746:

1.    I am a partner at the law firm of Kessler Topaz Meltzer & Check, LLP ("Kessler Topaz" or "Class Counsel"), counsel for Court-appointed Class Representatives Sjunde AP-Fonden ("AP7") and James Stephen Muhl ("Muhl" and together with AP7, "Class Representatives" or "Plaintiffs") and the Court-certified Classes in the above-captioned action ("Action").[1] I am admitted *pro hac vice* in this matter. I have actively supervised and participated in the prosecution and resolution of the Action and have personal knowledge of the matters set forth herein.

2.    I respectfully submit this Declaration in support of Plaintiffs' motion pursuant to Rule 23(e) of the Federal Rules of Civil Procedure ("Rule") for final approval of the proposed $250,000,000 cash settlement ("Settlement") with defendants Rivian Automotive, Inc. ("Rivian" or the "Company"), Robert J. Scaringe, Claire McDonough, Jeffrey R. Baker,[2] Karen Boone, Sanford Schwartz, Rose Marcario, Peter Krawiec, Jay Flatley, Pamela Thomas-Graham,[3] Morgan Stanley & Co. LLC, Goldman Sachs & Co., LLC, J.P. Morgan Securities LLC, Barclays Capital Inc., Deutsche Bank Securities Inc., Allen & Company LLC, BofA Securities, Inc., Mizuho Securities USA LLC, Wells Fargo Securities, LLC, Nomura Securities International, Inc., Piper Sandler & Co., RBC Capital Markets, LLC, Robert W. Baird & Co. Inc., Wedbush Securities Inc., Academy Securities, Inc., Blaylock Van, LLC, Cabrera Capital Markets LLC, C.L. King & Associates, Inc., Loop Capital Markets LLC, Samuel A. Ramirez & Co., Inc., Siebert Williams Shank &

---

[1]    Capitalized terms have the meanings ascribed in the Stipulation and Agreement of Settlement, dated October 23, 2025 ("Stipulation" or "Stip."). Dkt. No. 750-3.

[2]    Defendants Robert J. Scaringe ("Scaringe"), Claire McDonough ("McDonough"), and Jeffrey R. Baker ("Baker") are referred to herein as the "Executive Defendants."

[3]    Defendants Karen Boone ("Boone"), Sanford Schwartz ("Schwartz"), Rose Marcario ("Marcario"), Peter Krawiec ("Krawiec"), Jay Flatley ("Flatley"), and Pamela Thomas-Graham ("Thomas-Graham") are referred to herein as the "Director Defendants." Collectively, Rivian, the Executive Defendants and the Director Defendants are referred to as the "Rivian Defendants."

NIRMUL DECL. ISO PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, & CLASS COUNSEL'S ATTORNEYS' FEES & EXPENSES

Co., LLC, and Tigress Financial Partners LLC[4] (collectively, "Defendants"). If approved, the Settlement will resolve all claims asserted in the Action against Defendants and the other Released Defendant Parties on behalf of the following Classes: (i) **For 1934 Act Claims**: All persons and entities who purchased or otherwise acquired Rivian Class A common stock between November 11, 2021, and March 10, 2022, inclusive, and were damaged thereby;[5] and (ii) **For 1933 Act Claims**: All persons and entities who purchased or otherwise acquired Rivian Class A common stock between November 10, 2021, and March 10, 2022, inclusive, and were damaged thereby.[6] The Court preliminarily approved the Settlement and directed notice thereof to the Classes by Order dated December 18, 2025 ("Preliminary Approval Order"). Dkt. No. 758.

3.    I also respectfully submit this Declaration in support of: (i) the proposed plan for allocating the net proceeds of the Settlement to eligible Class Members ("Plan of Allocation" or "Plan"); and (ii) Class Counsel's motion, on behalf of Plaintiffs' Counsel,[7] for an award of attorneys' fees in the amount of 24% of the Settlement Fund, payment of

---

[4]    Defendants Morgan Stanley & Co. LLC ("Morgan Stanley"), Goldman Sachs & Co., LLC ("Goldman Sachs"), J.P. Morgan Securities LLC ("J.P. Morgan"), Barclays Capital Inc. ("Barclays"), Deutsche Bank Securities Inc. ("Deutsche Bank"), Allen & Company LLC ("Allen & Company"), BofA Securities, Inc. ("BofA"), Mizuho Securities USA LLC ("Mizuho"), Wells Fargo Securities, LLC ("Wells Fargo"), Nomura Securities International, Inc. ("Nomura"), Piper Sandler & Co. ("Piper Sandler"), RBC Capital Markets, LLC ("RBC"), Robert W. Baird & Co. Inc. ("Robert W. Baird"), Wedbush Securities Inc. ("Wedbush"), Academy Securities, Inc. ("Academy"), Blaylock Van, LLC ("Blaylock Van"), Cabrera Capital Markets LLC ("Cabrera"), C.L. King & Associates, Inc. ("C.L. King"), Loop Capital Markets LLC ("Loop"), Samuel A. Ramirez & Co., Inc. ("Samuel A. Ramirez"), Siebert Williams Shank & Co., LLC ("Siebert Williams Shank"), and Tigress Financial Partners LLC ("Tigress") are referred to herein as the "Underwriter Defendants."

[5]    The Class with respect to the 1934 Act Claims does not include those who purchased Rivian Class A common stock on November 10, 2021 at the fixed IPO price.

[6]    The persons and entities specifically excluded from the Classes are set forth in Paragraph 1(j) of the Stipulation. Also excluded from the Classes are the persons and entities who or which excluded themselves from the Classes pursuant to Class Notice as listed in Exhibit D to the March 24, 2025 Declaration of Lance Cavallo. Dkt. No. 504-1.

[7]    "Plaintiffs' Counsel" refers to: (i) Class Counsel Kessler Topaz; and (ii) Court-appointed Liaison Counsel, Larson LLP ("Larson").

NIRMUL DECL. ISO PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, & CLASS COUNSEL'S ATTORNEYS' FEES & EXPENSES

Plaintiffs' Counsel's Litigation Expenses in the total amount of $6,463,082.98 (plus interest), and in accordance with the Private Securities Litigation Reform Act of 1995 ("PSLRA"), reimbursement to Plaintiffs in the total amount of $95,899.50 for their costs incurred in connection with representing the Classes in the Action ("Fee and Expense Application"). *See infra* Section VII.

4.    For the reasons discussed below and in the accompanying memoranda,[8] I respectfully submit that: (i) the terms of the Settlement are fair, reasonable, and adequate in all respects and should be approved by the Court; (ii) the proposed Plan of Allocation is fair, reasonable, and adequate and should be approved by the Court; and (iii) the Fee and Expense Application is fair, reasonable, supported by the facts and the law, and should be granted in full. The Settlement, Plan of Allocation, and Fee and Expense Application have the full support of Plaintiffs—experienced investors that actively supervised the prosecution and resolution of this Action.[9]

## I.    INTRODUCTION

5.    Following over three years of extensive litigation efforts, and aided by arm's-length negotiations facilitated by a former federal judge and accomplished mediator, the Honorable Layn R. Phillips (Ret.) ("Judge Phillips"), Plaintiffs have achieved a cash settlement in the amount of $250,000,000 from Defendants.[10] As provided for in the Stipulation, in exchange for this consideration, the Settlement resolves all claims asserted in the Action by Plaintiffs and the Classes against Defendants and the other Released

---

[8]    In conjunction with this Declaration, Plaintiffs and Class Counsel are submitting: (i) the Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation ("Settlement Memorandum"); and (ii) the Memorandum of Points and Authorities in Support of Class Counsel's Motion for Attorneys' Fees and Litigation Expenses ("Fee and Expense Memorandum").

[9]    *See* Declaration of Hans Bergström on behalf of AP7 ("Bergström Decl.") and Declaration of James Stephen Muhl ("Muhl Decl.") attached hereto as Exhibits 1 and 2, respectively.

[10]    The Settlement was fully funded on January 21, 2026. The Settlement Amount is currently being held in the Escrow Account and earning interest for the Classes.

NIRMUL DECL. ISO PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, & CLASS COUNSEL'S ATTORNEYS' FEES & EXPENSES

Defendants' Parties.[11]

6.      From its inception, this Action was actively and vigorously litigated by the Parties. At the time of settlement in September 2025, the Parties had fully briefed Defendants' summary judgment motion, were briefing *Daubert* motions and were preparing for oral argument. Dkt. Nos. 749-50. Our litigation efforts preceding the Settlement were extensive and included, *inter alia*: (i) conducting an extensive investigation into the Classes' claims—including a detailed review of publicly available information, interviews with former Rivian employees, and consultation with experts; (ii) researching and preparing two detailed complaints, including the operative Amended Consolidated Complaint for Violations of the Federal Securities Laws (Dkt. No. 150) ("Amended Complaint");[12] (iii) defeating Defendants' motions to dismiss the Amended Complaint in their entirety; (iv) engaging in comprehensive fact and expert discovery, which included taking or defending 48 fact and expert depositions, analyzing over 3.5 million pages of documents produced by Defendants and third parties, and exchanging 15 opening and rebuttal expert reports; (v) successfully moving for class certification and overseeing an extensive Class Notice campaign; (vi) briefing Defendants' summary judgment motion and the Parties' seven motions seeking to exclude expert testimony; and (vii) beginning to prepare for trial. As a result of these efforts (and others), Class Counsel had a deep understanding of the strengths and weaknesses of the Class's claims at the time Judge Phillips issued his

---

[11]      As defined in Paragraph 1(ll) of the Stipulation, "Released Defendant Parties" means Defendants and each and all of their present and former subsidiaries, divisions, controlling persons, associates, entities, and affiliates, and each and all of their respective present and former employees, members, partners, principals, officers, directors, controlling shareholders, agents, attorneys, advisors (including financial or investment advisors), accountants, auditors, consultants, underwriters, investment bankers, commercial bankers, entities providing fairness opinions, general or limited partners or partnerships, limited liability companies, members, joint ventures, and insurers and reinsurers of each of them; as well as the predecessors, successors, assigns, estates, immediate family members, spouses, heirs, executors, trusts, trustees, administrators, agents, legal or personal representatives, assigns, and assignees of each of them, in their capacity as such.

[12]      "¶_" and "¶¶__" refers to paragraphs in the Amended Complaint.

NIRMUL DECL. ISO PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, & CLASS COUNSEL'S ATTORNEYS' FEES & EXPENSES

mediator's recommendation to resolve the Action for $250 million.

7.      In agreeing to settle the Action, Plaintiffs carefully considered the significant risks associated with continued litigation. While Plaintiffs and Class Counsel believed the Classes' claims were meritorious and supported by substantial evidence developed during discovery, they also understood that the Court could grant, in whole or in part, Defendants' summary judgment motion and/or *Daubert* motions—which were pending at the time of settlement), or that a trial of the claims in the Action could have precluded *any* recovery for the Classes, let alone one greater than the Settlement Amount.

8.      Ultimately, the facts necessary to prove Plaintiffs' theory of liability and to establish damages for this case rested on internal Rivian documents, testimony from current and former Rivian employees, other third parties, the Underwriter Defendants, and expert testimony and opinion, and presented complexities that could have been misconstrued, misunderstood, or simply interpreted by a jury in ways unhelpful to Plaintiffs' case. Plaintiffs and Class Counsel understood that they would be required to prove all elements of Plaintiffs' claims to prevail, while Defendants only needed to succeed on one defense to potentially defeat the entire Action. At all stages of the case, Defendants vigorously denied any wrongdoing and would continue to do so had the Action continued.

9.      Class Counsel believes that the Settlement, particularly when viewed in the context of the risks, uncertainties, and delays of continued litigation, is an excellent result for the Classes. If approved, the Settlement will provide a guaranteed recovery to eligible Class Members and conclude this complex Action in its entirety. Further, based on Plaintiffs' damages expert's estimates of maximum class-wide damages in the Action, the Settlement represents approximately 12.3% to 13.4% of the Classes' potential aggregate damages—a favorable recovery reflecting the informed assessment of Plaintiffs and Class Counsel regarding the strength of the Classes' claims and the risks of litigating this complex Action through a ruling on Defendants' summary judgment motion, trial, and post-trial appeals. The fact that the Settlement Amount was the product of a mediator's recommendation (following settlement discussions spanning nearly a year) provides further

NIRMUL DECL. ISO PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, & CLASS COUNSEL'S ATTORNEYS' FEES & EXPENSES

support for its reasonableness.[13]

10. Class Counsel has worked with the Court-approved Claims Administrator, Verita Global, LLC ("Verita"), to disseminate notice of the Settlement to Class Members as directed in the Preliminary Approval Order. As of March 18, 2026, Verita has disseminated 1,108,907 Postcard Notices and 531 Notice Packets to potential Class Members and their Nominees.[14] Additionally, Verita posted the Notice and Claim Form, along with other relevant documents, on the Website for the Action (www.RivianSecuritiesLitigation.com), updated the toll-free telephone number (1-888-298-2026) with information about the Settlement, and caused the Summary Notice to be published in *The Wall Street Journal* and transmitted over *PR Newswire*. Cavallo Decl., ¶¶ 11-14. Thus far, the Classes' reaction to the Settlement has been positive. As ordered by the Court and stated in the notices, the deadline for objecting to the Settlement or any aspect thereof is April 24, 2026. To date, there has been only one objection received.[15]

## II. BACKGROUND OF THE ACTION AND THE SETTLEMENT

### A. Summary of the Classes' Claims

11. The Classes' claims in the Action are fully set forth in the Amended Complaint

---

[13] While each securities class action reflects its own unique risks, the recovery obtained here compares favorably to recoveries achieved and approved in other securities class actions. *See, e.g.*, *Jiangchen v. Rentech, Inc.*, 2019 WL 5173771, at *9 (C.D. Cal. Oct. 10, 2019) (finding settlement was a "favorable outcome" where settlement represented 10% of total maximum damages); *In re Biolase, Inc. Sec. Litig.*, 2015 WL 12720318, at *4 (C.D. Cal. Oct. 13, 2015) (Staton, J.) (noting settlement representing "approximately 8% of the maximum recoverable damages . . . equals or surpasses the recovery in many other securities class actions"); *In re OmniVision Techs., Inc.*, 559 F. Supp. 2d 1036, 1046 (N.D. Cal. 2008) (noting recovery of "approximately 9% of the possible damages" was "more than triple the average recovery in securities class action settlements").

[14] *See* Declaration of Lance Cavallo Regarding: (A) Dissemination of Postcard Notice and Notice Packet; (B) Publication of Summary Notice; (C) Update to Telephone Helpline and Case Website; and (D) Report on Objections Received to Date ("Cavallo Decl."), ¶ 9, submitted herewith.

[15] The objection from Andrey Savov is attached to the Cavallo Decl. as Exhibit D. *See infra* Section VI.

NIRMUL DECL. ISO PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, & CLASS COUNSEL'S ATTORNEYS' FEES & EXPENSES

filed on March 2, 2023. Dkt. No. 150.[16] The Amended Complaint asserts: (i) claims against Rivian and the Executive Defendants under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), and the rules and regulations promulgated thereunder, including United States Securities and Exchange Commission ("SEC") Rule 10b-5; (ii) claims against Rivian and the Executive Defendants under Section 20(a) of the Exchange Act; (iii) claims against the Rivian Defendants and Underwriter Defendants under Section 11 of the Securities Act of 1933 ("Securities Act"); (iv) claims against the Underwriter Defendants under Section 12 of the Securities Act; and (v) claims against the Rivian Defendants under Section 15 of the Securities Act.

12. As background, prior to and during the Class Period, Rivian promised prospective customers one of two "category defining" "flagship" electric vehicles ("EVs")—an all-electric pickup truck dubbed the R1T and a full-size sport utility vehicle dubbed the R1S (together referred to as the "R1 Platform" or "R1"). ¶¶ 47-67. Both the R1T and R1S included quad-motors (i.e., one motor for each of the vehicles' wheels), a state-of-the-art battery that delivered roughly 300 miles of range, and luxurious interior and exterior finishes. ¶¶ 61-65. Rivian initially set the R1T and R1S retail prices at $69,000 and $72,500, respectively, and accepted preorders immediately in exchange for a refundable $1,000 deposit. ¶¶ 65-67. Then, in 2020, on the heels of EV industry leader Tesla's announcement of its own all-electric pickup truck, Rivian reduced the base prices for the R1T and R1S to $67,500 and $70,000, respectively. ¶¶ 85-87. Notably, the R1's price reduction did not come with a corresponding reduction in the vehicles' touted features. *Id.* By the time of its November 2021 Initial Public Offering ("IPO"), Rivian had received over 55,000 R1 pre-orders. ¶¶ 4-5, 100, 140.

13. The Amended Complaint alleges that, by the time of the IPO, Rivian understood that the publicly announced R1 pricing could not support Rivian's business

---

[16] All facts and allegations referenced in this Section are derived from the Amended Complaint and based on Plaintiffs' allegations. Paragraph references included in this Section are to the Amended Complaint.

NIRMUL DECL. ISO PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, & CLASS COUNSEL'S ATTORNEYS' FEES & EXPENSES

model, as the cost of the R1's bill of materials ("BOM")—i.e., the thousands of parts required to build each vehicle—significantly exceeded the R1's retail prices. ¶¶ 113-21. This meant that the revenues Rivian generated from the 55,000 pre-orders could not even cover the cost of the materials used to build those vehicles, let alone allow Rivian to recoup its significant investments in vehicle technology, manufacturing capacity, charging infrastructure, and other fixed costs. *Id.* The Amended Complaint further alleges that, by the time of the IPO, senior Rivian executives internally conceded that Rivian would need to raise R1 prices, but they consciously waited until *after* the IPO to do so. ¶¶ 122-23.

14. Plaintiffs claim that Defendants violated the federal securities laws by issuing materially false and misleading statements related to the pricing of Rivian's R1T and R1S vehicles during the Class Period. ¶¶ 124-40, 156-71, 294-312. Rivian's and the Executive Defendants' alleged misstatements and omissions were made in the Company's IPO Registration Statement and Prospectus ("Registration Statement"), 3Q21 Form 10-Q, a Shareholder Letter, and Rivian's 3Q21 earnings call with analysts and investors. ¶¶ 124-40, 156-71. Rivian and the Executive Defendants' alleged misstatements and omissions were made in the Company's IPO Registration Statement. ¶¶ 124-40, 294-312.

15. More specifically, Plaintiffs claim that, despite Rivian knowing that a material price increase in the R1 Platform was necessary for it to ever become profitable, its Registration Statement—which investors were told to *exclusively* rely upon in making their decision to invest in Rivian—failed to disclose the need for a price increase. ¶¶ 157-63, 294-312. Instead, as Plaintiffs allege, the Registration Statement misleadingly warned investors that Rivian **could** suffer financial harm **if** its material costs increased and **if** it had to increase R1 retail prices. *Id.* Plaintiffs allege that the Registration Statement also misleadingly informed investors that Rivian's profitability hinged upon its ability to increase production volumes, by asserting that Rivian expected to generate "a negative gross profit per vehicle for the near term ***as our fixed costs from investments in vehicle technology, manufacturing capacity, and charging infrastructure are spread across a smaller product base until we launch additional vehicles and ramp production***." ¶¶ 159,

296. Rivian's Registration Statement also stated that, over the long term, it expected to "*generate positive gross profit as production utilization increases and we leverage our investments*." ¶¶ 160, 297. All of the Rivian and Underwriter Defendants were involved in preparing the Registration Statement. ¶¶ 264-65.

16.     Plaintiffs further allege that Rivian and the Executive Defendants made substantially similar material misrepresentations and omissions about R1 Platform pricing in its 3Q21 Form 10-Q and Shareholder Letter, and likewise, that Defendants McDonough and Scaringe made material misrepresentations and omissions about R1 Platform pricing during Rivian's 3Q21 earnings call on December 16, 2021. ¶¶ 164-71. Specifically, during Rivian's 3Q21 earnings call, McDonough told investors that, "given the inflationary market backdrop, we also continue to evaluat[e] the pricing for our vehicle[s]." ¶ 165. Later in the call, in response to an analyst question about R1 pricing, Scaringe attributed Rivian's pricing evaluations to increased demand for the R1 vehicles, stating: "Now with regards to pricing, it's certainly the backdrop of inflation that we're seeing and the very strong demand for products not just looking our product (inaudible) broadly within the electrified space has caused us to look at our pricing . . . ." ¶ 167.

17.     The Amended Complaint asserts that Defendants' alleged conduct and relatedly, their allegedly false or misleading statements and omissions during the Class Period, artificially inflated the price of Rivian Class A common stock. ¶¶ 172-74. As a result, Class Members, including Plaintiffs, who purchased Rivian Class A common stock at artificially inflated prices during the Class Period allegedly suffered damages when the inflation was removed from Rivian's stock price following three disclosures that partially corrected or reflected the materialization of risks concealed by Defendants' alleged misstatements and omission:

- **March 1, 2022**: Rivian publicly announced the price increases that it had privately discussed prior to the IPO: the R1T price would jump roughly from $67,500 to $79,500, and the R1S price roughly from $70,000 to $84,500. ¶ 175. Rivian stated that the price increases were the result of "inflationary pressure on the cost of

NIRMUL DECL. ISO PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, & CLASS COUNSEL'S ATTORNEYS' FEES & EXPENSES

supplier components and raw materials across the world" and would apply not just to *future* orders, but also to virtually all *existing* pre-orders. ¶¶ 142, 175, 177. Rivian also announced downgraded options and increased prices for "certain options, upgrades and accessories." ¶ 175.

- **March 3, 2022**: Following intense backlash to the price increase, Rivian reversed course and announced that the price increase would not apply to pre-orders made before March 1, 2022. ¶ 182. A report from RBC stated that "[t]he roll-back on pricing is costing [Rivian] ~$850mm in revenue (assuming no cancellations) . . . ." *Id.*

- **March 10, 2022**: When Rivian released its 4Q21 financial results, the market finally learned the full extent to which Rivian's long-term financial prospects had been impacted by its previously undisclosed need to reprice its R1 vehicles. ¶ 185. Rivian projected an adjusted EBITDA for FY2022 of ($4,750 million) and reported that it would face negative gross margins. *Id.*

18.     The Amended Complaint asserts that, in response to the foregoing disclosures, the price of Rivian Class A common stock declined significantly, falling from $67.56 per share at the close of trading on February 28, 2022, to $35.83 per share at the close of trading on March 14, 2022—less than half of the $78 IPO share price. ¶¶ 178, 184, 186.

**B.      Commencement of the Action and Appointment of AP7 as Lead Plaintiff and Kessler Topaz as Lead Counsel**

19.     On March 7, 2022, a class action complaint, styled *Crews v. Rivian Automotive, Inc., et al.*, No. 2:22-cv-01524-RGK, was filed in the United States District Court for the Central District of California, asserting violations of Section 11 of the Securities Act against Rivian, Scaringe, McDonough, the Director Defendants, and the Underwriter Defendants, on behalf of persons and entities that acquired Rivian Class A common stock pursuant to or traceable to Rivian's IPO. Dkt. No. 1. That day, notice was published in *Globe Newswire* regarding the pendency of the *Crews* complaint. Dkt. No. 56-5. The notice advised putative class members of a May 6, 2022 deadline to move

NIRMUL DECL. ISO PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, & CLASS COUNSEL'S ATTORNEYS' FEES & EXPENSES

for appointment as lead plaintiff in accordance with the PSLRA. *Id.*

20. On March 8, 2022, the case was assigned to the Honorable Gary Klausner ("Judge Klausner"). Dkt. No. 11.

21. Soon thereafter, two related complaints were filed against the same defendants, asserting the same Section 11 claims as well as claims under Section 15 of the Securities Act and Sections 10(b) and 20(a) of the Exchange Act. *See Horvath v. Rivian Automotive, Inc., et al.*, No. 8:22-cv-0444-RGK; *Smith v. Rivian Automotive, Inc., et al.*, No. 8:22-cv-00829-RGK.

22. On May 6, 2022, AP7 moved the Court for: (i) consolidation of the related actions pursuant to Rule 42(a); (ii) appointment as lead plaintiff pursuant to the PSLRA, 15 U.S.C. §§ 77z-1(a)(3)(B) and 78u-4(a)(3)(B); and (iii) approval of AP7's selection of Kessler Topaz to serve as lead counsel for the class and Larson to serve as liaison counsel. Dkt. No. 56. By its motion, AP7 asserted, among other things, that it was the "most adequate plaintiff" under the PSLRA as it "believe[d] that it ha[d] the 'largest financial interest'" in the litigation and satisfied the typicality and adequacy requirements of the Federal Rules of Civil Procedure. *See id.*; *see also* Dkt. No. 92 (AP7 asserting it suffered over $17.4 million in losses).

23. In addition to AP7's motion, 11 other motions for consolidation and appointment as lead plaintiff were filed. *See* Dkt. Nos. 32, 36, 42, 44, 46, 50, 54, 58, 61-62, 88. Three movants subsequently withdrew their motions, and six movants filed notices of non-opposition. *See* Dkt. Nos. 68, 72, 73, 76, 81, 82, 84, 88, 90. In addition, since Charles Crews never filed a motion of withdrawal, opposition, or non-opposition, the Court deemed Crews to have consented to the denial of his motion. *See* Dkt. No. 111. The remaining motion was filed by a group of state-run investment funds, comprised of the Office of the Treasurer as Trustee for the Connecticut Retirement Plans and Trust Funds, the New Mexico State Investment Council, and the Indiana Public Retirement System (collectively, the "State Systems"). Dkt. No. 54.

24. Following briefing by AP7 and the State Systems (*see* Dkt. Nos. 92-93, 98-

NIRMUL DECL. ISO PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, & CLASS COUNSEL'S ATTORNEYS' FEES & EXPENSES

99), on July 1, 2022, the Court: (i) consolidated the three actions for all purposes including trial; (ii) appointed AP7 as Lead Plaintiff for the putative claims; and (iii) appointed Kessler Topaz and Larson as Lead Counsel and Local Counsel, respectively. Dkt. No. 111. On July 7, 2022, the Court ordered AP7 to file a consolidated complaint by July 22, 2022. Dkt. No. 118.

### C.    Plaintiffs' Filing of the Consolidated Complaint

25.    Even before being appointed Lead Counsel, and while AP7's motion for appointment as Lead Plaintiff was pending, Class Counsel had already begun a thorough investigation into the facts underlying the Action.

26.    As part of this investigation, Class Counsel, prior to filing the Consolidated Complaint for Violations of the Federal Securities Laws (Dkt. No. 125) ("Consolidated Complaint"), reviewed an extensive number of publicly available documents, including: (i) Rivian's public filings with the SEC; (ii) press releases, publicly available presentations, interviews, and other public statements issued by the Rivian Defendants; (iii) securities and financial analysts' reports about Rivian; (iv) media and news reports related to Rivian; (v) transcripts of Rivian's earnings and other investor conference calls; (vi) filings in other litigation against Rivian; (vii) analysis by economic experts of the movement and pricing of Rivian publicly traded common stock; and (viii) other publicly available information concerning Rivian and the Rivian Defendants.

27.    In addition to reviewing documents, Class Counsel dedicated substantial time and resources to locating and interviewing Rivian's former employees ("FEs"). Class Counsel, through and in conjunction with its experienced in-house investigators, contacted or attempted to contact 239 potential witnesses and conducted 93 interviews. Class Counsel ultimately incorporated information provided from three such former Rivian employees into the Consolidated Complaint, identified therein as FE-1, FE-2, and FE-3. Dkt. No. 125 ¶¶ 36-38, 78-82, 84-89, 95, 235-38, 240-46.

28.    Moreover, Class Counsel conducted extensive legal research before filing the Consolidated Complaint to understand exactly which theories of liability AP7 could allege

NIRMUL DECL. ISO PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, & CLASS COUNSEL'S ATTORNEYS' FEES & EXPENSES

and how to allege them given the current state of the law. For instance, Class Counsel comprehensively researched the law related to standards for pleading securities fraud in the Ninth Circuit.

29. Furthermore, Class Counsel conducted research into the alleged misconduct by Rivian as detailed in a lawsuit, *Schwab v. Rivian Automotive, LLC*, No. 30-2021-01229809 (Cal. Super. Ct. Nov. 4, 2021), filed by a former employee, Laura Schwab ("Schwab"), in California State Court in Orange County on November 4, 2021, and in a Statement of Claims to the American Arbitration Association, *Schwab v. Rivian Automotive, LLC*, AAA No. 01-21-0017-2003. Schwab, who served as Rivian's Vice President ("VP") of Sales and Marketing from November 30, 2020 through October 15, 2021, when she was terminated by the Company, sued Rivian for gender discrimination, unlawful retaliation, wrongful termination, unfair termination, and unfair competition. Schwab also alleged that, starting in the spring of 2021, she "started to raise the alarm about concerns she had relating to Rivian's ability to deliver on its promises to investors," alleging, in particular, that Rivian's vehicles were underpriced. Class Counsel researched whether information from Schwab's allegations could be included as part of this Action.

30. Finally, Class Counsel conducted research into Rivian's R1 Platform manufacturing and pricing strategy, and the IPO offering documents.

31. Based upon Class Counsel's thorough investigation and research, Lead Plaintiff AP7 and additional plaintiff James Stephen Muhl, who purchased shares of Rivian Class A common stock in the IPO from Defendant Morgan Stanley, filed the 83-page Consolidated Complaint on July 22, 2022, detailing Defendants' alleged violations of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder; and Sections 11, 12(a)(2), and 15 of the Securities Act. Dkt. No. 125.

**D.    Defendants' Motions to Dismiss the Consolidated Complaint and the Court's Ruling Thereon**

32. In accordance with Local Rule 7-3, counsel for Defendants met and conferred with Class Counsel on July 27, 2022, regarding their forthcoming motion to dismiss. *See*

NIRMUL DECL. ISO PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, & CLASS COUNSEL'S ATTORNEYS' FEES & EXPENSES

Dkt. Nos. 135-36. The Parties were unable to resolve the motions. *See id.*

33. On August 29, 2022, Defendants moved to dismiss the Consolidated Complaint. *Id.* The Rivian Defendants filed their motion ("Rivian's First Motion to Dismiss"), pursuant to Rule 12(b)(6), along with a supporting memorandum, 24 exhibits and a request for judicial notice. Dkt. No. 135. The Underwriter Defendants' motion ("Underwriters' First Motion to Dismiss") was also filed pursuant to Rule 12(b)(6), along with a supporting memorandum. Dkt. No. 136.

34. In Rivian's First Motion to Dismiss, the Rivian Defendants argued that the Consolidated Complaint should be dismissed with prejudice because it failed to state a claim under the pleading requirements of Rule 9(b) and the PSLRA. Dkt. No. 135. More specifically, the Rivian Defendants asserted, *inter alia*, that: (i) Plaintiffs failed to adequately allege facts that the Registration Statement was materially false or misleading because Rivian had "[c]orrectly [d]isclosed [n]egative [p]rofits"; (ii) Plaintiffs failed to allege an undisclosed known trend because Rivian had "repeatedly disclosed its rising operating expenses" as well as particularized facts that "Rivian knew it was experiencing a trend of increasing component costs"; (iii) Plaintiffs failed to adequately allege that the December 2021 statements about Rivian's 3Q21 results were false or misleading because rising commodity prices and inflation were influencing pricing decisions; (iv) Plaintiffs failed to adequately allege a strong inference of scienter based on FE allegations, Schwab's allegations in a separate lawsuit made before the IPO, and the core operations theory of scienter; (v) Plaintiffs failed to plead a violation of Section 11 of the Securities Act because there was no false or misleading statement; and (vi) Plaintiffs' Section 20(a) claim and Section 15 claim should be dismissed for Plaintiffs' failure to state claims under Sections 10(b) and 11. *Id.*

35. In the Underwriters' First Motion to Dismiss, the Underwriter Defendants also argued that the Consolidated Complaint should be dismissed with prejudice because it failed to state a claim under Rule 9(b) and the PSLRA. Dkt. No. 136. More specifically, the Underwriter Defendants argued, *inter alia*, that: (i) Plaintiffs failed to adequately allege

14                                                    Case No. 2:22-cv-01524-JLS-E

facts showing that the Registration Statement contained a material misrepresentation or omission under Section 11 of the Securities Act because the Registration Statement did not suggest that the "large upfront fixed costs spread across a small initial product base was the 'only' reason for the company's negative margins"; (ii) Plaintiffs failed to adequately allege violations of Items 105 and 303 of Regulation S-K because (a) there was no requirement that the Registration Statement make detailed disclosures about Rivian's cost of goods sold, profits, and margins, and (b) Rivian's short operating history meant that "there could not have been any known 'trend' required to be disclosed"; and (iii) Plaintiff Muhl failed to adequately allege a Section 12(a)(2) claim because (a) there was no underlying false or misleading statement, and (b) the Consolidated Complaint did not adequately allege that the Underwriter Defendants were "sellers" of Rivian securities. *Id.*

36.     Upon receiving Defendants' motions to dismiss, Class Counsel reviewed and analyzed the supporting briefing, accompanying exhibits, and the legal authority cited therein. Class Counsel also conducted legal and factual research into Defendants' arguments and Plaintiffs' responses thereto. On September 12, 2022, Plaintiffs filed oppositions to Defendants' respective motions to dismiss, citing numerous authorities to support their contentions and distinguishing key authorities that Defendants cited in support of their motions. Dkt. Nos. 138-39.

37.     In their opposition to Rivian's First Motion to Dismiss, Plaintiffs vigorously defended their allegations and argued that they adequately alleged falsity and scienter under the Exchange Act. Dkt. No. 138. More specifically, Plaintiffs asserted, *inter alia*, that: (i) the Rivian Defendants ignored the well-pled allegations of falsity and improperly relied on extraneous materials (not part of the Consolidated Complaint) to rebut Plaintiffs' factual assertions; (ii) the PSLRA's Safe Harbor provision did not insulate the Rivian Defendants from liability; and (iii) Plaintiffs adequately pled scienter because (a) Plaintiffs alleged facts that raised a cogent and compelling inference of scienter, (b) the Rivian Defendants failed to identify any non-fraudulent inference that could be drawn from the facts alleged in the Consolidated Complaint, (c) the Rivian Defendants' challenges to Plaintiffs' FE allegations

NIRMUL DECL. ISO PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, & CLASS COUNSEL'S ATTORNEYS' FEES & EXPENSES

fell short, as the FEs were reliable, had personal knowledge of the matters alleged in the Consolidated Complaint, and their allegations supported a strong inference of Defendants' scienter, and (d) the core operations scienter theory applied because the R1 Platform was the only Rivian product and thus was central to Rivian's profitability. *Id.*

38.    In their opposition to the Underwriters' First Motion to Dismiss, Plaintiffs vigorously defended their allegations and argued that the Consolidated Complaint adequately alleged violations of Items 303 and 105 of Regulation S-K and Sections 11 and 12(a)(2) of the Securities Act. Dkt. No. 139. They argued, *inter alia*, that: (i) Plaintiffs' Securities Act claims did not sound in fraud and thus were governed by Rule 8(a)'s negligence standard, rather than Rule 9(b)'s heightened pleading standard; (ii) Plaintiffs adequately pled that the Registration Statement omitted material facts in violation of Item 303, as the Registration Statement failed to disclose a known trend (i.e., Rivian's rising BOM costs) and that Defendants' risk disclosures did not adequately warn reasonable investors that Rivian's component prices had been increasing over time and that the negative effects on gross margin had been known for years; (iii) Plaintiffs adequately pled that the Registration Statement omitted material facts in violation of Item 105, as the Registration Statement failed to disclose facts about the R1's increasing BOM cost, the required price increases needed to achieve profitability, and the related negative impact on Rivian's margins and profitability; (iv) Plaintiffs adequately pled that the Registration Statement omitted material facts in violation of Section 11, as the Registration Statement failed to disclose facts "necessary to make the statements . . . not misleading"; (v) the alleged misstatements were not protected by the PSLRA's Safe Harbor provision or the bespeaks caution doctrine; and (vi) Plaintiffs adequately pled that the Underwriter Defendants violated Section 12(a)(2) because Plaintiff Muhl adequately alleged that they were "sellers" of Rivian securities. *Id.*

39.    In response, both the Rivian and Underwriter Defendants filed replies in support of their motions to dismiss on September 19, 2022. Dkt. Nos. 140-41.

40.    The Rivian Defendants' reply reiterated that the Consolidated Complaint

16    Case No. 2:22-cv-01524-JLS-E
NIRMUL DECL. ISO PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, & CLASS COUNSEL'S ATTORNEYS' FEES & EXPENSES

should be dismissed, arguing, *inter alia*, that: (i) Plaintiffs conceded the veracity of two statements within the IPO Prospectus initially challenged as false; (ii) Plaintiffs shifted to claiming that the IPO Prospectus contained omissions, rather than affirmative misstatements, and that the omissions were not actionable because they did not render false any affirmative statement made by the Rivian Defendants within the IPO Prospectus; (iii) Plaintiffs failed to adequately plead a violation of Item 303 because (a) Rivian's profitability metrics were internal financial projections, and Rivian had no duty to disclose such projections, and (b) Plaintiffs relied on statements made by an FE about profitability *forecasts*, whereas Item 303 requires disclosure of known trends that concern historical trends based on the "results of *operations*"; (iv) Plaintiffs failed to adequately plead falsity for the post-IPO statements because (a) Rivian disclosed that it was considering price increases due to inflation and thus did not "tr[y] to defraud anyone with a surprise price increase in March 2022," (b) Plaintiffs' argument that this disclosure was false and misleading "makes no sense" because Rivian did not have "*actual* margins" and thus could not have attributed the price increase to saving its gross margins, and (c) the statements were protected by the PSLRA's Safe Harbor provision; and (v) Plaintiffs failed to plead scienter through a theory of recklessness. Dkt. No. 141.

41.     Likewise, the Underwriter Defendants' reply reiterated their arguments that the Consolidated Complaint should be dismissed because: (i) Rule 9(b), rather than Rule 8(a), applies to Plaintiffs' Securities Act claims; (ii) Plaintiffs failed to adequately plead a Section 11 claim because (a) Plaintiffs did not establish anything false or misleading with either of the challenged statements, and (b) Rivian satisfied the requirements of Items 105 and 303 by making sufficiently detailed disclosures; and (iii) Plaintiff Muhl failed to allege a Section 12(a)(2) violation because (a) there was no actionable Section 11 claim, and (b) he did not plausibly allege that the Underwriter Defendants either sold Rivian securities to him or solicited purchases of Rivian securities from him. Dkt. No. 140.

42.     On September 30, 2022, the Court took Defendants' motions to dismiss under submission and removed the previously scheduled hearing for October 3, 2022 from the

NIRMUL DECL. ISO PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, & CLASS COUNSEL'S ATTORNEYS' FEES & EXPENSES

calendar. *See* Dkt. No. 143.

43.    By Order dated November 14, 2022, Judge Klausner self-recused, pursuant to General Order 21-01, due to a financial conflict of interest. Dkt. No. 144. The case was reassigned to the Honorable Josephine L. Staton ("Judge Staton"). Dkt. No. 145.

44.    After consulting with Class Counsel pursuant to Local Rule 7-3, Defendants, on December 16, 2022, requested a hearing date for their motions to dismiss. Dkt. No. 147. On December 20, 2022, Plaintiffs responded to Defendants' request, asserting that oral argument was not necessary. Dkt. No. 148.

45.    By Minute Order dated February 16, 2023 ("First Motion to Dismiss Order"), the Court granted Defendants' motions to dismiss the Consolidated Complaint in their entirety. Dkt. No. 149. More specifically, the Court ruled that: (i) Plaintiffs failed to adequately allege that the five statements within the Registration Statement concerning gross margins were false or misleading because, among other reasons, the statements (a) did not create a false impression that Rivian could become profitable simply by ramping up R1 production volume, and (b) Rivian clearly indicated that it did not expect to be profitable for the foreseeable future and warned that it might not ever be profitable; (ii) Plaintiffs failed to adequately allege that the two statements made during the 3Q21 earnings call concerning inflationary pressures and price increases were false or misleading because, among other reasons, (a) increasing inflation was exacerbating costs, and (b) even if Rivian's internal forecasts showed that it would eventually have to raise R1 prices, "Rivian did not need to address all relevant considerations [to potential price increases] or disclose its internal profitability projections and pricing strategy"; (iii) Plaintiffs' Section 20(a) claims failed because Plaintiffs failed to plead an actionable violation of Section 10(b) or Rule 10b-5; (iv) Rule 9(b) applied to Plaintiffs' Section 11 claims; (v) Plaintiffs' Section 11 claims failed because Plaintiffs failed to adequately allege that the statements were false or misleading; (vi) Plaintiffs failed to adequately plead a violation of Items 105 or 303 of Regulation S-K because (a) Rivian did not need to disclose that it would increase R1 prices in the near term, and (b) there were no actual gross margins for the R1 platform until two

NIRMUL DECL. ISO PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, & CLASS COUNSEL'S ATTORNEYS' FEES & EXPENSES

months before the IPO, and as a result, there could not be a "persistent condition" that required disclosure; (vii) Plaintiff Muhl failed to adequately plead an actionable Section 12(a)(2) claim because there was no underlying violation of Section 11; and (viii) Plaintiffs failed to adequately plead an actionable Section 20(a) claim against the Executive and Director Defendants because there was no underlying violation of Sections 11 and 12. *Id.*

46.    By its First Motion to Dismiss Order, the Court also granted Plaintiffs leave to amend the complaint, judicially noticed the four documents "incorporated by reference in Plaintiffs' Consolidated Complaint," and denied Defendants' request to judicially notice 20 other documents. *Id.*

### E.    Plaintiffs' Filing of the Operative Amended Complaint

47.    While briefing the motions to dismiss, Class Counsel continued their investigation. This investigation included additional efforts to locate, interview, and memorialize interviews with former Rivian employees. In total, by the filing of the Amended Complaint, Kessler Topaz, with assistance from its in-house investigators, had collectively developed approximately 348 leads and conducted over 140 witness interviews. Class Counsel ultimately incorporated information provided from two new witnesses into the Amended Complaint, identified therein as FE-4 and FE-5, respectively. Dkt. No. 150, ¶¶ 41-42.

48.    Plaintiffs filed the 95-page Amended Complaint on March 2, 2023. Dkt. No. 150. The Amended Complaint addressed each of the deficiencies identified in the Court's First Motion to Dismiss Opinion. *See generally id.* More specifically, Plaintiffs' Amended Complaint, among other things: (i) argued that the statements from the Registration Statement were false or misleading under a materialization of risk theory, as Rivian's Registration Statement warned that BOM costs may increase in the future, but the BOM costs had *already* increased to such an extent that Rivian would need to increase R1 pricing and scaling up production would not lead to profitability; (ii) added allegations from two new former employees (FE-4 and FE-5) alleging that (a) Rivian's initial pricing

structure was based on erroneous BOM calculations made by an external consultant who was eventually fired, and (b) BOM costs had significantly increased from 2018 through the 2021 IPO, and Rivian had struggled to bring down BOM costs such that the BOM exceeded $100,000 by 2020; (iii) argued that the 3Q21 earnings call statements were false or misleading because the statements gave the misleading impression that "the possibility of a price increase due to inflation was a new development" when Rivian already knew that a price increase was necessary due to the high BOM costs; and (iv) amended the statements from the Registration Statement alleged to be false and misleading. *Compare* Dkt. No. 125, ¶¶ 126-28, *with* Dkt. No. 150, ¶¶ 157-63.

**F.     Defendants' Motions to Dismiss the Amended Complaint, the Court's Ruling Thereon, and Defendants' Answer**

49.     Pursuant to Local Rule 7-3, Class Counsel met with counsel for Defendants on March 8, 2023, to discuss Defendants' anticipated motions to dismiss the Amended Complaint. Dkt. No. 152-53. Defendants filed their motions to dismiss the Amended Complaint on March 16, 2023. *Id.*

50.     In their motion to dismiss, the Rivian Defendants argued that the Amended Complaint should be dismissed with prejudice for failure to state a claim under the pleading requirements of Rule 9(b) and the PSLRA. More specifically, the Rivian Defendants asserted, *inter alia*, that: (i) the two new FEs failed to bolster Plaintiffs' allegations because (a) one FE had no interaction with the Executive or Rivian Defendants, (b) Plaintiffs insufficiently described the role and seniority of the new FEs, (c) one FE did not have access to relevant information, (d) one FE's allegations were temporally irrelevant, and (e) the FEs' allegations, when combined with the other allegations, did not give rise to a strong inference of scienter; and (ii) Plaintiffs asserted the same theory of falsity that had previously been rejected by the Court. Dkt. No. 152.

51.     Likewise, the Underwriter Defendants' motion to dismiss argued that the Amended Complaint should be dismissed with prejudice because, among other things: (i) the Amended Complaint was not substantively different than the Consolidated

NIRMUL DECL. ISO PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, & CLASS COUNSEL'S ATTORNEYS' FEES & EXPENSES

Complaint because Plaintiffs relied on the same theory of falsity without alleging new facts that Rivian had definitively decided, before the IPO, to raise prices; (ii) the new statement identified by Plaintiffs as false or misleading in the Amended Complaint did not support an actionable Section 11 claim because the statement (a) contained language that was incapable of objective verification, (b) was accurate and not misleading in context, and (c) was forward-looking and thus protected by the bespeaks caution doctrine; and (iii) Plaintiffs otherwise asserted the same theory of falsity that had previously been rejected by the Court. Dkt. No. 153.

52. On March 29, 2023, Plaintiffs requested leave to file an omnibus opposition exceeding Local Rule 11-6.1's word limit. Dkt. No. 155. The Court granted this request on April 3, 2023. Dkt. No. 156. Plaintiffs filed their opposition to Defendants' motions to dismiss the Amended Complaint on April 14, 2023. Dkt. No. 157. Plaintiffs' opposition argued, *inter alia*, that: (i) the Amended Complaint cured the Consolidated Complaint's pleading deficiencies by (a) pleading facts demonstrating that the market viewed the R1's combination of high-end features and reasonable pricing as highly material to Rivian's overall valuation, and (b) the two new FEs bolstered the falsity and scienter allegations, and should be credited along with the other FEs' allegations; (ii) Defendants misconstrued Plaintiffs' theory that Defendants knew of the undisclosed, upside-down cost structure that existed at the time of the IPO and threatened Rivian's entire business strategy, and which Defendants were required to disclose to investors under the federal securities laws; (iii) Defendants were not shielded from liability because none of the risk disclosures alerted investors to the fact that the material risk of price increases had already materialized; and (iv) the R1 price increase revealed the relevant truth of Defendants' fraud. *Id.*

53. The Rivian and Underwriter Defendants filed their replies to Plaintiffs' opposition on April 21, 2023. Dkt. Nos. 159-60. On June 23, 2023, the Court held oral argument on Defendants' motions to dismiss and took the motions under submission. Dkt. No. 167. By Order dated July 3, 2023, the Court denied Defendants' motions to dismiss in full ("Second Motion to Dismiss Order"). Dkt. No. 172.

NIRMUL DECL. ISO PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, & CLASS COUNSEL'S ATTORNEYS' FEES & EXPENSES

54.     On August 7, 2023, Defendants answered the Amended Complaint denying Plaintiffs' claims and asserting affirmative defenses ("Answers to the Amended Complaint"). Dkt. Nos. 183-84.

### G.     The Parties Extensive Discovery Efforts

55.     Discovery in the Action was extremely hard-fought from beginning to end. In order to present a compelling record, Class Counsel engaged in extensive discovery-related negotiations with counsel for the Rivian Defendants, the Underwriter Defendants, and various third parties. The scope and timing of discovery was contested at every turn. While the Parties were successful in resolving many discovery disputes through the exchange of letters and meet-and-confers, Class Counsel brought and defended multiple disputes before the Magistrate Judge Charles F. Eick ("Magistrate Judge Eick"). Throughout this process, Class Counsel worked with Liaison Counsel who assisted with filings and guidance on local procedures.

56.     Through its efforts, Class Counsel obtained nearly 900,000 documents (over 3.5 million pages) of discovery from Defendants and third parties. As explained herein, Class Counsel reviewed and analyzed these documents in order to prepare for depositions, engage experts, and ultimately develop the record for class certification, summary judgment, and trial. On behalf of the Classes, Class Counsel also took advantage of other discovery tools available under the Federal Rules, including depositions and written discovery. To that end, Class Counsel took and/or defended 31 fact depositions, 17 expert depositions, and served comprehensive interrogatories and multiple sets of requests for production of documents on the Rivian and Underwriter Defendants. Class Counsel was assisted by Liaison Counsel in this process.

57.     Defendants also aggressively pursued discovery from Plaintiffs and third parties. In response to Defendants' discovery requests, Plaintiffs produced more than 1,100 pages of documents and each Plaintiff sat for deposition. Plaintiffs also served initial disclosures and responded to comprehensive contention interrogatories. As for third parties, Defendants served 45 document and/or deposition subpoenas. Of the 31 merit depositions,

NIRMUL DECL. ISO PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, & CLASS COUNSEL'S ATTORNEYS' FEES & EXPENSES

20 were non-party depositions.

58.    Class Counsel's extensive discovery efforts provided Plaintiffs with a thorough understanding of the strengths and weaknesses of their claims and assisted Class Counsel in considering and evaluating the fairness of the Settlement. A summary of those discovery efforts follows.

### 1.    Rule 26(f) Report, Initial Disclosures, Protective Order, and ESI Protocol

59.    On April 24, 2023, prior to the Second Motion to Dismiss Order, Judge Staton set an initial scheduling conference for June 16, 2023, and the next day, continued the initial scheduling conference to August 4, 2023. Dkt. Nos. 162-63. The Court required the Parties to confer, pursuant to Rule 26(f), and submit a joint Rule 26(f) report covering a variety of issues. Dkt. No. 162.

60.    In July 2023, the Parties held a series of conferences pursuant to Rule 26(f). As a result of these conferences, the Parties agreed to a date to exchange initial disclosures, that each side may serve no more than 35 written interrogatories, a preliminary trial estimate of three weeks, and, if they engaged in any mediation or Alternative Dispute Resolution ("ADR"), it would be through a private mediator. Dkt. No. 177. The Parties were unable to agree to much else at this stage of the litigation. *Id.*

61.    On July 21, 2023, the Parties filed with the Court a joint Rule 26(f) report that summarized the Parties' positions regarding, among other topics: (i) the legal and factual issues in the case; (ii) anticipated motions; (iii) discovery limitations; (iv) a proposed schedule; (v) amendment of pleadings; (vi) addition of parties; and (vii) anticipated length of trial. Dkt. No. 177. In addition, pursuant to Local Rule 16-15, the Parties requested that the Court approve the Parties' request to participate in a private dispute resolution proceeding. Dkt. No. 178.

62.    After reviewing the joint Rule 26(f) report, the Court vacated the August 4, 2023 scheduling conference and on July 31, 2023, entered a Scheduling Order setting a final pretrial conference date for May 30, 2025. Dkt. No. 180.

63. Following the filing of Defendants' Answers to the Amended Complaint on August 7, 2023 (*see* Paragraph 54 above), the Parties exchanged initial disclosures pursuant to Rule 26(a)(1) on August 11, 2023.

64. Thereafter, on November 14, 2023, after more than three months of extensive negotiations, the exchange of multiple drafts and rounds of edits, and numerous telephonic meet-and-confer sessions, the Parties entered into a Stipulated Protective Order concerning the disclosure or production of confidential information. Dkt. No. 198. Magistrate Judge Eick signed the Protective Order that same day. Dkt. No. 199.

65. On May 23, 2024, after months of additional extensive negotiations, the exchange of multiple drafts and rounds of edits, and numerous telephonic meet-and-confer sessions, the Parties entered into a Stipulated Order Regarding Documents and Electronically Stored Information ("ESI Protocol") governing the collection and production of electronically-stored information, which Magistrate Judge Eick signed the same day. Dkt. Nos. 334-35.

### 2. Plaintiffs' Discovery Propounded on Defendants

66. ***Requests for Production of Documents***. Class Counsel served Plaintiffs' First Set of Requests for Production of Documents to Defendants ("First RFPs") on July 21, 2023. The First RFPs included 85 unique requests and sought the production of documents concerning, among other things: (i) the R1 BOM costs; (ii) the R1 retail pricing; (iii) the R1 suppliers; (iv) Rivian's IPO and financial reporting; and (v) the statements and disclosures underlying Plaintiffs' securities law claims for varying periods of time between January 1, 2018 to June 30, 2022. The Rivian Defendants and the Underwriter Defendants each served responses and objections to the First RFPs on August 28, 2024. The Underwriter Defendants served amended responses and objections on October 13, 2024.

67. Class Counsel served Plaintiffs' Second Set of Requests for Production of Documents to the Underwriter Defendants ("Second RFPs") on January 2, 2024. The Second RFPs included one unique request and sought the production of documents concerning trades or transactions in Rivian common stock that were executed by or directed

NIRMUL DECL. ISO PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, & CLASS COUNSEL'S ATTORNEYS' FEES & EXPENSES

to the Underwriter Defendants. The Underwriter Defendants served responses and objections to the Second RFPs on February 1, 2024.

68.    Class Counsel served Plaintiffs' Third Set of Requests for Production of Documents to Defendants ("Third RFPs") on March 11, 2024. The Third RFPs included 22 unique requests and sought the production of documents concerning Rivian's R1 vehicle component inventories and related accounting calculations, including the lower of cost or net realizable value calculation ("LCNRV") described in Accounting Standards Codification, Section 330. The Defendants each served responses and objections to the Third RFPs on April 10, 2024.

69.    *Interrogatories*. In addition to requests for documents, Class Counsel also served Defendants with interrogatories. Plaintiffs' First Set of Interrogatories to Defendant Rivian ("First Set of Interrogatories") was served on July 21, 2023. The First Set of Interrogatories included four interrogatories and sought the production of information concerning R1 BOM costs, R1 retail pricing, Rivian's R1 consultants, Rivian's relationship with its R1 suppliers, and the R1 supply agreements. Dkt. No. 315. Rivian served responses and objections to the First Set of Interrogatories on August 28, 2023. Rivian supplemented its responses to Plaintiffs' First Set of Interrogatories on January 8, 2024, and on June 24, 2024, following Plaintiffs' successful motion to compel responses. *See infra* Section G.6.

70.    Class Counsel served Plaintiffs' Second Set of Interrogatories to Defendants ("Second Set of Interrogatories") on October 24, 2023. The Second Set of Interrogatories included six interrogatories and sought the production of information concerning experts on which Defendants relied with respect to the events in the Action (including Rivian's IPO), attorney advice on which Defendants intended to rely to defend this Action, and certain due diligence and good faith affirmative defenses. Defendants each served responses and objections to the Second Set of Interrogatories on November 27, 2023. The Rivian Defendants supplemented their objections and responses on October 10, 2024, and the Underwriter Defendants supplemented and then amended their responses on February 2, 2024, and September 16, 2024, respectively.

NIRMUL DECL. ISO PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, & CLASS COUNSEL'S ATTORNEYS' FEES & EXPENSES

71.    Class Counsel served Plaintiffs' Third Set of Interrogatories to Defendants ("Third Set of Interrogatories")—which included 23 interrogatories to Defendants Rivian, Scaringe, McDonough, and Baker, 20 interrogatories to the Director Defendants, and 17 interrogatories to the Underwriter Defendants—on December 27, 2024. The Third Set of Interrogatories sought the production of information concerning Defendants' contentions in the Action including, in particular, certain affirmative defenses asserted in Defendants' Answers to the Amended Complaint.

72.    Defendants Rivian, Scaringe, McDonough, and Baker, the Director Defendants, and the Underwriter Defendants served responses and objections to the Third Set of Interrogatories on January 27, 2025. The Rivian Defendants served supplemental responses to the Third Set of Interrogatories on March 5, 2025.

73.    As a result of the written discovery propounded by Plaintiffs, Defendants produced more than 875,000 documents or more than 3.4 million pages.

### 3.    Defendants' Discovery Propounded on Plaintiffs

74.    Defendants also served substantial written discovery on Plaintiffs.

75.    ***Requests for Production of Documents***. On August 4, 2023, the Rivian Defendants served their first request for documents on Plaintiffs. These requests included 17 unique requests and sought the production of documents concerning each Plaintiff's investments in Rivian securities, as well as documents concerning each Plaintiff's overall investment strategies, relationship with counsel, FEs, and Schwab, and decision to act as a lead plaintiff or additional plaintiff in the Action. Plaintiffs served their responses and objections to these requests on September 5, 2023.

76.    On September 6, 2023, the Rivian Defendants served their second set of requests for documents, which included one unique request seeking the production of all documents regarding any communications with Rivian employees. Plaintiffs served their responses and objections to this second set on October 10, 2023.

77.    On November 22, 2023, the Rivian Defendants served their third set of requests for documents, which included one unique request seeking the production of

NIRMUL DECL. ISO PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, & CLASS COUNSEL'S ATTORNEYS' FEES & EXPENSES

documents concerning Plaintiffs' "anti-money laundering policies." Plaintiffs served responses and objections to this third set on December 22, 2023.

78. In response to these requests, and subject to their objections, Plaintiffs performed diligent and reasonable searches to identify and produce responsive documents, reviewed potentially responsive documents for relevance and privilege, and ultimately produced more than 1,100 pages of documents.

79. ***Interrogatories***. On September 6, 2023, the Rivian Defendants served their initial interrogatories to Plaintiffs which sought the production of information concerning who communicated with Rivian employees regarding the Action. Plaintiffs served responses and objections to this interrogatory on October 10, 2023.

80. On February 18, 2025, the Rivian Defendants served their second set of interrogatories to Plaintiffs. These requests included 27 unique interrogatories and sought the production of information concerning certain of Plaintiffs' actual contentions as well as contentions that Defendants had derived based on their views of Plaintiffs' allegations and the evidentiary record. Plaintiffs served responses and objections to these interrogatories on March 20, 2025.

81. On February 19, 2025, the Underwriter Defendants served interrogatories to Plaintiffs, which included two unique interrogatories seeking the production of information concerning the Underwriter Defendants' due diligence and good faith defenses. Plaintiffs served responses and objections to these interrogatories on March 21, 2025.

### 4. The Parties' Negotiations Regarding Plaintiffs' Discovery Requests

82. ***Requests for Production of Documents***. Class Counsel and counsel for the Rivian Defendants met and conferred extensively concerning the First RFPs, including hours of telephonic meet-and-confers, the exchange of a multitude of correspondence, and at least two discovery motions (*see infra* Section G.6). A summary of some of the Parties' discovery disputes follows. To the extent that these disputes had to be adjudicated by Magistrate Judge Eick, they also are described below in Section G.6.

NIRMUL DECL. ISO PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, & CLASS COUNSEL'S ATTORNEYS' FEES & EXPENSES

83. *First*, the parties negotiated and ultimately litigated the scope of the First RFPs and the relevant time period for the Rivian Defendants' search for documents responsive to the First RFPs. Plaintiffs' position throughout these negotiations was based on the Amended Complaint's allegations, the Court's Second Motion to Dismiss Order, and later, the production of documents from third parties and Magistrate Judge Eick's decisions on Plaintiffs' motions to compel responses to a third-party subpoena and to the First Set of Interrogatories. These negotiations included tens of multi-hour telephonic meet-and-confer sessions, and extensive written correspondence setting forth the parties' positions and various offers and counter-offers. While the parties reached agreement as to the scope of 30 requests, Plaintiffs ultimately asked the Court to resolve disputes concerning the relevant time and/or scope for 55 requests.

84. *Second*, the parties negotiated and ultimately litigated the number and identity of custodians and custodial and non-custodial sources the Rivian Defendants would search to identify and produce documents responsive to the First RFPs. The parties based their negotiations concerning custodians and sources in part, on the Amended Complaint, the Court's Second Motion to Dismiss Order, Rivian's initial disclosures, Rivian's organizational charts, and information exchanged during the parties' telephonic meet-and-confer sessions and written correspondence. Later, Plaintiffs supplemented their positions with information from documents produced by Rivian and third parties in response to subpoenas. Ultimately, whether through agreement or as a result of a successful motion to compel (*see infra* Section G.6), the Rivian Defendants searched 30 custodians and 15 sources of ESI for documents responsive to the First RFPs.

85. *Finally*, the parties negotiated and ultimately litigated the search terms to be utilized by the Rivian Defendants to identify and produce documents responsive to the First RFPs. To that end, the parties exchanged several proposals and ultimately litigated this issue before Magistrate Judge Eick.

86. Class Counsel and counsel for the Rivian Defendants also conferred regarding the custodians, sources, and search terms for the Rivian Defendants to use in searching for

NIRMUL DECL. ISO PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, & CLASS COUNSEL'S ATTORNEYS' FEES & EXPENSES

documents responsive to the Third RFPs. The parties ultimately reached agreement with respect to the Rivian Defendants' search for and production of documents in response to these requests and, thus, no motion practice occurred.

87. In response to these requests, the parties' negotiations, and, ultimately, several orders resolving the above identified disputes, the Rivian Defendants produced more than 815,000 documents or nearly 2.7 million pages of discovery in response to the First and Third RFPs.

88. Additionally, Class Counsel and counsel for the Underwriter Defendants conferred extensively regarding the First RFPs. In particular, the Underwriter Defendants sought to limit discovery to the so-called "lead" underwriters, Defendants Morgan Stanley, J.P. Morgan, and Goldman Sachs. After multiple telephonic meet and confer sessions plus written correspondence, and after the Court granted Plaintiffs' motion to compel the production of documents responsive to the First RFPs from the custodial files of Defendant RBC's analysts, the parties agreed that (i) nine of the Underwriter Defendants (Morgan Stanley, J.P. Morgan, Goldman Sachs, Deutsche Bank, Barclays, BofA, Allen & Company, Wells Fargo, and Mizuho) would search for responsive documents in agreed-to ESI custodians and sources using agreed-to search terms; and (ii) the remaining 13 Underwriter Defendants would produce their internal "deal" files and responses to Plaintiffs' interrogatories.

89. Class Counsel and counsel for the Underwriter Defendants also conferred and came to an agreement on the scope of the Underwriter Defendants' production of documents in response to the Second and Third RFPs.

90. In response to these requests, the parties' negotiations, and orders resolving motions to compel (*see infra* Section G.6), the Underwriter Defendants produced nearly 60,000 documents or more than 800,000 pages of discovery in response to the First, Second, and Third RFPs.

91. ***Interrogatories***. Class Counsel conferred with Rivian repeatedly over several weeks to resolve disputes with respect to the First Set of Interrogatories and obtain

NIRMUL DECL. ISO PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, & CLASS COUNSEL'S ATTORNEYS' FEES & EXPENSES

substantive responses to the four interrogatories initially served on July 21, 2023. These disputes included as to the relevant time frame for information, the number of interrogatories, whether Rivian could invoke Rule 33(d) without producing documents or in situations where Class Counsel was unable to determine the answer to the interrogatory by reviewing the documents that had been produced, among other issues. Ultimately, Plaintiffs successfully moved to compel responses to these interrogatories (*see infra* Section G.6), and Rivian served supplemental responses on June 24, 2024.

92.    Class Counsel also conferred with both the Rivian Defendants and the Underwriter Defendants with respect to the Second Set of Interrogatories, including when Defendants would provide substantive responses to these interrogatories and, with respect to the Underwriter Defendants, whether each of the 22 Underwriter Defendants would provide substantive responses to the interrogatories. Following multiple telephonic meet-and-confer sessions and extensive written correspondence, Defendants supplemented their responses to these interrogatories in the fall of 2024.

93.    Additionally, Class Counsel conferred with the Rivian Defendants and the Underwriter Defendants with respect to the Third Set of Interrogatories, including as to a date Defendants would serve substantive responses. After these efforts, Defendants supplemented their responses to these interrogatories in the spring of 2025.

### 5.    Third Party Discovery

94.    During the litigation, Plaintiffs served 45 subpoenas for documents and/or depositions on the following individual or entities:

- Rodney Copes (Former Rivian Chief Operating Officer)
- Ryan Green (Former Rivian Chief Financial Officer)
- Laura Schwab (Former Rivian VP, Sales and Marketing)
- C. Michael Smith (Former Rivian VP, Enterprise Quality)
- Eric Socia (Former Rivian Manager, FP&A, Sales/Inventory Planning)
- Steve Gawronksi (Former Rivian Director of Vehicle Procurement, Head of Supply Chain, and VP, Supply Chain)

NIRMUL DECL. ISO PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, & CLASS COUNSEL'S ATTORNEYS' FEES & EXPENSES

- Michael A. Cook (Former Rivian Cost Estimator)

- FE-5 (Former Rivian Cost Estimator)

- FE-3 (Former Rivian Manager, Business Analytics & Finance)

- FE-1 (Former Rivian Senior Finance Director)

- FE-2 (Former Rivian VP, Quality)

- FE-4 (Former Rivian Cost Estimator)

- A2mac1 LLC (Rivian Consultant)

- McKinsey & Company, Inc. (Rivian Consultant)

- Financial Industry Regulatory Authority

- Depository Trust and Clearing Corporation

- National Securities Clearing Corporation

- Quick Release, Inc. (Rivian Consultant)

- Computershare Trust Company, N.A.

- Christian Walters (Former Rivian Head of Strategic Operations)

- Erik Fields (Former Rivian VP, Manufacturing)

- Jiten Behl (Former Rivian Chief Strategy Officer, Chief Growth (Commercial) Officer, and Advisor)

- Julie Price (Former Rivian Executive Administrator)

- Mark Yeager (Former Rivian Director, Vehicle Supplier Quality)

- Orlando Reyes (Rivian Former Director, Purchasing – ESS & Electronics)

- Intellicosting, LLC (Rivian Consultant)

- KPMG LLP (Rivian Outside Auditor)

- Jim Ward (Former Rivian Cost Engineering Manager)

- Market Street Partners (Rivian Consultant)

- Akhil Mahendra (Former Rivian VP, Corporate Development)

- Patrick Hunt (Former Rivian Senior Director, Strategy)

- Escalent, Inc. (Rivian Consultant)

- E*Trade Financial Corporation

NIRMUL DECL. ISO PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, & CLASS COUNSEL'S ATTORNEYS' FEES & EXPENSES

- Wolfe Research, LLC (Analyst)

- John Chrisekos, Jr. (Principal of Intellicosting)

- PricewaterhouseCoopers LLP (Rivian Consultant)

- Dennis Lucey (Rivian Head of Corporate Finance)

- Gerard Dwyer (Former VP, Business Finance and current Rivian Chief Information Officer)

- Derek Mulvey (Former Director of Strategic Finance and Investor Relations and current Rivian VP, Finance)

- Steve Martin (Rivian Director, Global Supply Chain Program Management)

- Dagan Mishoulam (Rivian Former VP, Strategy, and current Rivian Chief Strategy Officer)

- Jacob Kohn (Rivian VP, Consumer Vehicle Sales)

- Simon Phillips (Former Rivian Senior Finance Manager, R1 Controller)

- Neil Sitron (Rivian Former General Counsel)

- Skadden, Arps, Slate, Meagher & Flom LLP

95. Class Counsel extensively met and conferred with these third parties with respect to the subpoenas.

96. Notably, counsel for the Rivian Defendants also represented all of the current and former Rivian employees who Plaintiffs subpoenaed for documents and depositions and pressed the same objections concerning timeframe and scope made by the Rivian Defendants in response to the First RFPs. Although counsel extensively conferred regarding the timeframe, scope, and search parameters for the first six former employees Plaintiffs subpoenaed for responsive documents, they were unable to resolve the parties' disputes, leading Plaintiffs to move to compel the production of documents from Rivian's former CFO, Ryan Green. *See infra* Section G.6.

97. After the Court granted Plaintiffs' motion to compel Mr. Green production of documents, Plaintiffs moved to compel the production of documents from Rivian's former Supply Chain head, Steve Gawronski. Ultimately, the parties agreed that Mr. Gawronski,

NIRMUL DECL. ISO PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, & CLASS COUNSEL'S ATTORNEYS' FEES & EXPENSES

as well as all other former Rivian employees that had been or would be subpoenaed for documents, would comply with the timeframe, scope, and search terms ordered by the Court as to Mr. Green.

98. In response to these subpoenas, Plaintiffs received more than 16,000 documents (more than 32,000 pages) and took 20 non-party depositions.

### 6. Plaintiffs' Discovery Motions

99. As discussed above and herein, the Parties were not able to resolve several of their disputes with respect to the scope of discovery, leading Plaintiffs to file 12 discovery motions including (i) one motion for a protective order; (ii) ten motions to compel seeking the production of documents, information, or testimony; and (iii) one motion for discovery sanctions.

100. ***Plaintiffs' Motion for Protective Order***. After the Rivian Defendants issued deposition subpoenas to six former employees (including five former employees referenced in the Consolidated Complaint and Amended Complaint) in August 2023, Plaintiffs, on September 1, 2023, sought to stay these depositions until Rivian produced documents responsive to the First RFPs concerning these witnesses and their statements in the Consolidated Complaint and Amended Complaint. Dkt. Nos. 186-87. On September 11, 2023, Magistrate Judge Eick denied Plaintiffs' motion and the depositions of these former employees occurred in November and December 2023. Dkt. No. 191.

101. ***Plaintiffs' First Motion to Compel***. On November 15, 2023, Plaintiffs moved to compel the Rivian Defendants to produce discovery for two varying periods of time— i.e., from January 1, 2018 to June 30, 2022 and from November 1, 2018 to June 30, 2022, relying in large part on the allegations set forth in the Amended Complaint and the Court's Second Motion to Dismiss Order to demonstrate relevance and proportionality. Dkt. Nos. 200-01. On November 27, 2023, Magistrate Judge Eick denied Plaintiffs' motion without prejudice. Dkt. No. 216.

102. ***Plaintiffs' Second Motion to Compel***. On February 23, 2024, Plaintiffs moved to compel Rivian's former Chief Financial Officer, Ryan Green, to produce documents in

NIRMUL DECL. ISO PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, & CLASS COUNSEL'S ATTORNEYS' FEES & EXPENSES

response to a subpoena. Dkt. Nos. 233-34. On March 5, 2024, Magistrate Judge Eick granted in part and denied in part Plaintiffs' motion, ordering Mr. Green to produce all ESI and hardcopy documents responsive to the subpoena for the timeframe January 1, 2018 to May 31, 2021 (i.e., Mr. Green's departure from Rivian) that hit on search terms agreed to by the parties and proposed by Mr. Green. Dkt. No. 259.

103. ***Plaintiffs' Third Motion to Compel***. On April 1, 2024, Plaintiffs moved to compel Rivian's former VP, Supply Chain, Steve Gawronski, to produce documents in response to a subpoena consistent with Magistrate Judge Eick's March 5, 2024 Order regarding Mr. Green's compliance with an identical subpoena. Dkt. Nos. 276-77. After Plaintiffs filed the motion but before it was fully briefed, counsel for Mr. Gawronski (who also represents the Rivian Defendants) agreed to Plaintiffs' requested relief and the parties stipulated to withdraw the motion on April 11, 2024. Dkt. No. 294.

104. ***Plaintiffs' Fourth Motion to Compel***. On May 3, 2024, Plaintiffs moved to compel Rivian to produce information responsive to the First Set of Interrogatories concerning R1 BOM costs, R1 retail pricing, Rivian's R1 consultants, Rivian's relationship with its R1 suppliers, and the R1 supply agreements. Dkt. Nos. 302-03. On May 14, 2024, Magistrate Judge Eick granted in part and denied in part Plaintiffs' motion, ordering Rivian to serve verified further answers to Interrogatory Nos. 1(ii)-(v), 2(i)-(iv) & (vi)-(vii), 3(i)-(iii), and 4(i)-(iii), and 4(v) for the timeframe requested by Plaintiffs. Dkt. No. 324.

105. ***Plaintiffs' Fifth Motion to Compel***. On June 7, 2024, Plaintiffs moved to compel Rivian to produce documents responsive to 55 of the 85 requests from the First RFPs concerning the R1 BOM costs, the R1 retail pricing, the R1 suppliers, Rivian's IPO and financial reporting, and the statements and disclosure underlying Plaintiffs' claims for varying periods of time between January 1, 2018 to June 30, 2022, as well as documents sourced by eight custodians and seven sources. Dkt. No. 338. After the motion was filed, the parties agreed to (i) the timeframe and substantive scope for three requests; and (ii) timeframe for nearly all of the requests for which there was a timeframe dispute. Dkt. No. 354. On June 21, 2024, Magistrate Judge Eick granted in part and denied in part

Plaintiffs' motion, ordering Rivian to produce documents responsive to 48 of the 55 requests and search three of seven sources for the timeframes requested by Plaintiffs. Dkt. No. 372.

106. ***Plaintiffs' Sixth Motion to Compel***. On June 21, 2024, Plaintiffs moved to compel Defendant RBC to conduct a reasonable and diligent search of the files of three equity research analyst custodians for the timeframe January 1, 2021 to June 30, 2022, in order to identify and produce documents responsive to 41 of the 85 requests from the First RFPs. Dkt. No. 366. On July 8, 2024, Magistrate Judge Eick granted in part and denied in part Plaintiffs' motion, ordering Defendant RBC to produce documents from the custodial files of one analyst that were responsive to most of the requests identified in Plaintiffs' motion. Dkt. No. 388.

107. ***Plaintiffs' Seventh Motion to Compel***. On January 3, 2025, Plaintiffs moved to compel Rivian to produce certain non-privileged documents that had been withheld on the basis of attorney-client privilege or work product protections. Dkt. Nos. 419, 421. On January 23, 2025, Magistrate Judge Eick granted in part and denied in part Plaintiffs' motion, ordering Rivian to produce documents withheld only under claim of the work product doctrine. Dkt. No. 454.

108. ***Plaintiffs' Eighth Motion to Compel***. On March 13, 2025, Plaintiffs moved to enforce the Court's June 21, 2024 Order on Plaintiffs' fifth motion to compel and to compel the production of documents from additional custodians and sources. Dkt. Nos. 476, 483. On March 21, 2025, Magistrate Judge Eick granted in part and denied in part Plaintiffs' motion, ordering Rivian to produce text messages sent or received by the custodians on Rivian-issued devices as well as responsive documents from three additional custodians. Dkt. No. 494.

109. ***Plaintiffs' Ninth Motion to Compel***. On March 21, 2025, Plaintiffs moved to compel Rivian to designate a witness or witnesses for a deposition pursuant to Rule 30(b)(6) and for sanctions due to Rivian's failure to appear on the date noticed for the deposition. Dkt. Nos. 495-96. On April 3, 2025, Magistrate Judge Eick granted Plaintiffs' motion to

NIRMUL DECL. ISO PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, & CLASS COUNSEL'S ATTORNEYS' FEES & EXPENSES

compel Rivian to appear for a Rule 30(b)(6) deposition and denied Plaintiffs' request for sanctions. Dkt. No. 540.

110. ***Plaintiffs' Motion for Rule 37(c) and (e) Sanctions***. On April 2, 2025, Plaintiffs moved for sanctions under Rule 37(c) and (e) for Rivian's destruction or failure to preserve relevant data from the Company's Diligent and Zoom platforms. Dkt. Nos. 534-35. On April 14, 2025, Magistrate Judge Eick denied Plaintiffs' motion. Dkt. No. 576.

111. ***Plaintiffs' Tenth Motion to Compel***. On April 4, 2025, Plaintiffs moved to compel the Rivian Defendants to produce, without redaction, documents, communications, and testimony concerning the substance of their consultations with in-house and outside counsel regarding Rivian's public disclosures. Dkt. Nos. 542-43. On April 15, 2025, Magistrate Judge Eick denied Plaintiffs' motion. Dkt. No. 584.

### 7.    Implementation of Review Protocol and Document Review

112. Plaintiffs' approach to document review was multifaceted, highly organized, and effective. Document review began in or around January 2024 following Rivian's initial production of documents and information, and increased substantially as subsequent productions were received following Plaintiffs' successful motions to compel. Because Magistrate Judge Eick ultimately ordered the Rivian Defendants to produce documents after the conclusion of merits discovery, the document review continued through at least June 2025.

113. *First*, prior to receiving documents, Plaintiffs retained an outside vendor, Innovative Driven ("Driven"), to provide access to a Relativity database in order to accommodate the size of the anticipated production, enable the review of documents by multiple users, and offer the latest coding, review, and search capabilities for electronic discovery management. Plaintiffs utilized this electronic database to organize and search the large volume of documents produced in this matter. The database allowed attorneys performing document review to categorize documents by issues and level of relevance, and to identify the most critical documents supporting the Classes' claims.

114. *Second*, to enable effective document review and analysis, Plaintiffs developed

NIRMUL DECL. ISO PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, & CLASS COUNSEL'S ATTORNEYS' FEES & EXPENSES

a document coding manual, which provided detailed instructions on: (i) the key facts at issue in the Action; (ii) how to evaluate each document's relevance; and (iii) "tagging" documents with relevant issues and sub-issues via coding options built into Driven's Relativity platform. Plaintiffs revised their instructions throughout the review process to reflect new information and insights obtained during discovery.

115.   *Third*, Plaintiffs' review of the voluminous discovery in the Action relied on the persistent efforts of dozens of attorneys devoted to reviewing and analyzing documents and sharing their findings with the litigation team. The review team started with a core set of staff attorneys in February 2024 as Defendants started producing documents. As the document productions increased and given the need to review these productions expeditiously in order to prepare for depositions and summary judgment, Class Counsel brought on additional contract attorneys (supervised by staff attorneys and associates) to review and code the voluminous document productions and assist in preparing for depositions in 2024 and 2025. This team of staff and contract attorneys from Kessler Topaz was split into various project-specific groups to maximize the efficiency of the review. Together, partners, associates, and review team attorneys met weekly to discuss highly relevant documents and trends observed in the review process. These weekly meetings ensured that the reviewing attorneys were aware of: (i) the issues underlying the Classes' claims; (ii) key facts, individuals, and timelines identified concurrently in the document review process; (iii) the high-value importance of certain documents; and (iv) how such documents informed and supported Plaintiffs' theory of liability. Additionally, the review team attorneys communicated frequently to ensure that coding decisions were applied consistently and that all review team members were apprised of important developments with respect to the document review process, case theories, and the stage of the overall litigation.

116.   *Fourth*, Class Counsel worked to ensure that the document review process prepared them to effectively elicit integral deposition testimony and establish liability at summary judgment and trial. Thus, simultaneously with a broad linear review of the

NIRMUL DECL. ISO PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, & CLASS COUNSEL'S ATTORNEYS' FEES & EXPENSES

document production, the review team attorneys engaged in several discovery projects requiring targeted document searches, document organization, and synthesis. These projects included, *inter alia*: (i) preparing timelines of key events, including the timeline with respect to the statements Plaintiffs allege were false and misleading when made; (ii) identifying missing discovery, including as to R1 BOM costs; (iii) analyzing the Rivian Defendants' privilege logs; (iv) identifying evidence concerning R1 BOM costs, R1 retail prices, Rivian's relationship with R1 suppliers, the Company's IPO, any "due diligence" conducted by various Defendants, and Defendants' statements to investors; (v) drafting memoranda on key topics in the case; and (vi) identifying key players and potential deponents, which informed Class Counsel's determination of which witnesses to notice for depositions. Plaintiffs' early and continuing efforts to identify and analyze key research topics enabled Class Counsel's partners, associates, and review team attorneys to make informed decisions about depositions and the development of case theories.

117. *Finally*, to enhance the manual review of documents and to avoid review of voluminous duplicate files and ESI that should not have been produced under the Parties' stipulated ESI protocol, Class Counsel deployed and oversaw the refinement of algorithm-based and active learning TAR (i.e., Technology Assisted Review), as well as the deployment of scripts to isolate and set to the side categories of documents that did not contain non-duplicative, relevant information. As the review team engaged in the manual coding process, the team's coding decisions and assessment of the content of the documents produced fed data into and further refined the algorithm underlying the TAR process and the scripts utilized to avoid manual review of duplicative or irrelevant information, thereby allowing Plaintiffs to identify the most relevant documents.

### 8.    Merits Depositions

118. In August 2023, the Rivian Defendants served deposition subpoenas on six former Rivian employees, which they believed to be the FEs cited in either the Consolidated Complaint or Amended Complaint. The subpoenaed individuals included the five FEs cited by Plaintiffs and one individual whom the Rivian Defendants incorrectly

NIRMUL DECL. ISO PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, & CLASS COUNSEL'S ATTORNEYS' FEES & EXPENSES

identified as FE-4.

119.   Specifically, on August 11, 2023, the Rivian Defendants unilaterally noticed the depositions of two non-party witnesses whom they believed were FE-4 and FE-5, for depositions in Michigan on September 27 and September 28, 2023, respectively. Dkt. No. 187. On August 17, 2023, Plaintiffs informed Defendants that deposing any fact witness prior to the substantial completion of document production contravened the Federal Rules and the Court's scheduling order. *Id.* Plaintiffs requested to meet and confer on the matter and asked Defendants to respond to the request by August 21, 2023. *Id.* Defendants did not respond by August 21, 2023, and on August 23, 2023, Defendants subpoenaed the individuals they believed to be FE-1, FE-2, and FE-3 for depositions during the first week of October 2023. *Id.* Defendants did not agree to meet and confer regarding Plaintiffs' request to adjourn depositions until after substantial completion. *Id.*

120.   On August 24, 2023, Plaintiffs sent Defendants a joint stipulation concerning Plaintiffs' upcoming motion to stay fact depositions under Local Rule 37. Dkt. No. 187. The joint stipulation was filed on September 1, 2023, along with Plaintiffs' motion to stay fact depositions. *Id.*; Dkt. No. 186. Plaintiffs sought an order staying fact witness depositions under Rules 26(b)(1), 26(c)(1), and/or 26(d)(3) for four reasons: (i) it would be prejudicial to force Plaintiffs to depose percipient fact witnesses before the production of any documents by Defendants; (ii) Defendants sought discovery that was not relevant or proportional to the case's needs; (iii) Defendants sought discovery that did not comply with Rules 1 or 26 and that was inconsistent with the Court's scheduling order; and (iv) Defendants would not be prejudiced by waiting to take the depositions until after the substantial completion of document production. Dkt. No. 187. In response, Defendants argued that (i) Plaintiffs failed to demonstrate good cause to stay these depositions, as would be required by Rule 26(c)(1); (ii) the FE depositions would be relevant and proportional to the case's needs; and (iii) the Rivian Defendants would suffer prejudice if the depositions were stayed until after substantial completion of document discovery. *Id.* On September 8, 2023, the Parties both filed supplemental submissions concerning the motion to stay. Dkt.

NIRMUL DECL. ISO PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, & CLASS COUNSEL'S ATTORNEYS' FEES & EXPENSES

Nos. 189-90. On September 11, 2023, the Court denied Plaintiffs' motion to stay the depositions, ruling that the good cause standard was not met and that the depositions sought were relevant and proportional to the case's needs. Dkt. No. 191.

121.    Following Magistrate Judge Eick's order, Defendants conducted the following six merits depositions:

- FE-4 (10/31/23);
- FE-3 (11/7/23);
- FE-1 (11/13/23);
- FE-5 (12/18/23);
- Individual that Defendants misidentified as FE-4 (12/19/23); and
- FE-2 (12/20/23).

122.    Plaintiffs cross-noticed each of these depositions and examined the witnesses despite the limited discovery available to them at the time.

123.    On December 29, 2023, while Plaintiffs' motion for class certification was being briefed (*see supra* Section H), the Rivian Defendants served deposition notices on both AP7 (pursuant to Rule 30(b)(6)) and Muhl. Muhl sat for a deposition on January 12, 2024. AP7 served responses and objections to the Rivian Defendants' Rule 30(b)(6) notice on January 30, 2024. Thereafter, on February 15, 2024, AP7's Rule 30(b)(6) designee, Per Olofsson, sat for a deposition.

124.    As discovery progressed, Plaintiffs reviewed and analyzed the voluminous document productions by Defendants and third parties not only to gather facts but also to identify potential deponents. Plaintiffs compiled lists of potential deponents and organized them by priority and topic areas. Class Counsel internally discussed each potential witness and what information each could likely provide. Given the limitation on the number of depositions permitted, the selection of witnesses was critical to Plaintiffs' ability to explore and ultimately prove every aspect of their case.

125.    Given the number of potential witnesses and the complexity of the relevant facts, Plaintiffs sought to negotiate with Defendants an extension to the 10-deposition limit

NIRMUL DECL. ISO PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, & CLASS COUNSEL'S ATTORNEYS' FEES & EXPENSES

set forth in Rule 30(a)(2). On June 12, 2024, following extensive negotiations, the Parties filed a stipulation permitting each side to take up to 175 hours of fact witness depositions, with each deposition counting for a minimum of 3.5 hours. Dkt. No. 348. Later that same day, Magistrate Judge Eick granted the Parties' request. Dkt. No. 349.

126.    After reviewing and analyzing the documents produced by Defendants and third parties, Plaintiffs deposed the following additional individuals:[17]

| Deponent | Title/Position | Date of Deposition |
|---|---|---|
| Dagan Mishoulam | Former VP of Strategy and current Rivian Chief Strategy Officer | 12/4/24 |
| Imran Aijazzudin | Former Senior Manager of Strategy and Corporate Development and current Director of Rivian's Business Development | 12/17/24 |
| Tom Solomon | Former Senior Director of Strategy and Business Development and current Rivian VP of Business Development | 12/20/24 |
| Peter Krawiec | Defendant and Rivian Board Member | 1/27/25 |
| Ryan Green | Former Rivian Chief Financial Officer | 1/31/25 |
| Regina Savage | Rule 30(b)(6) designee of Defendant Morgan Stanley | 2/4/25 |
| Derek Mulvey | Former Director of Strategic Finance and Investor Relations and current Rivian VP of Finance | 2/7/25 |
| Sanford Schwartz | Defendant and Rivian Board Member | 2/19/25 |
| Benjamin Duell | Rule 30(b)(6) designee of Defendant Goldman Sachs | 2/19/25 |
| Harry Wagner | Rule 30(b)(1) designee of Defendant Allen & Company | 2/24/25 |
| Gerard Dwyer | Former VP of Business Finance and current Rivian Chief Information Officer | 2/24/25 |
| Jiten Behl | Former Rivian Chief Strategy Officer, Chief Growth (Commercial) Officer, and Advisor | 2/25/25 |

---

[17]    Plaintiffs also noticed a Rule 30(b)(6) deposition of Rivian for March 3, 2025. Plaintiffs prepared for the deposition and showed up on the morning of March 3, 2025, ready to conduct the deposition. However, Rivian did not appear for the deposition.

NIRMUL DECL. ISO PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, & CLASS COUNSEL'S ATTORNEYS' FEES & EXPENSES

| Deponent | Title/Position | Date of Deposition |
|---|---|---|
| Claire McDonough | Defendant and Chief Financial Officer | 2/27/25 |
| Neil Dalal | Rule 30(b)(6) designee of Defendant J.P. Morgan | 2/28/25 |
| Simon Phillips | Former Rivian Senior Finance Manager, R1 Controller | 3/6/25 |
| RJ Scaringe | Defendant and Rivian Chief Executive Officer | 3/10/25 |
| Neil Sitron | Former Rivian General Counsel | 3/14/25 |
| Jeffrey Baker | Defendant and former Rivian Chief Accounting Officer | 3/21/25 |
| Steve Gawronski | Former Rivian Director of Vehicle Procurement, Head of Supply Chain, and VP of Supply Chain | 3/31/25 |
| Ryan Dzierniejko | Rule 30(b)(6) designee of Skadden, Arps, Slate, Meagher & Flom LLP | 2/25/25 and 4/2/25 |
| Akhil Mahendra | Former VP of Corporate Development | 4/3/25 and 6/6/25 |

127.   Preparation for these depositions was arduous and time-consuming. Class Counsel relied on the knowledgeable team of attorneys assigned to review documents to assist in deposition preparation. Document reviewers worked directly under the instruction of associates and partners tasked with taking the depositions. Together they distilled clear, overarching goals for each deposition based on the deponent's knowledge of facts and documents relevant to Plaintiffs' claims and theories of the case.

128.   In preparing for depositions, review attorneys completed a first-tier document review to identify those documents most likely to contain useful information for a given deponent. Often, this involved a linear review of a substantial portion of the deponent's custodial file or of documents that mentioned the deponent's name, alongside targeted searches based on subject matter and time periods likely to return highly relevant documents.

129.   Following this initial research, review attorneys summarized key documents which, in their view, were most relevant for each deponent. The attorneys assigned to take

NIRMUL DECL. ISO PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, & CLASS COUNSEL'S ATTORNEYS' FEES & EXPENSES

the depositions analyzed the materials assembled by the review attorneys, including by conducting a secondary review of the documents flagged by the review attorney to prioritize and cut documents as necessary. In preparing for a deposition, the deposing attorneys continued working with the review attorneys as they sought additional detailed information and documents, often necessitating second and third reviews of each witness's documents.

130.   Finally, in order to prepare for depositions (as well as analyze the discovery record more broadly), Class Counsel had to become well-versed in complex topics, including (i) the BOM of Rivian's R1 vehicles, (ii) the processes and procedures Rivian used to determine the cost of the R1 BOM, (iii) changes to the R1 BOM and its cost over time, (iv) the impact of BOM costs on total vehicle costs and retail pricing, (v) Rivian's financial forecasts and the drivers of its financial projections, and (vi) the details of Rivian's contractual agreements with the suppliers of R1 parts.

131.   Overall, Class Counsel dedicated thousands of hours preparing for, taking and analyzing fact witness depositions. As noted above, Liaison Counsel also assisted in these efforts including the taking of several depositions of the Underwriter Defendants, participating in weekly status calls regarding the discovery efforts, participating in certain meet and confers with Defendants, and analyzing discovery in preparation for depositions.

**H.      Plaintiffs' Motion to Certify and the Class Notice Campaign**

**1.      Plaintiffs' Motion to Certify**

132.   On December 1, 2023, Plaintiffs moved for class certification ("Motion to Certify"). Dkt. No. 218. Plaintiffs sought certification of a class consisting of all persons and entities who purchased or otherwise acquired Rivian Class A common stock between November 10, 2021 and March 10, 2022, inclusive, and were damaged thereby. *Id.* Plaintiffs' Motion to Certify was accompanied by two expert reports. The first report, from Plaintiffs' economic expert Zachary Nye, Ph.D. ("Dr. Nye") of Stanford Consulting Group, Inc. ("Stanford Consulting"), opined that the market for Rivian Class A common stock was efficient throughout the Class Period, and that damages under both Section 10(b) of the Exchange Act and Sections 11 and 12(a)(2) of the Securities Act could be calculated on a

NIRMUL DECL. ISO PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, & CLASS COUNSEL'S ATTORNEYS' FEES & EXPENSES

class-wide basis using a common methodology that was consistent with Plaintiffs' theory of liability. Dkt. No. 218-3. The second report, from Joshua Mitts, Ph.D. ("Dr. Mitts"), opined that: (i) there was no evidence indicating unregistered shares of Rivian Class A common stock were sold during the Class Period and even if unregistered shares were sold during the Class Period, ownership of securities in "fungible bulk" form does not preclude tracing purchases of Rivian Class A common stock to the registration statement using standard accounting methods that do not amount to "statistical tracing"; and (ii) tracing purchases of Rivian Class A common stock to the registration statement is amenable to class-wide proof. Dkt. No. 218-4. Class Counsel prepared additional briefing related to the sealing of certain portions of the exhibits filed with the Motion to Certify (Dkt. No. 219),[18] which the Court granted on December 11, 2023. Dkt. No. 225. On the same day, the Court set the hearing on Plaintiffs' Motion to Certify for April 19, 2024. Dkt. No. 224.[19]

133.   Defendants took the depositions of Plaintiffs' experts, Dr. Nye and Dr. Mitts, on January 12 and 19, 2024, respectively, which Class Counsel prepared for and defended.

134.   The Rivian Defendants opposed Plaintiffs' Motion to Certify on February 29, 2025. Dkt. No. 251. This opposition was accompanied by reports from Defendants' experts, David I. Tabak, Ph.D. ("Dr. Tabak") of National Economic Research Associates and Lawrence W. Smith, CPA. ("Mr. Smith"). Dkt. No. 251. In their opposition, the Rivian Defendants argued that: (i) Plaintiffs failed to establish predominance because the class could not rely on an efficient market; (ii) the alleged misstatements had no impact on Rivian's stock price; and (iii) Plaintiffs were inadequate class representatives. Dkt. No. 251 at 6-21. The Underwriter Defendants joined in the Rivian Defendants' opposition. Dkt. No. 252. Additionally, the Rivian Defendants prepared additional briefing related to sealing certain exhibits filed with their opposition (Dkt. No. 253), which the Court granted on

---

[18]   Plaintiffs' request to seal was narrowly targeted to information that would identify confidential witnesses cited in the Complaint and Amended Complaint.

[19]   The hearing date was ultimately moved to May 10, 2024. Dkt. No. 229.

NIRMUL DECL. ISO PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, & CLASS COUNSEL'S ATTORNEYS' FEES & EXPENSES

March 7, 2024. Dkt. No. 260.

135. Following the filing of Defendants' opposition, Class Counsel thoroughly prepared to depose Defendants' experts, and took the depositions of Mr. Smith and Dr. Tabak on April 9 and April 11, 2024, respectively.

136. Plaintiffs filed a reply in further support of their Motion to Certify on April 19, 2024. Dkt. No. 298. Plaintiffs' reply was accompanied by an expert reply report prepared by Dr. Nye, (Dkt. No. 298-2) and exhibits, including transcripts from the class certification depositions of Dr. Tabak and Mr. Smith. Dkt. Nos. 298-3, 298-4. In their reply, Plaintiffs argued that: (i) Plaintiffs, through Dr. Nye, proposed a well-accepted class-wide damages methodology and class-wide issues predominate; and (ii) Plaintiffs are adequate class representatives. Dkt. No. 298 at 3-20. On April 26, 2024, the Rivian Defendants moved for leave to file a sur-reply in support of their opposition. Dkt. No. 299.

137. The Court held a hearing on Plaintiffs' Motion to Certify on May 10, 2024. Dkt. No. 321. At the hearing the Court granted the Rivian Defendants' motion for leave to file a sur-reply and took Plaintiffs' Motion to Certify under submission. *Id*.

138. By Order dated July 17, 2024, the Court granted Plaintiffs' Motion to Certify ("Class Certification Order"). Dkt. No. 392. Specifically, the Court certified the following two Classes: (i) For 1934 Act Claims: All persons and entities who purchased or otherwise acquired Rivian Class A common stock between November 11, 2021, and March 10, 2022, inclusive, and were damaged thereby;[20] and (ii) For 1933 Act Claims: All persons and entities who purchased or otherwise acquired Rivian Class A common stock between November 10, 2021, and March 10, 2022, inclusive, and were damaged thereby.[21] *Id*. The

---

[20] The Class excludes those who purchased Rivian Class A common stock at the fixed IPO price.

[21] Both Classes exclude Defendants and their families, the officers, directors and affiliates of Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

NIRMUL DECL. ISO PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, & CLASS COUNSEL'S ATTORNEYS' FEES & EXPENSES

Court also (i) appointed AP7 and Muhl as Class Representatives, and (ii) appointed Kessler Topaz as Class Counsel and Larson as Liaison Counsel for the Classes. *Id*. The Court directed the Parties to meet and confer regarding class notice and ordered the proposed notice be filed on or before August 23, 2024. *Id*.

### 2. Class Notice Campaign

139. As directed in the Class Certification Order, Plaintiffs, on August 23, 2024, filed an unopposed motion to approve the form and manner of notifying the Classes of the pendency of the Action as a class action (i.e., Class Notice) and to appoint Verita as the administrator in connection with the dissemination of notice ("Class Notice Motion"). Dkt. No. 400. On October 11, 2024, Class Counsel filed a notice of non-opposition advising the Court that the deadline for responses to the Class Notice Motion had passed and there was no opposition to the motion. Dkt. No. 404.

140. The Court issued an Order granting Plaintiffs' Class Notice Motion on October 23, 2024 ("Class Notice Order"). Dkt. No. 406. By its Class Notice Order, the Court found the proposed Class Notice sufficient under Rule 23 and ordered the submission of revised notices and an estimate of administration costs. *Id* at 6. Plaintiffs submitted revised notices and a declaration from Verita regarding estimated administration costs on November 4, 2024. Dkt. No. 407. On November 5, 2024, the Court entered an Order (i) approving the revised notices; (ii) approving Verita as the notice administrator; and (iii) ordering the Parties to carry out the notice procedures previously approved by the Class Notice Order. Dkt. No. 408.

141. Pursuant to the Class Notice Order, Class Notice was disseminated to potential Class Members and nominees via First-Class mail or email beginning on November 12, 2024. Dkt. No. 504, ¶¶ 3-10. The Class Notice provided Class Members with the opportunity to request exclusion from the Classes, explained that right, and set forth the procedures for doing so. *Id*. at Ex. B. The Class Notice stated that it would be within the Court's discretion whether to allow a second opportunity to request exclusion if there was a settlement. *Id*., ¶ 19.a. The Class Notice also informed Class Members that if they chose

NIRMUL DECL. ISO PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, & CLASS COUNSEL'S ATTORNEYS' FEES & EXPENSES

to remain a Class Member, they would "be bound by all past, present, and future orders and judgments in the Action, whether favorable or unfavorable." *Id*. In accordance with the Class Notice Order, Verita also caused a summary notice of the pendency of the Action as a class action to be published in *The Wall Street Journal* and transmitted over *PR Newswire* on December 9, 2024. Dkt. No. 504, ¶ 11.

142. On March 24, 2025, Plaintiffs filed the Declaration of Lance Cavallo on behalf of Verita, who reported that Verita had disseminated a total of 925,408 postcard notices and 292 notices to potential Class Members and nominees via First-Class mail or email. *Id*., ¶ 10. The deadline for requesting exclusion from the Classes was March 4, 2025. A total of 131 requests for exclusion were received. Of the 131 exclusion requests, 126 were timely (i.e., postmarked/received on or before March 4, 2025) and 5 were late (i.e., postmarked/received after March 4, 2025). *Id*., ¶ 16. *See also* Appendix 1 to the Stipulation.

**I.      Defendants' Summary Judgment Motion and the Parties' *Daubert* Motions**

**1.      Defendants' Summary Judgment Motion**

143. On July 3, 2025, Defendants moved for summary judgment under Rule 56 ("Summary Judgment Motion"). Dkt. Nos. 591, 591-1. Defendants' Summary Judgment Motion was accompanied by a statement of uncontroverted facts (Dkt. No. 591-2), a declaration, and 204 exhibits (Dkt. Nos. 592-96). In their motion, Defendants asserted that Plaintiffs could not demonstrate any triable issues of material fact and thus, Defendants were entitled to judgment as a matter of law. Dkt. No. 591-1. Specifically, Defendants argued, *inter alia*, that: (i) there was no Section 10(b) securities fraud because Plaintiffs could not prove that the statements in Rivian's Prospectus or during the Q3 2021 Earnings Call were materially false or misleading and there was no evidence of any fraudulent intent by the individual Defendants; (ii) Plaintiffs could not prove loss causation because, among other reasons, the market (a) already knew the alleged corrective information that Rivian's vehicles were not initially profitable, (b) expected a price increase, and (c) did not assume

NIRMUL DECL. ISO PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, & CLASS COUNSEL'S ATTORNEYS' FEES & EXPENSES

Rivian's profitability required R1 profitability; (iii) there were no violations of Sections 11 and 12 of the Securities Act, because Plaintiffs could not show that known material trend about BOM required disclosure under Item 303 or that material factors were required for Item 105; (iv) the independent directors acted diligently; and (v) no independent director was a control person. Dkt. No. 591-1 at 7-32. Defendants completed filing all of the documents in support of their Summary Judgment Motion on July 4, 2025. Dkt. Nos. 593-603.

144. On July 22, 2025, the Parties filed a joint stipulation to amend the scheduling order to continue the summary judgment deadlines. Dkt. No. 609. By Order dated July 25, 2025, the Court amended the scheduling order to continue the summary judgment deadlines pursuant to the Parties' joint stipulation. Dkt. No. 610. Pursuant to the scheduling order: (i) the last day to file an opposition to the motions for summary judgment was August 8, 2025; (ii) the last day to file a reply in support of the motions for summary judgment was September 5, 2025; and (iii) the hearing on summary judgment was set for September 19, 2025 at 10:30 a.m. *Id.*

145. On July 29, 2025, the Parties filed a joint stipulation to continue the hearing date on Defendants' Summary Judgment Motion to September 26, 2025. Dkt. No. 611. On August 1, 2025, the Court continued the hearing date to September 26, 2025 at 10:30 a.m. Dkt. No. 612.

146. On August 8, 2025, Plaintiffs opposed Defendants' Summary Judgment Motion. Dkt. No. 614. Plaintiffs' opposition was accompanied by a declaration attaching 398 exhibits (Dkt. No. 614-1), a statement of genuine disputes and a statement of additional material facts (Dkt. No. 614-79), and a statement of evidentiary objections to Defendants' declarations and evidence in support of their Summary Judgment Motion (Dkt. No. 614-80). Plaintiffs argued, *inter alia*, that: (i) as to the Securities Act claims, triable issues existed concerning whether the Management's Discussion & Analysis Section violated Sections 11 and 12(a)(2) and regarding negative causation; (ii) as to the Exchange Act claims, triable issues existed concerning falsity and scienter, and whether Defendants'

NIRMUL DECL. ISO PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, & CLASS COUNSEL'S ATTORNEYS' FEES & EXPENSES

statements caused the economic loss following the March 1 price increase; and (iii) triable issues existed regarding the Director Defendants' diligence, good faith, and control. Dkt. No. 614 at 11-29.

147. On September 5, 2025, Defendants filed a reply in support of their Summary Judgment Motion. Dkt. No. 687. Defendants also filed: (i) a response to Plaintiffs' evidentiary objections to declarations and evidence in support of Defendants' Summary Judgment Motion (Dkt. No. 688); (ii) objections to Plaintiffs' evidence offered in opposition to Summary Judgment Motion (Dkt. No. 689); and (iii) a response to Plaintiffs' statement of genuine disputes and statement of additional material facts (Dkt. No. 690).

148. On September 20, 2025, the Court ordered that the hearing on Defendants' Summary Judgment Motion be continued to October 24, 2025 at 10:30 a.m., and the hearing on all *Daubert* motions (detailed below) be continued to November 21, 2025 at 10:30 a.m. Dkt. No. 747.

### 2.     The Parties' *Daubert* Motions

149. On August 29, 2025, the Parties filed seven *Daubert* motions seeking to exclude, in whole or in part, the testimony of two plaintiff experts and five defense experts. Dkt. Nos. 666-67, 670-71, 674-76.

### a)     Defendants' *Daubert* Motions

150. On August 29, 2025, Defendants moved to exclude two of Plaintiffs' experts, Charles Baker ("Mr. Baker") and Robert J. Jackson, Jr. ("Professor Jackson"). Dkt. Nos. 666-67.

151. With respect to Mr. Baker, Defendants argued that the opinions of Mr. Baker, a seasoned automotive professional who Plaintiffs retained to explain BOM for the Rivian R1 models, were unreliable as he (i) lacked relevant experience assessing BOM costs for EVs or startup automakers; (ii) failed to identify any methodology to support his opinions; (iii) possessed irrelevant experience that did not constitute methodology; and (iv) prepared an expert report that was written by counsel. Dkt. No. 666 at 4-13.

152. Likewise, Defendants moved to exclude the opinion and testimony of

NIRMUL DECL. ISO PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, & CLASS COUNSEL'S ATTORNEYS' FEES & EXPENSES

Professor Jackson, a former SEC Commissioner and the Nathalie P. Urry Professor of Law at the New York University School of Law, who provided expert opinions and testimony concerning the disclosure regimes under the federal securities laws and the disclosure frameworks developed by practitioners in response to those regimes. Dkt. No. 667. Defendants argued that Professor Jackson's opinions should be excluded because: (i) he has no expertise in "practitioner frameworks;" (ii) his report consisted entirely of legal and policy advocacy, which do not assist the trier of fact; (iii) his testimony purportedly on behalf of the SEC and other entities was misleading and confusing, and may be excluded under Federal Rule of Evidence 403 given its lack of any probative value; and (iv) his report was supported by unsound methodology only. Dkt. No. 667 at 4-18.

### b)    Plaintiffs' *Daubert* Motions

153.    On August 29, 2025, Plaintiffs similarly moved to exclude five of Defendants' experts: (i) Robert Bartlett ("Professor Bartlett"), who offered opinions concerning independent director due diligence (Dkt. No. 670); (ii) Daniel R. Fischel ("Mr. Fischel"), who offered opinions concerning loss causation and damages (Dkt. No. 671); (iii) Peter Hasenkamp ("Mr. Hasenkamp"), who offered opinions concerning BOM costs in the EV industry and to evaluate Rivian's R1 BOM cost projections during the relevant period (Dkt. No. 674); (iv) Steven Schwartz, Ph.D. ("Dr. Schwartz"), who offered opinions concerning automotive pricing strategies, Rivian's R1 pricing decisions, and EV industry economics during the relevant period (Dkt. No. 675); and (v) Mr. Smith, who offered opinions concerning Defendants' LCNRV calculations and disclosures (Dkt. No. 676). Plaintiffs' *Daubert* motions were accompanied by a declaration attaching 40 exhibits. Dkt. No. 677.

154.    *First*, in Plaintiffs' motion to exclude Professor Bartlett's opinions and testimony, Plaintiffs argued that Professor Bartlett's three expert reports improperly: (i) opined on legal issues, including the reasonableness of the investigation undertaken by the independent directors and the customary standards of care in conducting a reasonable investigation; (ii) opined on the mental state of the independent directors and the SEC; and (iii) rehashed record evidence in support of the independent directors' factual narrative.

NIRMUL DECL. ISO PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, & CLASS COUNSEL'S ATTORNEYS' FEES & EXPENSES

Dkt. No. 670-1 at 4-16.

155.    *Second*, Plaintiffs' motion to exclude Mr. Fischel's rebuttal report addressing the loss causation opinions expressed by Plaintiffs' expert, Dr. Nye, in connection with Plaintiffs' Exchange Act claims, argued that: (i) Mr. Fischel applied a "mirror image" corrective disclosure standard that has been roundly rejected by courts in the Ninth Circuit, including this Court; (ii) Mr. Fischel's analysis was fundamentally inconsistent with Plaintiffs' claims, specifically, as he considered whether information concerning Rivian's BOM costs was revealed to investors during the Class Period rather than whether the market learned of information concerning Rivian's plan to implement post-IPO R1 price increases—an error that rendered his methodology unreliable and his opinion unsupported and unhelpful; and (iii) certain of Mr. Fischel's opinions were unreliable because they were based on a fundamental statistical fallacy—namely, that a stock price decline that is not statistically significant is attributable to random chance. Dkt. No. 671-1 at 3-8.

156.    *Third*, in Plaintiffs' motion to exclude Mr. Hasenkamp's opinions proffered in nine reports, Plaintiffs argued that: (i) Mr. Hasenkamp lacked the qualifications to testify about industry specialists or analysts, or the disclosure obligations and statements of publicly traded companies; (ii) Mr. Hasenkamp's opinions were premised upon his review of publicly available materials, which do not require any special competency and would not assist the trier of fact; (iii) several of Mr. Hasenkamp's opinions were not based on sufficient facts or data or the product of a reliable methodology; (iv) Mr. Hasenkamp improperly opined as to ultimate issues of facts or law, including as to relevance, Plaintiffs' experts and their opinions, Defendants' state of mind and disclosure obligations, and the falsity of Defendants' statements; and (v) Mr. Hasenkamp proffered improper rebuttal opinions. Dkt. No. 674-1 at 3-21.

157.    *Fourth*, in Plaintiffs' motion to exclude Dr. Schwartz's opinions and testimony, Plaintiffs argued that: (i) Dr. Schwartz's opinions concerning the economic reasonableness of Rivian's conduct were inadmissible; (ii) Dr. Schwartz's state-of-mind opinions were inadmissible; (iii) Dr. Schwartz's opinions regarding impact of economic

NIRMUL DECL. ISO PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, & CLASS COUNSEL'S ATTORNEYS' FEES & EXPENSES

conditions on Rivian and other EV manufacturers were inadmissible; (iv) Dr. Schwartz's narrative opinions were inadmissible; and (v) Dr. Schwartz's rebuttal opinions were inadmissible. Dkt. No. 675-1 at 5-20.

158. *Finally*, Plaintiffs' motion to exclude Mr. Smith's opinions and testimony argued that Mr. Smith's opinions were unpersuasive and failed to meet *Daubert*'s stringent requirements. Dkt. No. 676-1. Specifically, Plaintiffs argued that in opposition to class certification, Defendants offered Mr. Smith's opinions as evidence that investors should have been able to divine from Rivian's LCNRV disclosures that R1 BOM costs exceeded retail prices at the time of the IPO. *Id.* at 1, 6-18. The Court found Mr. Smith's opinions unpersuasive and ignorant of all the inputs under Generally Accepted Accounting Principles ("GAAP") that are required to be considered in connection with an LCNRV charge that had nothing to do with Rivian's BOM. *Id.* Plaintiffs argued that at the merits stage, Defendants improperly sought to offer Mr. Smith's opinions and testimony that Rivian adequately disclosed the risks related to material costs, were not required by GAAP or SEC rule to disclose its R1 BOM costs to investors, and the opinions of Plaintiffs' expert, Harris Devor, are irrelevant to the Action. *Id.*

159. On September 19, 2025, Defendants filed their oppositions to Plaintiffs' *Daubert* motions. Dkt. Nos. 737-41. Defendants' opposition was accompanied by a declaration attaching six exhibits. Dkt. No. 742.

160. The briefing related to Defendants' Summary Judgment Motion and the Parties' *Daubert* motions was comprehensive, as Defendants forcefully challenged nearly every substantive element of the Classes' claims and moved to exclude two of Plaintiffs' experts. Indeed, Plaintiffs and Class Counsel devoted substantial time, effort, and resources into marshaling the evidence they had obtained during discovery and the pertinent legal authorities to oppose Defendants' motions, culminating, for example, in the Classes' submission of 398 individual exhibits in support of their opposition to the Summary Judgment Motion. *See* Dkt. No. 614-1. The Parties prepared additional briefing related to the sealing and confidentiality of certain documents and exhibits. Dkt. Nos. 598, 616, 647,

668, 678, 692, 701-02, 727, 743. The Parties' applications for sealing documents were fully briefed, and by Court order, certain materials were directed to remain under seal. Dkt. Nos. 646, 659, 686, 696, 699, 734.

**J.      Work with Plaintiffs' Experts**

161.    Given the complexity of the issues implicated by the Classes' claims in this Action, Plaintiffs retained numerous experts to serve as consultants and/or trial witnesses. These experts analyzed and/or offered opinions on relevant matters at different stages of the litigation.

162.    As discussed above in Section H, in connection with their Motion to Certify, Plaintiffs retained Dr. Nye, an experienced financial economist, to provide expert opinions and testimony in reports and at a deposition regarding market efficiency and the existence of class-wide methodologies for calculating damages. Dr. Nye was also retained to respond to arguments made by Defendants and their experts, including arguments concerning price impact. In addition, Plaintiffs retained Dr. Mitts, the David J. Greenwald Professor of Law at Columbia Law School, to provide expert opinions and testimony in reports and at a deposition concerning the Classes' ability to trace Rivian common stock purchases on a class-wide basis.

163.    During the merits phase of the case, Plaintiffs retained seven experts to provide expert opinions and testimony related to the Classes' claims:

- Dr. Nye provided expert opinions and testimony concerning loss causation and damages;

- Dr. Mitts provided expert opinions and testimony concerning tracing;

- Professor Jackson provided expert opinions and testimony concerning the disclosure regimes under the federal securities laws and the disclosure frameworks developed by practitioners in response to those regimes;

- Mr. Baker provided expert opinions and testimony concerning Rivian's R1 BOM cost projections as of the date of the IPO;

NIRMUL DECL. ISO PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, & CLASS COUNSEL'S ATTORNEYS' FEES & EXPENSES

- James F. Miller, a former investment banker, provided expert opinions and testimony concerning underwriter due diligence;

- Benjamin Sacks, a financial economist at The Brattle Group, provided expert opinions and testimony concerning Rivian's projections for R1 BOM costs and per-unit gross margins during the relevant period; and

- Harris Devor, a Managing Director at CBIZ, provided expert opinions and testimony concerning the GAAP requirements related to calculating LCNRV inventory reserves, and Rivian's calculations of such reserves during the relevant time period.

164.   Plaintiffs' experts each submitted an opening expert report in this matter on April 25, 2025, and a rebuttal report on May 9, 2025. In addition, each sat for a merits deposition between May 22, 2025 and June 17, 2025.

165.   Plaintiffs engaged in extensive discussions with each of these experts as they prepared their opening and rebuttal reports. Plaintiffs also extensively prepared these experts for their merits depositions.

166.   Plaintiffs also consulted with each expert in preparing for the depositions of Defendants' merits experts, which included:

- Mr. Fischel, who offered opinions concerning loss causation and damages;

- Mr. Hasenkamp, who offered opinions concerning BOM costs in the EV industry and to evaluate Rivian's R1 BOM cost projections during the relevant period;

- Gary Lawrence, who offered opinions concerning underwriter due diligence, including the customs and practices related to such due diligence;

- Dr. Schwartz, who offered opinions concerning automotive pricing strategies, Rivian's R1 pricing decisions, and EV industry economics during the relevant period;

- Mr. Smith, who offered opinions concerning Defendants' LCNRV calculations and disclosures; and

- Professor Bartlett, who offered opinions concerning independent director due diligence.

NIRMUL DECL. ISO PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, & CLASS COUNSEL'S ATTORNEYS' FEES & EXPENSES

167.   Lastly, Dr. Nye also assisted Plaintiffs' Counsel in their mediation efforts and in developing the proposed Plan of Allocation.

### K.    Preparation for Trial

168.   At the time of settlement, there was no trial date set for the matter.

169.   Pursuant to the Court's July 31, 2023 scheduling Order, a final pretrial conference was set for May 30, 2025. Dkt. No. 180. On July 25, 2024, the Court issued an amended scheduling Order setting the final pretrial conference for July 25, 2025. Dkt. No. 394. Then, on October 3, 2024, the Court amended the final pretrial conference date to October 17, 2025, pursuant to the Parties' joint stipulation adjusting pretrial schedule. Dkt. Nos. 402-03. Finally, on January 10, 2025, the Court issued an amended scheduling Order that set the final pretrial conference date to December 5, 2025, pursuant to the Parties' stipulation to amend the scheduling order. Dkt. Nos. 438, 447.

170.   Plaintiffs began preparing for trial during the summer of 2025. In connection with this process, Plaintiffs began putting together the pre-trial order documents, including research and preparation of jury instructions, a verdict form, trial exhibits, deposition designations, and potential *in limine* motions. Plaintiffs also conferred with prospective jury consultants in connection with an anticipated focus group for the fall of 2025.

## III.    THE SETTLEMENT

### A.    The Parties' Mediation and Settlement Negotiations

171.   The Parties began discussing a possible resolution of the Action following the Court's certification of the Classes. On October 30, 2024, Plaintiffs and the Rivian Defendants participated in an in-person mediation session with Judge Phillips in New York, New York. Prior to the mediation, Plaintiffs and the Rivian Defendants exchanged and also submitted to Judge Phillips detailed mediation statements with exhibits. After a full-day mediation session, however, Plaintiffs and the Rivian Defendants were unable to reach an agreement to resolve the Action and litigation efforts continued.

172.   Nearly a year later—following full briefing on Defendants' motion for summary judgment, the Parties resumed settlement discussions with the continued

NIRMUL DECL. ISO PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, & CLASS COUNSEL'S ATTORNEYS' FEES & EXPENSES

assistance of Judge Phillips. After extensive negotiations, Judge Phillips issued a mediator's recommendation for the Parties to resolve the matter for $250 million, and on September 19, 2025, both sides accepted the mediator's recommendation. The Parties negotiated a confidential term sheet ("Term Sheet") setting forth the main terms of their agreement, which they executed on October 3, 2025.

**B.    Preparation of Settlement Documentation and Preliminary Approval Motion**

173.    Thereafter, Class Counsel began working on various documents in connection with the Parties' agreement to settle the Action, as well as Plaintiffs' anticipated motion for preliminary approval of the Settlement. During this time, Class Counsel also worked closely with Plaintiffs' damages expert Dr. Nye (and his colleagues at Stanford Consulting) to develop the proposed Plan of Allocation. *See* Section VI below. In addition, Class Counsel worked with The Huntington National Bank to set up the Escrow Account to receive and hold the Settlement Amount.

174.    Over the following weeks, counsel for the Parties negotiated the specific terms of the Stipulation, exchanging multiple drafts of the Stipulation as well as the exhibits thereto. After negotiating the specific terms of their agreement, the Parties executed the Stipulation setting forth their final and binding agreement to settle the Action on October 23, 2025. Dkt. No. 750-3.[22] That same day—i.e., the day prior to the scheduled hearing on Defendants' Summary Judgment Motion, Plaintiffs filed the Stipulation and related exhibits along with their Notice of Motion and Unopposed Motion for Preliminary Approval of Proposed Settlement and Authorization to Disseminate Notice to the Classes and supporting memorandum ("Preliminary Approval Motion"). Dkt. No. 750. The Court subsequently

---

[22]    On the same day, the Parties also entered into a confidential Supplemental Agreement which would apply only if the Court required a second opportunity to opt out of the Classes. In the Preliminary Approval Order, the Court exercised its discretion not to allow a second opportunity for Class Members to exclude themselves from the Classes in connection with the Settlement proceedings. Dkt. No. 758, § III.C.4. Accordingly, the Supplemental Agreement is moot.

NIRMUL DECL. ISO PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, & CLASS COUNSEL'S ATTORNEYS' FEES & EXPENSES

vacated Defendants' Summary Judgment Motion and other outstanding motions. Dkt. No. 751. On October 31, 2025, Defendants filed a notice of non-opposition to Plaintiffs' Preliminary Approval Motion. Dkt. No. 752.

175.   The Court held a hearing on Plaintiffs' Preliminary Approval Motion on November 21, 2025. Dkt. No. 756. At the hearing, the Court requested the submission of revised notice documents, which Plaintiffs filed on November 24, 2025. Dkt. No. 755. On December 18, 2025, the Court entered its Preliminary Approval Order, which, among other things, preliminarily approved the Settlement, directed notice of the Settlement to the Classes, and set the Settlement Hearing for May 15, 2026, at 10:30 a.m. Dkt. No. 758.

## IV.   RISKS OF CONTINUED LITIGATION AND DAMAGES

176.   As detailed above, when the Settlement was reached, the Parties were awaiting a decision on Defendants' Summary Judgment Motion, briefing seven *Daubert* motions, and Plaintiffs were beginning trial preparations. Through Plaintiffs' extensive and diligent efforts, including, among other things: (i) issuing document requests and interrogatories to Defendants; (ii) serving subpoenas on 45 third parties; (iii) reviewing and analyzing over 3.5 million pages of documents; (iv) searching for and producing 1,102 pages of documents and written discovery responses to Defendants; (v) reviewing and analyzing thousands of privilege log entries; (vi) preparing for, taking, and/or defending 48 depositions; (vii) exchanging 15 opening and rebuttal expert reports; and (viii) briefing 12 discovery-related motions before Magistrate Judge Eick, Class Counsel was armed with a comprehensive understanding of the risks related to further litigation and eventually trying the claims in this Action before a jury.

177.   While Plaintiffs remained steadfastly confident in the merits of their claims and the merits of Plaintiffs' opposition to Defendants' Summary Judgment Motion, there was a risk that the Court could rule in Defendants' favor, or substantially limit Plaintiffs' case going into trial. And, even if Plaintiffs survived Defendants' Summary Judgment Motion, the success of the case hinged on how the jury would receive the Parties' theories and arguments at trial, which was fraught with significant risks attendant to the unique facts

NIRMUL DECL. ISO PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, & CLASS COUNSEL'S ATTORNEYS' FEES & EXPENSES

of this case, as discussed below. Throughout the Action, Defendants vehemently denied any culpability and were prepared to aggressively defend their position at trial, which could have potentially foreclosed any recovery for the Classes. If the Court at summary judgment or a jury at trial sided with Defendants on any of their defenses, Class Members could have recovered nothing. Moreover, even if Plaintiffs were to fully prevail at trial, Defendants would likely appeal the verdict, resulting in further risk of little to no recovery for the Classes, and significant delay.

178.    Several of the most serious risks of an adverse outcome faced by the Classes are set forth below. Plaintiffs and Class Counsel carefully considered each of these risks (and others) at various stages of the litigation. Ultimately, consideration of the risks and unique complexities of the Classes' claims, thoroughly vetted during the pendency of the Action as well as during the Parties' settlement negotiations, informed Plaintiffs' conclusion that the Settlement represents an excellent result for the Classes.

**A.    Risks to Establishing Defendants' Liability**

179.    As the Court is aware, the core allegations in this case were built on the credible accounts of former employees of Rivian, including Laura Schwab, that in substance claimed that Rivian's management had developed a pre-IPO plan to increase prices for Rivian's vehicles after the IPO because the costs of the parts necessary to build the vehicles exceeded the retail price (an issue that Schwab had raised with several executives before she was fired). At all times, the success of Plaintiffs' claims hinged on the critical assumptions that the Court at summary judgment and a jury at trial would: (i) accept that the evidence would show that the cost of the parts needed to build Rivian's R1 vehicles exceeded the retail prices set for these vehicles, that a material price increase and/or a significant reduction in features was necessary to ensure Rivian's viability as a business, and that satisfying Rivian's pipeline of pre-orders at the prices promised to customers would cause significant financial harm to the Company; (ii) find that the evidence Plaintiffs had collected was sufficient to prove that Defendants failed to disclose these risks of price increases and the reduction of standard features for the Company's vehicles in Rivian's

NIRMUL DECL. ISO PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, & CLASS COUNSEL'S ATTORNEYS' FEES & EXPENSES

Registration Statement; (iii) find that the evidence was sufficient to demonstrate that Rivian, its senior executives, directors, and underwriters were made sufficiently aware of the fact that the cost of the materials to build the R1 vehicles far exceeded Rivian's retail prices for those cars, so as to establish that Defendants made their statements either with knowledge or deliberate recklessness as to the fact that their statements were misleading; and (iv) accept the evidence and conclusions of Plaintiffs' economic expert that the revelation of the facts concealed by Defendants' misrepresentations caused the stock price declines on March 2 and 11, 2022. Each of these core elements of Plaintiffs' claims against Defendants was vigorously challenged, not just in terms of whether sufficient evidence existed to support Plaintiffs' claims, but even as to whether the evidence that existed could credibly be interpreted to be evidence of Defendants' intentionally or negligently misleading disclosures to investors about whether Rivian could be profitable without raising prices or significantly reducing the cost of its parts. These core questions would necessarily turn on evidentiary issues that would need to be decided through *in limine* motions or at trial, and then through the perspectives of a jury.

180. At trial, the jury would be asked to evaluate Plaintiffs' claims that the alleged misstatements at issue in the Action were materially false or misleading based on the evidence that Plaintiffs would argue demonstrated that absent a material increase in R1 retail prices and/or a significant reduction in material costs, no amount of scaling would make Rivian profitable. Contrasting this evidence, jurors would hear from Defendants that BOM costs were not locked in and Rivian could always negotiate for cost reductions once production ramped up, Rivian did not make a decision to raise prices for its R1 vehicles until February 2022, based on unforeseen supply chain disruptions, and, at the time of the IPO, Rivian forecasted profitability even without price increases.

181. Defendants also argued that the fact that Rivian's BOM exceeded the retail price at the time of the IPO was evident in Rivian's SEC disclosures wherein Rivian had taken write downs of its inventory and disclosures that these write downs were related to LCNRV accounting, which requires write downs of inventory where the realizable value

NIRMUL DECL. ISO PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, & CLASS COUNSEL'S ATTORNEYS' FEES & EXPENSES

upon sale of the built product is less than the cost of the inventory. Rivan offered expert evidence regarding this truth on the market defense and it was a point of vigorous litigation and expert opinion.

182.  In addition, Defendants would have disputed whether evidence of material costs for initial vehicles exceeding the sale price of those vehicles rendered Defendants' statements false and misleading. Defendants likely would have argued that in the early stages of any EV manufacturing process, components are continually refined and redesigned to account for production workflows, machinery uses prototype tooling that wears out quickly, and suppliers charge a "start-up" premium to offset costs and risks, and thus, before and after the IPO, Rivian properly forecasted that its BOM would decline considerably with scale. Defendants would have argued that because BOM declined with scale, in Q4 2024, Rivian achieved profitability, just like Defendants said it would.

183.  Similarly, Plaintiffs expected Defendants to mount a potentially powerful defense on the element of scienter. For example, Defendants would have asserted that Plaintiffs had no evidence that any individual Defendants knew about erroneous and materially understated cost estimates for building Rivian's R1 vehicles leading up to the IPO, and that the alleged misstatements and omissions were therefore not made with intent to defraud. In so arguing, Defendants would have presented potentially persuasive live testimony from current and former Rivian employees with first-hand knowledge of the Company's pricing strategies and the development and manufacture of the R1 vehicle portfolio.

184.  In addition to the defenses on whether any of the statements in the offering materials were misleading, or whether any Defendant named in the Exchange Act claims had scienter, Class Counsel expected the Underwriter and Director Defendants to mount significant good faith defenses to their liability under the Securities Act. There were competing expert opinions on the due diligence defenses asserted by these Defendants and if accepted, Rivian and the Executive Defendants would be left as the sole defendants in the case.

NIRMUL DECL. ISO PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, & CLASS COUNSEL'S ATTORNEYS' FEES & EXPENSES

## B.    Risks Concerning Loss Causation and Damages

185.    Even if Plaintiffs defeated Defendants' liability arguments, they still faced significant risks in establishing loss causation and damages. Damages in securities cases like this one are typically measured by the amount a company's stock price declines, net of industry and market forces, in response to the disclosure(s) of corrective information.

186.    In its Class Certification Order, the Court held that Rivian's March 1, 2022 and March 10, 2022 disclosures were corrective disclosures related to Plaintiffs' claims. Dkt. No. 392 at 27, 29. However, Defendants vigorously argued at summary judgment that the evidentiary record did not support a finding that Rivian's March 1 and March 10 disclosures were corrective. Dkt. No. 591-1 at 24-25. Defendants likewise argued that the "truth" allegedly concealed by Defendants' false and misleading statements—including that Rivian planned to increase R1 prices—was known by the market before the alleged corrective disclosures. *Id.* at 21-23. Even if Plaintiffs demonstrated that Rivian's March 1 price increase was a corrective disclosure, they faced the risk that the Court would find it to be the *only* corrective disclosure—a result that would significantly reduce the Classes' recovery. Further, even if Plaintiffs survived all of Defendants' loss causation and damages challenges at summary judgment, the ultimate resolution of these issues would come down to a battle of the experts at trial, with "no guarantee whom the jury would believe." *Davis v. Yelp, Inc.*, 2022 WL 21748777, at *4 (N.D. Cal. Aug. 1, 2022) (citation omitted).

187.    For example, Defendants asserted and would continue to assert at trial that Plaintiffs had not provided a reliable method for proving loss causation and calculating the Classes' damages. With respect to loss causation, Defendants would have asserted, as they did at summary judgment, that Dr. Nye conceded that loss could only be attributed to the March 2 stock price decline. Even then, Defendants would argue that Dr. Nye failed to offer economic evidence that the March 1 price increase revealed that BOM exceeded sale prices, that Rivian could never be profitable without increasing prices, or that, pre-IPO, Rivian had decided to raise prices.

188.    Moreover, Defendants would have argued that the economic evidence did not

NIRMUL DECL. ISO PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, & CLASS COUNSEL'S ATTORNEYS' FEES & EXPENSES

support loss causation on March 10, and Dr. Nye failed to factor such evidence into his loss calculation. Dr. Nye did not disaggregate alternative explanations for the stock price decline in his economic analysis of that date. Therefore, Defendants would have argued that Dr. Nye's loss causation (and damages) methodology was unreliable. If the jury credited these arguments, damages could have been, at the very least, significantly reduced.

189. Further, Defendants would have argued that the March 11, 2022 decline was not statistically significant at the 95% level, and thus there was insufficient scientific evidence to demonstrate that it was caused by the market learning that R1T and R1S BOM costs were higher than their respective retail prices at the time of the IPO, or that there was an undisclosed trend of material costs far exceeding the R1's retail price at any time during the Class Period. Defendants would have argued that the fact of a price decline absent economic evidence linking the disclosure to the allegations does not establish that the price was artificially inflated at an earlier point in time. Had the jury accepted Defendants' or their experts' contentions on the statistical significance of the March 11, 2022 stock price decline, the Classes' damages could have been eliminated entirely.

190. In addition, with respect to damages, Defendants and their expert would have vigorously challenged Dr. Nye's opinion that the amount of artificial inflation in Rivian's stock price resulting from Defendants' false and misleading statements was constant throughout the Class Period. Defendants and their expert would have pointed out that the alleged misstatements themselves varied over time, that Dr. Nye ignored the economic evidence demonstrating that R1 input costs increased substantially after Rivian's IPO, and thus the impact of those increases could not have been disclosed in the Offering Materials. Given that variance, Defendants would have contended that it is implausible that the revelation of the concealed truth would have caused the exact same economic impact on Rivian's stock price on every single day of the Class Period.

191. While Plaintiffs were confident that they would overcome Defendants' challenges on these issues at summary judgment, there was a risk that the Court would grant Defendants' Summary Judgment Motion on loss causation grounds, which would have

NIRMUL DECL. ISO PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, & CLASS COUNSEL'S ATTORNEYS' FEES & EXPENSES

precluded any recovery by the Classes. Further, Plaintiffs fully expected Defendants to renew their challenges to proving loss causation and damages at trial. Even if Plaintiffs convinced a jury to render a unanimous verdict on liability, there were still significant risks in establishing the Classes' full amount of damages at trial. Plaintiffs' complex damages evidence also bore a risk of being rejected, in whole or in part, by the jury. For example, Plaintiffs' evidence to support their constant dollar inflation calculation was purely expert evidence, based on fairly technical economic analyses. While Plaintiffs believe their supporting evidence is strong, Defendants' economic expert would have asserted many technical grounds on which to reject the claim. Defendants also raised appealing, commonsense attacks on Plaintiffs' damages theory. Thus, Plaintiffs faced a real risk that a jury would embrace one of Defendants' simple damages arguments, or reject some of Plaintiffs' more complex damages evidence and award the Classes minimal, or no damages, even if liability and causation were otherwise established.

### C.   Jury Risks and Risks on Appeal

192.   In addition to the foregoing litigation risks, Plaintiffs would face additional risks at trial. The requirement of a unanimous jury verdict on liability meant that one single juror with entrenched sympathies towards Rivian or antipathies towards, among other things, class action lawsuits generally and investing in the stock market could defeat an otherwise meritorious case. Additionally, the prominence of Rivian as one of America's leading EV manufacturers increased the likelihood that one or more jurors would have difficulty awarding damages that could be seen as negatively impacting the Company. Class Counsel intended to test these topics and risks through a mock jury exercise.

193.   Even if Plaintiffs had prevailed at trial, post-trial motions and appeals would surely follow. Moreover, the appellate process could have extended for years, exposing Plaintiffs to the risk of having any favorable judgment reversed or reduced below the Settlement Amount. *See, e.g.*, *In re BankAtlantic Bancorp, Inc. Sec. Litig.*, 2011 WL 1585605, at *1 (S.D. Fla. Apr. 25, 2011) (granting defendants judgment as a matter of law on the basis of loss causation, overturning jury verdict and award in plaintiff's favor), *aff'd*

NIRMUL DECL. ISO PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, & CLASS COUNSEL'S ATTORNEYS' FEES & EXPENSES

*on other grounds sub nom.*, *Hubbard v. BankAtlantic Bancorp, Inc.*, 688 F.3d 713 (11th Cir. 2012); *Robbins v. Koger Props., Inc.*, 116 F.3d 1441, 1446, 1448-49 (11th Cir. 1997) (reversing jury verdict of over $81 million for plaintiffs against accounting firm on appeal on causation grounds, and judgment entered for defendant); *see also, e.g.*, Verdict Form, *Jaffe v. Household Int'l, Inc.*, No. 1:02-cv-05893 (N.D. Ill. May 7, 2009), Dkt. No. 1611 & Final Judgment and Order of Dismissal with Prejudice (N.D. Ill. Nov. 10, 2016), Dkt. No. 2267 (showing time from verdict to final judgment took seven years).

### D.    Insolvency Risk for Rivian

194.    At the time of the IPO, Rivian raised $13.7 billion in cash and ended 2021 with a cash balance of approximately $18 billion. The IPO price was $78 per share. At the time the Action settled in late-September 2025, Rivian's stock price was approximately $15 per share and its cash balance was projected to end 2025 at approximately $6 billion with an annual cash burn of $2.5 billion. As noted herein, damages in this case ranged from $1.87 to $2.04 billion before interest, and a judgment following trial in 2026 presented serious concerns about whether Rivian's solvency would have been affected by a judgment. As Rivian had indemnification agreements with the Underwriter Defendants, Director Defendants and other individual Defendants, any recovery from such Defendants necessitated a trial and an award of damages. Given this dynamic, Plaintiffs retained an economic consultant to advise on Rivian's solvency in the event of a judgment of varying sizes and of its continued solvency over the two-year period following trial and appeals. Based on these assessments, Plaintiffs weighed the potential risks of a settlement in the near term versus litigating against Rivian through trial and appeals.

### E.    Estimated Damages

195.    Plaintiffs' damages expert has estimated aggregate damages in this Action to range from approximately $1.87 billion to approximately $2.04 billion—the high-end assuming Plaintiffs could prove damages based on the March 1 and March 10 disclosures and would not need to disaggregate, or parse out, any confounding non-fraud related information on those dates. If Defendants had one or more of the alleged corrective

disclosures dismissed at summary judgment, or in proving that Plaintiffs had not adequately disaggregated the price impact of any confounding information, damages would be reduced if not eliminated. Additionally, at class certification and summary judgment, Defendants argued, in the alternative, that the Class Period should end no later than March 1, 2022, because: (i) the March 10 disclosure was not corrective; and (ii) the stock price decline on March 11, 2022, was not statistically significant. Dkt. No. 251 at 17-18; Dkt. No. 591-1 at 3, 25.[23] If this argument was credited, total aggregate damages, as estimated by Plaintiffs' damages expert, would be closer to $1.87 billion before accounting for any potentially confounding information.[24]

196.   Based on the foregoing estimates, the $250 million Settlement represents approximately 12.3% to 13.4% of the Classes' potential aggregate damages. This recovery reflects the informed assessment of Plaintiffs and their counsel of the strength of the Classes' claims and the risks of litigating this complex Action through a ruling on the pending Summary Judgment Motion, trial, and appeals.

197.   Moreover, if approved, the Settlement will provide a guaranteed near-term recovery to eligible Class Members.

## V.   COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER AND REACTION OF THE CLASSES TO DATE

198.   By its Preliminary Approval Order, the Court approved the appointment of Verita as the administrator for the Settlement—i.e., the Claims Administrator. Dkt. No. 758.[25] In accordance with the Preliminary Approval Order, Verita, working under Class

---

[23]   With respect to the March 10 disclosure, the Class Certification Order warned that "the absence of clear statistical significance and the mixed nature of the disclosures may affect Plaintiffs' success at later stages of the litigation." Dkt. No. 392 at 29.

[24]   Although Defendants did not raise any tracing-related arguments at summary judgment, there was a risk that at trial, or thereafter, Defendants could argue that many Class Members failed to trace their purchases of Rivian Class A common stock back to the IPO Registration Statement, which, if successful could have resulted in smaller damages.

[25]   The Court previously approved Verita to serve as the administrator for Class Notice. Dkt. No. 406.

NIRMUL DECL. ISO PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, & CLASS COUNSEL'S ATTORNEYS' FEES & EXPENSES

Counsel's supervision: (i) mailed by First-Class mail and/or emailed a copy of the Postcard Notice to potential Class Members who were previously mailed/emailed a copy of the Class Notice and any other potential Class Members identified through further reasonable effort, as well as followed up with the brokers and other nominees ("Nominees") who previously requested copies of the Class Notice in bulk to confirm the number of Postcard Notices they needed for this mailing; (ii) mailed a copy of the Notice and Claim Form (together, the "Notice Packet") to the Nominees contained in Verita's Nominee database; (iii) published the Summary Notice in *The Wall Street Journal* and transmitted it over the *PR Newswire*; and (iv) updated the Website, www.RivianSecuritiesLitigation.com, developed in connection with Class Notice to provide information about the Settlement, including posting downloadable copies of the Notice and Claim Form. Cavallo Decl., ¶¶ 4-14.

199. The Postcard Notice contains important information concerning the Settlement and, along with the Summary Notice, directs recipients to the Website for additional information regarding the Settlement (and the Action), including the long-form Notice, which includes, among other things, details about the Settlement and the proposed Plan of Allocation as Appendix A. Collectively, the notices provide the definitions of the Classes, a description of the Settlement, information regarding the claims asserted in the Action and information to enable Class Members to: (i) participate in the Settlement by completing and submitting a Claim Form; and (ii) object to any aspect of the Settlement, the Plan of Allocation, and/or the Fee and Expense Application. The notices also inform Class Members of Class Counsel's intent to: (i) apply for an award of attorneys' fees in an amount not to exceed 24% of the Settlement Fund; and (ii) request payment of Litigation Expenses in connection with the institution, prosecution, and resolution of the Action in an amount not to exceed $6.9 million, which amount may include a request for reimbursement of the reasonable costs and expenses incurred by Plaintiffs. *See* Cavallo Decl., Exs. A-B.

200. In accordance with the Preliminary Approval Order, Verita mailed Postcard Notices to potential Class Members and Nominees, as well as Notice Packets to Nominees, on January 20, 2026, and has continued to mail notices to potential Class Members and

NIRMUL DECL. ISO PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, & CLASS COUNSEL'S ATTORNEYS' FEES & EXPENSES

Nominees pursuant to requests. Cavallo Decl., ¶¶ 4-9. To date, Verita has disseminated 1,108,907 Postcard Notices and 531 Notices to potential Class Members and Nominees. *Id.*, ¶ 9. In addition, Verita caused the Summary Notice to be published in *The Wall Street Journal* and transmitted over *PR Newswire* on February 3, 2026. *Id.*, ¶ 11.[26]

201.    Contemporaneously with the mailing of the Postcard Notice, Verita updated the Website to provide Class Members and other interested parties with information concerning the Settlement and important dates and deadlines in connection therewith, as well as downloadable copies of the Postcard Notice, Notice, Claim Form, Stipulation, Preliminary Approval Motion, and Preliminary Approval Order, among others. *Id.*, ¶ 14. Additionally, Verita updated the interactive voice-response system callers hear when contacting the toll-free helpline for this matter in order to respond to inquiries regarding the Settlement. *Id.*, ¶ 12. Class Members with questions regarding the Settlement can also contact Verita by sending an email to the case-dedicated email address, info@RivianSecuritiesLitigation.com.

202.    As noted above and as set forth in the notices, the deadline for Class Members to submit an objection to the Settlement, the Plan of Allocation, and/or the Fee and Expense Application is April 24, 2026. To date, no objections have been received. Should any objections be received following this submission, Class Counsel will address them in its reply to be filed on May 1, 2026.[27]

---

[26]    Defendants also issued notice of the Settlement pursuant to the Class Action Fairness Act, 28 U.S.C. § 1715. Dkt. No. 753.

[27]    As discussed above, in connection with the Court's Class Notice Order (Dkt. No. 408), Class Notice was previously disseminated to potential members of the Classes to notify them of, among other things: (i) the Action pending against the Defendants; (ii) the Court's certification of the Action to proceed as a class action on behalf of the Court-certified Classes; and (iii) their right to request exclusion from the Classes, the effect of remaining in the Classes or requesting exclusion, and the requirements for requesting exclusion. As set forth on Appendix 1 to the Stipulation, 131 requests for exclusion were received pursuant to the Class Notice. In connection with preliminary approval of the Settlement, the Court exercised its discretion not to provide Class Members with a second opportunity to exclude themselves from the Classes in connection with the Settlement proceedings. Dkt. No. 758.

67                              Case No. 2:22-cv-01524-JLS-E
NIRMUL DECL. ISO PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, & CLASS COUNSEL'S ATTORNEYS' FEES & EXPENSES

## VI.  THE PROPOSED PLAN OF ALLOCATION IS FAIR, REASONABLE, AND ADEQUATE

203.  As explained in the Notice, Class Members who wish to receive a distribution from the Net Settlement Fund (i.e., the Settlement Fund less: (i) any Taxes; (ii) any Notice and Administration Costs; (iii) any Litigation Expenses awarded by the Court; (iv) any attorneys' fees awarded by the Court; and (v) any other costs or fees approved by the Court) must submit a valid Claim and all required supporting documentation to the Claims Administrator, Verita, postmarked (if mailed), or online via the Website, no later than April 20, 2026.[28] As provided in the Notice, the Net Settlement Fund will be distributed to Authorized Claimants[29] in accordance with the plan for allocating the Net Settlement Fund among Authorized Claimants approved by the Court.

204.  The Plan of Allocation proposed by Plaintiffs is attached as Appendix A to the Notice. *See* Cavallo Decl., Ex. B. The Plan is designed to achieve an equitable and rational distribution of the Net Settlement Fund among eligible Class Members. However, the Plan is not a formal damages analysis and the calculations made pursuant to it are not intended to be estimates of the amounts that Class Members might have been able to recover after a trial.

205.  Class Counsel developed the Plan in consultation with Plaintiffs' damages expert, Dr. Nye, and his colleagues at Stanford Consulting. The Plan creates a framework for the equitable distribution of the Net Settlement Fund among Class Members who suffered economic losses as a result of the alleged violations of the federal securities laws set forth in the Amended Complaint. To that end, Plaintiffs' damages expert considered price changes in Rivian Class A common stock in reaction to certain public disclosures

---

[28]  Verita will report on the Claims received, including preliminary Recognized Loss Amounts (as calculated pursuant to the Plan of Allocation), in connection with Plaintiffs' reply to be filed on May 1, 2026, after the Claims submission deadline has passed.

[29]  As defined in Paragraph 1(d) of the Stipulation, "Authorized Claimant" means "a Class Member who or which submits a Claim Form to the Claims Administrator that is approved by the Court for payment from the Net Settlement Fund."

NIRMUL DECL. ISO PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, & CLASS COUNSEL'S ATTORNEYS' FEES & EXPENSES

allegedly revealing the truth concerning Defendants' alleged misrepresentations and omissions, adjusting for price changes on those dates that were attributable to market and/or industry forces.[30]

206.   The Plan provides formulas for calculating Claimants' losses under both the Exchange Act (for purchases and acquisitions of Rivian Class A common stock during the period between November 11, 2021, and March 10, 2022, inclusive) and the Securities Act (for Rivian Class A common stock purchased or otherwise acquired pursuant or traceable to the Registration Statement filed in connection with the Company's IPO between November 10, 2021, and March 10, 2022, inclusive).[31] For shares of Rivian Class A common stock eligible for a recovery under both the Exchange Act and the Securities Act, the Recognized Loss Amount will be the *greater of*: (i) the Recognized Loss Amount under the Exchange Act calculation; or (ii) the Recognized Loss Amount under the Securities Act calculation.[32]

207.   As set forth in the Plan, a Claimant's losses will depend upon several factors, including the date(s) when the Claimant purchased or otherwise acquired his, her, or its shares of Rivian Class A common stock during the Class Period, and whether such shares

---

[30]   Section 11 of the Securities Act provides for an affirmative defense of negative causation, which prevents recovery for losses that Defendants prove are not attributable to misrepresentations and/or omissions alleged by Plaintiffs in the Registration Statement. Thus, calculation of Recognized Loss Amounts under the Securities Act assumes that the decline in the price of Rivian Class A common stock, net of market and industry effects, in response to disclosures allegedly correcting the alleged misrepresentations is the only compensable loss.

[31]   For purposes of the Securities Act claims, purchases and acquisitions of Rivian Class A common stock in the IPO or during the period between November 10, 2021, and March 10, 2022, inclusive, shall be considered purchases pursuant to or traceable to the Registration Statement. Rivian's IPO consisted of 175,950,000 shares of Class A common stock, priced at $78.00 per share.

[32]   Pursuant to the Plan, "[t]he sum of a Claimant's Recognized Loss Amounts will be the Claimant's 'Recognized Claim.'"

NIRMUL DECL. ISO PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, & CLASS COUNSEL'S ATTORNEYS' FEES & EXPENSES

were sold and if so, when and at what price.[33] Moreover, in order to have a loss pursuant to the Plan, a Claimant must have suffered damages proximately caused by the disclosure of the relevant truth concealed by Defendants' alleged fraud. Specifically, shares of Rivian Class A common stock purchased during the relevant time period must have been held through at least one of the dates when the disclosure of alleged corrective information partially removed the alleged artificial inflation from the price of the stock (i.e., on March 2, 2022 and March 11, 2022).

208. Verita, as the Claims Administrator, will determine each Authorized Claimant's *pro rata* share of the Net Settlement Fund by dividing the Authorized Claimant's Recognized Claim (i.e., the sum of the Claimant's Recognized Loss Amounts as calculated under the Plan) by the total Recognized Claims of all Authorized Claimants, multiplied by the total amount in the Net Settlement Fund. Plaintiffs' losses will be calculated in the same manner.

209. Once Verita has processed all Claims received and provided Claimants with an opportunity to cure any deficiencies in their Claims or challenge the rejection of their Claims, Class Counsel will file with the Court a motion for approval of Verita's determinations with respect to the Claims and authorization to distribute the Net Settlement Fund to Authorized Claimants. As set forth in the Plan, if nine months after the initial distribution, there is a balance remaining in the Net Settlement Fund (whether by reason of uncashed checks, or otherwise), and if it is cost-effective to do so, Verita will conduct an additional distribution of the funds remaining after payment of any unpaid fees and expenses incurred in administering the Settlement, including for such re-distribution, to Authorized Claimants who have cashed their initial distribution checks and would receive at least $10.00. *See* Notice (Appendix A), ¶ 7. Verita will conduct additional distributions until it is determined that distribution of the funds remaining in the Net Settlement Fund is

---

[33]    The loss calculation under the Exchange Act also takes into account the PSLRA's statutory limitation on recoverable damages. *See* Exchange Act Section 21D(e)(1), of the PSLRA.

NIRMUL DECL. ISO PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, & CLASS COUNSEL'S ATTORNEYS' FEES & EXPENSES

no longer cost-effective. *Id*. Thereafter, the remaining balance will be contributed to a non-sectarian, not-for-profit, 501(c)(3), organization(s), to be recommended by Class Counsel and Defendants' Counsel and subject to approval by the Court. *Id*.

210.   As discussed in the Settlement Memorandum, the structure of the Plan is similar to the structure of plans of allocation that have been used to apportion settlement proceeds in numerous other securities class actions. In sum, Class Counsel believes that the Plan provides a fair and reasonable method to equitably distribute the Net Settlement Fund among Authorized Claimants, and respectfully submits that the Plan should be approved.

211.   To date, there have been no objections to the Plan specifically, but Class Counsel has received one objection to the claims process generally. This objection, as well as any objections received after this submission, will be fully addressed in Plaintiffs' reply to be filed on May 1, 2026.

212.   To summarize, the objection from Andrey Savov, attached hereto as Exhibit 4, contends that the Settlement creates "an unreasonably burdensome claims process" by requiring Class Members (particularly smaller investors) to provide documentation to support their transactions in Rivian Class A common stock. Mr. Savov also asserts that the time required to fill out a Claim (both on paper and via the Website) is "excessive." Here, the claims process for the Settlement is the standard process routinely used and approved in securities class actions. Because neither the Parties nor the Claims Administrator have information regarding Class Members' transactions in the underlying security, Class Members must provide information to support their claimed transactions in Rivian Class A common stock in order for the Claims Administrator to calculate their losses pursuant to the Plan of Allocation. Further, supporting documentation is required to prove the authenticity of the claimed transactions and to eliminate fraudulent submissions. Class Counsel and the Claims Administrator are available to assist any Class Member who requires assistance in identifying ways to obtain the necessary documentation to support their transactions as well as completing their Claim in order to be eligible to receive a payment from the Settlement.

NIRMUL DECL. ISO PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, & CLASS COUNSEL'S ATTORNEYS' FEES & EXPENSES

213.    In addition, Mr. Savov also asserts that there was a lack of transparency in the appointment of Verita as the Claims Administrator. To the contrary, Verita was approved as the administrator in connection with Class Notice (Dkt. Nos. 400, 408) following a formal bidding process (in which potential administrators were requested to provide cost estimates in connection with both the Class Notice and settlement phases). Moreover, Verita is qualified to administer the Settlement. Verita is a recognized leader in class action administration services and has successfully administered numerous securities class actions, like this one, throughout the country.

214.    For these reasons (and others to be addressed in Plaintiffs' reply submission), Mr. Savov's objection is baseless and should be overruled.

## VII.    CLASS COUNSEL'S FEE AND EXPENSE APPLICATION

215.    In addition to seeking final approval of the Settlement and Plan of Allocation, Class Counsel is applying for an award of attorneys' fees and payment of expenses incurred during the course of the Action. Specifically, Class Counsel is applying for attorneys' fees in the amount of 24% of the Settlement Fund and for expenses in the total amount of $6,558,982.48.[34] This total expense amount includes: (i) a request for payment of $6,463,082.98 in expenses incurred by Plaintiffs' Counsel; and (ii) a request for reimbursement to Plaintiffs in the aggregate amount of $95,899.50 for the costs incurred in representing the Classes in the Action, as permitted by 15 U.S.C. § 78u-4(a)(4). As noted above, Class Counsel's Fee and Expense Application is consistent with the maximum fee and expense amounts set forth in the notices and, to date, no objections to these fee and

---

[34]    The lodestar and expense submissions of: (i) Sharan Nirmul, on behalf of Kessler Topaz ("Kessler Topaz Fee Decl."); and (ii) Stephen G. Larson, on behalf of Larson ("Larson Fee Decl.") (together, the "Fee Declarations"), are submitted herewith. The Fee Declarations set forth the names of the attorneys and professional support staff employees who worked on the Action and their respective hourly rates, the lodestar value of the time expended by each such attorney and professional support staff employee, the expenses incurred by each firm, and the background and experience of each firm. The Fee and Expense Declarations also include a breakdown of lodestar by litigation task as well as daily time entries pursuant to this Court's Procedures on Motions for Attorney Fees (Civil Cases).

NIRMUL DECL. ISO PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, & CLASS COUNSEL'S ATTORNEYS' FEES & EXPENSES

expense amounts have been received.[35]

216. Below is a summary of the primary factual bases for Class Counsel's Fee and Expense Application. A full analysis of the factors considered by courts in the Ninth Circuit when evaluating requests for attorneys' fees and expenses from a common fund, as well as the supporting legal authority, is presented in the accompanying Fee and Expense Memorandum.[36]

### A.    The Fee Request Is Fair and Reasonable and Warrants Approval

#### 1.    Plaintiffs Have Authorized and Support the Fee Request

217. Plaintiffs AP7 and Muhl are knowledgeable investors that supervised, monitored, and actively participated in the prosecution and the resolution of this Action. *See* Ex. 1 (Bergström Decl.) ¶ 7; Ex. 2 (Muhl Decl.) ¶ 7.

218. Plaintiffs have evaluated the fee request and believe it to be fair and reasonable. In addition, the 24% fee requested is consistent with the retainer agreement entered into between Court-appointed Lead Plaintiff AP7 at the outset of the Action. Bergström Decl., ¶ 10.

219. Moreover, after reaching the Settlement, Plaintiffs reviewed and approved the requested fee and both believe it is fair and reasonable in light of the quality of the work performed by Plaintiffs' Counsel and the favorable result obtained for the Classes. Bergström Decl., ¶ 10; Muhl Decl., ¶ 10. Plaintiffs' endorsement of Class Counsel's fee request further demonstrates its reasonableness.

#### 2.    The Favorable Settlement Achieved

220. As described above, the Settlement is an excellent result for the Class. Notably,

---

[35]    Class Counsel will address any objections received after the date of this submission in its reply to be filed by May 1, 2026.

[36]    Courts in this Circuit consider the following factors when determining whether a fee request sought from a common fund is fair and reasonable: the (1) results achieved; (2) risks of litigation; (3) skill required and quality of work; (4) contingent nature of the fee and financial burden carried by the plaintiffs; and (5) awards made in similar cases. *See Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048-50 (9th Cir. 2002); *see also* Fee and Expense Memorandum, §II.C.

NIRMUL DECL. ISO PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, & CLASS COUNSEL'S ATTORNEYS' FEES & EXPENSES

in absolute terms, the $250 million recovery ranks among the top five largest securities class action recoveries in this District. *See* ISS SEC. CLASS ACTION SERVS., THE TOP 100 U.S. CLASS ACTION SETTLEMENTS OF ALL-TIME 5 (2025), https://www.iss-scas.com/top-100-settlements-2025/. The $250 million Settlement also represents approximately 12.3% to 13.4% of the Classes' potential aggregate damages (as estimated by Plaintiffs' damages expert). This result is favorable when considered in view of the substantial risks to obtaining a larger recovery (or, any recovery) were the Action to continue to trial. Here, as a result of the Settlement, numerous Class Members will benefit and receive compensation for their losses and avoid the substantial risks to recovery in the absence of settlement.

### 3.    The Time and Labor Devoted to the Action

221.    Over the course of three years, Plaintiffs' Counsel devoted substantial time to the investigation, prosecution, and resolution of the Action. As more fully described above, these efforts included: (i) conducting an extensive investigation into the Classes' claims—including a detailed review of publicly available information, interviews with former Rivian employees, and consultation with experts; (ii) preparing two complaints based on this investigation, including the operative Amended Complaint; (iii) defeating Defendants' motions to dismiss the Amended Complaint; (iv) engaging in comprehensive fact and expert discovery, which included preparing for, taking and/or defending 48 depositions, analyzing over 3.5 million pages of documents produced by Defendants and third parties, and exchanging 15 opening and rebuttal expert reports; (v) successfully moving for class certification and overseeing the extensive Class Notice campaign; (vi) briefing Defendants' Summary Judgment Motion and the Parties' motions seeking to exclude expert testimony; (vii) beginning to prepare for trial; and (viii) preparing for and engaging in hard-fought settlement negotiations with Defendants, including a formal mediation with Judge Phillips. *See generally supra* ¶¶ 19-172. At all times throughout the Action, Plaintiffs' Counsel's efforts were focused on advancing the litigation to achieve the most successful outcome for the Classes, whether through settlement or trial, by the most efficient means possible.

222.    Throughout the litigation, Plaintiffs' Counsel maintained an appropriate level

NIRMUL DECL. ISO PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, & CLASS COUNSEL'S ATTORNEYS' FEES & EXPENSES

of staffing that avoided unnecessary duplication of effort and ensured the efficient prosecution of this Action. As the lead partner on the case, I personally monitored and maintained control of the work performed by other lawyers at Kessler Topaz and Larson throughout the litigation. Other experienced attorneys at my firm were also involved in the drafting of pleadings, motion papers, discovery efforts, and in the settlement negotiations. More junior attorneys and paralegals worked on matters appropriate to their skill and experience level.

223. The time devoted to this Action by Plaintiffs' Counsel is set forth in the accompanying Fee Declarations filed in support of Plaintiffs' Fee and Expense Application. Included with the Fee Declarations are schedules that summarize the time expended by the attorneys and professional support staff employees at Plaintiffs' Counsel, as well as their expenses ("Fee and Expense Schedules"). The Fee and Expense Schedules report the amount of time spent by each attorney and professional support staff employee who worked on the Action and their resulting "lodestar," i.e., their hours multiplied by their current hourly rates. Also included with the Fee Declarations is a breakdown of each firm's lodestar by litigation task as well as Plaintiffs' Counsel's time sheets.

224. The hourly rates of Plaintiffs' Counsel here range from $805 per hour to $1,700 per hour for partners, $370 per hour to $750 per hour for other attorneys, $255 per hour to $405 per hour for paralegals, and $300 per hour to $660 per hour for in-house investigators. *See* Kessler Topaz Fee Decl., Ex. A; Larson Fee Decl., ¶ 15. These hourly rates are reasonable for this type of complex litigation. *See* Larson Fee Decl., ¶¶ 9-12; *see also* Fee and Expense Memorandum, § II.D.2.

225. In total, from the inception of their involvement in the Action through the Court's entry of the Preliminary Approval Order on December 18, 2025, Plaintiffs' Counsel expended more than 69,000 hours on the investigation, prosecution, and resolution of the

NIRMUL DECL. ISO PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, & CLASS COUNSEL'S ATTORNEYS' FEES & EXPENSES

claims asserted in the Action for a total lodestar of $37,178,453.[37] Thus, pursuant to a lodestar "cross-check," Plaintiffs' Counsel's fee request of 24% of the Settlement Fund (or $60,000,000), if awarded, would yield a lodestar multiplier of approximately 1.6 on Plaintiffs' Counsel's lodestar. The requested fee multiplier falls on the lower end of the range of multipliers typically awarded in comparable securities class actions and in other class actions involving significant contingency fee risk. *See* Fee and Expense Memorandum, § II.D.3.

226.   Class Counsel believes that the time and lodestar calculations reflected in Plaintiffs' Counsel's Fee Declarations are reasonable and were necessary for the effective and efficient prosecution and resolution of the Action.

### 4.   The Experience and Standing of Plaintiffs' Counsel

227.   The skill and diligence of Plaintiffs' Counsel also supports the requested fee. In particular, Court-appointed Class Counsel has extensive experience in the securities litigation field, with a long and successful track record representing investors in such cases, and is consistently ranked among the top plaintiffs' firms in the country. *See* Kessler Topaz Fee Decl., Ex. A. Class Counsel believes their extensive experience in the field and the ability of their attorneys added valuable leverage during the settlement negotiations. Additionally, Liaison Counsel, Larson, has extensive complex litigation experience. *See* Larson Fee Decl., Ex. A. Indeed, the substantial result achieved for the Classes here reflects the superior quality of Plaintiffs' Counsel's representation.

### 5.   The Standing and Caliber of Defendants' Counsel

228.   The quality of the work performed and risks overcome by Plaintiffs' Counsel

---

[37]   Since entry of the Preliminary Approval Order, Plaintiffs' Counsel have devoted additional hours to the Action (i.e., drafting the motion for final approval of the Settlement and related papers and assisting with the notice campaign). Plaintiffs' Counsel will continue to perform legal work on behalf of the Classes should the Court approve the Settlement. Additional resources will be expended preparing for the final Settlement Hearing, assisting Class Members with their Claims and related inquiries, and working with Verita to ensure the smooth progression of claims processing. No additional legal fees will be sought for this work.

NIRMUL DECL. ISO PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, & CLASS COUNSEL'S ATTORNEYS' FEES & EXPENSES

in attaining the Settlement should also be evaluated in light of the quality of the opposition. Here, Defendants were represented by experienced and extremely able counsel from Freshfields US LLP and Orrick, Herrington & Sutcliffe LLP, which vigorously represented their clients. In the face of this skillful and well-financed opposition, Plaintiffs' Counsel were nonetheless able to negotiate with Defendants to settle the case on highly favorable terms for the Classes.

**6.    The Risks of Litigation and Need to Ensure Availability of Competent Counsel in High-Risk Contingent Securities Cases**

229.    The risks faced by Plaintiffs' Counsel in prosecuting this Action are highly relevant to the Court's consideration of an award of attorneys' fees, as well as its approval of the Settlement. Here, Defendants adamantly deny any wrongdoing and, if the Action had continued, Defendants would have aggressively litigated their defenses through trial and post-trial appeals. As detailed in Section IV above, Plaintiffs faced significant risks to proving Defendants' liability and the Classes' full amount of damages at trial.

230.    These case-specific litigation risks are in addition to the risks accompanying securities litigation generally, such as the fact that the Action is governed by stringent PSLRA requirements and case law interpreting the federal securities laws, and was undertaken on a contingent-fee basis. From the outset, Class Counsel understood that this would be a complex, expensive, and potentially lengthy litigation with no guarantee of ever being compensated for the substantial investment of time and financial expenditures that vigorous prosecution of the case would require. This risk was heightened with the Court's dismissal of the Consolidated Complaint in its entirety. Dkt. No. 149.

231.    In undertaking the case, Plaintiffs' Counsel were obligated to ensure that sufficient resources (in terms of attorney and support-staff time) were dedicated to prosecuting the Action, and that funds were available to compensate vendors and experts/consultants and to cover the considerable out-of-pocket costs that a case like this typically demands. With an average lag time of several years for these cases to conclude—

NIRMUL DECL. ISO PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, & CLASS COUNSEL'S ATTORNEYS' FEES & EXPENSES

more than three years in this case—the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an hourly, ongoing basis. Plaintiffs' Counsel have dedicated over 69,000 hours (over 65,000 hours by Kessler Topaz alone) prosecuting this Action for the benefit of the Classes, yet have received no compensation for their efforts.

232. Here, Plaintiffs' Counsel also fully bore the risk that no recovery would be achieved. Class Counsel knows from experience that the commencement and ongoing prosecution of a class action does not guarantee a settlement. To the contrary, it takes hard work and diligence by skilled counsel to develop the facts and legal arguments that are needed to sustain a complaint or win at class certification, summary judgment, and trial, or on appeal, or to cause sophisticated defendants to engage in serious settlement negotiations at meaningful levels.

233. Moreover, courts have repeatedly recognized that it is in the public interest to have experienced and able counsel enforce the securities laws and regulations pertaining to the duties of officers and directors of public companies. As recognized by Congress through the passage of the PSLRA, vigorous private enforcement of the federal securities laws can occur only if private investors, particularly institutional investors, take an active role in protecting the interests of shareholders. If this important public policy is to be carried out, the courts should award fees that adequately compensate plaintiffs' counsel, taking into account the risks undertaken in prosecuting a securities class action.

234. Plaintiffs' Counsel's extensive and persistent efforts in the face of substantial risks and uncertainties have resulted in a significant recovery for the benefit of the Classes, as described above. In circumstances such as these, and in consideration of the hard work and excellent result achieved, Class Counsel believes the requested fee is reasonable and should be approved.

**7.    The Reaction of the Classes to the Fee Request**

235. As stated above, through March 18, 2026, over 1,1 million notices have been disseminated to potential Class Members and Nominees advising them that Class Counsel would be applying for an award of attorneys' fees in an amount not to exceed 24% of the

NIRMUL DECL. ISO PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, & CLASS COUNSEL'S ATTORNEYS' FEES & EXPENSES

Settlement Fund. *See* Cavallo Decl. ¶ 9, Exs. A-B. In addition, the Court-approved Summary Notice (which also advised the Classes of Class Counsel's anticipated fee request) was published in *The Wall Street Journal* and transmitted over *PR Newswire*. *Id.* ¶ 11. To date, no objections to Class Counsel's request for attorneys' fees has been received. Any objections to the fee request received after this submission will be addressed in Class Counsel's reply papers to be filed on May 1, 2026, after the deadline for submitting objections has passed.

**B.    Class Counsel's Request for Litigation Expenses Is Fair and Reasonable and Warrants Approval**

236.    Class Counsel also seeks payment from the Settlement Fund of $6,463,082.98 for expenses that were reasonably and necessarily incurred in prosecuting and resolving the Action. The notices informed the Classes that Class Counsel will apply for expenses in an amount not to exceed $6.9 million, which amount may include a request for reimbursement of the reasonable costs incurred by Plaintiffs directly related to their representation of the Classes in accordance with 15 U.S.C. § 78u-4(a)(4) in an aggregate amount not to exceed $125,000. The amount of expenses requested by Plaintiffs' Counsel ($6,463,082.98), along with the total amount requested by Plaintiffs ($95,899.50), is below the $6.9 million expense cap set forth in the notices. To date, there have been no objections to the maximum amount of expenses set forth in the notices.

**1.    Class Counsel Seeks Payment of Plaintiffs' Counsel's Reasonable and Necessary Litigation Expenses from the Settlement Fund**

237.    From the beginning of the Action, Class Counsel was aware that it might not recover any of the expenses it incurred in prosecuting the claims against Defendants and, at the very least, would not recover any of its out-of-pocket expenses until the Action was successfully resolved. Class Counsel also understood that, even assuming the Action was ultimately successful, an award of expenses would not compensate counsel for the lost use or opportunity costs of funds advanced to litigate the claims against Defendants. Thus, Class

NIRMUL DECL. ISO PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, & CLASS COUNSEL'S ATTORNEYS' FEES & EXPENSES

Counsel was motivated to, and did, take significant steps to minimize expenses whenever practicable without jeopardizing the vigorous and efficient prosecution of the Action.

238.   Plaintiffs' Counsel's expenses are detailed in the Fee Declarations filed concurrently herewith, which identify each category of expense and the amount incurred for each category. Plaintiffs' Counsel's expenses include charges for: (i) filings; (ii) court reporters and transcripts; (iii) messenger services; (iv) overnight mail; (v) internal and external document reproduction; (vi) travel (meals, hotels, and transportation); (vii) online research; (viii) experts and consultants; (ix) confidential witness counsel; (x) mediation and settlement negotiations with Judge Phillips; (xi) document hosting and litigation support; (xii) process servers; and (xiii) Class Notice administration.[38] Courts have consistently found that these kinds of expenses are payable from a fund recovered by counsel for the benefit of a class. A summary chart of Plaintiffs' Counsel's expenses is set forth below.

| CATEGORY | AMOUNT |
| --- | --- |
| Filing Fees | $7,422.69 |
| Court Reporters & Transcripts | $189,953.13 |
| Messenger Services | $1,856.00 |
| Overnight Mail | $2,961.86 |
| External Reproduction Costs | $28,011.81 |
| Internal Reproduction Costs | $6,303.00 |
| Travel (Meals, Hotels & Transportation) | $159,853.15 |
| Online Research | $90,717.70 |
| Experts & Consultants | $4,874,601.92 |
| Mediation | $76,372.50 |
| Confidential Witness Counsel | $59,320.92 |
| Document Hosting & Litigation Support | $632,294.76 |
| Process Server | $16,931.58 |

[38]   These expenses are reflected in Plaintiffs' Counsel's books and records, which are prepared in the normal course of business and are an accurate record of the expenses incurred in the prosecution of this matter. These expense items are billed separately and are not duplicated in counsel's hourly rates.

NIRMUL DECL. ISO PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, & CLASS COUNSEL'S ATTORNEYS' FEES & EXPENSES

| CATEGORY | AMOUNT |
|---|---|
| Class Notice Administration Fees | $316,481.96 |
|  |  |
| **TOTAL EXPENSE REQUEST** | **$6,463,082.98** |

239. The largest component of Plaintiffs' Counsel's expenses ($4,874,601.92, or approximately 75% of their total expenses) was incurred for the retention of experts and consultants. As noted above and in the Kessler Topaz Fee Declaration, the retention of these experts/consultants was necessary and reasonable in order to plead and prove Plaintiffs' claims and to meet the considerable challenges posed by Defendants' well-credentialed experts. *See supra* ¶¶ 161-67; Kessler Topaz Fee Decl., ¶ 11(i).

240. Another substantial component of Plaintiffs' Counsel's expenses ($632,294.76) was incurred in connection with document hosting. *See* Kessler Topaz Fee Decl., ¶ 11(l). As noted above, Plaintiffs' Counsel utilized a discovery platform to, among other things: (i) maintain the electronic database through which over 3.5 million pages of documents produced by Defendants and third parties were reviewed; and (ii) process documents so they would be in a searchable format. Class Counsel believes these costs were reasonable at roughly 10% of Plaintiffs' Counsel's total expenses.

241. Another large component of Plaintiffs' Counsel's expenses was incurred for the Class Notice campaign conducted following the Court's certification of the Classes. In total, charges for the notice campaign were $316,481.96, or roughly 5% of Plaintiffs' Counsel's total expenses. Plaintiffs' Counsel also incurred the costs of online legal and factual research. This amount represents charges for computerized research services such as Lexis+, Westlaw, and PACER. It is standard practice for attorneys to use online services to assist them in researching legal and factual issues, and indeed, courts recognize that these tools create efficiencies in litigation and ultimately save money for clients and the class. Here, online research was necessary to conduct Plaintiffs' Counsel's factual investigation and identify potential witnesses, prepare the complaints, research the law pertaining to the claims asserted in the Action, oppose Defendants' motions to dismiss and for summary

NIRMUL DECL. ISO PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, & CLASS COUNSEL'S ATTORNEYS' FEES & EXPENSES

judgment, support Plaintiffs' Motion to Certify, and conduct research in connection with, among other things, *Daubert* motions, certain discovery-related issues, and the Parties' settlement negotiations. The total charges for online research amounted to $90,717.70.

242.   In addition, Plaintiffs' Counsel incurred $76,372.50 for Plaintiffs' portion of the charges related to the mediation sessions with Judge Phillips and the settlement negotiations that followed with his assistance. Plaintiffs' Counsel also incurred $159,853.15 for work-related travel (i.e., airline/train tickets, meals, and lodging), as well as meals related to working late hours on filings and in-office team meetings, and $189,953.13 for charges incurred in connection with court reporter, transcript, and video services for the 48 depositions conducted in the Action.

243.   The remaining expenses incurred by Plaintiffs' Counsel during the course of the Action are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour. These expenses include charges for, among others, court filings, process servers, copying/printing, and overnight delivery. The expenses incurred by Plaintiffs' Counsel were reasonably necessary to the successful litigation of the Action, and have been approved by Plaintiffs. *See* Bergström Decl., ¶ 11; Muhl Decl., ¶ 11.

### 2.    Reimbursement to Plaintiffs Is Fair and Reasonable

244.   Plaintiffs also seek reimbursement of the reasonable costs they incurred directly related to their representation of the Class. Such payments are expressly authorized and anticipated by the PSLRA, which provides that an "award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class" may be made to "any representative party serving on behalf of a class." 15 U.S.C. § 78u-4(a)(4). Specifically, Plaintiffs seek reimbursement in the aggregate amount of $95,899.50— i.e., $56,712.00 to AP7 and $39,187.50 to Muhl. *See* Bergström Decl., ¶¶ 14-15; Muhl Decl., ¶ 14.

245.   The amount of time and effort devoted to this Action by Plaintiffs is detailed in their accompanying declarations, attached as Exhibits 1 and 2 hereto. As discussed therein, Plaintiffs have been fully committed to pursuing the Classes' claims since they

became involved in the Action and have provided valuable assistance to Plaintiffs' Counsel during the prosecution and resolution of the Action. Plaintiffs' efforts during the Action included: (i) regular communications with Plaintiffs' Counsel concerning significant developments in the litigation and case strategy; (ii) reviewing pleadings and briefs filed in the Action; (iii) responding to written discovery; (iv) searching for and collecting documents responsive to Defendants' document requests and consulting with Plaintiffs' Counsel regarding the same; (v) preparing for and being deposed; (vi) participating in the Parties' settlement negotiations; and (vii) evaluating and approving Judge Phillips' recommendation to settle the Action. *See* Bergström Decl., ¶ 7; Muhl Decl., ¶ 7. These are precisely the types of activities courts have found to support reimbursement of the costs incurred by class representatives, and fully support Plaintiffs' request for reimbursement here.

246.    More specifically, AP7 seeks reimbursement of $56,712.00 largely for the 265 hours expended by its employees in connection with the Action (*see* Bergström Decl., ¶¶ 14-15);[39] and Muhl seeks reimbursement of $39,712.00 for roughly 104 hours (*see* Muhl Decl., ¶ 14).

## VIII. CONCLUSION

247.    For all the reasons set forth above, Plaintiffs respectfully submit that the Settlement and the Plan of Allocation should be approved as fair, reasonable, and adequate. Class Counsel further submits that: (i) the request for attorneys' fees in the amount of 24% of the Settlement Fund should be approved as fair and reasonable; (ii) the requests for Plaintiffs' Counsel's Litigation Expenses in the amount of $6,463,082.98 (plus interest) should be approved; and (iii) Plaintiffs' request for costs in the aggregate amount of $95,899.50 should also be approved.

---

[39]    Also included in its $56,712.00 request are attorneys' fees of $6,160.00 for legal work performed related to this case by Setterwalls Advokatbyrå, AP7's outside legal counsel in Sweden, that was billed directly to AP7, and $8,427.00 in travel expenses. Bergström Decl., ¶ 14.

NIRMUL DECL. ISO PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, & CLASS COUNSEL'S ATTORNEYS' FEES & EXPENSES

I declare, under penalty of perjury, that the foregoing is true and correct to the best of my knowledge. Executed on March 20, 2026, in Radnor, Pennsylvania.

/s/ Sharan Nirmul
Sharan Nirmul

Case No. 2:22-cv-01524-JLS-E

NIRMUL DECL. ISO PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, & CLASS COUNSEL'S ATTORNEYS' FEES & EXPENSES